IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
Filed

APR 1 6 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| CSL DEVELOPMENT CORPORATION, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-01-059 |
| | § | |
| GAIM-KO, INC.; RAY GALLEGOS; SOUTH | § | |
| PADRE ISLAND FISHING CENTER, INC.; | § | |
| STANLEY McELROY; DAVE FRIEDMAN; | § | |
| SRFP, INC.; and SOUTH PADRE ISLAND | § | |
| FISHING CENTER JOINT VENTURE | § | |

**DEFENDANTS SOUTH PADRE ISLAND FISHING CENTER, INC.,
STANLEY McELROY, DAVE FRIEDMAN, SRFP, INC. AND
SOUTH PADRE ISLAND FISHING CENTER JOINT VENTURE'S
FIRST MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, SOUTH PADRE ISLAND FISHING CENTER, INC., STANLEY

McELROY, DAVE FRIEDMAN, SRFP, INC. and SOUTH PADRE ISLAND FISHING

CENTER JOINT VENTURE (hereinafter known as the "Pier Defendants") and file their First

Motion for Summary Judgment and in support would show the court as follows:

I.

**FACTUAL BACKGROUND**

Gaim-Ko, Inc. is a New Mexico company which is in the business of operating slot

machines and other gambling devices.  In the summer of 2000, Gaim-Ko became

interested in placing gambling machines owned by the company on a vessel which would

operate from the Gulf Coast of Texas as a "cruise to nowhere" vessel.  A "cruise to

nowhere" is an operation where apparently customers board a vessel at a United States port, the vessel then sails about ten miles offshore, where gambling is allowed, the gambling customers gamble, and the ship returns to the original port.  Through a vessel broker named Lou Daleo, who specialized in arranging for the purchase and sale of vessels in the cruise to nowhere business, Gaim-Ko became aware that CSL Development Corporation, Inc. was operating a cruise to nowhere vessel from a pier in South Padre Island, Texas.  The vessel used in the operation was the Casino Padre (referred to as the "M/V Entertainer" in Plaintiff's Original Complaint), the vessel originally constructed as a ferry boat in 1965 and later converted for use as an offshore gambling vessel.  After protracted negotiations, Gaim-Ko and CSL Development Corporation, Inc. entered into a contract for Gaim-Ko to purchase the Casino Padre from CSL Development Corporation, Inc.

The contract between Gaim-Ko and CSL was conditioned on Gaim-Ko's negotiation of a berthing lease for the vessel at the South Padre Island Fishing Pier.  The South Padre Island Fishing Pier was the only pier in the area suitable for use as an operating base for the Casino Padre.  It was the pier from which CSL had operated the Casino Padre.

The South Padre Island Fishing Pier is owned by the Pier Defendants. Representatives of Gaim-Ko, Inc. met with Defendant Friedman and Defendant McElroy to discuss Gaim-Ko's leasing of the fishing pier as a base of operation for the Casino Padre.  No terms were agreed to.  Gaim-Ko sent a proposal for Defendant Friedman and McElroy to consider, along with a check for $10,000.00.  This check was returned to Gaim-Ko by Defendant Friedman, with a letter explaining that Defendants Friedman and McElroy

were not interested.  It became clear to Gaim-Ko that the Pier Defendants were not interested in negotiating a lease for the South Padre Island Fishing Pier.  Its representatives asked CSL to return the earnest money paid under the contract.  CSL returned the money.

## II.

## THE LAWSUIT

On April 20, 2001, CSL Development Corporation, Inc. initiated this lawsuit by filing its Original Complaint in this court.

Plaintiff alleges that Gaim-Ko breached its contract to charter and purchase the Casino Padre.

Plaintiff alleges that the Pier Defendants tortiously interfered with the contract between CSL and Gaim-Ko for the charter and sale of the vessel.  They allege that the Pier Defendants made false statements regarding the Casino Padre, to wit: that the Casino Padre was unseaworthy and unsafe.  They allege that because of this Gaim-Ko was induced to breach its charter and sale agreement with CSL.

Plaintiff also claims that the Pier Defendants by publishing statements that the vessel was unseaworthy and unsafe, damaged CSL Development in its business.  CSL sues for defamation.

Finally, Plaintiff alleges that Defendants Friedman and McElroy are responsible for the conduct of the South Padre Island Fishing Center, Inc. because one or more of the entities which make it up were the alteregos of the individuals or that they were inadequately capitalized.

### III.

### SUMMARY JUDGMENT EVIDENCE

Defendants rely on the following Summary Judgment Evidence:

1.      Affidavit from Stan McElroy;

2.      Affidavit from David Friedman;

3.      Affidavit from Lou Daleo;

4.      Affidavit from Captain Louis Lasne;

5.      Affidavit from Ray Gallegos; and

6.      Agreement to Charter and Purchase Vessel

### IV.

### SUMMARY JUDGMENT ARGUMENT

The attached affidavits show that, contrary to Plaintiff's pleadings, none o f the Pier
Defendants, either individually or as representatives of their companies, ever said that the
Casino Padre was unseaworthy or unsafe or said anything else about the vessel which was
untrue.  The evidence shows that the contract for the charter and sale of the Casino Padre
which was entered into by CSL and Gaim-Ko was not enforceable by CSL unless Gaim-Ko
negotiated a berthing lease for the vessel at the South Padre Island Fishing Pier.  The
evidence shows that the Pier Defendants had no intention of leasing their pier to Gaim-Ko
and that only very preliminary negotiations took place between Gaim-Ko and the Pier
Defendants regarding the lease of the pier.  Since the contract was only enforceable if the
pier lease was negotiated, it was unenforceable by CSL Development Corporation, Inc.
Since the contract could never have been enforced by Gaim-Ko, there was no real contract

to interfere with.

The summary judgment evidence shows that Pier Defendants, either acting individually or for their companies did not tell Lou Daleo that the vessel was unsafe or unseaworthy, nor did they tell Gaim-Ko this, nor did they tell this to anyone else. As shown by the affidavit of Captain Louis, the Casino Padre was an old, converted ferry boat which was not appropriate for use as an offshore gambling vessel in the waters off South Padre Island, Texas.

## V.

## CONCLUSION

There is no evidence to support any of the relevant factual allegations made in Plaintiff's complaint, nor is there evidence to support any of their causes of action. There are no issues of relevant facts. The Pier Defendants are entitled to summary judgment as a matter of law.

WHEREFORE, PREMISES CONSIDERED, Defendants SOUTH PADRE ISLAND FISHING CENTER, INC., STANLEY McELROY, DAVE FRIEDMAN, SRFP, INC. and SOUTH PADRE ISLAND FISHING CENTER JOINT VENTURE pray that this summary judgment motion be set hearing, and that after hearing the motion be granted, and that these Defendants be dismissed from this lawsuit and for such other relief to which they may be entitled at law or in equity.

Respectfully submitted,

ROERIG, OLIVEIRA & FISHER, L.L.P.
855 W. Price Road, Suite 9
Brownsville, Texas  78520
Tel:    (956) 542-5666
Fax:    (956) 542-0016

By:_____

W. Michael Fisher
State Bar No. 07062420
Federal Admission No.1080

**ATTORNEYS FOR DEFENDANTS SOUTH PADRE ISLAND FISHING CENTER, INC., STANLEY MCELROY, DAVE FRIEDMAN AND SRFP, INC.**

CARLA M. SAENZ & ASSOCIATES, P.L.L.C.
1325 Palm Blvd., Suite H
Brownsville, Texas 78520
Tel:    (956) 541-2862
Fax:    (956) 541-2864

By:_____

Carla M. Saenz
State Bar No. 17514595
Federal Admission No. 7994

**ATTORNEYS FOR DEFENDANT SOUTH PADRE ISLAND FISHING CENTER JOINT VENTURE**

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true and correct copy of the above and foregoing has been mailed Via **CERTIFIED MAIL RETURN RECEIPT REQUESTED 7160 3901 9844 5409 8350** to Mr. John T. Flood, FLOOD & FLOOD, 555 North Carancahua, Suite 830, Corpus Christi, Texas 78478, Via U.S. First Class Mail to Mr. Rudy A. Ortiz, Attorney at Law, 800 Gold Ave. SW, P.O. Box 26191, Albuquerque, New Mexico 87125, Mr. Joseph W. Grant, THE GRANT LAW FIRM, 2437 Bay Area Blvd., #100, Houston, Texas 77058, Via U.S. First Class Mail to Ms. Carla Saenz, CARLA M. SAENZ & ASSOCIATES, 1325 Palm Blvd., Suite H, Brownsville, Texas 78520, and Via U.S. First Class Mail to Paul L. Fourt, Jr., Attorney at Law, 1000 E. Van Buren Street, Brownsville, Texas 78520 on this 16th day of April, 2002.

W. Michael Fisher

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CSL DEVELOPMENT CORPORATION, INC. §
§
    Plaintiff, §
§
VS. §        CIVIL ACTION NO. B-01-059
§
GAIM-KO, INC.; RAY GALLEGOS; SOUTH §
PADRE ISLAND FISHING CENTER, INC.; §
STANLEY McELROY; DAVE FRIEDMAN; §
SRFP, INC.; and SOUTH PADRE ISLAND §
FISHING CENTER JOINT VENTURE §

## AFFIDAVIT OF STAN MCELROY

STATE OF TEXAS §
§
COUNTY OF TRAVIS §

BEFORE ME, the undersigned authority, on this day personally appeared STAN
MCELROY, who being by me duly sworn, on his oath deposed as follows:

1.      My name is STAN MCELROY. I am over eighteen (18) years of age, have
never been convicted of a felony, and am fully competent to make this
Affidavit. I have personal knowledge of the facts stated in this Affidavit,
unless stated to the contrary, and those facts are true and correct. I am one
of the Defendants in the above-styled lawsuit.

2.      I have an interest in the South Padre Island Fishing Center, Inc., and South
Padre Island Fishing Center Joint Venture.

3.      .It is alleged in the above-referenced lawsuit that I made representations to
others that the Casino Padre f/k/a M/V Entertainer was unseaworthy or
unsafe. I never made this representation to Lou Daleo or anyone from
Gaim-Ko, Inc. or anyone else. I never represented anything to anyone about
the Casino Padre which was not true.

4.      .Plaintiff alleges in the above-referenced lawsuit that on or about November
10, 2000, a lease at SPIFCJV's pier was negotiated to Gaim-Ko, Inc.'s
satisfaction. Such a pier lease would have had to have been approved by
me, my partner, Dave Friedman and our Lessor, the State of Texas, acting
by and through the Texas General Land Office. Although we had some very
preliminary discussions with Gaim-Ko representatives about entering into a
lease, the essential terms were never fully discussed, much less agreed on.
In fact, we decided not to negotiate further with the Gaim-Ko representatives,

and returned their check for $10,000.00 which had been sent to us by them by a cover letter dated November 27, 2000 which described the $10,000 as consideration for an agreement to "enter into negotiations to enter into a sublease".

5.    I never told Ray Gallegos or anyone else from Gaim-Ko that the Casino Padre was unseaworthy or that it was not safe or that it was a "liability".

6.    Neither I nor anyone of the Pier Defendants entered into an agreement whereby Gaim-Ko would lease the pier in question for any vessel.

Further affiant sayeth not.

STAN MCELROY

SUBSCRIBED AND SWORN TO BEFORE ME by the said STAN MCELROY, on this the _20th_ day of March, 2002.

DEBBIE FRANK
Notary Public, State of Texas
My Commission Expires
12-20-03

Notary Public, State of Texas

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CSL DEVELOPMENT CORPORATION, INC. | § | |
| Plaintiff, | § § § | |
| VS. | § § | CIVIL ACTION NO. B-01-059 |
| GAIM-KO, INC.; RAY GALLEGOS; SOUTH PADRE ISLAND FISHING CENTER, INC.; STANLEY McELROY; DAVE FRIEDMAN; SRFP, INC.; and SOUTH PADRE ISLAND FISHING CENTER JOINT VENTURE | § § § § § § | |

### AFFIDAVIT OF DAVE FRIEDMAN

STATE OF TEXAS          §
                                    §
COUNTY OF TRAVIS    §

BEFORE ME, the undersigned authority, on this day personally appeared STAN MCELROY, who being by me duly sworn, on his oath deposed as follows:

1.    My name is Dave Friedman. I am over eighteen (18) years of age, have never been convicted of a felony, and am fully competent to make this Affidavit. I have personal knowledge of the facts stated in this Affidavit, unless stated to the contrary, and those facts are true and correct. I am one of the Defendants in the above-styled lawsuit.

2.    I have an interest in the SRFP, Inc., and South Padre Island Fishing Center Joint Venture.

3.    .It is alleged in the above-referenced lawsuit that I made representations to others that the Casino Padre f/k/a M/V Entertainer was unseaworthy or unsafe. I never made this representation to Lou Daleo or anyone from Gaim-Ko, Inc. or anyone else. I never represented anything to anyone about the Casino Padre which was not true.

4.    .Plaintiff alleges in the above-referenced lawsuit that on or about November 10, 2000, a lease at SPIFCJV's pier was negotiated to Gaim-Ko, Inc.'s satisfaction. Such a pier lease would have had to have been approved by me, my partner Stan McElroy and our Lessor, the State of Texas, acting by and through the Texas General Land Office. Although we had some very preliminary discussions with Gaim-Ko representatives about entering into a lease, the essential terms were never fully discussed, much less agreed on. In fact, we decided not to negotiate further with the Gaim-Ko representatives,

and returned their check for $10,000.00 which had been sent to us by them by a cover letter dated November 27, 2000 which described the $10,000 as consideration for an agreement to "enter into negotiations to enter into a sublease".

5.    I never told Ray Gallegos or anyone else from Gaim-Ko that the Casino Padre was unseaworthy or that it was not safe or that it was a "liability".

6.    Neither I nor anyone of the Pier Defendants entered into an agreement whereby Gaim-Ko would lease the pier in question for any vessel.

Further affiant sayeth not.

DAVE FRIEDMAN

SUBSCRIBED AND SWORN TO BEFORE ME by the said DAVE FRIEDMAN, on this the _____19th_____ day of March, 2002.



JUDITH M. LEHN
MY COMMISSION EXPIRES
December 14, 2005

Notary Public, State of Texas

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CSL DEVELOPMENT CORPORATION, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-01-059 |
| | § | |
| GAIM-KO, INC.; RAY GALLEGOS; SOUTH | § | |
| PADRE ISLAND FISHING CENTER, INC.; | § | |
| STANLEY McELROY; DAVE FRIEDMAN; | § | |
| SRFP, INC.; and SOUTH PADRE ISLAND | § | |
| FISHING CENTER JOINT VENTURE | § | |

## AFFIDAVIT OF LOU DALEO

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared LOU DALEO, who being by me duly sworn, on his oath deposed as follows:

1.   My name is LOU DALEO. I am over eighteen (18) years of age, have never been convicted of a felony, and am fully competent to make this Affidavit. I have personal knowledge of the facts stated in this Affidavit, unless stated to the contrary, and those facts are true and correct.

2.   I was the broker for the sale of the vessel Casino Padre f/k/a M/V Entertainer to Gaim-Ko, Inc. I understand that the seller of the vessel was CSL Development Corporation. The Casino Padre is a casino gambling boat was operated by CSL Development Corporation or Charles Liberis or one of his associated companies from South Padre Island, Texas.

3.   I understand that a written agreement was signed by CSL Development Corporation and Gaim-Ko, Inc. for the sale of the vessel by CSL Development Corporation to Gaim-Ko, Inc. As the broker for this transaction, I had certain escrow monies paid by Gaim-Ko, Inc. in trust for CSL Development Corporation, to be paid to CSL in the event that the sale was completed. The sale was not completed and I returned these escrow funds in accordance with the terms of the agreement.

4.   In discussion with Charles Liberis I was advised that this operation was not profitable because of what he considered to be the poor business management and the vessel's poor maintenance and housekeeping.

5.   I understand that CSL Development Corporation has filed suit against South Padre Island Fishing Center, Inc., Stanley McElroy, Dave Friedman, SRFP,

Inc. and South Padre Island Fishing Center Joint Venture alleging, among other things, that all or some of these Defendants, individually or through their authorized agents, represented to representatives of Gaim-Ko, Inc. and others that the Casino Padre was unseaworthy and unsafe, or that it is alleged that they represented to Gaim-Ko or others things about the vessel which were untrue and which caused Gaim-Ko, Inc. to breach its contract with CSL Development Corporation to purchase the vessel. None of these Defendants, either individually or as agents for their companies ever told me that the Casino Padre was unworthy or unsafe, nor have they made other statements to me about the vessel which I know to be untrue. I was informed by a representative of Gaim-Ko, Inc. that either a current or former employee of CSL Development Corporation and/or the Casino Padre advised Gaim-Ko that the vessel was in bad mechanical condition. I was also informed by a Gaim-Ko representative that from an inspection of the vessel they could see that the interior, where gambling customers would be, was in bad condition cosmetically.

6.    In discussion with Charles Liberis I was advised that an operator of this vessel, in connection with an operation based on South Padre Island, should be prepared to lose approximately one-third of the days due to water and weather conditions.

Further affiant sayeth not.

PEARL SALUZZI
Notary Public, State of Texas
My Commission Expires
JULY 31, 2005

LOU DALEO

SUBSCRIBED AND SWORN TO BEFORE ME by the said LOU DALEO, on this the ___28___ day of _February_, 2002.

Notary Public, State of Texas

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CSL DEVELOPMENT CORPORATION, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-01-059 |
| | § | |
| GAIM-KO, INC.; RAY GALLEGOS; SOUTH | § | |
| PADRE ISLAND FISHING CENTER, INC.; | § | |
| STANLEY McELROY; DAVE FRIEDMAN; | § | |
| SRFP, INC.; and SOUTH PADRE ISLAND | § | |
| FISHING CENTER JOINT VENTURE | § | |

## AFFIDAVIT OF CAPTAIN LOUIS LASNE

| | |
|---|---|
| STATE | § |
| OF | § |
| FLORIDA | § |

BEFORE ME, the undersigned authority, on this day personally appeared Captain Louis Lasne who being by me duly sworn, on his oath deposed as follows:

1. My name is Louis Lasne. I am over eighteen (18) years of age, have never been convicted of a felony, and am fully competent to make this Affidavit. I have personal knowledge of the facts stated in this Affidavit, unless stated to the contrary, and those facts are true and correct.

2. I am certified as a Merchant Marine Master by the United States Coast Guard. I am a Captain. I am acquainted with most of the vessels and their operators who are involved in the "cruise to nowhere" or "offshore gambling business".

3. I was hired by Charles Liberis and CSL Development Corporation to captain the vessel now known as the Casino Padre on its voyage from its prior berthing spot in Florida to South Padre Island, Texas. I was directed by Charles Liberis to make the Casino Padre ready for several U.S. Coast Guard inspections and to obtain the various approvals and certifications required by the Coast Guard to operate the vessel from South Padre Island as a "cruise to nowhere" vessel.

4. The Casino Padre was constructed in 1965 as a 473 ton ferry boat. It has a draft of about ten feet six inches and is powered by oil fueled turbo charge diesel engines. It has been retrofitted for use as an offshore gambling vessel.

5. The Casino Padre is required in order to operate as an offshore gambling cruise vessel, to be inspected periodically by the United States Coast Guard. It must

comply with very detailed Coast Guard requirements relating to everything from its motors to suspension gear to its steering gear and anything else which might effect its operation and safety as a passenger vessel. It must also comply with Coast Guard requirements relating to the number of crewmen required to operate the vessel and their minimum qualifications.

6. Large ocean going vessels require constant and expensive maintenance. Because the Casino Padre was thirty five years old when operated from South Padre Island, the maintenance required on it was much more substantial than that on a newer vessel. It is also much more expensive to fuel and sail than a newer vessel.

7. Because of the Casino Padre's hull design, and because of the nature of the waters of the South Padre Island area where it cruised, many of the passengers on board became seasick.

8. I was retained by Gaim-Ko, Inc. to consult with that company regarding its proposed purchase of the Casino Padre. I advised Gaim-Ko regarding the condition of the vessel, its operating costs, its suitability for operation in sea conditions, to the waters of South Padre Island. I advised Gaim-Ko that the Casino Padre would not be economically viable as a "cruise to nowhere" vessel in the South Padre Island area. There were many, many things wrong with this vessel which would have required expensive repairs and modifications.

9. I am not aware of any statements that Stan McElroy or Dave Friedman made to me or anyone else to the effect that the Casino Padre was unsafe or unseaworthy or a liability or that would have altered the decisions or actions of Gaim-Ko regarding their contractual or business relationship with CSL Development Corporation. Although I advised representatives of Gaim-Ko, that, in my opinion the vessel would never be economically viable as a "cruise to nowhere" vessel, it is my understanding that Gaim-Ko previously entered a contract to purchase the vessel and that it intended to purchase the vessel. However, the purchase contract never went through because Gaim-Ko could not negotiate a berthing contract with the owners of the South Padre Island Fishing Pier.

Further affiant sayeth not.

_Capt. Louis Lasne_
CAPTAIN LOUIS LASNE

SUBSCRIBED AND SWORN TO BEFORE ME by the said CAPTAIN LOUIS, on this the _____ day of March, 2002.

Johanna C Anzaldana
My Commission CC933245
Expires June 19 2004

_Johanna C Anzaldana_
Notary Public, State of Texas

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CSL DEVELOPMENT CORPORATION, INC. §
§
    Plaintiff, §
§
VS. § CIVIL ACTION NO. B-01-059
§
GAIM-KO, INC.; RAY GALLEGOS; SOUTH §
PADRE ISLAND FISHING CENTER, INC.; §
STANLEY McELROY; DAVE FRIEDMAN; §
SRFP, INC.; and SOUTH PADRE ISLAND §
FISHING CENTER JOINT VENTURE §

## AFFIDAVIT OF RAY GALLEGOS

STATE §
OF §
NEW MEXICO §

BEFORE ME, the undersigned authority, on this day personally appeared RAY GALLEGOS, who being by me duly sworn, on his oath deposed as follows:

1.    My name is RAY GALLEGOS. I am over eighteen (18) years of age, have never been convicted of a felony, and am fully competent to make this Affidavit. I have personal knowledge of the facts stated in this Affidavit, unless stated to the contrary, and those facts are true and correct. I am one of the Defendants in the above-styled lawsuit. I am the principle owner and Chief Executive of Gaim-Ko, Inc.

2.    In the summer of 2000, I and my company developed an interest in placing gambling machines owned by the company on a vessel which would operate from the Gulf Coast of Texas. We had in mind what is known in the industry as a "cruise to nowhere". Customers would board the vessel and would be served food and entertained while the vessel traveled offshore about ten miles. Once the vessel reached this point, the customers would be allowed to use our slot machines and other gambling devices. Thereafter, the ship would return to the port from which it departed.

3.    My company made contact with Lou Daleo, who is a broker specializing in connecting buyers and sellers of offshore cruise to nowhere gambling vessels. He advised us that there was a vessel Casino Padre which was

operating out of South Padre Island, Texas and was for sale. Eventually we entered into a contract with the vessel's owner, CSL Development Corporation, to purchase the vessel. Attached is a copy of the contract which was entered into.

4.      Gaim-Ko was never able to negotiate a contract for the lease of the South Padre Island Fishing Pier from its owners. That pier was the only one in the area suitable for docking the Casino Padre. We did speak to Stan McElroy and Dave Friedman who are the principals in the South Padre Island Fishing Pier partnership, about the possibility of leasing the pier in connection with the operation of the Casino Padre, and we sent them a proposal to enter into negotiations which contained basic deal points for a lease that were intended to prompt them to respond along with a check in the amount of $10,000.00 as consideration for them entering into negotiations with us. Mr. McElroy and Mr. Friedman advised that they were not interested in leasing the pier to us at that time and returned the check to us.

5.      Neither Stan McElroy or Dave Friedman or anyone from the Pier Defendants told us that the Casino Padre was unseaworthy or unsafe or a liability. We wanted to purchase the Casino Padre and would have purchased it had the South Padre Island Fishing Pier been available for lease to us.

6.      Neither I nor my company negotiated with Stan McElroy or Dave Friedman or anyone from the companies regarding the lease of the South Padre Island Fishing Pier to me or my company for use with another offshore gambling boat. My company did lease gaming equipment to another operator of a vessel to use for a cruise to nowhere gambling operation. This vessel operated near Houston, Texas.

Further affiant sayeth not.

RAY GALLEGOS

State:  New Mexico
County:  Bernalillo

SUBSCRIBED AND SWORN TO BEFORE ME by the said RAY GALLEGOS, on this the _____21_____ day of March, 2002.

OFFICIAL SEAL
Barbara A. Garrity
NOTARY PUBLIC
STATE OF NEW MEXICO
My Commission Expires 11/27/2006

Notary Public, State of New Mexico

# AGREEMENT TO CHARTER AND PURCHASE VESSEL

This AGREEMENT TO CHARTER AND PURCHASE VESSEL ("Agreement") is dated as of this _____ day of November, 2000, between CSL Corporation, Inc., a Delaware corporation, with its principal place of business at Three Christina Centre, 201 N. Walnut Street, Wilmington, DE 19801 ("Owner"), and Gaim-Ko, Inc., a New Mexico corporation, with its principal office at 2403 San Mateo Blvd, NE, Suite W17, Albuquerque, NM 87110 ("Operator").

## Terms and Conditions

1.  <u>Charter</u>.  Owner agrees to let and Operator agrees to hire the vessel M/V Entertainer, O.N. 500051, built in Warren, Rhode Island in 1965, and converted at Bender ShipBuilding & Repair Co., Inc., Mobile, Alabama in January 1994, a U.S. registered ship ("the Vessel," which term shall include all gear, machinery, equipment, furnishings and other articles located on the Vessel ("Owner's supplied equipment"), specifically excluding casino equipment including but not limited to slot machines, gaming tables and cage equipment.)

2.  <u>Delivery: Closing: Charter Period: Extension Payments</u>.  The Vessel shall be delivered by Owner to Operator on the closing date ("Closing"), which shall be December 1, 2000.   A photo log will be taken to record the Vessel's delivery condition (for Owner's account).  The period that the Vessel is chartered hereunder (the "Charter Period") is for twelve (12) months commencing on the date of Closing. Operator has the option to extend  the Charter for up to two additional twelve (12) month periods upon payment by Operator to Owner of Two-Hundred Fifty Thousand

Dollars ($250,000) per extension, in cash or cashier's check, on or before September 30, 2001 and 2002, respectively. All of the amounts of such extension payment(s), and one-half (½) of the additional charter payments, will be applied towards the Purchase Price.

3.    Inventory. Promptly after execution of this Agreement, an inventory shall be made jointly by Owner and Operator of all galley, salon, bar and public rooms furnishings that are to be available for Operator's use as of the date of delivery of the Vessel, and the inventory shall be signed by Operator and Owner at Closing and shall be attached hereto as Exhibit A. This inventory shall be maintained at Operator's expense, and any missing or damaged articles shall be replaced or paid for by Operator upon ten (10) days written notice from Owner.

4.    Charter Hire and Deposit. The Charter Hire shall be One Million Five-Hundred Thousand Dollars ($1,560,000) annually, payable in twelve (12) equal monthly installments of One-Hundred Thirty Thousand Dollars ($130,000.00) due on the 1st day of each month, beginning on December 1, 2000. In addition, Operator shall pay all applicable state and federal taxes resulting from the charter and operation of the Vessel, if any. The monthly Charter Hire payments and applicable taxes, if any, shall be paid by Operator in advance to Owner by wire transfer to Owner's account or by check as instructed by Owner in writing. Operator shall concurrently fax to owner evidence of each payment. One-half (½) of all Charter Hire payments will be applied towards the Purchase Price, defined below. All amounts expressed as dollars in this Agreement shall mean United States dollars.

Upon execution of this Agreement, Operator shall pay into an escrow with Coastal Marine for the benefit of Owner, the amount of One-Hundred Thirty Thousand Dollars ($130,000.00) plus applicable taxes to be applied as the first full month's Charter Hire. Such amount is fully refundable to Operator if the Pier Lease, hereafter defined, is not negotiated to Operator's satisfaction within one (1) week from execution hereof, in which event this Agreement shall be null and void. If the Pier Lease is timely negotiated to Operator's satisfaction, the $130,000 plus tax will be promptly paid to Owner and Owner will perform its obligations to dry dock and paint the Vessel, as more particularly described below. Once the $130,000 has been released from escrow it and all future deposits and payments of any nature shall be deemed earned and non-refundable.

5.    Purchase Price. The purchase price ("Purchase Price") of the Vessel is Four Million Dollars ($4,000,000). At Closing, Operator shall deliver or cause to be delivered the following:

5.1    The sum of Two-Hundred Fifty Thousand Dollars ($250,000) in cash or cashier's check, which shall be applied against the Purchase Price;

5.2    An executed promissory note ("Note") for the balance of the Purchase Price in the amount of Three Million, Seven Hundred Fifty Thousand Dollars ($3,750,000), plus interest thereon at the rate of six percent (6%) per annum, which shall be payable as follows:

5.2.1    An installment of Two-Hundred Fifty Thousand Dollars ($250,000) plus interest due on or before April 1, 2001;

5.2.2   Monthly payments of Sixty-Five Thousand Dollars ($65,000), representing one half (½) of each Charter Hire payment, beginning on December 1, 2000 and on the first of every month thereafter of the Charter Period or any extension thereof until the principal balance is paid in full;

5.2.3   The sum of $2,720,000 plus interest on November 30, 2001. Operator may make prepayments of principal all of which will be credited towards the purchase price.

5.3   The certificates of insurance required as described more fully below; and

5.4   The promissory note as well as the full and complete performance of this Agreement shall be secured by a valid first lien on Operator's property, as described in the attached Exhibit B. Such lien shall automatically expire on May 31, 2001, if Operator is not in default under this Agreement. The liened property shall be stored at a location acceptable to Owner and Operator.

6.   <u>Purchase</u>.  If Operator has fully and completely performed its payment and other charter obligations under this Agreement, it may at any time during the Charter Period or any extension thereof, without prepayment penalty, exercise its right to purchase the Vessel by paying the balance of the Note then owing to Owner, including all interest and charges, if any, accrued thereon.

7.    <u>Drydocking by Owner</u>.  After the execution of this Agreement and release of the earnest money from escrow, Owner shall, at Owner's expense, dry dock the Vessel for the purpose of sandblasting and repainting the bottom and painting the hull 12 inches above the waterline.

8.    <u>Operator's Inspection and Owner's Warranties</u>. At Closing, Owner shall, at Owner's sole expense, provide to Operator a current marine survey, U.S. Coast Guard certification, and ABS Load Line certification for its Port of Operation, all indicating that the Vessel is technically ready to trade in U.S. waters.   Certifications for Operator's crew, safety inspection, and inspection by OCMI for Certificate of Inspection at time of recertification or at new port of operation are Operator's responsibility.

Operator unconditionally accepts the Vessel by execution of this Agreement, and Operator understands and agrees that, except as it otherwise provided in this Agreement, the charter and purchase are on an "as is" basis, and that no warranty either real, expressed, or implied, and no representation as to condition, seaworthiness, merchantability or fitness for any purpose or use in any trade whatsoever of the Vessel (including among other uses gambling activities), including but not limited to whether current or future United States Federal or State law or regulations, will permit the Vessel to operate for Operator's intended purposes as a day cruise vessel in its intended area of operation, has been given by Owner or its authorized representatives.

It is further agreed that the Owner shall have no responsibility for any incidental, special or consequential damages or any other damages of any nature whatsoever

arising from this Agreement or from negotiations relating to this Agreement, including, without limitation, damages for lost profits or personal injury, which result or are claimed to result from any defect, failure, fault, or condition in the Vessel or related assets. The warranties set forth in this Agreement are in lieu of all other warranties, whether express or implied or statutory, and there are no warranties which extend beyond the description on the face hereof. Upon execution of this Agreement, Operator confirms that it has not relied on any representation of Owner (Owner's representation) or Broker regarding this Vessel or the business of the Vessel and has decided to charter the Vessel based upon its own investigation. Operator waives its right to any *in rem* claim against the Vessel that may arise under or as a result of this Agreement.

9.   Mortgages: Retention of Title.  Not withstanding anything herein or elsewhere contained to the contrary, it is specifically agreed to by the parties that title to the Vessel shall remain in owner until such time as all obligations of Operator shall have been fully performed. The Vessel is subject to a First Preferred Ship's Mortgage in favor of Bank of Pensacola ("Mortgagee"). Operator shall, at execution hereof, execute a Second Preferred Ship's Mortgage in favor of Owner to secure the payments due hereunder. This Agreement shall be subject and subordinate to the Mortgage. Owner shall deliver to title to the Vessel free and clear of all mortgages at the time the Purchase Price, plus any accrued interest, is paid in full. It is specifically agreed to by the parties that title to the Vessel shall remain in Owner until such time as all obligations of Operator shall have been fully performed.

10.   Use of Vessel.  The Operator, having already inspected the Vessel, is satisfied that the Vessel is suitable for its required purpose, and the Operator is responsible for

obtaining from the authorities necessary approvals to operate the Vessel in its proposed area of operations and for its intended purpose. The Vessel shall not carry more passengers or cargo than can lawfully and safely be carried and shall not in any event exceed the number of passengers as stipulated by local and survey authorities. Cargo capacity is limited to passengers personal luggage only. The Vessel shall not sail in any territorial waters outside the United States. Vessel shall only operate out of South Padre Island, Texas ("Port of Operation") as may be permitted by its then current survey, and shall be restricted to voyage within the number of miles from shore as permitted by its then current survey.

11.    <u>Risk of Loss Prior to Delivery</u>. The risk of loss, damage or destruction of the Vessel shall be borne by Owner prior to Delivery. If there is no Delivery due to loss, damage or destruction of the Vessel, any monies paid by Operator shall be returned to Operator, and this Agreement shall be deemed null and void.

12.    <u>Documentation.</u> Throughout the Charter Period, Operator at its expense will maintain the registration and documentation of Vessel in Owner's name under the laws and regulations of the United States. Owner will, at the expense of Operator, execute such documents and furnish such information as Operator may reasonably require to enable Operator to obtain and maintain the documentation of the Vessel, and Operator will not permit the Vessel to be registered or documented or operated under any flag other than that of the United States or suffer or permit to be done anything that might injuriously affect or prejudice in any way the registration and documentation of the Vessel under the laws and regulations of the United States. Owner will not change the Port of Documentation of the Vessel.

13.    <u>Maintenance</u>.  Operator shall have full responsibility for maintenance and repair of the Vessel and all of its fixtures, furnishings and equipment throughout the Charter period and at its expense will

13.1    maintain and preserve the Vessel and maintain and preserve or replace Owner's supplied equipment to the end that (i) the Vessel and her equipment will at all times during the Charter Period be in the same condition, running order and repair as on Delivery, reasonable wear and tear excepted, and (ii) the Vessel shall be tight, staunch, strong and well and sufficient tackled, appareled, furnished, equipped and in every respect as seaworthy and in as good operating condition as at Delivery, and

13.2    cause the Vessel to be overhauled, drydocked, cleaned and bottom-painted as may be required to maintain the Vessel in class to maintain its load line certificate and in compliance with all regulatory and survey requirements. (c) cause the Vessel to undergo surveys as may be required by the Vessel's underwriters and promptly comply with all recommendations and requirements resulting from each survey.  Operator will notify Owner of each proposed drydocking as far in advance as practicable.  Operator must receive Owner's prior written approval, which approval will not be unreasonably withheld, both as to scope of work and as to the designated shipyard.  Owner in its sole discretion may appoint a supervisor to represent the Vessel while in dry dock. The cost of said representative, if any, shall be paid by Operator.    All replacements to Owner's supplied equipment placed on or installed in the Vessel shall be of identical or superior quality, free and clear of all liens,

encumbrances and rights of others and shall immediately become the property of Owner and be subject to this Agreement.

14.   <u>Repair</u>.  Operator will permit representatives of Owner at any time and without notice to inspect the Vessel and the Vessel's logs, papers and cargo but in such a manner as to not unduly disrupt the operations of the Vessel.  All reasonable expenses in connection with any such inspection shall be paid by Operator.  Operator agrees to undertake at its expense to perform any repair work that in Owner's reasonable opinion is necessary.  Without limitation, any repair or maintenance requested by Owner shall be deemed reasonable and shall be performed promptly if:

14.1   Requested by the Insurance Carrier, U.S. Coast Guard, the American Bureau of Shipping or any other regulatory agency having jurisdiction over the Vessel.

14.2   As to any matter affecting the hull, stability, passenger safety or comfort to a standard that existed on the date of this Agreement as determined by Boris Kirilloff, the Naval Architect who supervised conversion of the Vessel or if not available, another Naval Architect selected by Owner.

14.3   As to any matter relating to the maintaining of the running gear and machinery of every nature including but not limited to engines, generators, mechanical, electrical, plumbing, and HVAC to a standard that existed on the date of this Agreement as determined by International Marine Diesel Specialists, Inc., Ft. Lauderdale, Florida, independent Marine consultants or if not available, another marine consultant selected by Owner.

15.    <u>Relocation Expenses</u>.  All of the preparation expenses for relocating the Vessel and all of the expenses incurred in relocating the Vessel shall be paid by Operator.

16.    <u>Payment of Taxes and Compliance with Governmental Laws and Regulations</u>.  All applicable state and federal taxes on the Charter Hire payments, and taxes that may be imposed as a result of the operation or from income earned by Operator, are the sole responsibility of Operator, and Operator shall indemnify, defend and hold Owner harmless from payment of same and shall not permit any lien to be imposed against the Vessel with regard to the same.  Any and all taxes that may be imposed against Owner as a result of income earned by Owner (except for sales tax on the Charter) are the responsibility of Owner, and Owner shall indemnify, defend and hold Operator harmless from payment of same and shall not permit any lien to be imposed against the Vessel with regard to the same.  Any duties, taxes or fees on the Vessel of any country, state, city, regulatory or taxing authority incurred prior to the date of this Agreement shall be the responsibility of the Owner, and validation of such payment is the responsibility of Owner.  Any duties, taxes, or fees of the Vessel, incurred on or after the date of this Agreement shall be the responsibility of Operator, and validation of such payment is the responsibility of Operator.  Further, Operator warrants that it shall comply with all operational requirements imposed by any governmental agency or law of the United States including but not limited to surveys or other inspections.

It shall be Operator's responsibility to comply with all United States Federal, State and local laws and regulations relating to crew manning and operation of the Vessel, including compliance with all drug and alcohol regulations.

Operator warrants that, during the Charter Period and any extensions thereto, the Vessel will comply with all applicable U.S. Federal and State laws and regulations relating to navigation, pollution and safety, including, but not limited to, the U.S.C.G. Regulations contained in Titles 33 and 46 of the Code of Federal Regulations, as amended, and will reimburse Owner for any expenses, insurance premiums, costs of modifications to the Vessel, or other costs that Mortgagee and/or Owner may incur in complying with such laws and regulations.

17.  <u>Assignment</u>.  Operator shall not assign this Agreement nor transfer possession or control the Vessel or cause a change in control in or of Operator or of management except with the prior consent in writing of Owner.  Operator may not sub-let the Vessel.

18.  <u>Officers and Crew</u>.  During the Charter Period, Operator shall provide and pay the master and such other officers and seamen as required by the authorities and governments that shall have jurisdiction in the areas in which the Vessel is to be operated and, in any event, a sufficient complement of master, officers and seamen as shall be required for the safe and efficient operation of the Vessel.  The Operator shall at all times indemnify and keep indemnified, and hold harmless and defend Owner and Mortgagee and their servants or agents from any actions, proceedings, claims or demands made against them or any one of them by any master, officer or crew member of the Vessel for crew's wages, salvage or otherwise.  The senior captain, marine manager and chief engineer shall be employees of Owner.  Their salary will be reimbursed to Owner by Operator or at Owner's sole option paid by Operator directly to the employee.

19.    <u>Working Expenses</u>.  Operator shall provide and pay for all provisions, fuel oil, greases and other consumables and shall pay all port charges, pilotage, agencies, commissions and all other charges whatsoever.

20.    <u>Liens Against Vessel</u>.  During the Charter Period or any extension thereto, neither Operator nor its agents, nor the Master of the Vessel, shall have any right, power, or authority to create, incur, or permit to be imposed upon the Vessel any liens whatsoever except for crews' wages and salvage.  Operator agrees to carry a properly certified copy of this Agreement, and any addendum thereto, with the ship's papers. In no event shall Operator procure or permit to be procured for the Vessel any supplies, necessaries or services, except for crew services and salvage, without previously obtaining a statement signed by an authorized representative of the furnisher thereof acknowledging such supplies, necessaries or services are being furnished on the credit of Operator and not on the credit of the Vessel or her Owner or Mortgagee, and that the furnisher claims no maritime lien against the Vessel, and therefore waives any such lien that may arise from operation of law or customer, usage and practice.  Operator shall notify any person furnishing repairs, supplies, towage, or other necessaries to the Vessel that neither Operator, its agents, nor the Master, has any right to create, incur, or permit to be imposed upon the Vessel any liens whatsoever.  Such notice shall be in writing with copy to Owner.  Operator further agrees to fasten to the Vessel at all points of entrance, in the engine room, the wheelhouse, and other locations in the Vessel where notices are normally displayed, and to maintain during the life of this Agreement, a conspicuous notice reading as follows:

"This Vessel is the property of CSL Development Corporation. It is under charter to Gaim-Ko, Inc., and by the terms of the Charter Agreement, neither Gaim-Ko, Inc., nor the Master, nor anyone in possession of the Vessel has any right, power, or authority to create, incur, or permit to be imposed upon the Vessel any liens whatsoever."

Should any lien or liens, excluding the permitted Mortgages described above, be placed against the Vessel for any reason whatsoever including but not limited to crew's wages, salvage, or otherwise, Operator is responsible and agrees at its expense and cost to discharge and eliminate any and all such liens within 24 hours of placement of said lien. Failure to do so may, at Owner's option, result in immediate termination of this Agreement. Operator waives any lien it currently has or may have in the future against the Vessel.

21.    <u>Survey</u>.

21.1    The Vessel is a U.S. registered Vessel as evidenced by the Survey Certificate provided to Operator. The Vessel shall remain a U.S. registered ship.

21.2    After Delivery, Operator shall be responsible for keeping the Vessel in survey and in obtaining the necessary approvals from the surveying authorities, depending on its area of operation. The Vessel shall be dry docked as required by the authorities, and during that period the Operator shall pay all costs and expenses of the dry docking and survey.

22. <u>Change of Name</u>. Operator shall have the right, at its expense, to rename and to change the name of the Vessel, to paint the Vessel it its own colors, to install and display its tack insignia, and to fly its own house flag. Owner will, at the cost and expense of Operator, cooperate in the execution and filing of any documents necessary to affect a change in the name of the Vessel. At time of redelivery to Owner, Operator, at its expense, shall return Vessel to its original colors, flag and name.

23. <u>Owner Cooperation</u>. Operator intends to operate the Vessel as a day cruise vessel on voyages out of the Port of Operation. Operator will be required to obtain necessary approvals from United States governmental authorities, including the United States Coast Guard, for operation of the Vessel. Owner shall fully cooperate and assist Operator, as reasonably necessary, with regard to Operator's dealings with such authorities. Such cooperation shall include Owner's making the Marine Manager or other appropriate representative of Owner reasonably available at mutually convenient times and places for meetings with such authorities, provided however that Operator shall pay a reasonable fee and reasonable travel expenses, including lodging and meals of Owner's representatives.

24. <u>Security Bonds</u>. Any security bonds or deposits required by the governments or other authorities in the area of operation shall be provided by Operator, and all costs and expenses incurred in providing such shall be met by Operator.

25. <u>Area of Operation</u>. The Vessel shall be employed only in lawful trade and carriage of passengers from the Port of Operation only. Further, the Vessel may only be operated in such areas or in such parts of that area in which the Vessel can be safely

operated and can always safely lie afloat and within the limits imposed by the authorities under which the Vessel is registered.

26.     <u>Notice of Loss, Requisition, Liable, Sale, Casualties</u>.  In the event of

26.1     actual total loss of the Vessel,

26.2     requisition of the use of or title to, or seizure of, the Vessel by any governmental authority or persons acting under the color thereof,

26.3     the filing of any libel against the Vessel, or the attachment, levying upon, detection, sequestration or taking into custody of the Vessel in connection with any proceeding;

26.4     Marshal's or other sale of the Vessel, or

26.5     any casualty, accident or damage to the Vessel,

Operator will immediately give verbal notice thereof (containing full particulars) to Owner and Mortgagee, and within 24 hours give written notice by facsimile and registered mail.

27.     <u>Insurance</u>.

27.1     <u>Hull & Machinery</u>.  During the term of this Agreement, the Vessel and Owner's supplied equipment shall be kept insured by Operator at its expense against Fire, Collision, Hull, Machinery, Salvage marine and War Risks in the

names of Operator, Owner and Mortgagee, as their interests may appear. The hull and machinery insurance coverage shall be for an amount no less than Six Million Five-Hundred Thousand Dollars ($6,500,000) and for on-board gambling equipment in the amount no less than Seven-Hundred Thousand Dollars ($700,000) with a carrier acceptable to Owner exclusive of coverage for any equipment owned or leased by Operator. Operator, at its expense, shall carry appropriate personal property insurance with a carrier reasonably suitable to Owner for any equipment owned or leased by operator in an amount equal to its fair market value.

27.2    <u>Protection and Indemnity</u>.  Operator shall purchase Protection and Indemnity Insurance with a carrier acceptable to Owner in the names of Operator, Owner and Mortgagee as their interests may appear, in an amount not less than U.S. Ten Million Dollars ($10,000,000.00), the cost of which shall be payable by the Operator.  Deductibles, if any,  shall not exceed Five Thousand Dollars ($5,000).  Operator shall be responsible for the deductible on any insurance claim for injury to anyone on the vessel including but not limited to employees, independent contractors, concessionaires, passengers and guests.

27.3    <u>Carrier and Coverage</u>.  The insurances shall be underwritten by a first class insurer who shall be approved by Owner and Mortgagee, and Certificates of Currency showing Owner's and Mortgagee's interest shall be supplied to Owner and Mortgagee.  The above insurance shall include both an Innocent Owner's Interest Clause and a Loss Payable and Non-Cancellation Clause in forms acceptable to Owner.

28.   <u>War</u>.

28.1   Unless Owner's consent in writing be first obtained, the Vessel shall not be ordered to voyage to nor continue to any place or on any voyage nor be used on any service which will bring the Vessel within a zone which is dangerous as a result of any actual or threatened act of war, war-like operations, acts of piracy or hostility, revolution, civil war, civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of sanctions, nor carry goods that may in any way expose the Vessel to any risks of seizure, capture, penalties or any other interferences of any kind whatsoever by belligerent or fighting powers or parties or by governments or rulers.

28.2   Should the Vessel approach or be brought or ordered within such zone or be exposed in any way to the said risks, the Charter Hire payments shall be paid for all the time lost, including any loss owing to loss or injury to the Master, officers or crew or to the action of the crew in refusing to proceed to such zone or to be exposed to such risks.

28.3   Operator shall have the liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destinations, delivery or in any other ways whatsoever given by any government or any person or body acting or purporting to act with the authority of such government of by any committee or any persons having under the terms of the way risk insurance on the Vessel the right to give such orders or directions.

29. <u>Salvage</u>.  Operator will not permit the Vessel to be used in salvage operations of any nature save as required by law.  All delays occasioned by attempting or rendering towage or salvage services as required by law or repairing damage occasioned thereby shall be borne by Operator, and all benefits arising from such salvage operations shall be for Operator's sole benefit.

30. <u>Modification</u>.  During the term of this Agreement or any extension thereof, Operator shall not modify or alter the Vessel in any respect without the prior approval of Owner in writing, which consent (in case of minor and not structural modifications) shall not unreasonably be withheld.  Any modifications or alterations to the Vessel agreed by Owner shall be carried out to a standard approved by Owner and the Survey authorities, and the cost and expenses incurred in such modifications or alterations shall be paid by Operator.

31. <u>Affirmative Representations of Operator</u>:  As an inducement for Owner to enter into this Agreement, Operator makes the following representations:

31.1  Neither Owner nor Charles S. Liberis, or broker or any of their representatives have made any representations regarding the legality, viability, or profitability of operating the Vessel.

31.2  All financial projections provided by Owner to Operator were hypothetical, for discussion purposes only, and not relied on by Operator in making its business decision to enter into this transaction.

31.3   Either Operator nor any of its directors, officers, or stockholders, is under investigation for, has ever been indicted, charged or convicted of a felony of any nature or a misdemeanor involving gambling.

32.   Corporate Authority. Operator and Owner warrant that they each have the power and authority to enter into this Agreement and all other documents executed, received or delivered hereunder. Each represents that all necessary corporate and stock owner action has been to authorize and direct the execution hereof by Operator and Owner and to consummate this transaction, and that Operator shall obtain, as required, permits and approvals in accordance with all governmental regulatory requirements.

33.   Conveyance of Personalty. As additional consideration for this Agreement, Operator does hereby grant and convey to Owner all of the personalty, currency, food, liquor stores, furniture, equipment, fixtures, of every kind and nature presently on the Vessel and any additions and replacements thereof (the "personalty") brought upon the Vessel during the period of this Agreement or any extensions thereto. Owner grants to Operator the right to the use of the personalty during the term of this Agreement upon the condition precedent that Operator is in compliance with each of the terms and conditions of this Agreement and further conditioned on Operator's promptly replacing all personalty so used.

34.   No Set-Off. No payment of Charter Hire or other payment required to be made by Operator by the terms of this Charter shall be subject to any right of set-off, counterclaim, defense, abatement, suspension, deferment or reduction, and Operator shall have no right to terminate this Agreement (except as expressly provided herein)

or to be released, relieved or discharged from any obligation or liability hereunder for any reason whatsoever, including without limitation:

34.1   any damage to, or loss, requisition, seizure, forfeiture or Marshal's or other sale of the Vessel;

34.2   any libel, attachment, levy, detention, sequestration or taking into custody of the Vessel, or any restriction of or prevention of or interference with the use of the Vessel; or

34.3   any title defect or encumbrance or any disposition from the Vessel not by reason of some act, omission or breach on the part of Owner or a third party, whether or not resulting from accident and whether or not without fault on the part of Operator, Operator will continue to make all payments required of Operator by the terms of this Agreement without interruption or abatement.

35.   <u>Events of Default; Retaking</u>.

35.1   If any of the following events ("Events of Default") shall occur, namely, if

35.1.1 Operator shall fail to pay any Charter Hire or additional payments on Purchase Price on the due dates hereof, or

35.1.2 Operator shall fail to perform or comply with any of the provisions of this Agreement,

then and in such event, Owner may, at its option, immediately withdraw the Vessel from the service of Operator upon giving written notice to Operator, without compensation of liability to Operator and without prejudice to any claim for damage suffered or to be suffered by reason of any such default which Owner might otherwise have had against Operator in the absence of such withdrawal, and, upon the giving of such notice, retaking this Vessel, wherever found, whether upon the high seas or in any port, harbor or other place, without prior demand and without legal process, and for that purpose enter upon any dock, pier or other premises where the Vessel may be and take possession thereof, or require Operator, at Operator's expense, forthwith to redeliver the Vessel to Owner and/or exercise any rights and privileges Owner may have in law and/or in equity.

35.2    Upon the occurrence of an Event of Default and at any time thereafter so long as the same shall be continuing, Owner may, at its option, upon ten (10) days written notice to Operator, declare Owner to be in default; and at any time thereafter, so long as Operator shall not have remedied all outstanding Events of Default, Owner may do, and Charterer shall comply with, one or more the following, as Owner in its sole discretion shall so elect to the extent permitted by, and subject compliance with any mandatory requirements of applicable law then in effect:

35.2.1  Upon written demand, Owner may cause Operator at Operator's expense to, and Operator hereby agrees that it will, promptly redeliver the Vessel, or cause the Vessel to be redelivered, to Owner with all reasonable dispatch and in the same manner and in the same condition

as if the Vessel were being redelivered at the expiration of the Charter Period in accordance herewith, and all obligations of Operator shall apply to such redelivery; or Owner or its agent, at Owner's option without further notice, may, but shall be under no obligation to, retake the Vessel where ever found, whether upon the high seas or at any port, harbor or other place and irrespective of whether Operator, any suboperator or any other person may be in possession of the Vessel, all without prior demand and without legal process, and for that purpose Owner or its agent may enter upon any dock, pier or other premises where the Vessel may be and may take possession thereof, without Owner or its agent incurring any liability by reason of such retaking, whether for the restoration or damage to property caused by such retaking or otherwise. Operator, to induce Owner to enter into this Agreement, covenants not to sue Owner or Owner's agents or assert as an affirmative defense in any litigation Owner or Owner's agents anything that is related or connected with Owner or Owner's agents fulfilling any of the above purposes.

35.2.2 Owner, by written notice to Operator, may require Operator to pay to Owner, and Operator hereby agrees that it will pay to Owner, all unpaid Charter Hire payments as liquidated damages for loss of a bargain and not as a penalty, plus interest on such amount at the rate of 10% per annum, from the payment date specified in such notice to the date of actual payment.

35.2.3 Owner, by written notice to Operator, may accelerate all payments due under the promissory note.

36.    Assignment of Pier Lease. Operator does hereby assign, transfer and set over unto the Owner, with the right to reassign all of its rights, title and interest in and to the lease and in and to the demised premises and berth located at the Sea Ranch Pier ("Pier Lease"); it being expressly understood and agreed that this assignment of the Pier Lease is made by Operator to Owner upon the following terms, covenants, limitations, and conditions:

36.1    Operator shall retain possession of the leased premises in accordance with the terms and conditions of the Pier Lease so long as no default is made in this Agreement.

36.2    If default be made by Operator in the performance of this Agreement, then Owner shall have the option of taking over the leased pier premises, provided, however, that in the event Owner elects to exercise said option of taking over the demised premises for the purpose of operating the same, written notice of its election so to do shall be mailed promptly by Owner to Lessor. Upon the exercise of such option, Owner shall be deemed to be substituted as the Lessee in said Pier Lease in the place and instead of Operator, and shall be deemed to have assumed expressly all of the terms, covenants, and obligations of the Pier Lease theretofore applicable to Operator, and shall likewise be entitled to enjoy all of the rights and privileges granted to Operator under the terms and conditions of the Pier Lease, with the right to reassign same.

36.3    It is understood and agreed that so long as Owner shall not have exercised its option under the foregoing provisions hereof as to the leased pier premises, Owner shall not be liable for rent or any obligation of Operator under and by virtue of or in connection with the Pier Lease, and Operator shall remain liable for such rent and obligations.

36.4    As a condition precedent to this Charter taking effect, Lessor shall execute its approval in form satisfactory to Owner.

37.    <u>Termination of Agreement and Turnover</u>.  In the event that this Agreement terminates for any reason whatsoever, other than by Operator exercising and closing on its option to purchase the Vessel, including but not limited to, termination of the Charter Period or any extensions thereof, or upon a material default by Operator hereunder, then in that event, Operator at Owner's sole option, shall use reasonable efforts to deliver and turn over the business conducted on the Vessel as a going concern and without disruption in service ("the Turnover").  The Turnover shall include but not be limited to:

37.1    Operator's delivery to Owner of the name, address and pay schedule of each employee;

37.2    Operator's granting a release of any employee who will not be employed by Operator or its affiliates from any contractual arrangement that would prevent said employee from being employed by Owner;

37.3    All customer lists and rating cards;

37.4    All mailing lists;

37.5    An assignment of all telephone numbers and yellow page listings;

37.6    All advertising promotion and collateral material;

37.7    An assignment of all media contracts;

37.8    All software including but not limited to reservations and accounting software;

37.9    Group sales lists, lead lists and existing group contracts;

37.10   Operating manuals;

37.11   Internal controls; and

37.12   Employee procedure manuals.

38.     Right of First Refusal.  In the event that Operator elects for the business to be turned over, then in that event, Owner shall have the right of first refusal for a period of thirty (30) days to purchase at a mutually agreed upon fair market value, all furniture, fixtures and equipment used by Operator in the conduct of the business.

39.     Remedies Cumulative.  Each and every power and remedy herein given to Owner or otherwise existing shall be cumulative and in addition to every other remedy herein so given or now or hereafter existing at law, in equity, in admiralty, or under statute,

and each and every power and remedy, whether herein so given or otherwise existing, maybe exercised from time to time and as often and in such order as may be deemed expedient by Owner, and the exercise, or the beginning of the exercise, of any power or remedy shall not be construed to be a waiver of the right to exercise at the same time, or thereafter, any other right, power or remedy. No delay or omission by Owner in the exercise of any right or power or in the pursuit of any remedy shall impair any such right or be construed a waiver of any default or to be an acquiescence therein.

Owner shall be liable for any and all additional hire payable hereunder before, during or after the exercise of any of the available remedies and for all reasonable legal fees and any other reasonable costs and expenses whatsoever incurred by Owner by reason of the occurrence of any Event of Default or by reason of the exercise by Owner of any remedy hereunder, including, without limitation, any reasonable costs and expenses incurred by Owner in connection with retaking of the Vessel, or upon the redelivery or taking of the Vessel, or the placing of the Vessel in the condition and seaworthiness required by the terms hereof. No remedy referred to in this Section is intended to be exclusive, but each shall be cumulative and is in addition to, and may be exercised concurrently with, any other remedy that is referred to in this section or that may otherwise be available to Owner at law, in equity or in admiralty; provided, however, that liquidated damages having been agreed to by the parties hereto, Owner shall not be entitled to recover from Operator as damages for the Vessel upon the occurrence of one or more Events of Default an amount in excess of such liquidated damages for the Vessel plus costs and expenses referred to in the following subsection hereof as may be incurred by Owner in connection with the occurrence of such Event or Events of Default. The rights of Owner and the obligations of Operator under this Section shall be effective and enforceable regardless of the pendency of any

proceeding that has or might have the effect of preventing Owner or Operator from complying with the terms of this Charter. No express or implied waiver by Owner of any Event of Default shall in any way be, or be construed to be, a waiver of any further or subsequent Event of Default.

Operator and R.A. Gallegos, personally, shall be liable for payment of any deficiency after retaking of the Vessel by Owner subsequent to default by Operator. Owner shall be entitled to exercise all legal rights upon the Guarantor whether under this Agreement, the Promissory Note or the Secured Ship Preferred Mortgage of this Agreement prior to bringing any civil action against Operator seeking to collect any amounts due hereunder.

40.    Operator's Obligation Unconditional. Operator's obligation to pay all charter hire and other amounts payable hereunder shall be absolute and unconditional under any and all circumstances and shall not be affected by any circumstances of any character, including, without limitation the following: (i) any defect in the title, seaworthiness, condition, design, operation or fitness for use of the Vessel or the ineligibility of the Vessel for any particular trade, (ii) any loss or destruction of, or damage to, the Vessel or interruption or cessation in the use or possession thereof by Operator for any reason whatsoever and of any whatever duration, (iii) the ineligibility of the Vessel for documentation under the laws or flag of any nation or to engage in the United States coastwise trade for any reason, (iv) any insolvency, bankruptcy, reorganization or similar proceeding by or against Operator or (v) any other circumstance or happening whatsoever whether or not similar to any of the foregoing. Operator hereby waives, to the extent permitted by applicable law, any and all rights that it may now have or that at any time hereafter may be conferred upon it by statute or otherwise, to

terminate, cancel, quit or surrender the charter of the Vessel hereunder except in accordance with the express terms hereof. If for any reason whatsoever this Agreement shall be terminated in whole or in part by operation of law or otherwise except as specifically provided herein, Operator nonetheless agrees to pay to Owner an amount equal to each hire payment at the time such payment would have become due and payable in accordance with the terms hereof had this Agreement not been terminated in whole or in part. Each payment made by Operator hereunder shall be final, and Operator will not seek to recover all or any part of such payment from Owner or any assignee of Owner for any reason whatsoever.

41.    <u>Owner May Cure Defaults: Reimbursement of Expenses.</u>  If Operator shall fail to perform or observe any of the terms of this Agreement, Owner may, in its discretion, do all acts and make all expenditures necessary to remedy such failure, including without limitation, the taking out of insurance on the Vessel and entry upon the Vessel to make repairs, and Operator shall promptly reimburse Owner, with interest at the rate of 10% per annum for any and all expenditures so made; but Owner, though privileged so to do, shall be under no obligation to Operator to do any such act or make any such expenditures nor shall the making thereof relieve Operator of any default in that respect. Operator will also reimburse Owner promptly, with interest at the rate of 10% per annum for any and all expenditures made by Owner at any time in withdrawing the Vessel from service of Operator or otherwise protecting its rights hereunder and for any and all damages sustained by Owner from or by reason of any default or defaults of Operator.

42.    <u>Purchase of Fuel and Inventory.</u>  Operator shall purchase from Owner the fuel on the vessel at the time of the closing at the cost price thereof to Owner, and Operator shall

pay Owner for the same at the time of delivery of the Vessel. The written statement of the Marine Manager as to the amount of fuel on the Vessel at such time shall be accepted as conclusive by the parties. Operator shall purchase all unopened liquor and groceries, unopened food stuffs, paper and plastic goods, stores, disposables, oils, lubricants, and other operating inventories on the Vessel from Owner at Owner's invoiced cost.

43.   Indemnity.  Operator shall at all times indemnify and keep indemnified, and hold harmless and defend Owner and Mortgagee and their servants or agents from any actions, proceedings, claims or demands made against them or anyone of them by any passenger, servant or agent or guest of Operator arising out of any act of any passenger, servant, agent or guest of Operator.

Should the Vessel be arrested, confiscated or detained as a result of the act or omission of Operator or of the unlawful use of the Vessel by Operator during the Charter Period or any extension thereto, Operator indemnifies Owner against all costs, expenses and damages sustained by Owner resulting from such arrest, confiscation or detention. Operator shall take all steps reasonably required to insure that no illegal drugs or other substances are transported aboard the Vessel, whether by crew, passengers or otherwise. Such steps shall include, but not be limited to, the adoption of policies specifically prohibiting the use or carriage of illegal drugs aboard the Vessel and publicizing such policies to passengers and crew.

44.   Insolvency of Operator.  The filing of any petition in bankruptcy, or the adjudication of Operator as a bankrupt or insolvent, or the appointment of a receiver or trustee to take possession of all or substantially all of the assets of Operator, or a general

assignment by Operator for the benefit of creditors, or any action taken or suffered by Operator under any state or federal Insolvency or Bankruptcy Act shall constitute a breach and a default of this agreement by Operator, and in such event Owner may at its option terminate this Agreement and exercise any and all of its rights as set forth in this Agreement.

It is understood and agreed that neither this Agreement, nor any interest herein or hereunder, nor any estate created hereby, shall pass by operation of law under any state or Federal Insolvency or Bankruptcy Act to any trustee, receiver, assignee for the benefit of creditors, or any other person whatsoever without the prior express written consent of Owner and Mortgagee. Any purported transfer in violation of the provisions of this paragraph shall constitute a breach and a default of this Agreement, and in such event Owner may at its option declare this Agreement terminated and exercise any and all of its rights and remedies as set forth in this Agreement.

45.  Applicable law.  The interpretation of this Agreement shall be governed by the general maritime law of the United States. All non-maritime issues of law will be decided by application of Florida law. Neither party hereof shall be considered the drafter of this Agreement. While Owner and Operator have no authority to confer jurisdiction upon any court that does not have jurisdiction over a dispute, both consent to *in personam* jurisdiction of the United States District Court for the Northern District of Florida for enforcement of this Agreement.

46.  Notices.  All notices, requests, demands or other communications to or upon the respective parties hereto shall be deemed to have been duly given upon the date of delivery, if sent by courier or overnight delivery; seven (7) business days after

dispatch if set by prepaid registered post; or one (1) business day after dispatch if made by confirmed telex, cable or facsimile transmission to the party to which such notice, request, demand or other communication is required or permitted to be given or made under this Agreement. Such notices, request, demands, or other communications shall be addressed as follows:

If to the Owner:    CSL Development Corporation

c/o Edward M. Luria, Esquire, Trustee

918 Sixteenth Street, N.W., Suite 200

Washington DC 20006

And

Charles S. Liberis

1610 Barrancas Avenue

Pensacola, Florida 32501

If to the Operator:    R.A. Gallegos

2403 San Mateo Blvd, NE, Suite W17

Albuquerque, NM 87110

47.    <u>Time</u>. This is of the essence for the performance of all obligations and the satisfaction of all conditions of this Agreement.

48.    <u>Attorneys' Fees</u>. Should any party hereto employ an attorney for the purpose of enforcing or construing this Agreement, or any judgment based on this Agreement,

in any legal proceeding whatsoever, including but not limited to insolvency, bankruptcy, arbitration, declaratory relief, or other litigation as well as any appeals thereof, the prevailing party shall be entitled to receive from the other party or parties thereof reimbursement for reasonable attorneys' fees and costs, including, but not limited to, service of process costs, filing fees, court and court reporter costs, investigative costs, expert witness fees, and the cost of any bonds, and such reimbursement shall be included in any judgment or final order issued in that proceeding.

49. <u>Counterparts</u>.   This Agreement may be executed in any manner of identical counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same instrument when each party has signed one (1) such counterpart.   In addition, facsimile signed copies of this Agreement shall serve and have the effect of binding originals until such time as the parties hereto are able to exchange original signed copies.

50. <u>Severability</u>.   In the event that any of the terms, conditions, or provisions of this Agreement are held to be illegal, unenforceable, or invalid by any court of competent jurisdiction, the legality, validity, and enforceability of the remaining terms, conditions, or provisions shall not be affected thereby.

51. <u>Lien on Equipment</u>.   Operator does hereby pledge to Owner as security for the Charter Hire, Promissory Note and other payments and performance of this Agreement, all furniture, fixtures, gaming equipment, cash in banks, and personal property of every nature used by Operator in connection with the Vessel's operation,

whether located on the Vessel or elsewhere. Operator agrees to execute any further documentation necessary to protect Owner's security interest in the above.

52. <u>Guarantee and Pledge of Ownership Interest</u>.  For valuable consideration, R.A. Gallegos, ("Guarantor") does hereby guarantee the performance of the terms and conditions and the payments of the sums set forth in this Agreement by Operator including but not limited to the Charter Agreement and payments due under the Promissory Note. In addition, Guarantor agrees to pay any attorneys' fees and costs incurred in enforcing this Guarantee. It is further agreed that any assignment of this Agreement shall not release Guarantor from his obligations as Guarantor hereunder. Guarantor hereby further waives the right to require Owner to proceed against Operator or its assignees, or to pursue any other remedy in its power and Guarantor hereby authorizes Owner to proceed directly against Guarantor. Performance of the Guarantee shall be secured by a pledge of all of Guarantor's interest in Operator which interest will represent no less than One-Hundred percent (100%).

53. <u>Complete Agreement and Severability</u>.  The parties acknowledge receipt of a copy of this Agreement; that the terms of the Agreement are the entire agreement between them; and that they have not received or relied on any representations that are not expressed in this Agreement.  **No prior, present, or future agreements or representations will be relied on or will bind the parties unless in writing and incorporated into this Agreement.**  Modifications of this Agreement will not be binding unless in writing, signed and delivered by the party to be bound.  Signatures, initials and modifications communicated by facsimile or telecopy will be considered as original.   If any provision of this Agreement is or becomes invalid or

unenforceable, all remaining provisions will continue to be fully effective unless said provision specifically provides to the contrary.

54.   <u>Pilot, Tugboat or Stevedor Negligence</u>.  Operator shall be responsible for all losses sustained by Owner or Vessel or Mortgagee through the negligence of pilots, tugboats or stevedores.

55.   <u>Tickets</u>.  Operator shall use a form of passenger ticket approved by the insurance carrier.

56.   <u>Attorney Disclosure</u>.  Operator is aware that Charles S. Liberis is an attorney and represents that Charles S. Liberis has not given any legal advice to Operator. Operator further represents that it has received its own independent legal advice regarding this Agreement.

57.   <u>Miscellaneous</u>.  This Agreement constitutes the entire agreement between the parties hereto, and it is agreed and understood that there are no other duties, obligations, liability or warranties implied or otherwise. This Agreement is binding on Owner and Operator, their successors or assigns, as soon as executed by both parties hereto.

WITNESS:                           OWNER:

                                   **CSL DEVELOPMENT CORPORATION**


_____            By:_____

                                   Its:_____

OPERATOR:

GAIM-KO, INC.

By: *R. A. Gallegos*

Its: *President – owner*

## GUARANTY

The undersigned, being the principal shareholder of the Operator named in the within and foregoing Agreement, individually guarantees the performance of the Operator (as well as any successors and assigns) of each of the terms, covenants and obligations of such Agreement and the payment by the Operator (as well as the successors and assigns of Operator) of all amounts due under this Agreement including but not limited to the Charter Payments and payments due under the Promissory Note. The undersigned's obligations and liabilities under this Guaranty are primary, absolute and unconditional and this Guaranty may be enforced directly against the undersigned independently of the Operator (or Operator's successors or assigns) and independently of any other security that has been pledged in connection with the transaction contemplated by such Agreement.

DATED: *November 3, 2020*

GUARANTOR(S):

*R. A. Gallegos*

R.A. Gallegos, individually

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CSL DEVELOPMENT CORPORATION, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-01-059 |
| | § | |
| GAIM-KO, INC.; RAY GALLEGOS; SOUTH | § | |
| PADRE ISLAND FISHING CENTER, INC.; | § | |
| STANLEY McELROY; DAVE FRIEDMAN; | § | |
| SRFP, INC.; and SOUTH PADRE ISLAND | § | |
| FISHING CENTER JOINT VENTURE | § | |

# ORDER SETTING HEARING

It is hereby ORDERED that this Honorable Court has set a hearing date on the First Motion

for Summary Judgment filed by Defendants SOUTH PADRE ISLAND FISHING CENTER,

INC., STANLEY McELROY, DAVE FRIEDMAN, SRFP, INC. and SOUTH PADRE ISLAND

FISHING JOINT VENTURE, for the _____ day of _____, 2002, beginning at _____

o'clock ____.M.

SIGNED FOR ENTRY this _____ day of _____, 2002.

_____
JUDGE PRESIDING

Copies to:

W. Michael Fisher
ROERIG, OLIVEIRA & FISHER, L.L.P.
855 West Price Road, Suite 9
Brownsville, Texas 78520

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CSL DEVELOPMENT CORPORATION, INC. §
§
  Plaintiff, §
§
VS. §    CIVIL ACTION NO. B-01-059
§
GAIM-KO, INC.; RAY GALLEGOS; SOUTH §
PADRE ISLAND FISHING CENTER, INC.; §
STANLEY McELROY; DAVE FRIEDMAN; §
SRFP, INC.; and SOUTH PADRE ISLAND §
FISHING CENTER JOINT VENTURE §

## ORDER GRANTING DEFENDANTS SOUTH PADRE ISLAND FISHING CENTER, INC., STANLEY McELROY, DAVE FRIEDMAN, SRFP, INC. AND SOUTH PADRE ISLAND FISHING CENTER JOINT VENTURE'S FIRST MOTION FOR SUMMARY JUDGMENT

On the _____ day of _____, 2002, came on to be considered Defendants South Padre Island Fishing Center, Inc., Stanley McElroy, Dave Friedman, SRFP, Inc. and South Padre Island Fishing Center Joint Venture's First Motion for Summary Judgment. The Court after reviewing the file, is of the opinion that said Motion should be **GRANTED**;

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED** that Defendants South Padre Island Fishing Center, Inc., Stanley McElroy, Dave Friedman, SRFP, Inc. and South Padre Island Fishing Center Joint Venture's First Motion for Summary Judgment is hereby GRANTED and that the causes of action asserted by Plaintiff against these Defendants be and they are dismissed, with prejudice, with costs of court to be paid by Plaintiff herein.

**SIGNED FOR ENTRY** this _____ day of _____, 2002.

_____
JUDGE PRESIDING

Copies to:

W. Michael Fisher
ROERIG, OLIVEIRA & FISHER, L.L.P.
855 West Price Road, Suite 9
Brownsville, Texas 78520

John T. Flood
FLOOD & FLOOD
555 North Carancahua, Suite 830
Corpus Christi, Texas 78478

Mr. Rudy A. Ortiz
Attorney at Law
800 Gold Ave. SW
P.O. Box 26191
Albuquerque, New Mexico 87125

Mr. Joseph W. Grant
THE GRANT LAW FIRM
2437 Bay Area Blvd., #100
Houston, Texas 77058

Ms. Carla Saenz
CARLA M. SAENZ & ASSOCIATES
1325 Palm Blvd., Suite H
Brownsville, Texas 78520

Paul L. Fourt, Jr.
Attorney at Law
1000 E. Van Buren Street
Brownsville, Texas 78520