*5/*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

AUG 0 9 2002

Michael N. Milby
Clerk of Court

| | |
|---|---|
| CSL DEVELOPMENT CORPORATION, INC. § | |
| § | |
| Complainant, § | |
| § | |
| VS. § | CIVIL ACTION NO. B01-059 |
| § | JURY DEMANDED |
| GAIM-KO, INC. and RAY GALLEGOS § | |
| § | |
| Defendants. § | |

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Complainant CSL Development Corporation, Inc. asks the court to render a partial

summary judgment against defendants Gaim-Ko, Inc. and Ray Gallegos and to set for

hearing a fact finding as to plaintiff's damages.

## A. INTRODUCTION

1.      Complainant CSL Development Corporation, Inc. ("CSL") has sued defendants

Gaim-Ko, Inc. and Ray Gallegos for failure to perform under the contract attached to this

motion as Exhibit "A". The contract is a charter and purchase agreement for the vessel

M/V ENTERTAINER. Gaim-Ko agreed to purchase the ENTERTAINER for four

million dollars ($ 4,000,000.00). Ray Gallegos, the principal of Gaim-Ko, Inc., is a party

defendant because he guaranteed his company's performance under the contract. By its

complaint, CSL asks for an award of damages caused by defendants' breach.

Complainant's original complaint also included allegations of tortuous interference with

contract and tortuous interference with prospective business relations, defamation and a

claim for exemplary damages against former defendants South Padre Island Fishing Center, Inc., Stanley McElroy, Dave Friedman, SRFP, Inc., and South Padre Island Fishing Center Joint Venture. By stipulation and order of dismissal, such defendants are no longer parties to this case.

2.    Besides a plea that this court lacks subject matter and *in personam* jurisdiction (which appear to have been waived) and an allegation of *forum non conveniens*, the sole affirmative defense pleaded by defendants is that a single condition precedent was not satisfied. That condition, found on page 3 of Exhibit "A", is this:

> "Upon execution of this Agreement, Operator [Gaim-Ko] shall pay into an escrow with Coastal Marine[1] for the benefit of Owner [CSL], the amount of One-Hundred Thirty Thousand Dollars ($130,000.00) plus applicable taxes to be applied as the first full month's Charter Hire. Such amount is fully refundable to Operator if the Pier Lease, hereafter defined[2], is not negotiated to Operator's satisfaction within one (1) week from execution hereof, in which event this Agreement shall be null and void."

As will be shown herein, the pier lease was negotiated to Gaim-Ko 's satisfaction within one week; therefore, the condition precedent was satisfied. Complainant files this motion for partial summary judgment on its claim of breach of contract.

## B. STATEMENT OF FACTS

3.    In support of this motion, Complainant submits certain deposition testimony, deposition exhibits and an affidavit. That evidence is submitted through the affidavit of plaintiff's attorney-in-charge, John Flood, which is attached hereto and incorporated

---

[1] Coastal Marine refers to the broker of the sale, Mr. Lou Daleo.

[2] "Pier Lease" is defined on page 23 of the agreement to mean the lease of the "premises and berth located at the Sea Ranch Pier".

herein as if set forth fully.  The evidence attached to Flood's affidavit is this:

Exhibit "A":          The AGREEMENT TO CHARTER AND PURCHASE VESSEL

Exhibit "B":          Excerpts from the sworn deposition testimony of Charles Liberis taken on July 11, 2002.  Mr. Liberis is the President of the plaintiff, CSL Development Corporation, Inc.

Exhibit "C":          Excerpts from the sworn deposition testimony of Ray Gallegos taken on December 4, 2001, and its exhibits 1, 4, 21, 26, 29, and 32.  Mr. Gallegos is the President of defendant Gaim-Ko, Inc., and a personal guarantor of the contract made the basis of this action.

Exhibit "D":          Sworn deposition testimony of David "Dave" Robert Friedman taken on May 29, 2002.  Mr. Friedman is a principal of South Padre Island Center Joint Venture, the entity that controlled the lease berth where the M/V ENTERTAINER was docked at the times relevant to the contract made the basis of this suit.

Exhibit "E":          Sworn deposition testimony of Catherine Stetson taken on December 4, 2001.  Ms. Stetson is a lawyer in Albuquerque, New Mexico who counseled Gaim-Ko and Mr. Gallegos regarding the contract made the basis of this action.

Exhibit "F":         Affidavit of Wayne Marks, Chief Financial Officer of sureBET Casinos, Inc. and former General Manager of Casino Padre, LLC

Such evidence establishes the following uncontroverted facts.

4.      In the late Summer/early Fall of 2000, the prospect of Gaim-Ko purchasing the ENTERTAINER was presented to Gaim-Ko by ship broker Lou Daleo. (Gallegos deposition Exhibit 4). On October 18, 2000, Gallegos executed an "Offer to Charter/Purchase" the ENTERTAINER from CSL. (Gallegos deposition Exhibit 21). This document was not intended to be the actual charter/purchase instrument; rather, a final sales agreement was to be negotiated and executed by CSL and Gaim-Ko. (Liberis deposition, p. 11, line 4. – p. 13, line 13). At the time of the execution of the "Offer to Charter/Purchase" the vessel was docked at the Sea Ranch Pier on South Padre Island under a month-to-month lease agreement between the Sea Ranch and CSL. (Liberis depositin, p. 13, lines 6 – 19). One issue from the beginning of the negotiations was the dock out of which Gaim-Ko would operate the ENTERTAINER. (Liberis deposition, p. 16, line 16 – p. 18, line 3). Prior to October 20th, ship broker Lou Daleo suggested to Ray Gallegos that he have his attorney include a term within the charter/purchase agreement regarding a lease for the vessel. Specifically, Mr. Daleo stated to Gallegos by faxed memoranda on October 20th:

> "… to assure you have the lease on the dock you want, have your Attorney insert a paragraph 10 on pg. 4, setting for the condition that you and Mr. Liberis will meet with the Landlord at So. Padre Island, to negotiate a lease with reasonable extensions and rates … If such a lease with the

> landlord is not negotiated to your satisfaction, the agreement becomes null
> and void and the escrowed deposit is immediately refunded to you."

(Gallegos deposition Exhibit 26).  On October 29, 2000, Mr. Daleo again restated this

intended contingency:

> "[After the agreement is executed and $130,000 deposit is made into
> escrow], You (Gallegos) and Charles (Liberis of CSL) are then to schedule
> a meeting with the landlord of the dock in So. Padre Island, where you
> will both negotiate with the landlord for the best possible terms on the
> dock.  If these negotiations do not produce a lease satisfactory to you, the
> Agreement shall be voided and the escrowed deposit refunded."

(Gallegos deposition Exhibit 29).  A paragraph drafted by Gallegos' lawyer was included

in the final agreement. That document, entitled, "AGREEMENT TO CHARTER AND

PURCHASE VESSEL" was executed by Gallegos on November 3, 2000; however, as of

noon November 6, 2000, the initial consideration – the $130,000 deposit -- had not been

paid.  (Gallegos deposition Exhibit 32).

5.      Consistent with the intent of the parties and the agreement, Gallegos and Liberis

traveled to South Padre Island and on November 10, 2000, met with the owners of the

pier, Mssrs. McElroy and Friedman.  At that November 10, 2000, meeting, lease terms

such as rent and length of the lease were discussed by the pier lessors (McElroy and

Friedman) on one side, and, Gaim-Ko on the other.  (Friedman deposition p. 26, line 24 –

p. 27, line 11).  CSL's Charles Liberis acted as a "mediator" and made "would you take"

type inquiries.  (Friedman deposition p. 26, line 24 – p. 27, line 11).  The inquiries related

to amount of rent and term period.  Pier lessor Dave Friedman characterized the

discussions about rent as "back-and-forth type conversations."  (Friedman deposition p.

27, lines 15 – 19).  At his deposition, Mr. Friedman could not recall the exact numbers

for rent that were exchanged in the back-and-forth negotiations; however, he did remember that "$60,000 for the first year payable in advance and $120,000 per year for the following two years" were "numbers that were discussed at the meeting on November 10[th]".  (Friedman deposition p. 27, lines 20 – 22).  The term period of the lease was also discussed and were time periods less than the primary lease that CSL had received (Friedman deposition p. 27, l. 23 – p. 28, l. 8).  In fact, Mr. Friedman testified in his deposition that a sublease term of "one year with two one-year options" was a term discussed in the back-and-forth negotiations on November 10, 2000.  (Friedman deposition p. 28, lines 9 – 16).

6.       Immediately after the November 10, 2000, meeting, Ray Gallegos told then General Manager of Casino Padre, LLC Wayne Marks that satisfactory terms had been reached with the South Padre Island Fishing Center Joint Venture, the owner of the Sea Ranch Fishing Pier.  (Marks affidavit, paragraph 4).

7.       On November 13, 2000, Dave Friedman told Wayne Marks that a satisfactory agreement had been reached with Mr. Gallegos and that "the lease is a done deal." (Marks affidavit, paragraph 5).

8.       Seven-days after the meeting, on November 17, 2000, Mr. Gallegos signed a document that he labeled a "Sublease Agreement" and sent it along with a check in the amount of $10,000 to the pier owners.  (Gallegos deposition Exhibit 1).  Such "Sublease Agreement" contained the exact same essential terms that were negotiated on November 10, 2000:  (1) a lease term of "one year with two one-year options", and, (2) rent of

$60,000 for the first year payable in advance and $120,000 per year for the following two years.

9.      Mr. Friedman received the agreement and check. In his deposition, Mr. Friedman agreed that on November 17, 2000 – based on the letter that included a signed sublease agreement/proposal to sublease along with a $10,000 check – it appeared Mr. Gallegos "believed" he had a lease agreement with the pier owners. (Friedman deposition p. 20, line 24 – p. 21, line 18; and, p. 36, line 21 – p. 37, line 12).

10.     Gaim-Ko's lawyer, Catherine Stetson, negotiated the language of the contract on behalf of Gaim-Ko and Mr. Gallegos, and, provided professional legal advice to Gaim-Ko and Gallegos in regards to the transaction to "make sure the documents reflected the parties' agreement". (Stetson deposition p. 7, lines 6 – 14) In her deposition, Ms. Stetson testified that she found the contract to be ambiguous, inaccurate, too "one-sided", and not "well written". (Stetson deposition p. 26, lines 9 – 24; p. 39, line 20 – p. 41, line 5; p. 27, lines 20 – 23). Ms. Stetson counseled Mr. Gallegos of these opinions both before and after he signed it. (Stetson deposition p. 27, line 24 – p. 28, line 5). According to Mr. Liberis, Ms. Stetson made an effort to change the agreement to make the sale of the vessel contingent upon an executed lease, however, Mr. Liberis would not agree to such condition; as a result, Ms. Stetson told Mr. Liberis that "she was going to recommend that Ray [Mr. Gallegos] not sign this agreement the way it was because she wanted that to be a condition precedent". (Liberis deposition p. 28, line 20 – p. 29, line 8). Nevertheless, Mr. Gallegos signed the agreement "over [Stetson's] objection." (Stetson deposition p. 27, lines 4 – 7).

11.    CSL's President Mr. Charles Liberis knew, prior to the execution of the contract, that Gaim-Ko would have a difficult time entering a lease with the owners of the pier. (Liberis deposition p. 20, line 19 – p. 21, line 14).  For this reason, he intentionally did not include in the contract a condition that a pier lease be executed; only that it be "negotiated" to Gaim-Ko's satisfaction. (Liberis deposition p. 20, line 19 – p. 21, line 14).

12.    Mr. Gallegos and Gaim-Ko did not take delivery of the ENTERTAINER nor perform the balance of its obligations under the contract.

## B. ARGUMENT & AUTHORITIES

13.    Summary judgment is proper when there exists no genuine issue of material fact. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2552 (1986).  A plaintiff moving for summary judgment may satisfy its burden by submitting summary judgment proof that establishes all elements of its cause of action as a matter of law. *San Pedro v. U.S.*, 79 F.3d 1065, 1068 (11th Cir. 1996).  Plaintiff should show that no reasonable trier of fact could find other than for plaintiff. *Calderone v. U.S.*, 799 F.2d 254, 259 (6th Cir. 1986).  This motion and its attached evidence establish there is no genuine issue of material fact.

14.    To prevail on its claim of breach of contract, CSL must prove the following elements as a matter of law:

    (1)    CSL and Gaim-Ko had a valid, enforceable contract;

(2)     CSL performed, tendered performance, or was excused from performing its contractual obligations;

(3)     Gaim-Ko breached the contract; and

(4)     Gaim-Ko's breach of the contract caused CSL injury.

*Southwell v. University of the Incarnate Word*, 974 S.W.2d 351, 354-55 (Tex. App. – San Antonio 1998, pet. denied).

15.     The pleadings and summary judgment evidence attached hereto establish that the AGREEMENT TO CHARTER AND PURCHASE VESSEL attached as Exhibit "A" was a valid and enforceable agreement. Gaim-Ko has not pled that the underlying contract was not valid.

16.     The pleadings and evidence also show that CSL was, at all times, ready to perform under the contract. Gaim-Ko has not pled that CSL failed to perform. Although CSL sought to fully perform, when Gaim-Ko demanded the return of its initial $130,000 escrow payment it breached the agreement and CSL was excused from further performance.

17.     The sole element of plaintiff's breach of contract claim that is in dispute is Gaim-Ko's alleged excuse for not performing -- that a pier lease was not "negotiated to Operator's satisfaction". The pleadings and evidence reveal that such excuse is simply not logical because the exact terms Mr. Gallegos included in the sublease agreement that he signed and delivered were those specifically negotiated at the November 10 meeting. Mr. Gallegos' signature on the Agreement that he had prepared, along with his signature on a $10,000 check to the pier owners, are conclusive evidence that Mr. Gallegos was

9

satisfied with the negotiations; however, Mr. Gallegos' own sworn testimony seals the

deal. When asked about the lease term and rent that he included in the Sublease

Agreement that he signed on November 17, 2002, Mr. Gallegos testified as follows:

> Q. Well, wherever the terms came from, they were acceptable to you?
> A. Yes, they were.
> …
>
> Q. Were these the terms that you were looking for?
> A. Yes.

(Gallegos deposition, p. 141, lines 20 – 22, and p. 142, lines 2 – 4).

18.    That the pier owners later chose not to enter the Sublease Agreement with

Gallegos is immaterial and was not a condition of the AGREEMENT TO CHARTER

AND PURCHASE VESSEL; in fact, as testified-to by Mr. Liberis, he consciously

intended to exclude any requirement that the pier owners execute a Sublease with Gaim-

Ko:

> Q. I'm going to show you a document that was produced by you in answers to discovery. This is -- I'll let you look at it. It's a memo -- it's a memo to Ray Gallegos from Lou Daleo. And if you don't mind, could you read the last paragraph of that document.
> A. "If such a lease with the landlord is not negotiated to your satisfaction, the agreement becomes null and void and the escrowed deposit is immediately refunded to you."
>
> Q. When did you first become aware that Lou Daleo had suggested that information - or that language to be included in the contract, and/or when did Gaim-Ko first suggest that language to you?
> A. Lou Daleo suggested the language to me.
>
> Q. Okay.
> A. And I -- and I told him that I was not going to make my deal with Gaim-Ko contingent on Sea Ranch. It took me forever to negotiate a lease with them and that it was not physically possible to do it within the time frame of this

> lease. And I wanted to get the hell out of there. Gaim-Ko either had to proverbially get off the pot, or I was leaving.
>
> Q.    Was --
> A.    Daleo called me back, and he said will you at least help them negotiate? And I said I will do that; but they'll never get anything signed within the time period that's allowed, because dealing with Stan McElroy was an eternal battle and trying To get a final document was an eternal battle. I agreed to help them negotiate, which is what I did.

(Liberis deposition p. 20, line 10 – p. 21, line 14). In later testimony, Mr. Liberis

explained the business decision behind not wanting the charter and sale of his vessel

contingent upon the execution of the pier lease, and, that Gallegos' lawyer Cate Stetson

knew full-well that the charter and purchase was not contingent upon execution of a

lease:

> You've got to understand, I am burning cash. I'm trying to get out of South Padre Island. I've been negotiating with these guys since September. It's now October, Going into November. I've not gone into the shipyard. I've not gotten my lease signed in Florida because I can't do anything if I'm going to sell my boat. And all I want to do at this point is go because I don't think they're going to do a deal. I keep telling Lou if they want to go to South Padre -- let me explain. Gaim-Ko's success is my success. If they don't make money, I don't get paid. I'm convinced today, as I was then, that there was no way to make money in South Padre Island, Texas. All I want to do is get out of there and all that Daleo's trying to do is put a deal together to make a fee and I've seen no money. He keeps asking me, Cate wants a condition of our agreement to be that a lease gets in place there, and Cate's a good enough lawyer to want to demand that on her client. I refused to do that because I know that it won't be done in a reasonable period of time, and I'm the only guy that's at risk. They won't pay me any money to sit there while they negotiate with Stan for 30 or 60 days. So I refused to make it a condition. Finally, Daleo says will you help them negotiate? And I said yes, but we got to get it over with. And that's the short fuse in there, is a seven-day fuse. That's my language. That's my requirement, not theirs.

(Liberis deposition p. 24, line 13 – p. 25, line 16). Because all the evidence shows that Mr. Gallegos was satisfied with the negotiations over the pier lease, the only fair conclusion is that Gaim-Ko's sole defense to plaintiff's breach of contract claim is that the charter and sales agreement was contingent upon a pier lease being signed by the pier owners. That is not what the contract says, and, it is not what the parties intended. Even more, Gallegos' lawyer Ms. Stetson wanted execution of the pier lease to be "a condition" of the charter and purchase agreement that she saw as "one-sided". However, for the business reasons expressed, Liberis refused. That Gallegos executed the charter and sales agreement over Ms. Stetson's objection is even more evidence that the parties did not intend that execution of the lease be a condition of the lease and purchase agreement – only that a pier lease be "negotiated to [Gaim-Ko's] satisfaction", which it was.

19.    Ray Gallegos is a very experienced businessman with many years of experience in business as both an owner and operator of businesses from lounges and restaurants to commercial parking garages, gambling operations and casinos grossing over one million dollars ($1,000,000) per month. (Gallegos deposition p.20, line 21 – p. 53, line 1).

20.    Ray Gallegos was intimately familiar with the difference between "negotiating" and "executing" a contract. Ray Gallegos had negotiated many leases and contracts as well as executed many contracts. Ray Gallegos knew from his own extensive business experience that negotiation of a contract did not constitute execution of a contract and that a party was not bound to a contract until it was executed, regardless of satisfactory negotiations. (Gallegos deposition p. 103, line 10 – p. 111, line 20).

21.    Ray Gallegos felt that contracts he entered into were meaningless and that he conducted business by how he felt, and not according to contracts that he signed. (Gallegos deposition, p. 127, line 14 – p. 128, line 8).

22.    Ray Gallegos thought that he had a sublease when he left the South Padre meeting on November 11, 2000.  (Marks affidavit). Ray Gallegos sent a ten thousand dollar ($10,000) check along with a sublease to the South Padre Pier owners.  Ray Gallegos thought that he had a sublease when he sent the check and the sublease.  The terms of the sublease were acceptable to Ray Gallegos, they were the same terms that CSL had leased the pier under, and Ray Gallegos had no problems with purchasing the entertainer.  Ray Gallegos office, or his attorney drafted the sublease with terms acceptable to Ray Gallegos and he forwarded those terms to the Pier owners.  (Gallegos depositoin p. 129, line 9 – p. 144, line 7; p. 160, line 18 – p. 165, line 23).

23.    The Pier owners had a number of outstanding issues to resolve with Ray Gallegos concerning "parking and how it is handled, and boat quality", however they were interested in continuing to negotiate with Ray Gallegos.  Ray Gallegos did not consider parking or the boat condition to be of any consequence and did not consider them to be issues that concerned him or affected the sublease terms he was satisfied with when he put them in the sublease. (Gallegos deposition p. 176, line 15 – p. 179, line 23).  Ray Gallegos was satisfied with the terms of CSL's lease and would have purchased the Entertainer had he been able to execute a lease on the same terms as CSL's lease, which were the same terms in the sublease Ray Gallegos sent to the Pier owners on November 17, 2000.  When Ray Gallegos sent his check and sublease to the Pier owners it was

specifically for the ENTERTAINER. Ray Gallegos was still in contact with CSL and trying to finalize a lease for the ENTERTAINER at the South Padre Pier. (Gallegos deposition p. 147, line 12 – p. 151, line 14; p. 173, line 23 – p. 175, line 18).

24.    Ray Gallegos was offered by CSL and Charles Liberis the option to purchase the pier himself, or, have CSL purchase the Pier and lease it to Ray Gallegos and Gaim-Ko on the same terms as Ray Gallegos' proposed sublease and the sublease CSL had for the ENTERTAINER at the South Padre Pier. Ray Gallegos stated that he would have accepted those same terms but that he never got back in touch with CSL or Charles Liberis to tell him. Ray Gallegos had an opportunity to lease the Pier on terms acceptable to him and that matched his sublease and CSL's lease, and he chose not to pursue them. Ray Gallegos had negotiated lease terms to his satisfaction, had those terms presented to him, yet, backed down from his agreement after full performance by CSL. (Gallegos deposition p. 165, line 24 – p. 173, line 11; p. 176, line 15 – p. 179, line 23).

### C. Conclusion

25.    A partial summary judgment in this case is proper because plaintiffs' summary judgment evidence is of such a quality that there is no genuine issue of material fact as to each element of plaintiffs' breach of contract cause of action; only a fact finding as to the amount of plaintiff's damages remains. Further, despite not being required to do so, plaintiff's summary judgment evidence also demonstrates a lack of any genuine issue of material fact as to defendant's sole affirmative defense – that a pier lease was not negotiated to its satisfaction. *See, Zands v. Nelson*, 797 F. Supp. 805 (S.D. Ca. 1992)

(plaintiff need not provide evidence but may simply point out absence of evidence from defendant).

## D. **Prayer**

26.    For these reasons, plaintiff asks the court to grant its motion for partial summary judgment.

Respectfully Submitted,

By: _____

John Flood
State Bar. No. 07155910
Fed. I.D. No. 12593
900 Frost Bank Plaza
802 N. Carancahua
Corpus Christi, Texas 78470
(361) 654-8877
(361) 654-8879 (Facsimile)

**ATTORNEY IN CHARGE FOR COMPLAINANT**

OF COUNSEL:

J.A. Magallanes
State Bar No. 12809500
Magallanes, Hinojosa & Mancias
1713 Boca Chica
Brownsville, Texas 78520
(956) 544-6571
(956) 544-4290 (Facsimile)

Bob Hilliard
State Bar No. 09677700
Hilliard & Muñoz, PPC
719 S. Shoreline, Suite 600
Corpus Christi, Texas 78401
(361) 882-1612
(361) 882-3015 (Facsimile)

Joseph M. Grant
State Bar No. 08301520
The Grant Law Firm
2437 Bay Area Blvd., #100
Houston, Texas 77058
(281) 286-1222
(281) 286-1444 (Facsimile)

## CERTIFICATE OF SERVICE

       I hereby certify that a true and correct copy of the foregoing was sent to Paul Fourt at the following address by overnight delivery on August 8, 2002.

Mr. Paul L. Fourt, Jr.
**Law Office of Paul L. Fourt, Jr.**
1000 E. Van Buren
Brownsville, Texas 78520

John Flood

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CSL DEVELOPMENT CORPORATION, INC. §
§
    Complainant, §
§
VS. § CIVIL ACTION NO. B01-059
§ JURY DEMANDED
GAIM-KO, INC. and RAY GALLEGOS §
§
    Defemdants §

## AFFIDAVIT OF JOHN FLOOD

STATE OF TEXAS §
§
COUNTY OF NUECES §

BEFORE ME, the undersigned authority, duly appeared JOHN FLOOD, and after being duly sworn by me, testifies as follows:

1.    My name is JOHN FLOOD. I am over the age of twenty-one and competent to make this Affidavit. I have personal knowledge of all the facts set forth herein and these facts are true and correct.

2.    I am the attorney in charge for the plaintiff, CSL Development Corporation, Inc. I have either attended or participated in all written and oral discovery in this case with the exception of the deposition of Lou Daleo. I attended the depositions of Ray Gallegos, Cate Stetson, and Dave Friedman. I attended the beginning of the deposition of Charles Liberis; but, left during the deposition and my co-counsel Joe Grant stayed for the remainder. I received the original depositions of Ray Gallegos, Cate Stetson and Dave Friedman. As of the date of this affidavit, the original of the depostion of Charles Liberis is with Mr. Liberis for his review and signature; however, I received a copy of such deposition.

1

3.    Attached as Exhibit "A" is a copy of the AGREEMENT TO CHARTER AND PURCHASE VESSEL.  This is a true and correct copy of the agreement that was attached to the deposition of Ray Gallegos as deposition Exhibit 36.  Another copy of the agreement was attached as deposition Exhibit 3.  At his deposition Mr. Liberis produced the Agreement with his signature dated Saturday, November 4, 2000.

4.    Attached as Exhibit "B" are true and correct copies of certain pages of the transcript I received from the court reporter of the deposition of Charles Liberis.

5.    Attached as Exhibit "C" are true and correct copies of both excerpts from the deposition of Ray Gallegos as well as certain deposition exhibits; namely numbers 1, 4, 21, 26, 29, and 32.

6.    Attached as Exhibit "D" are true and correct copies of certain pages of the deposition of Dave Friedman.

7.    Attached as Exhibit "E" are true and correct copies of certain pages of the deposition of Catherine Stetson.

8.    Attached as Exhibit "F" is an affidavit I received by facsimile on August 6, 2002, at 2:06 p.m.  The affiant is Wayne Marks.  When and if I receive the original of this affidavit, I will file it with the Court.



JOHN FLOOD

SWORN and SUBSCRIBED to before me, the undersigned notary public, on this ____ day of _____, 2002.

IRMA KAWAS CANTU
Notary Public
STATE OF TEXAS
Exp. 04-24-2006

_____
Notary Public in and for the State of Texas
County of Nueces

2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CSL DEVELOPMENT CORPORATION, INC. | § | |
| | § | |
| Complainant, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B01-059 |
| | § | JURY DEMANDED |
| GAIM-KO, INC. and RAY GALLEGOS | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# EXHIBIT "A":

# AGREEMENT TO
# CHARTER AND PURCHASE VESSEL

11/04/2000  21:29    7135322618                    COASTAL MARINE                              PAGE  01

# Coastal Marine

Coastal Passenger Vessels, LTD., LLP.
9363 Shady Lane Circle
Houston, Texas 77063

Serving the Maritime Gaming
& Passenger Vessel Industry

**TO:**      Charles Liberis

**FAX#:**    850-433-5409

**DATE:**    11-4-00

**RE:**      Galm-Ko Agreement

**FROM:**    Lou Daleo          PH: 713-532-2525              FAX: 713-532-2618

**EMAIL:**   ldaleo@coastalmarineltd.com    Web Page: www.coastalmarineltd.com

The following signed agreement, received last night, is being forwarded for your
signature. I noticed that the paragraph that was inserted concerning Brokers, has
again been deleted?



11/04/2000  21:29  7135322618                COASTAL MARINE                     PAGE  02
03-NOV-2000 10:10  FROM-STETSON LAW OFFICES       +305-256-5177     T-375  P 001   F-013

# AGREEMENT TO CHARTER AND PURCHASE VESSEL

This AGREEMENT TO CHARTER AND PURCHASE VESSEL ("Agreement") is dated as of this _____ day of November, 2000, between CSL Corporation, Inc., a Delaware corporation, with its principal place of business at Three Christina Centre, 201 N. Walnut Street, Wilmington, DE 19801 ("Owner"), and Gaim-Ko, Inc., a New Mexico corporation, with its principal office at 2403 San Mateo Blvd, NE, Suite W17, Albuquerque, NM 87110 ("Operator").

### Terms and Conditions

1.    <u>Charter</u>.  Owner agrees to let and Operator agrees to hire the vessel M/V Entertainer, O.N. 500051, built in Warren, Rhode Island in 1965, and converted at Bender ShipBuilding & Repair Co., Inc., Mobile, Alabama in January 1994, a U.S. registered ship ("the Vessel," which term shall include all gear, machinery, equipment, furnishings and other articles located on the Vessel ("Owner's supplied equipment"), specifically excluding casino equipment including but not limited to slot machines, gaming tables and cage equipment.)

2.    <u>Delivery; Closing; Charter Period; Extension Payments</u>.  The Vessel shall be delivered by Owner to Operator on the closing date ("Closing"), which shall be December 1, 2000.   A photo log will be taken to record the Vessel's delivery condition (for Owner's account).  The period that the Vessel is chartered hereunder (the "Charter Period") is for twelve (12) months commencing on the date of Closing. Operator has the option to extend the Charter for up to two additional twelve (12) month periods upon payment by Operator to Owner of Two-Hundred Fifty Thousand

Charter.Agmt/Rev 11/01/00 9:10 a.m.                1

Dollars ($250,000) per extension, in cash or cashier's check, on or before September 30, 2001 and 2002, respectively. All of the amounts of such extension payment(s), and one-half (½) of the additional charter payments, will be applied towards the Purchase Price.

3.   Inventory. Promptly after execution of this Agreement, an inventory shall be made jointly by Owner and Operator of all galley, salon, bar and public rooms furnishings that are to be available for Operator's use as of the date of delivery of the Vessel, and the inventory shall be signed by Operator and Owner at Closing and shall be attached hereto as Exhibit A. This inventory shall be maintained at Operator's expense, and any missing or damaged articles shall be replaced or paid for by Operator upon ten (10) days written notice from Owner.

4.   Charter Hire and Deposit. The Charter Hire shall be One Million Five-Hundred Thousand Dollars ($1,560,000) annually, payable in twelve (12) equal monthly installments of One-Hundred Thirty Thousand Dollars ($130,000.00) due on the 1st day of each month, beginning on December 1, 2000. In addition, Operator shall pay all applicable state and federal taxes resulting from the charter and operation of the Vessel, if any. The monthly Charter Hire payments and applicable taxes, if any, shall be paid by Operator in advance to Owner by wire transfer to Owner's account or by check as instructed by Owner in writing. Operator shall concurrently fax to owner evidence of each payment. One-half (½) of all Charter Hire payments will be applied towards the Purchase Price, defined below. All amounts expressed as dollars in this Agreement shall mean United States dollars.

Upon execution of this Agreement, Operator shall pay into an escrow with Coastal Marine for the benefit of Owner, the amount of One-Hundred Thirty Thousand Dollars ($130,000.00) plus applicable taxes to be applied as the first full month's Charter Hire. Such amount is fully refundable to Operator if the Pier Lease, hereafter defined, is not negotiated to Operator's satisfaction within one (1) week from execution hereof, in which event this Agreement shall be null and void. If the Pier Lease is timely negotiated to Operator's satisfaction, the $130,000 plus tax will be promptly paid to Owner and Owner will perform its obligations to dry dock and paint the Vessel, as more particularly described below. Once the $130,000 has been released from escrow it and all future deposits and payments of any nature shall be deemed earned and non-refundable.

5.    Purchase Price. The purchase price ("Purchase Price") of the Vessel is Four Million Dollars ($4,000,000). At Closing, Operator shall deliver or cause to be delivered the following:

5.1    The sum of Two-Hundred Fifty Thousand Dollars ($250,000) in cash or cashier's check, which shall be applied against the Purchase Price;

5.2    An executed promissory note ("Note") for the balance of the Purchase Price in the amount of Three Million, Seven Hundred Fifty Thousand Dollars ($3,750,000), plus interest thereon at the rate of six percent (6%) per annum, which shall be payable as follows:

5.2.1    An installment of Two-Hundred Fifty Thousand Dollars ($250,000) plus interest due on or before April 1, 2001;

      5.2.2   Monthly payments of Sixty-Five Thousand Dollars ($65,000), representing one half (½) of each Charter Hire payment, beginning on December 1, 2000 and on the first of every month thereafter of the Charter Period or any extension thereof until the principal balance is paid in full;

      5.2.3   The sum of $2,720,000 plus interest on November 30, 2001. Operator may make prepayments of principal all of which will be credited towards the purchase price.

5.3    The certificates of insurance required as described more fully below; and

5.4    The promissory note as well as the full and complete performance of this Agreement shall be secured by a valid first lien on Operator's property, as described in the attached Exhibit B. Such lien shall automatically expire on May 31, 2001, if Operator is not in default under this Agreement. The liened property shall be stored at a location acceptable to Owner and Operator.

6.    **Purchase**. If Operator has fully and completely performed its payment and other charter obligations under this Agreement, it may at any time during the Charter Period or any extension thereof, without prepayment penalty, exercise its right to purchase the Vessel by paying the balance of the Note then owing to Owner, including all interest and charges, if any, accrued thereon.

Charter.Agrmt/Rev 11/01/00 9.10 a.m.        **4**

7.   Drydocking by Owner.  After the execution of this Agreement and release of the earnest money from escrow, Owner shall, at Owner's expense, dry dock the Vessel for the purpose of sandblasting and repainting the bottom and painting the hull 12 inches above the waterline.

8.   Operator's Inspection and Owner's Warranties.  At Closing, Owner shall, at Owner's sole expense, provide to Operator a current marine survey, U.S. Coast Guard certification, and ABS Load Line certification for its Port of Operation, all indicating that the Vessel is technically ready to trade in U S. waters    Certifications for Operator's crew, safety inspection, and inspection by OCMI for Certificate of Inspection at time of recertification or at new port of operation are Operator's responsibility.

Operator unconditionally accepts the Vessel by execution of this Agreement, and Operator understands and agrees that, except as it otherwise provided in this Agreement, the charter and purchase are on an "as is" basis, and that no warranty either real, expressed, or implied, and no representation as to condition, seaworthiness, merchantability or fitness for any purpose or use in any trade whatsoever of the Vessel (including among other uses gambling activities), including but not limited to whether current or future United States Federal or State law or regulations, will permit the Vessel to operate for Operator's intended purposes as a day cruise vessel in its intended area of operation, has been given by Owner or its authorized representatives.

It is further agreed that the Owner shall have no responsibility for any incidental, special or consequential damages or any other damages of any nature whatsoever

arising from this Agreement or from negotiations relating to this Agreement, including, without limitation, damages for lost profits or personal injury, which result or are claimed to result from any defect, failure, fault, or condition in the Vessel or related assets.  The warranties set forth in this Agreement are in lieu of all other warranties, whether express or implied or statutory, and there are no warranties which extend beyond the description on the face hereof.  Upon execution of this Agreement, Operator confirms that it has not relied on any representation of Owner (Owner's representation) or Broker regarding this Vessel or the business of the Vessel and has decided to charter the Vessel based upon its own investigation.  Operator waives its right to any *in rem* claim against the Vessel that may arise under or as a result of this Agreement.

9.    <u>Mortgages: Retention of Title</u>.  Not withstanding anything herein or elsewhere contained to the contrary, it is specifically agreed to by the parties that title to the Vessel shall remain in owner until such time as all obligations of Operator shall have been fully performed.  The Vessel is subject to a First Preferred Ship's Mortgage in favor of Bank of Pensacola ("Mortgagee").  Operator shall, at execution hereof, execute a Second Preferred Ship's Mortgage in favor of Owner to secure the payments due hereunder.  This Agreement shall be subject and subordinate to the Mortgage.  Owner shall deliver to title to the Vessel free and clear of all mortgages at the time the Purchase Price, plus any accrued interest, is paid in full.  It is specifically agreed to by the parties that title to the Vessel shall remain in Owner until such time as all obligations of Operator shall have been fully performed.

10.    <u>Use of Vessel.</u>  The Operator, having already inspected the Vessel, is satisfied that the Vessel is suitable for its required purpose, and the Operator is responsible for

obtaining from the authorities necessary approvals to operate the Vessel in its proposed area of operations and for its intended purpose. The Vessel shall not carry more passengers or cargo than can lawfully and safely be carried and shall not in any event exceed the number of passengers as stipulated by local and survey authorities. Cargo capacity is limited to passengers personal luggage only. The Vessel shall not sail in any territorial waters outside the United States. Vessel shall only operate out of South Padre Island, Texas ("Port of Operation") as may be permitted by its then current survey, and shall be restricted to voyage within the number of miles from shore as permitted by its then current survey.

11.   **Risk of Loss Prior to Delivery**. The risk of loss, damage or destruction of the Vessel shall be borne by Owner prior to Delivery. If there is no Delivery due to loss, damage or destruction of the Vessel, any monies paid by Operator shall be returned to Operator, and this Agreement shall be deemed null and void.

12.   **Documentation**. Throughout the Charter Period, Operator at its expense will maintain the registration and documentation of Vessel in Owner's name under the laws and regulations of the United States. Owner will, at the expense of Operator, execute such

documents and furnish such information as Operator may reasonably require to enable Operator to obtain and maintain the documentation of the Vessel, and Operator will not permit the Vessel to be registered or documented or operated under any flag other than that of the United States ....... or permit to be done anything that might injuriously affect or prejudice in any way the registration and documentation of the Vessel under the laws and regulations of the United States. Owner will not change the Port of Documentation of the Vessel.

11/04/2000  21:29    7135322618    COASTAL MARINE    PAGE  09
03-NOV-2000  10:16    FROM-STETSON LAW OFFICES    +505-256-5177    T-375  P 008/035  F-013

13.  <u>Maintenance</u>. Operator shall have full responsibility for maintenance and repair of the Vessel and all of its fixtures, furnishings and equipment throughout the Charter period and at its expense will

13.1  maintain and preserve the Vessel and maintain and preserve or replace Owner's supplied equipment to the end that (i) the Vessel and her equipment will at all times during the Charter Period be in the same condition, running order and repair as on Delivery, reasonable wear and tear excepted, and (ii) the Vessel shall be tight, staunch, strong and well and sufficient tackled, appareled, furnished, equipped and in every respect as seaworthy and in as good operating condition as at Delivery, and

13.2  cause the Vessel to be overhauled, drydocked, cleaned and bottom-painted as may be required to maintain the Vessel in class to maintain its load line certificate and in compliance with all regulatory and survey requirements. (c) cause the Vessel to undergo surveys as may be required by the Vessel's underwriters and promptly comply with all recommendations and requirements resulting from each survey.  Operator will notify Owner of each proposed drydocking as far in advance as practicable. Operator must receive Owner's prior written approval, which approval will not be unreasonably withheld, both as to scope of work and as to the designated shipyard.  Owner in its sole discretion may appoint a supervisor to represent the Vessel while in dry dock. The cost of said representative, if any, shall be paid by Operator.  All replacements to Owner's supplied equipment placed on or installed in the Vessel shall be of identical or superior quality, free and clear of all liens,

encumbrances and rights of others and shall immediately become the property of Owner and be subject to this Agreement.

14.   Repair.  Operator will permit representatives of Owner at any time and without notice to inspect the Vessel and the Vessel's logs, papers and cargo but in such a manner as to not unduly disrupt the operations of the Vessel.  All reasonable expenses in connection with any such inspection shall be paid by Operator.  Operator agrees to undertake at its expense to perform any repair work that in Owner's reasonable opinion is necessary.  Without limitation, any repair or maintenance requested by Owner shall be deemed reasonable and shall be performed promptly if:

14.1   Requested by the Insurance Carrier, U.S. Coast Guard, the American Bureau of Shipping or any other regulatory agency having jurisdiction over the Vessel.

14.2   As to any matter affecting the hull, stability, passenger safety or comfort to a standard that existed on the date of this Agreement as determined by Boris Kirilloff, the Naval Architect who supervised conversion of the Vessel or if not available, another Naval Architect selected by Owner.

14.3   As to any matter relating to the maintaining of the running gear and machinery of every nature including but not limited to engines, generators, mechanical, electrical, plumbing, and HVAC to a standard that existed on the date of this Agreement as determined by International Marine Diesel Specialists, Inc., Ft. Lauderdale, Florida, independent Marine consultants or if not available, another marine consultant selected by Owner.

15.   Relocation Expenses. All of the preparation expenses for relocating the Vessel and all of the expenses incurred in relocating the Vessel shall be paid by Operator.

16.   Payment of Taxes and Compliance with Governmental Laws and Regulations. All applicable state and federal taxes on the Charter Hire payments, and taxes that may be imposed as a result of the operation or from income earned by Operator, are the sole responsibility of Operator, and Operator shall indemnify, defend and hold Owner harmless from payment of same and shall not permit any lien to be imposed against the Vessel with regard to the same. Any and all taxes that may be imposed against Owner as a result of income earned by Owner (except for sales tax on the Charter) are the responsibility of Owner, and Owner shall indemnify, defend and hold Operator harmless from payment of same and shall not permit any lien to be imposed against the Vessel with regard to the same. Any duties, taxes or fees on the Vessel of any country, state, city, regulatory or taxing authority incurred prior to the date of this Agreement shall be the responsibility of the Owner, and validation of such payment is the responsibility of Owner. Any duties, taxes, or fees of the Vessel, incurred on or after the date of this Agreement shall be the responsibility of Operator, and validation of such payment is the responsibility of Operator. Further, Operator warrants that it shall comply with all operational requirements imposed by any governmental agency or law of the United States including but not limited to surveys or other inspections.

It shall be Operator's responsibility to comply with all United States Federal, State and local laws and regulations relating to crew manning and operation of the Vessel, including compliance with all drug and alcohol regulations.

Charter Agmt/Rev 11/01/00 9:10 a.m.                    10

Operator warrants that, during the Charter Period and any extensions thereto, the Vessel will comply with all applicable U.S. Federal and State laws and regulations relating to navigation, pollution and safety, including, but not limited to, the U.S.C.G. Regulations contained in Titles 33 and 46 of the Code of Federal Regulations, as amended, and will reimburse Owner for any expenses, insurance premiums, costs of modifications to the Vessel, or other costs that Mortgagee and/or Owner may incur in complying with such laws and regulations.

17.   <u>Assignment.</u>  Operator shall not assign this Agreement nor transfer possession or control the Vessel or cause a change in control in or of Operator or of management except with the prior consent in writing of Owner.  Operator may not sub-let the Vessel.

18.   <u>Officers and Crew.</u>  During the Charter Period, Operator shall provide and pay the master and such other officers and seamen as required by the authorities and governments that shall have jurisdiction in the areas in which the Vessel is to be operated and, in any event, a sufficient complement of master, officers and seamen as shall be required for the safe and efficient operation of the Vessel.  The Operator shall at all times indemnify and keep indemnified, and hold harmless and defend Owner and Mortgagee and their servants or agents from any actions, proceedings, claims or demands made against them or any one of them by any master, officer or crew member of the Vessel for crew's wages, salvage or otherwise.  The senior captain, marine manager and chief engineer shall be employees of Owner.  Their salary will be reimbursed to Owner by Operator or at Owner's sole option paid by Operator directly to the employee.

19.  Working Expenses. Operator shall provide and pay for all provisions, fuel oil, greases and other consumables and shall pay all port charges, pilotage, agencies, commissions and all other charges whatsoever.

20.  Liens Against Vessel. During the Charter Period or any extension thereto, neither Operator nor its agents, nor the Master of the Vessel, shall have any right, power, or authority to create, incur, or permit to be imposed upon the Vessel any liens whatsoever except for crews' wages and salvage. Operator agrees to carry a properly certified copy of this Agreement, and any addendum thereto, with the ship's papers. In no event shall Operator procure or permit to be procured for the Vessel any supplies, necessaries or services, except for crew services and salvage, without previously obtaining a statement signed by an authorized representative of the furnisher thereof acknowledging such supplies, necessaries or services are being furnished on the credit of Operator and not on the credit of the Vessel or her Owner or Mortgagee, and that the furnisher claims no maritime lien against the Vessel, and therefore waives any such lien that may arise from operation of law or customer, usage and practice. Operator shall notify any person furnishing repairs, supplies, towage, or other necessaries to the Vessel that neither Operator, its agents, nor the Master, has any right to create, incur, or permit to be imposed upon the Vessel any liens whatsoever. Such notice shall be in writing with copy to Owner. Operator further agrees to fasten to the Vessel at all points of entrance, in the engine room, the wheelhouse, and other locations in the Vessel where notices are normally displayed, and to maintain during the life of this Agreement, a conspicuous notice reading as follows:

"This Vessel is the property of CSL Development Corporation.
It is under charter to Gaim-Ko, Inc., and by the terms of the
Charter Agreement, neither Gaim-Ko, Inc., nor the Master, nor
anyone in possession of the Vessel has any right, power, or
authority to create, incur, or permit to be imposed upon the
Vessel any liens whatsoever."

Should any lien or liens, excluding the permitted Mortgages described above, be
placed against the Vessel for any reason whatsoever including but not limited to
crew's wages, salvage, or otherwise, Operator is responsible and agrees at its expense
and cost to discharge and eliminate any and all such liens within 24 hours of
placement of said lien. Failure to do so may, at Owner's option, result in immediate
termination of this Agreement. Operator waives any lien it currently has or may have
in the future against the Vessel.

21.    Survey.

21.1    The Vessel is a U.S. registered Vessel as evidenced by the Survey Certificate
provided to Operator.  The Vessel shall remain a U.S. registered ship.

21.2    After Delivery, Operator shall be responsible for keeping the Vessel in survey
and in obtaining the necessary approvals from the surveying authorities,
depending on its area of operation. The Vessel shall be dry docked as required
by the authorities, and during that period the Operator shall pay all costs and
expenses of the dry docking and survey.

22.    <u>Change of Name</u>. Operator shall have the right, at its expense, to rename and to change the name of the Vessel, to paint the Vessel it its own colors, to install and display its tack insignia, and to fly its own house flag. Owner will, at the cost and expense of Operator, cooperate in the execution and filing of any documents necessary to affect a change in the name of the Vessel. At time of redelivery to Owner, Operator, at its expense, shall return Vessel to its original colors, flag and name.

23.    <u>Owner Cooperation</u>. Operator intends to operate the Vessel as a day cruise vessel on voyages out of the Port of Operation. Operator will be required to obtain necessary approvals from United States governmental authorities, including the United States Coast Guard, for operation of the Vessel. Owner shall fully cooperate and assist Operator, as reasonably necessary, with regard to Operator's dealings with such authorities. Such cooperation shall include Owner's making the Marine Manager or other appropriate representative of Owner reasonably available at mutually convenient times and places for meetings with such authorities, provided however that Operator shall pay a reasonable fee and reasonable travel expenses, including lodging and meals of Owner's representatives.

24.    <u>Security Bonds</u>. Any security bonds or deposits required by the governments or other authorities in the area of operation shall be provided by Operator, and all costs and expenses incurred in providing such shall be met by Operator.

25.    <u>Area of Operation</u>. The Vessel shall be employed only in lawful trade and carriage of passengers from the Port of Operation only. Further, the Vessel may only be operated in such areas or in such parts of that area in which the Vessel can be safely

Charter.Agmt/Rev 11/01/00 9:10 a.m.                    14

operated and can always safely lie afloat and within the limits imposed by the authorities under which the Vessel is registered.

26.     Notice of Loss, Requisition, Liable, Sale, Casualties.  In the event of

   26.1    actual total loss of the Vessel,

   26.2    requisition of the use of or title to, or seizure of, the Vessel by any governmental authority or persons acting under the color thereof,

   26.3    the filing of any libel against the Vessel, or the attachment, levying upon, detection, sequestration or taking into custody of the Vessel in connection with any proceeding,

   26.4    Marshal's or other sale of the Vessel, or

   26.5    any casualty, accident or damage to the Vessel,

Operator will immediately give verbal notice thereof (containing full particulars) to Owner and Mortgagee, and within 24 hours give written notice by facsimile and registered mail.

27.     Insurance.

   27.1    Hull & Machinery.  During the term of this Agreement, the Vessel and Owner's supplied equipment shall be kept insured by Operator at its expense against Fire, Collision, Hull, Machinery, Salvage marine and War Risks in the

11/04/2000  21:29    7135322618              COASTAL MARINE                   PAGE  18
03-NOV-2000  19:21  FROM-STETSON LAW OFFICES      +805-256-5177      T-375  P 016/039  F-813

names of Operator, Owner and Mortgagee, as their interests may appear. The hull and machinery insurance coverage shall be for an amount no less than Six Million Five-Hundred Thousand Dollars ($6,500,000) and for on-board gambling equipment in the amount no less than Seven-Hundred Thousand Dollars ($700,000) with a carrier acceptable to Owner exclusive of coverage for any equipment owned or leased by Operator. Operator, at its expense, shall carry appropriate personal property insurance with a carrier reasonably suitable to Owner for any equipment owned or leased by operator in an amount equal to its fair market value.

27.2  Protection and Indemnity. Operator shall purchase Protection and Indemnity Insurance with a carrier acceptable to Owner in the names of Operator, Owner and Mortgagee as their interests may appear, in an amount not less than U.S. Ten Million Dollars ($10,000,000.00), the cost of which shall be payable by the Operator. Deductibles, if any, shall not exceed Five Thousand Dollars ($5,000). Operator shall be responsible for the deductible on any insurance claim for injury to anyone on the vessel including but not limited to employees, independent contractors, concessionaires, passengers and guests.

27.3  Carrier and Coverage. The insurances shall be underwritten by a first class insurer who shall be approved by Owner and Mortgagee, and Certificates of Currency showing Owner's and Mortgagee's interest shall be supplied to Owner and Mortgagee. The above insurance shall include both an Innocent Owner's Interest Clause and a Loss Payable and Non-Cancellation Clause in forms acceptable to Owner.

28.    <u>War</u>.

    28.1   Unless Owner's consent in writing be first obtained, the Vessel shall not be
ordered to voyage to nor continue to any place or on any voyage nor be used
on any service which will bring the Vessel within a zone which is dangerous
as a result of any actual or threatened act of war, war-like operations, acts of
piracy or hostility, revolution, civil war, civil commotion or the operation of
international law, nor be exposed in any way to any risks or penalties
whatsoever consequent upon the imposition of sanctions, nor carry goods that
may in any way expose the Vessel to any risks of seizure, capture, penalties or
any other interferences of any kind whatsoever by belligerent or fighting
powers or parties or by governments or rulers.

    28.2   Should the Vessel approach or be brought or ordered within such zone or be
exposed in any way to the said risks, the Charter Hire payments shall be paid
for all the time lost, including any loss owing to loss or injury to the Master,
officers or crew or to the action of the crew in refusing to proceed to such zone
or to be exposed to such risks.

    28.3   Operator shall have the liberty to comply with any orders or directions as to
departure, arrival, routes, ports of call, stoppages, destinations, delivery or in
any other ways whatsoever given by any government or any person or body
acting or purporting to act with the authority of such government of by any
committee or any persons having under the terms of the way risk insurance on
the Vessel the right to give such orders or directions.

09-NOV-2000  10:22    FROM-STETSON LAW OFFICES          +805-258-5177          T-375  P 018/035  F-013

29.    Salvage.  Operator will not permit the Vessel to be used in salvage operations of any
       nature save as required by law.  All delays occasioned by attempting or rendering
       towage or salvage services as required by law or repairing damage occasioned thereby
       shall be borne by Operator, and all benefits arising from such salvage operations shall
       be for Operator's sole benefit.

30.    Modification.  During the term of this Agreement or any extension thereof, Operator
       shall not modify or alter the Vessel in any respect without the prior approval of
       Owner in writing, which consent (in case of minor and not structural modifications)
       shall not unreasonably be withheld.  Any modifications or alterations to the Vessel
       agreed by Owner shall be carried out to a standard approved by Owner and the Survey
       authorities, and the cost and expenses incurred in such modifications or alterations
       shall be paid by Operator.

31.    Affirmative Representations of Operator:  As an inducement for Owner to enter into
       this Agreement, Operator makes the following representations:

       31.1    Neither Owner nor Charles S. Liberis, or broker or any of their representatives
               have made any representations regarding the legality, viability, or profitability
               of operating the Vessel.

       31.2    All financial projections provided by Owner to Operator were hypothetical, for
               discussion purposes only, and not relied on by Operator in making its business
               decision to enter into this transaction.

03-NOV-2000  10:22     FROM-STETSON LAW OFFICES                    +585-258-5177     T-375  P 018/035  F-013

31.3   Either Operator nor any of its directors, officers, or stockholders, is under investigation for, has ever been indicted, charged or convicted of a felony of any nature or a misdemeanor involving gambling.

32.   <u>Corporate Authority</u>.  Operator and Owner warrant that they each have the power and authority to enter into this Agreement and all other documents executed, received or delivered hereunder.  Each represents that all necessary corporate and stock owner action has been to authorize and direct the execution hereof by Operator and Owner and to consummate this transaction, and that Operator shall obtain, as required, permits and approvals in accordance with all governmental regulatory requirements.

33.   <u>Conveyance of Personalty</u>.  As additional consideration for this Agreement, Operator does hereby grant and convey to Owner all of the personalty, currency, food, liquor stores, furniture, equipment, fixtures, of every kind and nature presently on the Vessel and any additions and replacements thereof (the "personalty") brought upon the Vessel during the period of this Agreement or any extensions thereto.  Owner grants to Operator the right to the use of the personalty during the term of this Agreement upon the condition precedent that Operator is in compliance with each of the terms and conditions of this Agreement and further conditioned on Operator's promptly replacing all personalty so used.

34.   <u>No Set-Off</u>.  No payment of Charter Hire or other payment required to be made by Operator by the terms of this Charter shall be subject to any right of set-off, counterclaim, defense, abatement, suspension, deferment or reduction, and Operator shall have no right to terminate this Agreement (except as expressly provided herein)

03-NOV-2000  10:22    FROM-STETSON LAW OFFICES             +505-256-5177      T-375  P 028/036  F-813

or to be released, relieved or discharged from any obligation or liability hereunder for any reason whatsoever, including without limitation:

34.1    any damage to, or loss, requisition, seizure, forfeiture or Marshal's or other sale of the Vessel;

34.2    any libel, attachment, levy, detention, sequestration or taking into custody of the Vessel, or any restriction of or prevention of or interference with the use of the Vessel; or

34.3    any title defect or encumbrance or any disposition from the Vessel not by reason of some act, omission or breach on the part of Owner or a third party, whether or not resulting from accident and whether or not without fault on the part of Operator, Operator will continue to make all payments required of Operator by the terms of this Agreement without interruption or abatement.

35.    **Events of Default: Retaking.**

35.1    If any of the following events ("Events of Default") shall occur, namely, if

35.1.1 Operator shall fail to pay any Charter Hire or additional payments on Purchase Price on the due dates hereof, or

35.1.2 Operator shall fail to perform or comply with any of the provisions of this Agreement,

then and in such event, Owner may, at its option, immediately withdraw the Vessel from the service of Operator upon giving written notice to Operator, without compensation of liability to Operator and without prejudice to any claim for damage suffered or to be suffered by reason of any such default which Owner might otherwise have had against Operator in the absence of such withdrawal, and, upon the giving of such notice, retaking this Vessel, wherever found, whether upon the high seas or in any port, harbor or other place, without prior demand and without legal process, and for that purpose enter upon any dock, pier or other premises where the Vessel may be and take possession thereof, or require Operator, at Operator's expense, forthwith to redeliver the Vessel to Owner and/or exercise any rights and privileges Owner may have in law and/or in equity.

35.2    Upon the occurrence of an Event of Default and at any time thereafter so long as the same shall be continuing, Owner may, at its option, upon ten (10) days written notice to Operator, declare Owner to be in default; and at any time thereafter, so long as Operator shall not have remedied all outstanding Events of Default, Owner may do, and Charterer shall comply with, one or more the following, as Owner in its sole discretion shall so elect to the extent permitted by, and subject compliance with any mandatory requirements of applicable law then in effect:

35.2.1 Upon written demand, Owner may cause Operator at Operator's expense to, and Operator hereby agrees that it will, promptly redeliver the Vessel, or cause the Vessel to be redelivered, to Owner with all reasonable dispatch and in the same manner and in the same condition

as if the Vessel were being redelivered at the expiration of the Charter Period in accordance herewith, and all obligations of Operator shall apply to such redelivery; or Owner or its agent, at Owner's option without further notice, may, but shall be under no obligation to, retake the Vessel where ever found, whether upon the high seas or at any port, harbor or other place and irrespective of whether Operator, any suboperator or any other person may be in possession of the Vessel, all without prior demand and without legal process, and for that purpose Owner or its agent may enter upon any dock, pier or other premises where the Vessel may be and may take possession thereof, without Owner or its agent incurring any liability by reason of such retaking, whether for the restoration or damage to property caused by such retaking or otherwise.  Operator, to induce Owner to enter into this Agreement, covenants not to sue Owner or Owner's agents or assert as an affirmative defense in any litigation Owner or Owner's agents anything that is related or connected with Owner or Owner's agents fulfilling any of the above purposes.

35.2.2 Owner, by written notice to Operator, may require Operator to pay to Owner, and Operator hereby agrees that it will pay to Owner, all unpaid Charter Hire payments as liquidated damages for loss of a bargain and not as a penalty,  plus interest on such amount at the rate of 10% per annum, from the payment date specified in such notice to the date of actual payment.

35.2.3 Owner, by written notice to Operator, may accelerate all payments due under the promissory note.

36.   Assignment of Pier Lease. Operator does hereby assign, transfer and set over unto the Owner, with the right to reassign all of its rights, title and interest in and to the lease and in and to the demised premises and berth located at the Sea Ranch Pier ("Pier Lease"); it being expressly understood and agreed that this assignment of the Pier Lease is made by Operator to Owner upon the following terms, covenants, limitations, and conditions:

36.1   Operator shall retain possession of the leased premises in accordance with the terms and conditions of the Pier Lease so long as no default is made in this Agreement.

36.2   If default be made by Operator in the performance of this Agreement, then Owner shall have the option of taking over the leased pier premises, provided, however, that in the event Owner elects to exercise said option of taking over the demised premises for the purpose of operating the same, written notice of its election so to do shall be mailed promptly by Owner to Lessor. Upon the exercise of such option, Owner shall be deemed to be substituted as the Lessee in said Pier Lease in the place and instead of Operator, and shall be deemed to have assumed expressly all of the terms, covenants, and obligations of the Pier Lease theretofore applicable to Operator, and shall likewise be entitled to enjoy all of the rights and privileges granted to Operator under the terms and conditions of the Pier Lease, with the right to reassign same.

36.3    It is understood and agreed that so long as Owner shall not have exercised its option under the foregoing provisions hereof as to the leased pier premises, Owner shall not be liable for rent or any obligation of Operator under and by virtue of or in connection with the Pier Lease, and Operator shall remain liable for such rent and obligations.

36.4    As a condition precedent to this Charter taking effect, Lessor shall execute its approval in form satisfactory to Owner.

37.    <u>Termination of Agreement and Turnover</u>. In the event that this Agreement terminates for any reason whatsoever, other than by Operator exercising and closing on its option to purchase the Vessel, including but not limited to, termination of the Charter Period or any extensions thereof, or upon a material default by Operator hereunder, then in that event, Operator at Owner's sole option, shall use reasonable efforts to deliver and turn over the business conducted on the Vessel as a going concern and without disruption in service ("the Turnover"). The Turnover shall include but not be limited to:

37.1    Operator's delivery to Owner of the name, address and pay schedule of each employee;

37.2    Operator's granting a release of any employee who will not be employed by Operator or its affiliates from any contractual arrangement that would prevent said employee from being employed by Owner;

37.3    All customer lists and rating cards;

37.4    All mailing lists;

37.5    An assignment of all telephone numbers and yellow page listings;

37.6    All advertising promotion and collateral material;

37.7    An assignment of all media contracts;

37.8    All software including but not limited to reservations and accounting software;

37.9    Group sales lists, lead lists and existing group contracts;

37.10  Operating manuals;

37.11  Internal controls; and

37.12  Employee procedure manuals.

38.    **Right of First Refusal.**  In the event that Operator elects for the business to be turned over, then in that event, Owner shall have the right of first refusal for a period of thirty (30) days to purchase at a mutually agreed upon fair market value, all furniture, fixtures and equipment used by Operator in the conduct of the business.

39.    **Remedies Cumulative.**  Each and every power and remedy herein given to Owner or otherwise existing shall be cumulative and in addition to every other remedy herein so given or now or hereafter existing at law, in equity, in admiralty, or under statute,

03-NOV-2000  18:24    FROM-STETSON LAW OFFICES             +505-256-5177        T-375  P 026/039  F-813

and each and every power and remedy, whether herein so given or otherwise existing, maybe exercised from time to time and as often and in such order as may be deemed expedient by Owner, and the exercise, or the beginning of the exercise, of any power or remedy shall not be construed to be a waiver of the right to exercise at the same time, or thereafter, any other right, power or remedy. No delay or omission by Owner in the exercise of any right or power or in the pursuit of any remedy shall impair any such right or be construed a waiver of any default or to be an acquiescence therein.

Owner shall be liable for any and all additional hire payable hereunder before, during or after the exercise of any of the available remedies and for all reasonable legal fees and any other reasonable costs and expenses whatsoever incurred by Owner by reason of the occurrence of any Event of Default or by reason of the exercise by Owner of any remedy hereunder, including, without limitation, any reasonable costs and expenses incurred by Owner in connection with retaking of the Vessel, or upon the redelivery or taking of the Vessel, or the placing of the Vessel in the condition and seaworthiness required by the terms hereof. No remedy referred to in this Section is intended to be exclusive, but each shall be cumulative and is in addition to, and may be exercised concurrently with, any other remedy that is referred to in this section or that may otherwise be available to Owner at law, in equity or in admiralty; provided, however, that liquidated damages having been agreed to by the parties hereto, Owner shall not be entitled to recover from Operator as damages for the Vessel upon the occurrence of one or more Events of Default an amount in excess of such liquidated damages for the Vessel plus costs and expenses referred to in the following subsection hereof as may be incurred by Owner in connection with the occurrence of such Event or Events of Default. The rights of Owner and the obligations of Operator under this Section shall be effective and enforceable regardless of the pendency of any

proceeding that has or might have the effect of preventing Owner or Operator from complying with the terms of this Charter. No express or implied waiver by Owner of any Event of Default shall in any way be, or be construed to be, a waiver of any further or subsequent Event of Default.

Operator and R.A. Gallegos, personally, shall be liable for payment of any deficiency after retaking of the Vessel by Owner subsequent to default by Operator. Owner shall be entitled to exercise all legal rights upon the Guarantor whether under this Agreement, the Promissory Note or the Secured Ship Preferred Mortgage of this Agreement prior to bringing any civil action against Operator seeking to collect any amounts due hereunder.

40.    **Operator's Obligation Unconditional**. Operator's obligation to pay all charter hire and other amounts payable hereunder shall be absolute and unconditional under any and all circumstances and shall not be affected by any circumstances of any character, including, without limitation the following: (i) any defect in the title, seaworthiness, condition, design, operation or fitness for use of the Vessel or the ineligibility of the Vessel for any particular trade, (ii) any loss or destruction of, or damage to, the Vessel or interruption or cessation in the use or possession thereof by Operator for any reason whatsoever and of any whatever duration, (iii) the ineligibility of the Vessel for documentation under the laws or flag of any nation or to engage in the United States coastwise trade for any reason, (iv) any insolvency, bankruptcy, reorganization or similar proceeding by or against Operator or (v) any other circumstance or happening whatsoever whether or not similar to any of the foregoing. Operator hereby waives, to the extent permitted by applicable law, any and all rights that it may now have or that at any time hereafter may be conferred upon it by statute or otherwise, to

terminate, cancel, quit or surrender the charter of the Vessel hereunder except in accordance with the express terms hereof.  If for any reason whatsoever this Agreement shall be terminated in whole or in part by operation of law or otherwise except as specifically provided herein, Operator nonetheless agrees to pay to Owner an amount equal to each hire payment at the time such payment would have become due and payable in accordance with the terms hereof had this Agreement not been terminated in whole or in part.  Each payment made by Operator hereunder shall be final, and Operator will not seek to recover all or any part of such payment from Owner or any assignee of Owner for any reason whatsoever.

41.    Owner May Cure Defaults: Reimbursement of Expenses.  If Operator shall fail to perform or observe any of the terms of this Agreement, Owner may, in its discretion, do all acts and make all expenditures necessary to remedy such failure, including without limitation, the taking out of insurance on the Vessel and entry upon the Vessel to make repairs, and Operator shall promptly reimburse Owner, with interest at the rate of 10% per annum for any and all expenditures so made; but Owner, though privileged so to do, shall be under no obligation to Operator to do any such act or make any such expenditures nor shall the making thereof relieve Operator of any default in that respect.  Operator will also reimburse Owner promptly, with interest at the rate of 10% per annum for any and all expenditures made by Owner at any time in withdrawing the Vessel from service of Operator or otherwise protecting its rights hereunder and for any and all damages sustained by Owner from or by reason of any default or defaults of Operator.

42.    Purchase of Fuel and Inventory.  Operator shall purchase from Owner the fuel on the vessel at the time of the closing at the cost price thereof to Owner, and Operator shall

Charter.Agree/Rev 11/01/00 9:10 a.m.                    28

pay Owner for the same at the time of delivery of the Vessel. The written statement of the Marine Manager as to the amount of fuel on the Vessel at such time shall be accepted as conclusive by the parties. Operator shall purchase all unopened liquor and groceries, unopened food stuffs, paper and plastic goods, stores, disposables, oils, lubricants, and other operating inventories on the Vessel from Owner at Owner's invoiced cost.

43.    Indemnity. Operator shall at all times indemnify and keep indemnified, and hold harmless and defend Owner and Mortgagee and their servants or agents from any actions, proceedings, claims or demands made against them or anyone of them by any passenger, servant or agent or guest of Operator arising out of any act of any passenger, servant, agent or guest of Operator.

Should the Vessel be arrested, confiscated or detained as a result of the act or omission of Operator or of the unlawful use of the Vessel by Operator during the Charter Period or any extension thereto, Operator indemnifies Owner against all costs, expenses and damages sustained by Owner resulting from such arrest, confiscation or detention. Operator shall take all steps reasonably required to insure that no illegal drugs or other substances are transported aboard the Vessel, whether by crew, passengers or otherwise. Such steps shall include, but not be limited to, the adoption of policies specifically prohibiting the use or carriage of illegal drugs aboard the Vessel and publicizing such policies to passengers and crew.

44.    Insolvency of Operator. The filing of any petition in bankruptcy, or the adjudication of Operator as a bankrupt or insolvent, or the appointment of a receiver or trustee to take possession of all or substantially all of the assets of Operator, or a general

03-NOV-2000  10:25    FROM: STETSON LAW OFFICES         +305-298-9177    T-373  P 030/039  F-012

assignment by Operator for the benefit of creditors, or any action taken or suffered by Operator under any state or federal Insolvency or Bankruptcy Act shall constitute a breach and a default of this agreement by Operator, and in such event Owner may at its option terminate this Agreement and exercise any and all of its rights as set forth in this Agreement.

It is understood and agreed that neither this Agreement, nor any interest herein or hereunder, nor any estate created hereby, shall pass by operation of law under any state or Federal Insolvency or Bankruptcy Act to any trustee, receiver, assignee for the benefit of creditors, or any other person whatsoever without the prior express written consent of Owner and Mortgagee. Any purported transfer in violation of the provisions of this paragraph shall constitute a breach and a default of this Agreement, and in such event Owner may at its option declare this Agreement terminated and exercise any and all of its rights and remedies as set forth in this Agreement.

45.    <u>Applicable law</u>.  The interpretation of this Agreement shall be governed by the general maritime law of the United States.  All non-maritime issues of law will be decided by application of Florida law.  Neither party hereof shall be considered the drafter of this Agreement.  While Owner and Operator have no authority to confer jurisdiction upon any court that does not have jurisdiction over a dispute, both consent to *in personam* jurisdiction of the United States District Court for the Northern District of Florida for enforcement of this Agreement.

46.    <u>Notices</u>.  All notices, requests, demands or other communications to or upon the respective parties hereto shall be deemed to have been duly given upon the date of delivery, if sent by courier or overnight delivery; seven (7) business days after

08-NOV-2000  10:25    FROM-STETSON LAW OFFICES              +505-256-5177        T-375   P 031/035   F-913

dispatch if set by prepaid registered post; or one (1) business day after dispatch if made by confirmed telex, cable or facsimile transmission to the party to which such notice, request, demand or other communication is required or permitted to be given or made under this Agreement.  Such notices, request, demands, or other communications shall be addressed as follows:

If to the Owner:      CSL Development Corporation
                      c/o Edward M.  Luria, Esquire, Trustee
                      918 Sixteenth Street, N.W., Suite 200
                      Washington DC 20006


                      And


                      Charles S. Liberis
                      1610 Barrancas Avenue
                      Pensacola, Florida 32501


If to the Operator:   R.A. Gallegos
                      2403 San Mateo Blvd, NE, Suite W17
                      Albuquerque, NM 87110


47.    <u>Time</u>. This is of the essence for the performance of all obligations and the satisfaction of all conditions of this Agreement.


48.    <u>Attorneys' Fees</u>.  Should any party hereto employ an attorney for the purpose of enforcing or construing this Agreement, or any judgment based on this Agreement,

03-NOV-2000  10:28    FROM-STETSON LAW OFFICES         +508-298-5177        T-375   P 032/035   F-012

in any legal proceeding whatsoever, including but not limited to insolvency, bankruptcy, arbitration, declaratory relief, or other litigation as well as any appeals thereof, the prevailing party shall be entitled to receive from the other party or parties thereof reimbursement for reasonable attorneys' fees and costs, including, but not limited to, service of process costs, filing fees, court and court reporter costs, investigative costs, expert witness fees, and the cost of any bonds, and such reimbursement shall be included in any judgment or final order issued in that proceeding.

49.    Counterparts.  This Agreement may be executed in any manner of identical counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same instrument when each party has signed one (1) such counterpart.  In addition, facsimile signed copies of this Agreement shall serve and have the effect of binding originals until such time as the parties hereto are able to exchange original signed copies.

50.    Severability.  In the event that any of the terms, conditions, or provisions of this Agreement are held to be illegal, unenforceable, or invalid by any court of competent jurisdiction, the legality, validity, and enforceability of the remaining terms, conditions, or provisions shall not be affected thereby.

51.    Lien on Equipment.  Operator does hereby pledge to Owner as security for the Charter Hire, Promissory Note and other payments and performance of this Agreement, all furniture, fixtures, gaming equipment, cash in banks, and personal property of every nature used by Operator in connection with the Vessel's operation,

whether located on the Vessel or elsewhere. Operator agrees to execute any further documentation necessary to protect Owner's security interest in the above.

52.    <u>Guarantee and Pledge of Ownership Interest</u>.  For valuable consideration, R.A. Gallegos, ("Guarantor") does hereby guarantee the performance of the terms and conditions and the payments of the sums set forth in this Agreement by Operator including but not limited to the Charter Agreement and payments due under the Promissory Note.  In addition, Guarantor agrees to pay any attorneys' fees and costs incurred in enforcing this Guarantee.  It is further agreed that any assignment of this Agreement shall not release Guarantor from his obligations as Guarantor hereunder. Guarantor hereby further waives the right to require Owner to proceed against Operator or its assignees, or to pursue any other remedy in its power and Guarantor hereby authorizes Owner to proceed directly against Guarantor.  Performance of the Guarantee shall be secured by a pledge of all of Guarantor's interest in Operator which interest will represent no less than One-Hundred percent (100%).

53.    <u>Complete Agreement and Severability</u>.  The parties acknowledge receipt of a copy of this Agreement; that the terms of the Agreement are the entire agreement between them; and that they have not received or relied on any representations that are not expressed in this Agreement.  **No prior, present, or future agreements or representations will be relied on or will bind the parties unless in writing and incorporated into this Agreement.**  Modifications of this Agreement will not be binding unless in writing, signed and delivered by the party to be bound.  Signatures, initials and modifications communicated by facsimile or telecopy will be considered as original.  If any provision of this Agreement is or becomes invalid or

unenforceable, all remaining provisions will continue to be fully effective unless said provision specifically provides to the contrary.

54. <u>Pilot, Tugboat or Stevedor Negligence</u>. Operator shall be responsible for all losses sustained by Owner or Vessel or Mortgagee through the negligence of pilots, tugboats or stevedores.

55. <u>Tickets</u>. Operator shall use a form of passenger ticket approved by the insurance carrier.

56. <u>Attorney Disclosure</u>. Operator is aware that Charles S. Liberis is an attorney and represents that Charles S. Liberis has not given any legal advice to Operator. Operator further represents that it has received its own independent legal advice regarding this Agreement.

57. <u>Miscellaneous</u>. This Agreement constitutes the entire agreement between the parties hereto, and it is agreed and understood that there are no other duties, obligations, liability or warranties implied or otherwise. This Agreement is binding on Owner and Operator, their successors or assigns, as soon as executed by both parties hereto.

WITNESS:                          OWNER:

                                 CSL DEVELOPMENT CORPORATION



_____       By:_____

                                 Its:_____

Charter.Agmt/Rev 11/01/00 9:10 a.m.              34

OPERATOR:

GAIM-KO, INC.

By: *R. A. Gallegos*

Its: *President - Owner*

## GUARANTY

The undersigned, being the principal shareholder of the Operator named in the within and foregoing Agreement, individually guarantees the performance of the Operator (as well as any successors and assigns) of each of the terms, covenants and obligations of such Agreement and the payment by the Operator (as well as the successors and assigns of Operator) of all amounts due under this Agreement including but not limited to the Charter Payments and payments due under the Promissory Note. The undersigned's obligations and liabilities under this Guaranty are primary, absolute and unconditional and this Guaranty may be enforced directly against the undersigned independently of the Operator (or Operator's successors or assigns) and independently of any other security that has been pledged in connection with the transaction contemplated by such Agreement.

DATED: *November 3, 2000*

GUARANTOR(S):

*R. A. Gallegos*
R.A. Gallegos, individually

Charter.Agmt/Rev 11/01/00 9:10 a.m.          35

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CSL DEVELOPMENT CORPORATION, INC. | § | |
| | § | |
| Complainant, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B01-059 |
| | § | JURY DEMANDED |
| GAIM-KO, INC. and RAY GALLEGOS | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# EXHIBIT "B":

# Excerpts from the sworn deposition testimony of Charles Liberis taken on July 11, 2002.

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                   BROWNSVILLE DIVISION

 3   CSL DEVELOPMENT CORPORATION, :
     INC.                        :
 4                               :
     VS.                         : Civil Action No. B-01-059
 5                               :
     GAIM-KO, INC.; RAY GALLEGOS; :
 6   SOUTH PADRE ISLAND FISHING  :
     CENTER, INC.; STANLEY       :
 7   McELROY; DAVE FRIEDMAN; SRFP,:
     INC.; and SOUTH PADRE ISLAND :
 8   FISHING CENTER JOINT VENTURE :

 9
             ****************************************
10                    ORAL DEPOSITION OF
                      CHARLES LIBERIS
11                     JULY 11, 2002
             ****************************************
12

13      ORAL DEPOSITION of CHARLES LIBERIS, produced as a

14   witness at the instance of the Defendants Gaim-Ko, Inc.,

15   and Ray Gallegos, and duly sworn, was taken in the

16   above-styled and numbered cause on July 11, 2002, from

17   10:03 a.m. to 12:13 p.m., before PHYLLIS WALTZ

18   BLANCHARD, CSR, RPR, in and for the State of Texas,

19   recorded by machine shorthand, at the offices at

20   1000 Memorial, Suite 320, Houston, Texas, pursuant to

21   the Federal Rules of Civil Procedure and the provisions
```

22   stated on the record or attached hereto; that the

23   deposition shall be read and signed before any notary

24   public.

25                          JOB NO. 12487

2

1                    A P P E A R A N C E S

2

3   COUNSEL FOR PLAINTIFF:
         Mr. Joe Grant
4        THE GRANT LAW FIRM
         2437 Bay Area Boulevard, Suite 100
5        Houston, Texas  77058
         (281) 286-1222

6

7   COUNSEL FOR WITNESS:
         Mr. John Flood
8        FLOOD & FLOOD
         900 Frost Bank Plaza
9        802 N. Carancahua
         Corpus Christi, Texas  78470
10       (361) 654-8877

11
    COUNSEL FOR DEFENDANTS GAIM-KO, INC., and RAY GALLEGOS:
12       Mr. Paul L. Fourt, Jr.
         ATTORNEY AT LAW
13       1000 E. Van Buren
         Brownsville, Texas  78520
14       (956) 574-0109

15

16

17

18

19

20

21

22

23

24

25

3

1                    INDEX

2                                     PAGE
  Appearances                          2
3 Stipulations

4 CHARLES LIBERIS
      Examination by Mr. Fourt          5
5
  Signature and changes               75
6 Reporter's Certificate              77

7
                   EXHIBITS
8
                                     PAGE
9 LIBERIS EXHIBIT NO. 1               13
      Berth and Sublease Agreement, 15 pages
10
  LIBERIS EXHIBIT NO. 2               20
11    Fax from Mr. Daleo to Ray, dated 10/20/00,
      0039, one page
12
  LIBERIS EXHIBIT NO. 3               21
13    Fax from Mr. Daleo to John, dated 10/23/00,
      0040, one page
14
  LIBERIS EXHIBIT NO. 4               22
15    Letter from Mr. Liberis to Mr. Gallegos,
      dated 10/30/00, 0054, one page
16
  LIBERIS EXHIBIT NO. 5               23
17    Fax from Mr. Daleo to Ray and Pete, dated
      11/1/00, 0058, one page
18
  LIBERIS EXHIBIT NO. 6               45
19    Letter from Mr. Liberis to Mr. Gallegos,
      dated 11/14/02, 0079, two pages
20
  LIBERIS EXHIBIT NO. 7               47
21    Letter from Mr. Liberis to Ms. Stetson,

          dated 11/14/02, 0080, one page
22
    (Exhibits referenced.)
23
    GALLEGOS EXHIBIT NO.  1                              38
24
    GALLEGOS EXHIBIT NO.  12                              7
25

4

1                      EXHIBITS (Continued)

2
     GALLEGOS EXHIBIT NO.  13                              9
3
     GALLEGOS EXHIBIT NO.  21                             10
4
     GALLEGOS EXHIBIT NO.  22                             11
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                    CHARLES LIBERIS,

2   having been first duly sworn, testified as follows:

3                  E X A M I N A T I O N

4   BY MR. FOURT:

5       Q.    Good morning.  My name is Paul Fourt.  I'm an

6   attorney representing Gaim-Ko and Ray Gallegos.

7   Liberis -- how do you pronounce your last name?

8       A.    Liberis.

9       Q.    "Liberis"?

10      A.    Uh-huh.

11      Q.    Okay.  So I have that correct the rest of the

12  deposition.  Mr. Liberis, I represent Ray Gallegos and

13  Gaim-Ko.  We're here today because of the lawsuit filed

14  by you over the alleged breach of contract for the sale

15  of the Entertainer.

16      A.    Right.

17      Q.    I'd like to just start in directly with your

18  involvement in the negotiations for the sale or charter

19  of that vessel to Ray Gallegos.  Do you remember back in

20  the year 2000 when you first either were approached --

21  or how did you first initiate negotiations for the sale

22  of the Entertainer?

23      A.    I think in September of 2000 I was contacted by

24  a broker named Lou Daleo who wanted to know if I wanted

25  to sell the entertain ambiguously and/or the Entertainer

.

1   and the port.  He registered a number of people with me,

2   and Gaim-Ko was one of the prospects that he had.

3       Q.   Who did you first contact -- or who contacted

4   you first from Gaim-Ko?

5       A.   I'm trying to remember if I even had any

6   contact with anyone from Gaim-Ko.  Everything was pretty

7   much done through Mr. Daleo until sometime in October, I

8   guess, Mr. Gallegos, Mr. Peter Montoya, John Hale, and

9   Mr. Gallegos' wife wanted to come, look at the vessel,

10  look at the operation, and see if it would be anything

11  they would be interested in.  And I'm -- and I didn't

12  meet any of them first.  I met them all at one time at

13  the Sea Ranch Restaurant.  We had dinner that night.

14      Q.   Do you have any idea what day that was?

15      A.   No, but I could probably go back into my

16  calendar and find it.

17      Q.   Was it sometime in October?

18      A.   That's my recollection.

19      Q.   Of 2000?

20      A.   Yeah.  Late September, October.  And I'll tell

21  you why I think it was then, because I was anxious to

22  move the vessel to Florida.  It was -- it was after -- I

23  believe it would have been after Labor Day, and I was

24  trying to get the boat the heck out of Padre and get to

25  Florida.

7

1    Q.   A document that's previously been marked as

2    Exhibit 12 to Ray Gallegos' deposition is I -- what I

3    believe is the initial offer to charter and purchase,

4    and that document's dated September 6th.  Do you recall

5    that document?

6    A.   I do.

7    Q.   Is this the first, I guess, written exchange

8    between the parties outlining deal points?

9    A.   Without going through my file, I couldn't

10   answer that question.  But I remember that document.

11   Whether it was early in the ser- -- early in the

12   negotiations.  Whether it was the first or the last, I

13   don't know.

14   Q.   Prior to September 6th who had you dealt with

15   at Gaim-Ko as far as deal points on the boat?

16   A.   Well, really, no one.  Everything was done

17   through Lou Daleo until we got to the time of drafting

18   the charter, and that's when Cate Stetson --

19   Q.   Correct.

20   A.   -- was Mr. Gallegos' lawyer.  I don't know if I

21   contacted her or she contacted me.  I had very little

22  contact with Ray.

23      Q.   Take a minute and look at this Exhibit 12 to

24  Ray's deposition and see if you can identify that if

25  that is, in fact, the offer to charter and purchase that

8

1   was sent to you.  And I believe as part of that there is

2   a cover page addressed to Lou Daleo.  So were you copied

3   on that?  Do you remember seeing that document?

4       A.   Again, this is a typical -- and I dealt with

5   Daleo over the years.  This was a typical letter from

6   Daleo.  Whether he faxed it or -- or Gaim-Ko faxed it, I

7   don't know.  It's unsigned.  I would have to look in my

8   files to see if I have this particular draft, which I'm

9   happy to do.

10      Q.   Sure.  This -- and I'm not interested so much

11  in the different drafts, because there are more drafts

12  to this that we're going to get to later.

13      A.   Yeah, okay.

14      Q.   This is the earliest dated one that I could

15  find.  So I just wanted to know if -- in your memory, if

16  there is something before September 6th that you can

17  recall or not.

18      A.   Not without looking at my file, I wouldn't be

19  able to.

20      Q.   Okay.  What is this document?  Can you describe

21  for the jury what this document is or what -- and what

22  it means to you?

23      A.    It's what I would call, basically, a letter of

24  intent.

25      Q.    Would you characterize this as a contract?

9

1    A.    No.

2    Q.    Would you characterize it as an agreement?

3    A.    I would characterize it as a letter of intent.

4    Q.    And what is your definition of letter of

5    intent?

6    A.    An expression of interest leading up to a final

7    contract.

8    Q.    Would you characterize it as a proposal?

9    A.    Yeah, it would be a proposal.

10    Q.    The next exhibit to Ray Gallegos' deposition is

11    Exhibit 13, and this is a letter -- a letter from you to

12    Gaim-Ko.  Without me describing it to the jury, I'll

13    just let you take a look at it and see if you recognize

14    that document.

15    A.    Okay, I've reviewed it.

16    Q.    Do you recognize that document?

17    A.    Yeah.

18    Q.    What is that document?

19    A.    It's a response to their proposal of September

20    the 6th.

21    Q.    Would you characterize that as a counteroffer,

22  or is it an agreement to their proposal?  How would you

23  characterize that?

24      A.    Just further negotiations.  It says in here

25  there is a definitive agreement that will be prepared.

10

1      Q.   So at this point you wouldn't consider this

2   letter a contract?

3      A.   I would not.

4      Q.   Exhibit 21 to Mr. Gallegos' deposition is also

5   titled offer to charter and purchase, and I believe

6   it's -- it's a later draft of the same document.  Could

7   you take a look at that and see if you could identify

8   that?

9      A.   Just further negotiations.

10      Q.   Would you characterize this as -- as a proposal

11   or a contract?

12      A.   Proposal.

13      Q.   And what's the date of that document?

14      A.   October the 16th.

15      Q.   And this document is signed only by Ray

16   Gallegos.  Do you know if you signed this document?

17      A.   No.

18      Q.   No, you don't know or no, you didn't?

19      A.   No, I don't know; but I would be very surprised

20   if I did.

21      Q.   And why is that?

22      A.    There is no room -- I mean, there is no

23   signature line.

24      Q.    Well, I don't think there is a line; but there

25   is a -- your company by and title.  So I don't -- I

11

1    don't -- there is no line, you're correct about that.

2    But you don't recall signing that?

3        A.   I do not recall, no, sir.

4        Q.   Okay.  Exhibit 22 to Mr. Gallegos' deposition

5    is another draft or version of the same document.  Could

6    you take a look at that and see if you recognize that

7    one?

8        A.   Again, I don't recall it.  I don't know whose

9    handwriting that is on there.  It's not mine.

10       Q.   Do you recall signing a version of this offer

11   to charter and purchase?

12       A.   I do not.

13       Q.   Do you have -- do you have a copy -- a signed

14   copy of this document?

15       A.   Not that I'm aware of.

16       Q.   Okay.  So, again, this one dated October 16th,

17   would you characterize this as a contract or a proposal?

18       A.   Proposal.  I don't know that it ever went out.

19   It says it's a draft on it.

20       Q.   Okay.

21       A.   So I don't know that I received it.

22    Q.    So you characterize the other -- the previous

23  document that's titled the same title as further

24  negotiations.   Would that also apply to this document?

25    A.    Yes.

12

1    Q.   Now, the proposal to -- or, I'm sorry, offer to

2   charter and purchase, what is the purpose of this

3   document?

4    A.   That's Daleo's methodology of trying to get

5   deal points on the table for people to negotiate from.

6    Q.   All right.  And from there you would negotiate

7   with Gaim-Ko deal points that led up to the signed

8   contract?

9    A.   To a definitive signed contract.

10    Q.   And in this case we have a definitive signed

11   contract that was signed by my client on November 3rd.

12   When did you sign that document?

13    A.   Saturday, November the 4th.

14    Q.   And I have a couple of copies, and I'll -- I'll

15   give you one in case you don't have one handy.  This is,

16   unfortunately, one of the ones that doesn't have your

17   signature.  Yeah.  So if you're comfortable using this

18   one, we can use this one.  If you want to use the one

19   that you signed, I'll wait while y'all can make copies

20   of that, however your --

21           THE WITNESS:  Should we do that, just to

22  make sure?

23              MR. GRANT:  Yeah.

24      A.   Do you want to just go ahead and use a -- copy

25  it later, or do you want to copy it now?

13

1    Q.    (BY MR. FOURT)  Well, set it aside, because I'm

2  going to go on to something else; and we'll come back to

3  it.  I just wanted to make sure we're working off the

4  same document.

5    A.    Yeah, okay.

6    Q.    Now, at the time you were negotiating with

7  Gaim-Ko for the sale or charter of the Entertainer

8  vessel, where is that vessel?  And let's -- I'll give

9  you a reference:  September, October, November of 2000

10  where is the vessel?

11    A.    It's in South Padre Island.

12    Q.    And were you under a current lease for that

13  boat?

14    A.    No.

15    Q.    Where did you have the boat docked?

16    A.    At the Sea Ranch Pier.

17    Q.    How -- how were you able to dock the boat at

18  that pier without a lease agreement?

19    A.    I was on a month-to-month.

20    Q.    And I'm going to show you what has been

21  produced by your attorneys a document -- and I don't

22  think it's been entered in any deposition.  So I can

23  make this Exhibit 1.  But it -- I believe, is that the

24  original lease for the Entertainer --

25       A.    Uh-huh, yes.

14

1    Q.   -- at the Sea Ranch Pier?

2    A.   Yes.

3    Q.   How many -- if you don't mind, will you count

4  real quick and tell me how many pages that document is?

5    A.   It is -- appears to be 16 pages, but something

6  is out of sync here.

7    Q.   It may be --

8    A.   It's 15 pages.  There is -- they're transposed.

9  It's 15 pages.

10    Q.   15 pages.  If you'll look to Paragraph 2 of --

11  that is, the term of that lease.  What was the term of

12  your lease?

13    A.   180 days.

14    Q.   From the date of the --

15    A.   From the date of commencement.

16    Q.   And what is that commencement date on that

17  lease?

18    A.   I think it's the day we started.

19    Q.   Is it referenced on the first page?

20    A.   But that's not the date of commencement.

21    Q.   Okay.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CSL DEVELOPMENT CORPORATION, INC. | § | |
| | § | |
| Complainant, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B01-059 |
| | § | JURY DEMANDED |
| GAIM-KO, INC. and RAY GALLEGOS | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# EXHIBIT "C":

Excerpts from the sworn deposition testimony of Ray Gallegos taken on December 4, 2001, and its exhibits 1, 4, 21, 26, 29, and 32.

1

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
2               BROWNSVILLE DIVISION

3   CSL DEVELOPMENT CORPORATION, INC.,

4                        Plaintiff,

5    -vs-              CIVIL ACTION NO. B01 059

6   GAIM-KO, INC.; RAY GALLEGOS;
    SOUTH PADRE ISLAND FISHING
7   CENTER, INC.; STANLEY McELROY;
    DAVE FRIEDMAN; SRFP, INC.; and          ORIGINAL
8   SOUTH PADRE ISLAND FISHING
    CENTER JOINT VENTURE,
9
                        Defendants.
10

11

12          VIDEO DEPOSITION OF RAY GALLEGOS
                  December 4, 2001
13                   9:00 a.m.
              2403 San Mateo Blvd., NE #W17
14               Albuquerque, New Mexico

15

16

17      PURSUANT TO THE FEDERAL RULES OF CIVIL
    PROCEDURE, this deposition was:
18

19   TAKEN BY:  JOSEPH M. GRANT, ESQ.
               ATTORNEY FOR PLAINTIFF
20

21   REPORTED BY:  DEBORAH L. O'CONNOR, RPR, CRR, CCR #297
                   BEAN & ASSOCIATES, INC.
22                 Professional Court Reporting Service
                   500 Marquette, N.W., Suite 280
23                 Albuquerque, New Mexico 87102

24   (5736-18) DEB

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

2

1                          APPEARANCES

2    For the Plaintiff:

3        THE GRANT LAW FIRM
         2437 Bay Area Blvd., #100
4        Houston, Texas 77058
         BY:  JOSEPH M. GRANT, ESQ.
5
         HILLIARD & MUNOZ, PPC
6        719 S. Shoreline Blvd., Suite 600
         Corpus Christi, Texas 77401
7        BY:  JOHN FLOOD, ESQ.

8    For the Defendants Gaim-Ko and Ray Gallegos:

9        PAUL J. FOURT, JR., ESQ.
         1000 E. Van Buren
10       Brownsville, Texas 78520

11   For the Defendant South Padre Island Fishing Center
     Joint Venture:
12
         GRIFFITH, SAENZ & HILL, LLP
13       1325 Palm Blvd., Suite H
         Brownsville, Texas 78520
14       BY:  CARLA SAENZ, ESQ.

15   For the Defendants Stanley McElroy, Dave Friedman,
     and SRFP, Inc.:
16
         ROERIG, OLIVERIA & FISHER, LLP
17       855 West Price Road, Suite 9
         Brownsville, Texas 78520
18       BY:  W. MICHAEL FISHER, ESQ. (by telephone)

19   Also Present:

20       Rudy Ortiz, Esq.
         Mr. Dale Alverson, Videographer
21       Mr. Stanley McElroy (by telephone)
         Mr. Dave Friedman (by telephone)

22

23

24

25

 

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

3

| | INDEX | PAGE |
|---|---|---|
| | | |

RAY GALLEGOS

Examination By Mr. Grant                                        7
Examination By Ms. Saenz                                      192


EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Letter to Friedman, check, and sublease agreement | 132 |
| 2 | 11/27/00 letter from Dave Friedman to Ray Gallegos | 144 |
| 3 | Agreement to charter and purchase vessel | 147 |
| 4 | Opportunity in Texas | 158 |
| 5 | Specific buyer brokerage agreement | 158 |
| 6 | 8/17/00 memo from Daleo to Hale re Casino Padre | 158 |
| 7 | 8/20/00 memo from Daleo to Hale re inspection | 158 |
| 8 | 8/25/00 memo from Daleo to Ray and John re draft of offer | 158 |
| 9 | Gaim-Ko balance sheet and income statement | 159 |
| 10 | 8/26/00 memo from Daleo to Ray and John re proposed offer | 158 |
| 11 | 9/6/00 memo from Daleo to Hale re revised offer | 158 |
| 12 | Offer to Charter/Purchase | 159 |
| 13 | 11/11/00 letter from Liberis to Gaim-Ko re M/V Entertainer | 158 |
| 14 | 9/11/00 memo from Daleo to Ray and John re acceptance of offer | 158 |



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

4

| 15 | 9/12/00 memo from Daleo to Gallegos re South Padre casino opportunity | 158 |
| 16 | 9/15/00 memo from Daleo to Ray re Casino Padre | 159 |
| 17 | 9/18/00 memo from Daleo to Ray and John re The Casino Padre | 158 |
| 18 | 9/27/00 memo from Daleo to Hale re slot machines | 158 |
| 19 | 10/13/00 memo from Daleo to Ray re proposed offer | 158 |
| 20 | 10/13/00 memo from Daleo to Ray and John re proposed offer | 159 |
| 21 | Offer to charter/purchase | 159 |
| 22 | Offer to charter/purchase | 159 |
| 23 | 10/18/00 memo from Daleo to Ray and John re new survey | 159 |
| 24 | List of Gaim-Ko machines | 159 |
| 25 | 10/19/00 memo from Daleo to Ray re Casino Padre | 159 |
| 26 | 10/20/00 memo from Daleo to Ray re Casino Padre | 159 |
| 27 | 10/23/00 memo from Daleo to John re Casino Padre | 158 |
| 28 | 10/23/00 memo from Daleo to Ray and Pete re wire transfer route | 159 |
| 29 | 10/29/00 memo from Daleo to Ray re Clarification to Cate | 159 |
| 30 | 10/30/00 memo from Daleo to Ray re meeting | 159 |
| 31 | 11/1/00 memo from Daleo to Ray and Pete re dock lease | 159 |



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

5

| 32 | 11/6/00 memo from Daleo to Albers re wire transfer | 159 |
|----|----|----|
| 33 | 11/2/00 memo from Daleo to Ray and Pete re South Padre Island | 158 |
| 34 | 11/4/00 memo from Daleo to Liberis re Gaim-Ko | 158 |
| 35 | 11/4/00 memo from Daleo to Liberis re Gaim-Ko | 158 |
| 36 | Agreement to charter and purchase vessel | 159 |
| 37 | 11/3/00 Memo from Daleo to Ray and Pete re South Padre opportunity | 159 |
| 38 | 11/6/00 memo from Daleo to Ray re Casino Padre | 158 |
| 39 | 11/14/00 letter from Liberis to Gallegos re M/V Entertainer | 159 |
| 40 | 11/16/00 memo from Daleo to Ray re property at South Padre | 159 |
| 41 | 11/17/00 letter from Liberis to Ray re M/V Entertainer | 159 |
| 42 | Personal reference package | 159 |
| 43 | 11/1/00 letter from Albers to Daleo re escrow funds | 182 |

CERTIFICATE OF COMPLETION OF DEPOSITION    195

WITNESS SIGNATURE/CORRECTION PAGE    198

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

6

```
 1              THE VIDEOGRAPHER:  My name is Dale
 2    Alverson, videographer for Bean and Associates, Inc.,
 3    at 500 Marquette, Suite 280, Albuquerque, New Mexico
 4    87102.  The court reporter is Deborah O'Connor.
 5              This is the videotaped deposition of Ray
 6    Gallegos in the matter of CSL Development
 7    Corporation, Inc., vs. Gaim-Ko, Inc.; Ray Gallegos;
 8    south Padre Island Fishing Center, Inc.; Stanley
 9    McElroy; Dave Friedman; SRFP, Inc.; and South Padre
10    Island Fishing Center Joint Venture, Case No. B01-059
11    in the United States District Court for the Southern
12    District of Texas, Brownsville Division.
13              We are in the offices of Ray Gallegos at
14    2403 San Mateo Blvd., NE, #W17, Albuquerque, New
15    Mexico 87110.  Will the attorneys please state their
16    names for the record.
17              MR. GRANT:  John Flood and Joe Grant for
18    the plaintiff.
19              MS. SAENZ:  Carla Saenz for South Padre
20    Island Fishing Center Joint Venture.
21              MR. FISHER:  Michael Fisher for the Pier
22    defendants other than the ones that Carla represents,
23    and I'm participating by telephone.
24              MR. FOURT:  Paul Fourt for Ray Gallegos and
25    Gaim-Ko, Inc.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

7

1           THE VIDEOGRAPHER:  We are on the record.

2      The date is December 4, 2001.  The time now is 9:26

3      a.m.  Will the reporter please swear in the witness.

4                          RAY GALLEGOS,

5      having been first duly sworn, testified as follows:

6                          EXAMINATION

7           Q.     (By Mr. Grant)  Will you state your full

8      name for the record, please?

9           A.     Raymond A. Gallegos.

10          Q.     Will you spell your last name, please?

11          A.     G-A-L-L-E-G-O-S.

12          Q.     Mr. Gallegos, my name is Joe Grant and I am

13     here along with John Flood representing the

14     plaintiffs in this lawsuit.  Do you understand that?

15          A.     Yes, I do.

16          Q.     All right, sir.  And you understand that

17     we're here take your deposition today in the lawsuit

18     that you've been sued in both individually and your

19     company, Gaim-Ko?

20          A.     Yes.

21          Q.     And are you represented by counsel here

22     today?

23          A.     Yes, I am.

24          Q.     And do you have both your personal counsel

25     and -- well, you have two counsel here.  Who are they

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

8

1    representing?

2        A.    I've got Mr. Fourt here, who is

3    representing me, and Mr. Ortiz is my everyday

4    attorney here.

5        Q.    He's your personal, everyday attorney?

6        A.    Yes, sir.

7        Q.    Okay. And was he also your attorney in this

8    matter prior to Mr. Fourt coming in?

9        A.    No.

10       Q.    Mr. Ortiz was never your attorney in this

11   matter?

12       A.    No, I'm sorry, I take that back.  He called

13   the office of -- I think it was Mr. Fisher's office

14   to get a lawyer there for Mr. Lerma's office.

15       Q.    But at least when this litigation started,

16   when you answered and filed your first disclosures,

17   Mr. Ortiz was your attorney and then sometime after

18   that you retained Mr. Fourt?

19       A.    Yes, sir.

20       Q.    But you still retain Mr. Ortiz as a

21   personal attorney?

22       A.    Yes, sir.

23       Q.    Mr. Gallegos, have you ever had your

24   deposition taken before?

25       A.    Yes, I have.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

19

```
1    the district attorney to store the equipment until
2    you find place to put it?
3         A.    Right.
4         Q.    Which district attorney is that?
5         A.    I'm not sure, sir.
6         Q.    And where are you going to store it?
7         A.    Oh, for bringing it back, now?
8         Q.    For storage.
9         A.    Oh, no, no, not to bringing it back.  The
10   one that we had, we had an okay from the district
11   attorney already.
12        Q.    What okays do you have now to bring the
13   equipment back into Texas?
14        A.    We don't know yet.
15        Q.    You don't have any okays?
16        A.    No.
17        Q.    Where is your warehouse located in Texas?
18        A.    It's in Lubbock.
19        Q.    Is that where you're planning to store it
20   if you can get permission?
21        A.    Yes, sir.
22        Q.    All right.  Are you operating any gambling
23   operations anyplace in the country at this point?
24        A.    No, sir.
25        Q.    When was the last time you did?  Excuse me.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

20

1    We just talked about where you had your equipment

2    that you were operating on the Southern Princess

3    Casino.

4         A.    That was it.

5         Q.    Prior to that where was the last

6    gambling --

7         A.    I operated in Indian reservations .

8         Q.    Mr. Gallegos, if you will, they have a hard

9    time typing with both of us talking, so if you'll

10   wait until after I finish my question, it will be a

11   lot easier on this lady to type your answer down and

12   I'll try to do the same thing with you if you'll

13   agree to do that with me.  The other thing is, I'll

14   need you to respond verbally, either yes or no,

15   instead of shaking your head.  I know we all get into

16   that habit of nodding when we're looking at somebody,

17   but just for the court reporter, I'll need verbal

18   responses, if you will, sir, and I'll try to help you

19   remember --

20        A.    Okay.

21        Q.    So the last gambling operations that you

22   ran were at an Indian reservation prior to your

23   gambling operations on the Southern Princess; is that

24   correct?

25        A.    That's right.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

21

1    Q.    When was that, from when to when?

2    A.    I think it was from '91 to '98 at the

3    Mescalero reservation.

4    Q.    Where was that located?

5    A.    Southern New Mexico.

6    Q.    What town?

7    A.    Ruidoso, New Mexico.

8    Q.    And where was it?

9    A.    It was in Mescalero.

10   Q.    No, I mean, where actually was the casino

11   located?

12   A.    Inside the reservation.

13   Q.    Was it inside of a hotel --

14   A.    It was inside a convention center.

15   Q.    Okay, a convention center.  What was the

16   name of the convention center?

17   A.    Apache Casino -- Casino Apache.

18   Q.    And that was a convention center?

19   A.    Yes, sir.

20   Q.    So it would be the Casino Apache Convention

21   Center?

22   A.    No, it used to be a convention center.  It

23   was transformed to a casino.

24   Q.    Is that adjacent to a hotel or anything

25   like that?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

22

```
1        A.    It's right next to the hotel there.

2        Q.    What's the hotel?

3        A.    Inn of the Mountain Gods.

4        Q.    Now, approximately when in '98 did you stop

5   that?

6        A.    Around November the 24th, I believe,

7   President Window Chino died on the 4th of November

8   and the new regime came in and they took over and

9   they made changes, so that's where it was.

10       Q.    And so you -- your contract with them was

11  cancelled?

12       A.    Yes, sir.

13       Q.    I take it you had a contract that could be

14  cancelled at will by the tribe?

15       A.    The thing -- I think I had three-year

16  contracts and I only had one more month to go on my

17  contract.

18       Q.    So they just chose not to renew the

19  contract?

20       A.    No, no, they got us out a month before the

21  contracts.

22       Q.    Was there any litigation?

23       A.    Sir?

24       Q.    Was there any litigation?

25       A.    Yeah, there was litigation.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

102

1    transported them to Florida, put them on the

2    machine -- on the boat there and then brought them

3    back to Texas?

4        A.    Right.

5        Q.    And then the other two to three hundred

6    that you put on, you took out of the warehouse in

7    Lubbock and brought those down to Freeport and put

8    them on kind of piecemeal for over a two- or

9    three-week period.

10            Where did you keep the machines in Freeport

11   while you were putting them on the ship?

12       A.    What do you mean -- we had them in

13   trailers.

14       Q.    Okay.  So did you bring them all down from

15   Lubbock at one time and just keep them in trailers

16   and put them on or did you make several trips from

17   Lubbock?

18       A.    I don't know.  You're going to have to

19   check with John Hale on that.

20       Q.    He would have been in charge of the

21   transport?

22       A.    Yes, right.

23       Q.    He would have arranged the proper

24   authorities to do it?

25       A.    Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


DEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

103

1     Q.    He arranged the transport from Lubbock all

2  the way to Florida?

3     A.    Yes, sir.

4     Q.    And then from Lubbock down to Freeport?

5     A.    Right.

6     Q.    Where in Florida were the machines put on?

7     A.    I don't know.  I can't recall that.

8     Q.    John would know that also, John Hale?

9     A.    That's right.

10     Q.    Now, in between the time that you had

11  negotiated a lease that was acceptable to you with

12  Southern Gaming and the time that the contract was

13  finished and executed, during that time period were

14  you free to just decide that you didn't want to enter

15  into the contract and walk?

16     A.    What do you mean by that question?

17     Q.    Well, you said that you guys, you and the

18  folks from Southern Gaming, negotiated a contract

19  that was acceptable to you and you had your lawyer

20  draw up the contract.  In between the time that you

21  negotiated the terms that were acceptable to you and

22  the time the contract was executed, could you have

23  decided -- could you have changed your mind and just

24  not entered into the contract, not executed the

25  contract?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

104

1    A.    No, I had a contract.

2    Q.    When did you have a contract?

3    A.    When I signed that contract.

4    Q.    Okay.  But you had negotiated the contract

5    prior to signing it, hadn't you?

6    A.    How is that?

7    Q.    You negotiated the contract with Southern

8    Gaming, correct?

9    A.    Yeah, we talked about it.

10    Q.    Okay.

11    A.    Yeah.

12    Q.    Well, I mean, and you came to terms that

13    you were agreeable with when you negotiated with

14    them, correct?

15    A.    Right.

16    Q.    And once you had reached that point where

17    you had negotiated a contract that was acceptable to

18    you, the next step was your attorney drew the

19    contract up?

20    A.    Right.

21    Q.    My question is, between the time when you

22    had negotiated a contract, the terms that were

23    acceptable to you, and the date that you signed it,

24    could you have just changed your mind and not

25    executed that contract?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

105

1      A.      In other words, if I --

2      Q.      Had second thoughts.

3      A.      See, if I would have second thoughts or if

4   I didn't sign the contract, I'm sure we didn't have a

5   contract then.

6      Q.      And the same was true for Southern Gaming,

7   right?  If after you two had sat down and had agreed

8   on the terms and negotiated terms that were

9   acceptable to both of you, could Southern Gaming have

10  done the same thing before they signed the contract,

11  executed it?

12     A.      I'm sure, I'm sure.

13     Q.      Did that happen?

14     A.      No, it didn't.

15     Q.      Now, if after you two had sat down and

16  negotiated the terms that were acceptable to both of

17  you and while your attorney was drafting the

18  contract, Southern Gaming had come to you and said,

19  Ray, not going to do it, what would you have done?

20     A.      I'm sorry?

21     Q.      If that had happened, if after you had

22  negotiated the terms with Southern Gaming that were

23  acceptable to you and you had your attorney drafting

24  the contract up, if in between the negotiations and

25  him finishing the contract Southern Gaming had called

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

106

1    you up and said, Ray, we changed our mind, we don't

2    want to do this --

3        A.    Well, you know what, I've had deals like

4    that happen to me before.  Once they don't have the

5    signature, well, they --

6        Q.    So you just go on your way?

7        A.    Right.

8        Q.    But that's not the first time that you've

9    ever heard of that happening?

10       A.    Not the first time.

11       Q.    And that's happened to you before?

12       A.    Sure.

13       Q.    Somebody else has done that to you?

14       A.    Well, no, not to me, to other people.

15       Q.    But you've heard about that?

16       A.    Yeah.

17       Q.    Have you ever been in a position that

18   you've done that?

19       A.    Not that I know of.

20       Q.    Has anybody ever done it to you, where

21   you've negotiated, agreed on terms, and then they

22   won't signed the contract?

23       A.    I don't think so.

24       Q.    But you have heard about it happening?

25       A.    Yes, sir.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

107

1    Q.    So the concept doesn't surprise you?

2    A.    No, it don't surprise me.

3    Q.    And if it had happened here with Southern

4 Gaming, you wouldn't have been surprised by it?

5    A.    I probably wouldn't have been surprised.

6    Q.    What would you have done, just continue to

7 find another boat or work with Mr. Daleo or what?

8    A.    Well, the thing is, if the man didn't want

9 my services, what good was it for me to be there

10 forcing myself on to him?

11    Q.    Well, there really wasn't anything you

12 could do in between those two?

13    A.    Right.

14    Q.    Now, what do you think the difference is,

15 since we're talking about this, what do you think the

16 difference is between negotiating an agreement and

17 executing an agreement, just from your business?

18    A.    What now?

19    Q.    From your business experience, what do you

20 think the difference is between negotiating an

21 agreement and executing an agreement?

22    A.    I'm not a lawyer.  I can't really --

23    Q.    That's why I'm asking you, just from your

24 business experience.

25    A.    I can't relay that to you.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

108

1      Q.    Well, what do you think it means to

2  negotiate an agreement?  We've been talking about it

3  all morning.

4      A.    Well, you know, talking about a contract or

5  whatever, I -- and executing an agreement is signing

6  it, right?

7      Q.    Correct.

8      A.    Okay.  Negotiating it is, if both parties

9  are in compliance, they want to agree to it, then you

10  can execute it.

11      Q.    I guess negotiating is the two parties, you

12  or somebody else, are sitting down and you're

13  negotiating the terms to an agreement that you will

14  execute in the future if you two can come to terms

15  that you both accept.  Is that a fair definition?

16      A.    Yes.  Providing that everything that the

17  people that made the contract had to offer was right

18  on the table, you know.

19      Q.    Sure.  But basically negotiation is just

20  you talking to somebody --

21      A.    Right, sure.

22      Q.    -- and either through letters or talking

23  coming to what you two think will be terms that are

24  acceptable to both of you?

25      A.    Right.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

DEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

109

1     Q.    And just because you've negotiated it,

2  doesn't mean you're bound by a contract, correct?

3     A.    Right.

4     Q.    It's just -- it's not until you execute a

5  contract that you're bound?

6     A.    Right, but, now, here, there is another

7  thing.  You can sign something but if the other party

8  is not fulfilled the way it should have been

9  fulfilled, I don't think it's legal.

10     Q.    I understand, but that's the next stage.

11  Once you have an agreement, if somebody breaches the

12  agreement, then you would go after them under the

13  agreement.  Do you agree with me?

14     A.    No, I don't.

15     Q.    In your negotiations with Southern Gaming,

16  all right, you said that you guys sat down over a

17  period of time, a month, two months, whatever, and

18  you negotiated terms that were acceptable to both of

19  you.

20     A.    Right.

21     Q.    Now, at that point, you were not bound to

22  go through with the agreement if you didn't want to,

23  correct?

24     A.    How was that again, sir?

25     Q.    At the point that you two had said, all

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

110

1   right, we've negotiated this, we think we've got the

2   terms we both can live with, we'll have the attorney

3   draw up the contract, you are not bound at the point

4   where you had negotiated terms that were acceptable

5   to you, were you?

6       A.    If I hadn't signed it.

7       Q.    So from your understanding, until you had

8   signed the document, until you had executed the

9   document, you were not bound to go through with

10  anything?

11      A.    Right.

12      Q.    So even though you had sat down and agreed

13  to terms with the other party and both sides had

14  agreed to the terms, you're still not bound by it

15  until you both have signed a contract, correct?

16      A.    Uh-huh.

17      Q.    Do you agree with me?

18      A.    I agree with you.

19      Q.    And that's what I was trying to get at.    I

20  wanted to make sure we were using the same

21  understandings of negotiate, which is to sign -- or

22  to talk about terms and agree on terms and execute is

23  to sign the document.    Are we on the same terms --

24      A.    I still -- you got me lost.    I don't -- I

25  don't understand what you're talking about.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

111

1      Q.    Well, you don't think negotiating is the

2    same as executing an agreement, do you?

3      A.    No, I don't.

4      Q.    And you understand what the term to

5    negotiate means, to discuss with somebody else terms?

6      A.    Yeah, you can discuss and try to make

7    arrangements to where you can form a contract or

8    whatever and -- but negotiate is a lot more than

9    that, I think.

10     Q.    Well, is it a contract?  Is negotiating a

11   contract?

12     A.    No, it isn't.  I don't think so.

13     Q.    And when you negotiate with somebody,

14   you're not binding yourself, are you?

15     A.    I think a contract is when you sign

16   something, you sign something that you feel that

17   is --

18     Q.    It's just a written contract when you sign

19   a contract.

20     A.    Right.

21     Q.    And it could be for anything.  I mean, when

22   you get your cable, you sign an agreement, cable TV,

23   that's a contract.  Have you ever done that?

24     A.    Yes, I have.

25     Q.    If you get water, if you have water

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

112

1    delivered, they have a little contract that you sign?

2        A.    Yes.

3        Q.    So it can be as simple as signing for water

4    or it can be something where, you know, you're

5    negotiating to buy the Empire State Building.   I

6    mean, all those are contracts.   One is going to be a

7    lot bigger than the other, but they're both

8    contracts, right, and until you sign that contract,

9    you're not bound to do anything?

10       A.    I feel that if the party meets the

11   requirements of that contract --

12             MR. GRANT:   Why don't you push it over

13   closer to him so he can see what you're trying to

14   tell him there.

15             MR. FOURT:   Excuse me, counselor?

16             MR. GRANT:   Go ahead and push it over so he

17   can look right at it instead of having to look on

18   your desk.

19             MR. FOURT:   If you'd like to take a break

20   and let my client read something, I'd be happy to do

21   that.

22             MR. GRANT:   Well, apparently you're the one

23   that wants him to read something since you're sending

24   him a signal.

25             MR. FOURT:   No, I was just checking my

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


DEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

126

1   the bathroom or something and either Stan or the

2   other gentleman said that they just didn't want that

3   boat there, they weren't happy with the boat --

4       Q.    What weren't they happy about with it?

5       A.    I don't know.  I can't tell you, I mean,

6   because -- I didn't go into specifics with them.  But

7   they -- he told me he had a lease and I told him,

8   "Well, can I get a lease on this?"  He said, "Well,

9   we'll think about it."  So I said, "Well, can I give

10  you a retainer just to secure the pier?"  And then

11  when they went and confided for a little while

12  together and they came back and he says, "Well, we'll

13  take $10,000."  In a couple of weeks, without no note

14  or nothing, they sent us a check back.  No lease, no

15  nothing.

16      Q.    Now, you sent them a contract along with

17  the $10,000 check.  Who drafted that?

18      A.    No, just a check.  No, I don't think I sent

19  them no contract.

20      Q.    You didn't send them a proposal or contract

21  or anything?

22      A.    No, not that I know of.

23      Q.    That was signed by you?

24      A.    No, I can't recall that, sir.

25      Q.    You didn't send anything to them with terms

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

127

1   in it?

2       A.    No, I can't recall that.  No, in fact, I

3   was waiting for them to give me the terms.  I was

4   just anxious to get the pier.  Because they were the

5   ones who were going to draft the -- and they seemed

6   like real nice people, I mean, very professional, and

7   I thought that they were going to do the paperwork

8   and stuff like this and send it to me.

9       Q.    So when you left they said they'd have

10  their lawyers draft the contract and send it to you?

11      A.    No, they said they'd get back to me.

12  That's all they said.  And all we got back was a

13  cashier's check.

14      Q.    Now, you said that various people had told

15  you bad things about the boat but you liked it.  Who

16  were the people that told you bad things about the

17  boat?

18      A.    I can't recall.  I mean, a lot of people.

19  You know, not a lot, but people -- some -- Captain

20  Louie told John Hale that it was -- that they had a

21  lot of problems and stuff like this.  I guess Captain

22  Louie used to ride that boat years ago for them or

23  somebody, for Charles Liberis or something, I don't

24  know, and other people.  But you know what?  When I

25  make decisions, I make them.  I do things.  Sometimes

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

128

1    I do them on my own, at my own discretion, because I

2    think from my heart, not from my head, you know.

3    That's why I tell you, contracts and all these don't

4    mean a damn thing to me.  If you look me straight in

5    the eye and we shake hands, that's how they way it

6    is, and if you look me straight in the eye and you

7    come up and make a U-turn, then you're not what I

8    thought you were.

9        Q.    You had said earlier that you liked the

10   boat and you were ready to buy it but you couldn't,

11   get a lease; is that correct?

12       A.    That's right.

13       Q.    And had you been able to get a lease, you

14   would have bought the boat --

15       A.    I would have, yes, sir.

16       Q.    Okay.

17       A.    I mean, there was a lot of work to be done

18   to it.  I mean, including carpet because it needed

19   carpet and I think the sewer service center or

20   whatever because it really smelled and they said that

21   they were working on it, so I mean, I give them the

22   benefit of the doubt.  We could have fixed that.  I

23   mean, there would be no problem.

24       Q.    Well, I think the contract you entered into

25   said you would do the cosmetic work and Charles

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

129

1    Liberis would take care of everything below water

2    that the coast guard wanted done and take care of all

3    the certifications on it?

4         A.    Yeah.

5         Q.    So it was either Stan or Dave that were

6    telling you, "We don't like this boat.  We don't want

7    it here"?

8         A.    I'm sure.

9         Q.    Now, after you left on the 10th, the day of

10   the negotiations, Mr. Daleo stated that you called

11   him up and told him that you had gotten a call from

12   Stan and Stan said, "The deal's off.  We don't want

13   to sell -- we don't want to lease it to the

14   Entertainer.  We don't want that boat there and the

15   deal's off."  And you then called Mr. Daleo.  Do you

16   recall that?

17        A.    No, I don't recall that.

18        Q.    Okay.  Well --

19        A.    Mr. Daleo probably has more memory than I

20   do.

21        Q.    Well, that was my next question.  If

22   Mr. Daleo says he had the conversation with you and

23   that's what you said, do you have any reason to

24   believe it didn't happen?

25        A.    No.  I don't remember saying anything or

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

140

1    A.    Yeah, I guess they had a reason not to sign

2    it.  They sent it back.

3    Q.    Have you had a chance to review it?

4    A.    Yeah, I saw it.

5    Q.    Is it fair to say that the terms of this

6    agreement were acceptable to you when you signed it?

7    A.    The $10,000?

8    Q.    No, the terms of this agreement that we've

9    marked as Exhibit 1.

10   A.    I signed it.  It's fair to say yes.

11   Q.    So the terms were acceptable to you?

12   A.    Yes.

13   Q.    Now, do you recall when you sent the check

14   and this agreement to Mr. Friedman?

15   A.    I don't recall.

16   Q.    How would you be able to find that out?

17   A.    You'll have to check with my controller on

18   that.

19   Q.    Would you look at page 2 of the photocopy

20   of the official check?  And in the right-hand corner

21   it appears to say "November 17, 2000."  Do you see

22   that, sir, right above the $10,000?

23   A.    Yeah.

24   Q.    All right.  So you got your check,

25   cashier's check, on November 17, and the sublease



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

141

1   agreement that you signed states that it's effective

2   November 17.  So is it fair to say that you

3   transmitted this to Mr. Friedman shortly after you

4   got your cashier's check?

5       A.    Yes, sir.

6       Q.    Do you have any reason to believe that you

7   didn't send it right after you got your cashier's

8   check?

9       A.    I believe so.

10      Q.    Do you have any reason to believe that you

11  did not do it right after you got the cashier's

12  check?

13      A.    If I sent it on the 17th and the cashier's

14  check says the 17th, I imagine that's when it was

15  sent.

16      Q.    All right.  Where did you come up with the

17  terms for this sublease agreement?

18      A.    Probably my attorney.  I don't even know

19  who is the one that did it.

20      Q.    Well, wherever the terms came from, they

21  were acceptable to you?

22      A.    Yes, they were.

23      Q.    Do you remember negotiating these terms?

24      A.    No.

25      Q.    Don't know where these terms came from?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

142

1     A.     No.

2     Q.     Were these the terms that you were looking

3  for?

4     A.     Yes.

5     Q.     And were these the terms that if you had

6  gotten these terms earlier and Mr. Friedman and

7  Mr. McElroy had been willing to allow the Entertainer

8  to stay at the pier, would these have been the same

9  terms that you would have agreed to on that lease?

10    A.     I'm sure.  That's what I offered for the

11  lease.

12    Q.     So let me ask that in another way.  If

13  these terms were agreeable to you with a sublease

14  with South Padre Island, would they have also been

15  agreeable to you for the charter agreement with the

16  Entertainer?

17    A.     Come again?

18    Q.     Well, to ask you in another way, if these

19  terms were agreeable to you on the 17th with a lease

20  with South Padre Island, would these terms also have

21  been agreeable to you with regard to your contract

22  with Mr. Liberis for the Entertainer?

23    A.     Well, right.  I mean I had no problems with

24  the Entertainer.

25    Q.     And these, if you look at them, these are

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

DEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

143

1   the same terms that you had in your contract with

2   Mr. Liberis for the Entertainer, 120,000 per year for

3   the rent?

4       A.    Could be.

5       Q.    Would it surprise you if they were?

6       A.    No.  All you have to do is add.

7       Q.    Now, earlier in your testimony you stated

8   that you did not send any agreements or sign any

9   agreements with Mr. Friedman, you just sent the check

10  to him.  Does this refresh your recollection?

11      A.    I guess it does, sir.  I mean, it's my

12  signature, so I can't lie.

13      Q.    Okay.  But you just don't recall doing

14  this?

15      A.    I don't recall.

16      Q.    And you don't recall where this contract

17  came from, who drafted the contract?

18      A.    No, I don't.

19      Q.    So it could have come from your office but

20  it could have come from their office, Mr. Friedman's

21  office, you just don't know?

22      A.    No, that's our letterhead.

23      Q.    No, sir, I'm talking about the agreement,

24  the sublease agreement.  You're not sure whose office

25  that came from, your office or Mr. Friedman's office?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

144

1  A.  No, no, that came from our office.

2  Q.  That came from your office.  Okay.  So

3 somebody here drafted it, either your attorney or

4 somebody in your office?

5  A.  Yeah.

6  Q.  But you don't have any idea who?

7  A.  No.

8  Q.  Mr. Gallegos, I'd like to show you what has

9 been marked as Exhibit No. 2 and ask you to take a

10 look at that.

11  A.  I remember that.

12  Q.  And Exhibit No. 2 is a letter dated

13 November 27, 2000, from the Sea Ranch Fishing Center

14 Joint Venture signed by Dave Friedman to Mr. Ray

15 Gallegos, Gaim-Ko.  Do you recall receiving this

16 letter?

17  A.  Yes.

18  Q.  In the second paragraph he says, "I

19 certainly want to make a deal with you and your

20 company.  I will assure you," and he underlines

21 assure, "I will not make any commitments without

22 talking to you first," which is underlined.

23 "However, there are a number of issues that must be

24 addressed in a sublease agreement such as parking and

25 how it's handled, boat quality, etc."  Did you ever



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

145

1    talk with Mr. Friedman about this letter?

2        A.    I'm sure I did.

3        Q.    What were his comments about boat quality?

4        A.    He just wanted -- they wanted another boat

5    there, period.  They just wanted another boat.

6        Q.    Who was it that told you that the

7    Entertainer was unseaworthy?

8        A.    Nobody told me that it was unseaworthy.

9        Q.    So if Mr. Daleo has written correspondence

10   saying that Ray Gallegos told him that he had been

11   told by the joint venturers that the boat was

12   unseaworthy, you don't believe that you said that --

13       A.    First of all, let me tell you.  I would

14   never use that word because I'm not that familiar,

15   unseaworthy, seaworthy, whatever.  If Lou Daleo told

16   you that, he is a liar and I'll tell you right now in

17   front of the microphone here.  And you get Lou Daleo

18   right in front of me and ask me that question.  If

19   you want me to, I can get him on the phone right now.

20       Q.    Well, that won't be necessary.  I just want

21   to ask you the questions.

22            Now, after you got this letter on the

23   27th -- or actually from the date that you had the

24   meeting on the 10th of November until you received

25   this letter from Dave Friedman, do you recall having



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

146

1    any written communications with either Mr. McElroy or

2    Mr. Friedman?

3        A.    I don't recall, sir.

4        Q.    You don't recall them sending you anything?

5        A.    I don't recall.

6        Q.    Do you recall sending them anything other

7    than this check and the sublease agreement and your

8    letter?

9        A.    You know, I send so many letters and so

10   many communications, so I don't know.  I might have

11   and I might have not.  So I don't --

12       Q.    So at this point you don't know.  Is that

13   correct?

14       A.    Yes.

15       Q.    Why would you have been sending out the

16   Gaim-Ko balance sheet and income statement on

17   November 15 of 2000?

18       A.    To who?

19       Q.    Well, you don't have a cover letter.  It

20   says to somebody at area code 707.

21       A.    You know, there is a lot of people that ask

22   me for my financial statement and my balance sheet,

23   everything else.  Lou Daleo, I've sent a bunch of --

24   I've sent a lot of people that.  Charles Liberis has

25   a bunch of balance sheets and my credit reports and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

147

1    everything.

2        Q.    But as you sit here today, you don't know

3    why you would have sent that out on November 15?

4        A.    No, I don't.  It could have been November

5    the 30th.  Excuse me for a minute.  I've got to use

6    the bathroom.

7            THE VIDEOGRAPHER:  We are off the record.

8    The time now is 12:35 p.m.

9            (A recess was taken.)

10            THE VIDEOGRAPHER:  We are back on the

11    record.  The time now is 12:50 p.m.

12        Q.    (By Mr. Grant)  Mr. Gallegos, let me show

13    you what's been marked as Exhibit 3.  It's sitting

14    right there in front of you.  Would you take a look

15    at that?  Can you identify Exhibit 3?

16        A.    It's an agreement to charter and purchase

17    vessel.

18        Q.    Who is it between?

19        A.    CSL Corporation and Gaim-Ko.

20        Q.    Would you look at the last page, page 35,

21    of Exhibit 3?

22        A.    Yeah.

23        Q.    Is that your signature --

24        A.    Yes, it is.

25        Q.    -- for Gaim-Ko, Inc.?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

148

1    A.    Yes, it is.

2    Q.    And is it your signature as guarantor at

3 the bottom?

4    A.    Yes, sir.

5    Q.    Is this the agreement that you entered into

6 on behalf of Gaim-Ko with Charles Liberis and CSL

7 Corporation?

8    A.    Yes.

9    Q.    Now, I believe you had said earlier that if

10 Stan and Dave had agreed give you the lease, give you

11 a lease at the pier, you would have gone through with

12 your contract and purchased the boat and put it in at

13 the CLN pier?

14    A.    I'm sure I would have.

15    Q.    I believe you stated earlier that the

16 reason they told you that they would not was because

17 they did not want the Entertainer at their dock?

18    A.    That's right.

19    Q.    And if you had come there with a boat that

20 they liked, they would have given you a lease?

21    A.    I never heard them tell me that.

22    Q.    Did they tell you that they wouldn't let

23 any boat be there?

24    A.    In fact, they weren't even interested in

25 leasing at the time.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

149

Q.    Well, what I'm asking you is, you had
stated while Mr. Liberis was out of the room, they
came to you and told you --

A.    Excuse me.  I got a hiatal hernia.  Okay.

Q.    You had stated earlier that they came to
you while Mr. Liberis was out of the room and told
you that the reason that they weren't going to go
into a lease with you on this was because they did
not want the Entertainer there.

A.    I think also most likely they didn't want
to do business with Charles Liberis.

Q.    Well, they weren't doing business with him,
they were doing business with you.

A.    No, but, I mean, Charles Liberis and the
boat, they didn't want the boat there.

Q.    So that was the reason, was they told you
they just didn't want his boat there?

A.    Right.

Q.    They didn't tell you, "We don't want any
boat here," they said, "We just don't want the
Entertainer here;" isn't that correct?

A.    I don't know if they told me that, sir.

Q.    Do you recall them telling you that we
don't want any boat at this dock?

A.    I don't recall that either.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

150

1    Q.    But you do recall them saying that we don't
2    want this boat at the dock?
3    A.    Right.
4    Q.    And, obviously, you thought that you could
5    enter into a lease with them because you sent a
6    sublease to them with a certified check for $10,000?
7    A.    I sent a proposal to them, yes.
8    Q.    And you took the terms and these were the
9    same terms under your contract with Charles Liberis
10   that you put into the sublease?
11   A.    Right.
12   Q.    Now, if you didn't think they were going to
13   enter into any agreement with you and they didn't
14   want any boats there, why would you have sent that
15   agreement to them and sent them a $10,000 check?
16   A.    Because I thought they were going to give
17   me the lease.  That's what Charles Liberis kept
18   telling me, that he had a long term lease and he
19   could sublease it to me, so evidently he didn't have
20   no lease.
21   Q.    And you thought they were going to give you
22   the same lease that Charles had?
23   A.    That's right.
24   Q.    And the terms of the lease that Charles had
25   were fine with you?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

151

1    A.    I don't know what terms he had, but they

2    wanted $10,000 from me is what they wanted.

3    Q.    But that's what your hope was when you went

4    there, that they would give you the same lease that

5    Charles had?

6    A.    Yes, sir.

7    Q.    And had they been willing to do that, you

8    would have accepted it and purchased the boat?

9    A.    Probably.

10    Q.    If they had given you that same lease he

11    had and it was only because of Mr. Liberis and the

12    Entertainer that they said they weren't going to do

13    that?

14    A.    Probably.

15    Q.    Now, are you still dealing with the folks

16    from the Sea Island pier?

17    A.    The who?

18    Q.    Stan and Dave from Sea Island Pier?

19    A.    No.

20    Q.    You're not dealing with anybody from the

21    pier?

22    A.    No.

23    Q.    When was the last time you had any dealings

24    with anybody from Sea Island Pier, whether it was

25    Stan or Dave or anybody working for them?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

152

1    A.    Who is Sea Island Pier?

2          MR. FOURT:  Sea Ranch.

3    Q.    (By Mr. Grant)  Excuse me, Sea Ranch Pier.

4    A.    No, I haven't talked to them in months.

5    Q.    And you haven't had any communications with

6    them since they sent back your check on November 27?

7    A.    I can't recall.  I really can't.

8    Q.    But you or nobody in your office is working

9    with them currently on any deals?

10   A.    No, I don't think so.  I hope not.

11   Q.    And you're not working with them?

12   A.    No, sir.

13   Q.    They're not trying to find boats for you?

14   A.    No, sir.

15   Q.    Are you currently looking for a boat?

16   A.    In fact, we were hoping to buy one.

17   Q.    Which one are you hoping to buy?

18   A.    Well, we're looking at several, you know,

19   so I'm not going to divulge that.

20   Q.    Who were you looking with?

21   A.    Who was I looking with?

22   Q.    Yeah, do you have anybody that you're

23   working with, Mr. Daleo or anybody else?

24   A.    No, just personally, John and myself.

25   Q.    So you two are just out looking for boats?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

164

1     Q.    And you were still communicating with

2  Charles in between the 10th, which was the meeting,

3  and the 17th when you sent that sublease in?

4     A.    I'm sure I did.  I'm not sure if we did or

5  not or with Lou Daleo, either one.

6     Q.    It's possible that you had?

7     A.    Yes.

8     Q.    And did you have any conversations with

9  Stan or with Dave after the 10th?

10    A.    I can't recall that.

11    Q.    Okay.  So you may have, you just don't

12  know?

13    A.    Don't know.

14    Q.    Bear with me one minute here.  Now, is it

15  safe to assume that both you and Mr. Liberis, since

16  you were both trying to still carry out the contract

17  and to get the lease at the pier there, that you two

18  would have spoken before you sent the proposed

19  sublease to Stan on the 17th?

20    A.    Well, I don't know if we would have.  I

21  mean, the thing is that I wanted to acquire the

22  sublease -- the sublease -- I mean, if Charles

23  Liberis didn't have a lease like he said that he had,

24  a long lease on there, I wanted to protect myself to

25  make sure if they had it, then it would have been



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

165

1    fine then.  So --

2        Q.    But as you two left it on the 10th, you

3    still wanted to try to get the thing done, you still

4    had hopes that you could get it done?

5        A.    Sure.

6        Q.    And when you executed your contract on the

7    17th and then sent it along with the check, you still

8    hoped to enter into the sublease with the pier

9    owners?

10        A.    Yes, sir.

11        Q.    Okay.  And it was sometime after the 17th

12    that you sent that to Mr. Friedman?

13        A.    I believe so.

14        Q.    I mean, it's safe since the check was

15    issued on the 17th, it had to have been at least the

16    17th or after before you sent it to him?

17        A.    Could be.

18        Q.    And you don't have any recollection one way

19    or other if you talked with Charles Liberis in

20    between the 10th and the 17th before you sent that?

21        A.    No, I don't.  I mean, he is a pretty hard

22    fellow to talk to.  He calls -- he calls millions of

23    times.

24        Q.    Now, on the 16th -- and I'm looking at

25    Exhibit 40.  This is one of the exhibits that you had

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

166

1    received.   It's a letter from Lou Daleo to you and

2    it's dated the 16th of November.   I'm going to go

3    ahead and read it to you and then ask you a question

4    if that's all right.

5        A.    Sure.

6        Q.    It says, "Charles called this morning and

7    said Dave Friedman advised him last night that they

8    would sell the property for 1.2 million.   If this is

9    correct, most banks will finance land and income

10   property and this property has the income to retire

11   the debt.   As I understand it from Charles, the

12   casino boat dock could easily bring in 10,000 per

13   month, the bar about 50,000 per year.   They currently

14   get a 5 percent fee on each passenger going on the

15   two charter boats operating there and there is still

16   other income that could be included.   I am advised

17   that the owners will not carry any paper but you may

18   want to structure an offer on this property to the

19   owners possibly using part of your slot inventory or

20   the future income from the parking garage as a

21   guarantee."   Did you call Lou Daleo after you got

22   this memorandum?

23       A.    I don't know if I did.   I think I talked to

24   Charles about it or somebody.

25       Q.    But you don't remember talking to Lou Daleo

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

167

1    about it?

2       A.    No, I don't think so.

3       Q.    The next exhibit is Exhibit No. 41 and this

4    was another of the exhibits that you had

5    authenticated.  This is a letter from Charles Liberis

6    dated November 17, 2000, to Mr. Ray Gallegos and it

7    shows it was transmitted at 9:16 in the morning,

8    which would be 8:16 your time here.  And in this

9    letter it says, "Dear Ray, I have been thinking about

10   the situation at South Padre and I am of the opinion

11   that the purchase of the leasehold interest and

12   improvements for 1.2 million is a great buy.  I am

13   prepared to purchase the property and lease it to you

14   on the same terms that you have previously agreed to

15   which are as follows.  First year prepaid base rent,

16   $60,000 or $5,000 a month and second and third year

17   prepaid base rent $120,000, which translates to

18   10,000 a month with a right of first refusal to

19   purchase the property.  The vessel will be leaving

20   South Padre today and I need your response so it can

21   either be directed to Corpus or returned to Florida."

22          This was the same day that you had executed

23   your contract and got the cashier's check.  Did you

24   call Charles back about his offer?

25      A.    I don't know if I did.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

168

1    Q.    When you received the check back on

2  November 27 from Dave Friedman, did you call Charles

3  back?

4    A.    No, I can't recall.

5    Q.    Well, if on the 17th or even after that you

6  were still hopeful of entering into a sublease there

7  in the South Padre at the pier with the Entertainer

8  as your boat on the same terms that the Entertainer's

9  lease had been prior to that time, why didn't you

10 take Mr. Liberis up on his offer and let him buy the

11 property and go ahead and lease you on the same terms

12 that you had agreed to the lease?

13   A.    Because probably at the time I wasn't

14 thinking of the purchase yet or whatever, you know.

15 I just wanted to go in there -- I mean, 2.7 million

16 or whatever they wanted for that property, I just

17 didn't -- first of all, I didn't have the money.

18   Q.    Well, no, Mr. Liberis says, "I am prepared

19 to purchase the property."

20   A.    That's what I said, but he wanted to buy it

21 and I just didn't feel that I wanted to go in and get

22 myself involved in buying the property.  Because Lou

23 Daleo told me to get involved with him and buy the

24 property 50/50.  I didn't have the money and I think

25 that's what he's referring to there.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

169

1     Q.     No, he says, "I am prepared to purchase the

2   property and lease it to you on the same terms that

3   have been previously agreed to," and then he sets out

4   the terms.  So I'm wondering --

5     A.     I don't think -- I mean, I don't think they

6   would have sold it to him, first of all.

7     Q.     That's not my question.  In this letter he

8   says, it's available and I am prepared to buy the

9   property and lease it to you on the same terms that

10  have been previously agreed to and then he sets the

11  terms out.  And I'm asking, why didn't you take him

12  up on this deal as opposed to sending the same lease

13  terms to Stan with a $10,000 check?

14    A.     Because I had already made a commitment.

15  When I make commitments, that's what it is.  I made a

16  commitment for $10,000, I sent $10,000.  I wasn't

17  actually -- we hadn't come up to a total price.  I

18  didn't know whether it was going to be 5,000, 3,000

19  or 20,000, you see.  So that was just tying up the

20  pier is what I was doing with what I sent them.

21    Q.     I understand that's what you did.  But the

22  terms in your proposed sublease are the same terms

23  that are in this letter and they're the same terms

24  that Mr. Liberis was operating under his lease, which

25  was 5,000 a month.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

170

1     A.    Yeah, but he didn't have it in hand.  He

2  said that he was proposing to buy it.

3     Q.    I understand.  I'm asking why you didn't

4  then call up --

5     A.    That was probably one of the reasons.

6     Q.    I'm asking, why didn't you call up and say,

7  Charles, if you can buy that property and lease it to

8  me under the same terms that we agreed to, I'll do it

9  and then I don't have to deal with Dave or Stan or

10 anybody else?

11    A.    Well, it's like anything else, you know,

12 you do things sometimes out of not thinking.  You

13 know, maybe I didn't think right that time or

14 whatever.

15    Q.    If he had been able to buy the property for

16 1.2 million and turn around and lease it to you on

17 the same terms that you two had agreed to, would you

18 have done it if he had been able to purchase it?

19    A.    With the Entertainer in there or what?

20    Q.    Yes, with the Entertainer.

21    A.    Probably so.

22    Q.    And the terms that he was proposing in this

23 lease that you had in your sublease and that he had,

24 those were agreeable terms to you?

25    A.    What are the terms there?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

1      Q.    Well, the first year base rent was 60,000

2  and then the second and third year base rent was

3  120,000.

4      A.    So the second year was 10,000 a month,

5  right?

6      Q.    Right, second and third year.

7      A.    First year was --

8      Q.    5,000.

9      A.    I'm sure I would have gone for something

10  like that if it was going to be less than -- because

11  I wasn't even sure what Stan and David was going to

12  charge me.

13      Q.    You didn't know what they were going to do?

14      A.    Right, I sure didn't.

15      Q.    So had he been able to do that -- these

16  were agreeable terms as well if he had been able to

17  buy the property?

18      A.    Well, yeah, if he would have been able to.

19      Q.    And weren't these the same terms you had

20  already agreed to with him --

21      A.    With who?

22      Q.    -- with Mr. Liberis, 60,000 the first year

23  and the 120,000 the next two years?

24      A.    On what?

25      Q.    In your contract with him.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

1    A.    We didn't have a contract.

2    Q.    The original contract that was signed

3 between Gaim-Ko and CLS.

4    A.    But he did not have a pier lease.

5    Q.    You're misunderstanding me.  These were the

6 same terms that were in your agreement with

7 Mr. Liberis, were they not, in your contract?

8    A.    I'm not even sure.

9    Q.    Well, they were the same terms that you put

10 in your sublease proposal to Stan, correct?

11    A.    I'm not sure.

12    Q.    But if they were, they were agreeable to

13 you?

14    A.    If they were, they would have been

15 agreeable, right.

16    Q.    And you said earlier if you had been able

17 to get the same lease terms that Charles had had,

18 that was agreeable to you if Stan and Dave would have

19 given those to you to put the Entertainer in?

20    A.    Well, if I was looking at the Entertainer

21 to buy and I would have gotten the dock, I would have

22 put it in there.

23    Q.    But my question is, you had stated earlier

24 that if you had been able to get the same lease terms

25 that Charles had had at the pier, those were




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

173

```
 1    acceptable to you and you would have executed that --

 2        A.    I probably would have.

 3        Q.    And so when he says if I can buy this, I'll

 4    give it to you on the same terms we've previously

 5    agreed to --

 6        A.    Uh-huh.

 7        Q.    And that would have been fine with you, it

 8    would have been acceptable --

 9        A.    Probably would have, yeah.

10        Q.    Okay.  But you did not follow up on this?

11        A.    No, I didn't.

12        Q.    And no boats have been suggested to you or

13    brought to your attention by Stan or Dave since the

14    10th of November when they said we just don't want

15    the Entertainer here?

16        A.    Not that I know of, sir.

17        Q.    But I guess you would be the person who

18    would know if they had?

19        A.    Right.

20        Q.    And you're not aware of any?

21        A.    I'm not aware, sir.  I don't think they're

22    in the brokerage business.

23        Q.    Now, on Exhibit 39, which is another of the

24    exhibits that you had authenticated, this is a letter

25    dated November 14, 2000, from Charles Liberis to you
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

174

1    and this states, "Dear Ray, it is important that we

2    finalize the lease with Sea Ranch so the money can be

3    released from escrow and the boat scheduled for dry

4    dock." So this was after the 10th but before the

5    17th, so at that time you both were still working on

6    obtaining the lease, correct?

7        A.    That's right.

8        Q.    And after this letter, you did try to

9    finalize the lease and you continued to try to

10   finalize the lease by sending those terms to Stan

11   with your check; is that correct?

12       A.    Yes.

13            MS. SAENZ:   Objection to the form.

14       Q.    (By Mr. Grant)   This letter, Exhibit 39, is

15   dated November 14. After November 14 did you and I

16   guess Mr. Liberis still try to finalize the lease

17   with Sea Ranch as evidenced by your November 17

18   contract?

19       A.    Not Charles Liberis, myself, trying to

20   finalize the dock to make sure I had a dock.

21       Q.    But you were still working with Charles at

22   that point?

23       A.    I wasn't working with Charles. I was

24   working by myself. I'm the one that seen the ship,

25   not Charles.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

175

1     Q.    You and he both had talked on the 10th that

2   you were still trying to find a way to do this and he

3   had sent the letter to you and then you went ahead

4   and sent your letter on the 17th, correct?

5     A.    What was that now?

6     Q.    Well, you went ahead and sent your contract

7   and check sometime after the 17th, correct?

8     A.    Right.

9     Q.    And that was for the lease?

10    A.    Right.

11    Q.    With the Entertainer as the boat?

12    A.    Right.

13    Q.    Under the same terms --

14    A.    Right.

15    Q.    -- that you had agreed to earlier?

16    A.    Right.

17    Q.    That was my question.

18    A.    Right.

19    Q.    I guess I asked a bad question there.  Now,

20   on November 20 you faxed to Lou Daleo -- this is

21   Exhibit 42, which is another one of the documents --

22   you faxed to Lou Daleo a 45-page fax which consists

23   of -- it looks like Dunn and Bradstreet's financial

24   information, letters of reference, financials, and

25   things like that?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

176

1      A.    Right.

2      Q.    On the 20th.  Why did you send that to

3   Mr. Daleo on the 20th?

4      A.    Probably so he could give it to Dave and

5   Stan so they could see my background, you know, my

6   credit rating like I did to Charles Liberis and

7   everybody else.

8      Q.    Exhibit 36, which is in the stack of

9   documents that you authenticated, appears to be

10  another copy of the agreement to charter and purchase

11  vessel between Gaim-Ko and CSL with your signature on

12  the back.  Is this a duplicate of what we've got

13  marked as Exhibit 3?

14     A.    Right.

15     Q.    Now, between the time -- between the time

16  November 17, when you had executed your contract and

17  then subsequently sent it to Dave Friedman, and

18  November 27, when Dave Friedman sent the check back

19  to you, had you had any telephone conversations with

20  either Dave or Stan or anybody on their behalf?

21     A.    I can't recall, sir.

22     Q.    As you sit here today you don't remember

23  having any?

24     A.    No.

25     Q.    On November 22, the year 2000, Mr. Daleo

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

177

1    had your $130,000 deposit transferred back out of his

2    trust account back to Gaim-Ko.  Do you recall that?

3        A.    Yes, I do.

4        Q.    What led up to Mr. Daleo sending that back

5    to you on the 22nd?

6        A.    We didn't have a deal.  We didn't have a

7    dock.

8        Q.    Well, you had sent your check and had sent

9    your sublease to them on the 17th or sometime after

10   that and you hadn't heard back from them, so did you

11   instruct Mr. Daleo to release the funds back to you?

12       A.    Yes, I did.

13       Q.    Because regardless of what you heard back

14   from Stan, you didn't think you had a deal?

15       A.    Right.

16       Q.    And that was after you had received the

17   letter on the 17th from Charles Liberis saying I'll

18   go ahead and buy the property and lease it to you at

19   the same terms that you agreed to and also give you a

20   first option to purchase, so there was no obligation

21   to purchase but he'd give you a first option?

22       A.    Uh-huh.  There was nothing to purchase

23   there.  The property belonged to the State.

24       Q.    Okay.  Well, you never followed up with

25   anybody to see if the property could be purchased,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

178

1    correct?

2        A.    Well, no, the way we discussed it that day,

3    in fact, Dave and Stan were the ones that were

4    saying, when they were talking about the lease, that

5    they were just afraid because they didn't have no

6    parking, this and that, that's why they didn't want

7    to lease the dock.

8        Q.    So they told you that they didn't have any

9    parking at that meeting on the 10th and that's why

10   they didn't want to lease the dock?

11       A.    Right.

12       Q.    So it didn't matter what the boat was, they

13   didn't have parking for any boat, whether it was the

14   Entertainer or anything else?

15       A.    I guess.

16       Q.    So if that's the case, then why did you

17   send a cashier's check and a sublease agreement to

18   them when they told you that we don't have any

19   parking for any boat no matter how good the boat is?

20       A.    Well, you know what, they -- well,

21   actually, the reason I sent the check is because they

22   said that they would take $10,000 down as a deposit

23   and then they would consider it.  So I guess after

24   they considered it, they decided against it.

25       Q.    Well, what was there to consider if they

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

179

1  had already told you on the 10th that they didn't
2  have any parking no matter what the boat was?
3      A.    I don't know.
4      Q.    So you thought --
5      A.    I mean, they had that boat there already
6  and they still didn't have the parking, so they could
7  have changed their mind too, you know.
8      Q.    So you were willing to enter into a
9  sublease with them based on the terms that you had
10  already agreed to even though they didn't have
11  parking?
12      A.    Right.  Yes, sir.  Yes, because Charles
13  Liberis was there, so I figured if he had his boat
14  there, I couldn't see why they couldn't accommodate
15  the customers we would get.  It accommodated for him.
16  It's the same boat.
17      Q.    So for your purposes, that didn't matter to
18  you that they said they didn't have parking or not?
19      A.    Right.
20      Q.    If they said, all right, we'll go into the
21  lease but we haven't got any parking for you, would
22  you still have gone into the lease?
23      A.    Yeah.
24      Q.    Mr. Gallegos, this may have been an error
25  on your part, but I've got an exhibit here marked 15

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

180

1    that we read into the record as being one that you

2    did not recognize.  This is to Ray Gallegos from Lou

3    Daleo.  Would you take a look at that?  That may have

4    just stuck to the back of another page.  Actually,

5    I've got two other exhibits, 14 and 13, that I'd like

6    you to take a look at as well that appear to be

7    addressed to you.  Do you recognize Exhibit 15?

8         A.    Yes.

9         Q.    Okay.  So we can put that -- you received

10   that and it's a letter that you got?

11        A.    Sure.

12        Q.    Let's do these one at a time, Mr. Gallegos.

13   Exhibit 14, it's to Ray and John from Lou Daleo.  Do

14   you recall receiving this fax?

15        A.    I don't recall that one.

16        Q.    14 you do not recall?

17        A.    No.

18        Q.    And which one are you looking at now?

19        A.    "Gentlemen, this will acknowledge receipt

20   of your offer to charter."

21             MR. FOURT:  What's the number?

22             THE WITNESS:  No. 13.

23        Q.    (By Mr. Grant)  Do you recall seeing

24   document No. 13?

25        A.    I think I do.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

Aug-24-01 09:56P

P.05

 **Gaim-Ko, Inc.**

Mr. Dave Friedman
South Padre Island Center Joint Venture
One Padre Boulevard
South Padre Island, Texas 78597

Dear Mr. Friedman:

Enclosed is my check, number 5017004189 in the amount of $10,000, per our Sublease
Agreement (see attached).

Sincerely,

R. A. Gallegos
President/Owner

1 Attachment

1 Enclosure



EXHIBIT

DEAN
ASSOCIATES

Aug-24-01  09:56P                                                                    P.06



### Proposal For Sublease Agreement

This proposal to enter into a Sublease Agreement (the "Sublease") is made and effective November 17, 2000, by Gaim-ko Inc. to South Padre Island Center Joint Venture (Sublessor).

Sublessor is the tenant in a lease agreement dated June 30, 1994 with The State of Texas.

Gaim-ko Inc. now desires to sublease the Leased Property from Sublessor.

NOW, THEREFORE, in consideration of $10,000 of Earnest money, the receipt and sufficiency of which are hereby respectively acknowledged, the Sublessor agrees to enter into negotiations with Gaim-ko Inc. to Sublease the Premises as described below. If a mutually acceptable lease is not negotiated between the parties within ninty (90) days from the date of this proposal then Sublessor shall return the $10,000 of Earnest money to Gaim-ko Inc. Sublessor also agrees to discuss the possibility of Gaim-ko purchasing from Sublessor the rights to the lease with the State of Texas.

### PREMISES

A. Berth. The exclusive right to a berth for one (1) cruise ship. The berth is located at the end of the Pier.

B. Ticket Counter. The non-exclusive right to use the area designated "Ticket Counter" on the plat for the sale of Cruse Ship tickets.

C. Modular Office. The non-exclusive right to use a maximum of two (200) parking spaces in the area designated as "Parking" on the Plat for free parking.

### 1. Sublease.

A. Sublessor proposes to sublease the Leased Property as follows:
Sublease Term: The term of this sublease is proposed to be one year, with two, one year options.
Sublease Rent: The rent for the first year is proposed to be Sixty Thousand ($60,000), payable in advance. Rent for the second and third years is proposed to be One Hundred Twenty Thousand ($120,000) per year payable at the beginning of each year.

### 2. Obligations Under Master Lease.

Subtenant agrees to comply with the terms of the Master Lease and shall not do or permit to be done anything that would constitute a breach or default of Sublessor's obligations in the Master Lease. Sublessor agrees to comply with all of Sublessor's obligations in the Master Lease. Sublessor agrees timely to pay rent and other charges due under the Master Lease and, provided Subtenant is not in breach or default of any obligation in this Sublease, shall not do anything to disturb Subtenant's use of the Leased Property pursuant to this Sublease.

### 3. Indemnification.

A. Subtenant will indemnify, protect, defend and hold Sublessor harmless from and against any and all loss, cost, damage and expense arising out of or in any way related to a breach or default

-1-

Aug-24-01  09:57P

P.08

of Sublessor's obligations in the Master Lease by Subtenant.

B.  Sublessor will indemnify, protect, defend and hold Subtenant harmless from and against any and all loss, cost, damage and expense arising out of or in any way related to a breach or default of the Master Lease by Sublessor.

3.  No Assignment or Sublease.
Subtenant shall not, without the prior written consent of both Sublessor and the landlord in the Master Lease, assign this Sublease or sublet the Leased Property or any part thereof.

4.  Notices.
Any notice given in connection with this Agreement, shall be in writing and shall be given to the appropriate party by personal delivery or by certified mail, postage prepaid, or recognized overnight delivery service as follows:

       If to Sublessor:
              South Padre Island Center Joint Venture
              One Padre Boulevard, South Padre Island, Texas 78597

       If to Subtenant:
              Gaim-ko, Inc
              2403 San Mateo Blvd. N.E. Ste. W17
              Albuquerque N.M. 87110

5.  Headings.
Headings used in this Agreement are provided for convenience only and shall not be used to construe meaning or intent.

IN WITNESS WHEREOF, the parties hereto have caused this Sublease to be duly executed as of the date first above written.


_____          _____

South Padre Island Center Joint Venture     Gaim-ko, Inc

# Coastal Marine

Coastal Passenger Vessels, LTD., LLP.
9363 Shady Lane Circle
Houston, Texas 77063

Serving the Maritime Gaming
& Passenger Vessel Industry

**TO:**  John Hale

**FAX#:**  505-880-0567

**DATE:**  8-15-00

**RE:**  Opportunity in Texas

**FROM:**  Lou Daleo    PH: 713-532-2525    FAX:713-532-2618
EMAIL:ldaleo@coastalmarineltd.com    Web Page: www.coastalmarineltd.com

We have an excellent opportunity in the "Cruises to Nowhere" casino boat industry in Texas, located at So. Padre Island, which is an internationally known resort area. This is a turn key operation with all trained personnel, a fully equipped casino boat and an excellent dock lease.

The complete operation can be purchased for $6.5 mil. and I believe the Owner will take back some paper.



EXHIBIT
4

DEAN
& ASSOCIATES

## OFFER TO CHARTER / PURCHASE

On this 16th day of October, 2000, the Buyer as noted herein offers to purchase the MV Entertainer, ON 500051 (Vessel), and assume the operations of the business known as Casino Padre, located at South Padre Island, Texas. In addition an assignment of the dock lease for all land based facilities will be included. All assets being acquired under the terms of this Offer shall be inventoried, identified as Schedule A, which shall be furnished to the Buyer upon the acceptance of this Offer. Schedule A shall then become a part of this and all other revisions of this Offer.

Buyer:
Gam-Ko, Inc. (GKI)
2403 San Mateo Blvd . NE, Ste. W17
Albuquerque, N M. 87110

OWNER:
C.S.L. Corporation, Inc. (C S L )
Three Christian Centre
Wilmington, De. 1960:

GKI offers to enter a Twelve (12) month Charter/Purchase Agreement for the Vessel, (without machines and table games), and the assignment of the Leasehold Assets, under the following terms

GKI agrees to pay a security deposit in the amount of Two Hundred & Fifty Thousand Dollars ($250,000.) at closing. In addition, GKI will pay an additional Two Hundred & Fifty Thousand Dollars ($250,000,000.) as an earnest deposit, within One Hundred & Twenty (120) Days from the date of closing. If GKI has not completed the purchase of the Vessel and assets within Twelve (12) months from the closing date, GKI agrees to pay an additional earnest deposit in the amount of Two Hundred & Fifty Thousand Dollars ($250,000.00) for an extension of this Agreement, for a Twelve (12) month period. GKI agrees to pay a charter fee in the amount of One Hundred & Twenty Five Thousand Dollars ($125,000 00), plus all applicable taxes, payable monthly in advance, for each month the vessel is chartered to the Buyer.

GKI offers the Owner additional security, by allowing the Owner a security interest in certain gaming machines owned by the Buyer, to the maximum extent of Seven Hundred & Fifty Thousand Dollars ($750,000.00) in value. The Buyer agrees to furnish the Owner, a complete list of those assets comprising the equipment being used as additional security, and the physical address where these assets are stored. This list of machines shall be identified as schedule B and shall become a part of this Offer and any modifications thereof. The security interest in these assets shall expire at the end of Six (6) months, provided the Buyer has not been in a state of default during the first Six (6) month period

During the effective term of this Agreement, GKI will purchase the Vessel, and the assignment of all rights and obligations of the property lease, for a total purchase price of Four Million Dollars ($4,000,000.00), less the security deposit and all earnest deposits made to the date of purchase. In addition, GKI shall be given credit for Fifty Percent (50%) of all monthly charter payments made to the date of purchase

*Security Interest on Equip*



EXHIBIT
21
DEAN & ASSOCIATES

After the execution of this, or any revisions of this Agreement, and as quickly as a dry dock date can be secured, the Owner shall, at Owners expense, dry dock the vessel for the purpose of sandblasting and repainting the bottom, up to and including the hull, One foot (1 ft ) above the waterline. Upon leaving the shipyard, the Vessel shall have a current U.S C.G. certificate, with no outstanding items needing correction or repair.

GKI acknowledges that there is no warranty of any kind, expressed or implied, except the guarantee of clear title to be furnished upon the full payment of all sums due under this offer. GKI accepts the Vessel/Assets, as is where is, except as stated above.

Upon the acceptance of this Offer, the C.S.L. agrees to furnish a more Definitive Agreement based on the terms of this Offer, for the review and acceptance of the GKI. The Buyer feels that time is of the essence in this transaction, and it is the expressed desire of the Buyer to close this transaction as quickly as possible

Both parties herein, agree that the only authorized broker involved in this transaction is Coastal Passenger Vessels, Ltd. LLP (Coastal Marine), and the commission due the broker will be paid by C S L. as funds are received from GKI or their assigns.

This Offer may be executed in two or more counterparts, all of which taken together, shall constitute one document.

Buyer: Gaim-Ko, Inc

By: _R.G. Gulley_ Date: _10/18/00_
Title: _President—OWNER_

Owner: C S.L. Development Corp

By: _____    Date: _____

Title: _____

# Coastal Marine

**Coastal Passenger Vessels, Ltd., LLP.**
9363 Shady Lane Circle
Houston, Tx. 77063

Serving the Maritime Gaming
& Passenger Vessel Industry

**2**

**TO:**      Ray

**FAX:**     505-880-0567

**DATE:**    10-20-00

**RE:**      Casino Padre

**FROM:**    Lou Daleo        PH: 713-532-2525      FAX: 713-532-2618
E-Mail: ldaleo@coastalmarineltd.com      Web Pg. http://www.coastalmarineltd.com

Ray, I suggest that you provide your Attorney with the information we discussed earlier about the dock lease, so that she can include a paragraph on this, along with any other changes that she may wish to make in the agreement sent by Charles.

As I mentioned to your earlier today, to assure that you have the lease on the dock that you want, have your Attorney insert a paragraph 10 on pg. 4, setting forth the condition that you and Mr. Liberis will meet with the Landlord at So. Padre Island, to negotiate a lease with reasonable extensions and rates, upon the execution of the Agreement and the wire transfer of the first payment due with the signed agreement.. If such a lease with the landlord is not negotiated to your satisfaction, the agreement becomes null and void and the escrowed deposit is immediately refunded to you.



EXHIBIT
26

BEAN
& ASSOCIATES



# Coastal Marine

Coastal Passenger Vessels, LTD., LLP.
9363 Shady Lane Circle
Houston, Texas 77063

Serving the Maritime Gaming
& Passenger Vessel Industry

**TO:**       Ray

**FAX#:**       505-898-3812

**DATE:**       10-29-00

**RE:**       Clarification To Cate On Terms Of Transaction

**FROM:**       Lou Daleo       PH: 713-532-2525       FAX:713-532-2618

**EMAIL:**       ldaleo@coastalmarineltd.com       Web Page: www.coastalmarineltd.com

In a conversation this evening at about 5:15 pm, with Charles and Kate, it was decided that Kate does not have the same interpretation of the "OfferTo Charter/Purchase", dated 10-16-00 and signed by you on 10-18-00 as you and I have. The basic deal points of this transaction need to be resolved before it can go forward.

It is my understanding, and please correct me if I am wrong, that the Offer to Charter/Purchase referenced above provides for the following to take place.

1. The Definitive Agreement (Agreement) is to be executed, with all related supporting documents, and upon the execution of the Agreement, a deposit in the amount of $130,000.00 is to be made into our escrow account. You and Charles are then to schedule a meeting with the landlord of the dock in So. Padre Island, where you will both negotiate with the landlord for the best possible terms on the dock. If these negotiations do not produce a lease satisfactory to you, the Agreement shall be voided and the escrowed deposit refunded.

2. Upon your acceptance of the terms offered for the dock lease, the escrow funds are to be released to Charles, and applied to the first months charter payment, and the first month shall have a start date on the date of delivery (see 3. below). Charles will then take the boat to dry dock, remove all of his games, and have the specified work done to the bottom of the hull. At this time, based on our conversation of Sunday afternoon, you will negotiate with

the shipyard, an agreement to have them do the balance of the painting that you wish to have done.

3. Delivery is understood to take place in the shipyard, as soon as the work Charles is having done is completed, and the Parties to this Agreement agree to use their best efforts to accomplish a delivery of the vessel on or before 12-1-00. Simultaneously with the delivery of the vessel at the shipyard, you will pay the initial Security Deposit in the amount of $250,000.00., from this point, you are in absolute control of the vessel, and will begin outfitting it with your games and décor.

4. Terms of the Offer To Charter/Purchase call for each monthly charter payment in the amount of $130,000. to be made in advance, and provides for 50% of all charter payments and 100% of all Security Deposits, made to the date of purchase, be applied to the purchase price of $4,000,000.. Any sales, use or other taxes due on the Charter/Purchase of the vessel are the responsibility of Gaim-Ko.

5. Gaim-Ko agrees to purchase the vessel at any time during the first year, however it has been verbally agreed, and shall be so stated in the Agreement, that provided Gaim-Ko has not been in default or otherwise violated the terms of the Agreement, Gaim-Ko may delay the purchase until the second or the third year, with the pre-payment of an additional $250,000.00 Security Deposit, prior to the effective date of the extension, and the continuation of the Charter payments in a timely manner.

6. Charles has requested, and Gaim-Ko has offered as additional security, a security interest in certain gaming machines that they own, to a maximum extent of $750,000. in value. This assignment of inventory shall expire at the end of the sixth month, provided Gaim-Ko has not been in a state of default during the first six months. Gaim-Ko agrees to identify the specific machines being offered, and provide the address of the place of storage. In the event Gaim-Ko has the opportunity to sell certain machines that comprise this collateral, a method of release for the machines being sold and the assignment of other collateral must be identified, to replace the machines sold.

# Coastal Marine

Coastal Passenger Vessels, LTD., LLP.
9363 Shady Lane Circle
Houston, Texas 77063

Serving the Maritime Gaming
& Passenger Vessel Industry

TO:       Ray

FAX#:     505-898-3812

DATE:     10-29-00

RE:       Clarification To Cate On Terms Of Transaction

FROM:     Lou Daleo       PH: 713-532-2525       FAX:713-532-2618

EMAIL:    ldaleo@coastalmarineltd.com    Web Page: www.coastalmarineltd.com

In a conversation this evening at about 5:15 pm, with Charles and Kate, it was decided that Kate does not have the same interpretation of the "OfferTo Charter/Purchase", dated 10-16-00 and signed by you on10-18-00 as you and I have. The basic deal points of this transaction need to be resolved before it can go forward.

It is my understanding, and please correct me if I am wrong, that the Offer to Charter/Purchase referenced above provides for the following to take place.

1. The Definitive Agreement (Agreement) is to be executed, with all related supporting documents, and upon the execution of the Agreement, a deposit in the amount of $130,000.00 is to be made into the escrow account of Coastal Passenger Vessels, LTD, LLP.. You and Charles are then to schedule a meeting with the landlord of the dock in So. Padre Island, no later than November 2, 2000, where you will both negotiate with the landlord for the best possible terms on the dock. If these negotiations do not produce a lease satisfactory to you, the Agreement shall be voided and the escrowed deposit refunded.

2. Upon your acceptance of the terms offered for the dock lease, the escrow funds are to be released to Charles, and applied to the first months charter payment, and the first month shall have a start date on the date of delivery (see 3. below). Charles will then take the boat to dry dock, remove all of his games, and have the specified work done to the bottom of the hull. At this time, based on our conversation of Sunday afternoon, you will negotiate with

the shipyard, an agreement to have them do the balance of the painting that you wish to have done.

3. Delivery is understood to take place in the shipyard, as soon as the work Charles is having done is completed, and the Parties to this Agreement agree to use their best efforts to accomplish a delivery of the vessel on or before 12-1-00. Simultaneously with the delivery of the vessel at the shipyard, you will pay the initial Security Deposit in the amount of $250,000.00., from this point, you are in absolute control of the vessel, and will begin outfitting it with your games and décor.

4. Terms of the Offer To Charter/Purchase call for each monthly charter payment in the amount of $130,000. to be made in advance, and provides for 50% of all charter payments and 100% of all Security Deposits, made to the date of purchase, be applied to the purchase price of $4,000,000.. Any sales, use or other taxes due on the Charter/Purchase of the vessel are the responsibility of Gaim-Ko.

5. Gaim-Ko agrees to purchase the vessel at any time during the first year, however it has been verbally agreed, and shall be so stated in the Agreement, that provided Gaim-Ko has not been in default or otherwise violated the terms of the Agreement, Gaim-Ko may delay the purchase until the second or the third year, with the pre-payment of an additional $250,000.00 Security Deposit, prior to the effective date of the extension, and the continuation of the Charter payments in a timely manner.

6. Charles has requested, and Gaim-Ko has offered as additional security, a security interest in certain gaming machines that they own, to a maximum extent of $750,000. in value. This assignment shall expire when Charles has received 3 payments in the amount of $250,000. Each, and there has been ·no other default under the Agreement. This security interest is intended to replace the security deposit of $750,000. originally requested by Charles. Gaim-Ko agrees to identify the specific machines being offered, and provide the address of the place of storage. In the event Gaim-Ko has the opportunity to sell certain machines that comprise this collateral, a method of release for the machines being sold and the assignment of other collateral must be identified, to replace the machines sold.

# Coastal Marine

Coastal Passenger Vessels, LTD., LLP
9363 Shady Lane Circle
Houston, Texas 77063

Serving the Maritime Gaming
& Passenger Vessel Industry

TO:        Mr. Michael Albers

FAX #:     505-875-1510

DATE:      11-6-00

RE:        Wire Transfer/ Gaim-Ko, Inc.

FROM:     Lou Daleo        PH.: 713-532-2525        FAX : 713-532-2618
E-MAIL: ldaleo@coastalmarineltd.com   Web Pg.: http://www.coastalmarineltd.com

Per your letter of 11-1-00, we were to receive a wire transfer in the amount
of "$130,000.00 from the subject account no later than Monday Morning,
Nov. 6, 2000". This wire has not been received as of this time which is
12:15pm.



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CSL DEVELOPMENT CORPORATION, INC. | § | |
| | § | |
| Complainant, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B01-059 |
| | § | JURY DEMANDED |
| GAIM-KO, INC. and RAY GALLEGOS | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# EXHIBIT "D":

# Excerpts from the sworn deposition testimony of David "Dave" Robert Freidman taken on May 29, 2002.

01-12036
KC/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| CSL DEVELOPMENT CORPORATION, INC. § | |
| § | |
| Plaintiff, § | |
| § | |
| VS. § | CIVIL ACTION NO. B01-059 |
| § | JURY DEMANDED |
| GAIM-K0, INC.; RAY GALLEGOS; SOUTH § | |
| PADRE ISLAND FISHING CENTER, INC.; § | |
| STANLEY McELROY; DAVE FRIEDMAN; § | |
| SRFP, INC.; and SOUTH PADRE ISLAND § | |
| FISHING CENTER JOINT VENTURE § | |
| § | |
| Defendants. § | |

DEPOSITION OF:

# DAVID  ROBERT  FRIEDMAN

MAY  29,  2002

*COPY*



**Worldwide**
**Corporate Headquarters**
3000 Weslayan, Suite 235
Houston, Texas 77027
Tel: 713-572-2000
Fax: 713-572-2009

For Services Worldwide
**800-745-1101**
*worldwidecourtreporters.com*

**Texas**
**Regional Office**
4245 N. Central Expwy, Suite 475
Dallas, Texas 75205
Tel: 214-219-3080
Fax: 214-219-3055

1

1     IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF TEXAS
2              BROWNSVILLE DIVISION

3  CSL DEVELOPMENT                )
   CORPORATION, INC.              )
4                                 )
            Plaintiff,            )
5                                 )
   V.                             )   CIVIL ACTION NO. B01-059
6                                 )   JURY DEMANDED
   GAIM-K0, INC.; RAY GALLEGOS;   )
7  SOUTH PADRE ISLAND FISHING     )
   CENTER, INC.; STANLEY          )
8  McELROY; DAVE FRIEDMAN;        )
   SRFP, INC.; and SOUTH PADRE    )
9  ISLAND FISHING CENTER          )
   JOINT VENTURE                  )
10                                )
            Defendants.           )
11
         ORAL DEPOSITION OF DAVID ROBERT FRIEDMAN
12
                   MAY 29, 2002
13
                    Volume 1
14

15       ORAL DEPOSITION of DAVID ROBERT FRIEDMAN,

16  produced as a witness at the instance of the Plaintiff,

17  and duly sworn, was taken in the above-styled and

18  numbered cause on the 29th of May, 2002, from 6:56 p.m.

19  to 7:53 p.m. before Kimberly J. Carter, CSR in and for

20  the State of Texas, reported by machine shorthand

21  method, at the Law Office of Roerig, Oliveria & Fisher,

22  L.L.P., 855 West Price Road, Suite 9, Brownsville,

23  Texas, pursuant to Notice, the Federal Rules of Civil

24  Procedure, and the provisions stated on the record or

25  attached therein.

2

```
 1                    A P P E A R A N C E S

 2

     FOR THE PLAINTIFF:
 3            Mr. Joseph M. Grant
              THE GRANT LAW FIRM
 4            2437 Bay Area Boulevard
              Suite 100
 5            Houston, Texas   77058

 6            Mr. John Flood
              FLOOD & FLOOD
 7            900 Frost Bank Plaza
              Corpus Christi, Texas   78470

 8

 9   FOR THE DEFENDANTS GAIM-KO, INC. and RAY GALLEGOS:
              Mr. Paul L. Fourt, Jr.
10            ATTORNEY AT LAW
              1000 East Van Buren
11            Brownsville, Texas   78520

12

     FOR THE DEFENDANTS SOUTH PADRE ISLAND FISHING
13   CENTER, INC.; STANLEY McELROY, DAVE FRIEDMAN;
     and SRFP, INC.:
14            Mr. W. Michael Fisher
              ROERIG, OLIVERIA & FISHER, L.L.P.
15            855 West Price Road
              Suite 9
16            Brownsville, Texas   78520

17

     FOR THE DEFENDANTS SOUTH PADRE ISLAND FISHING
18   CENTER JOINT VENTURE:
              Ms. Marcy L. Rothman
19            Mr. Todd Wright
              SPAGNOLETTI ROTHMAN
20            1600 Smith Street
              45th Floor
21            Houston, Texas   77002

22

     ALSO PRESENT:
23            Mr. Stan McElroy

24

25
```

3

1          IT IS STIPULATED and agreed by and between

2     counsel for the respective parties hereto that the

3     deposition of the witness named in the caption hereto

4     may be taken at this time and place before the officer

5     named in the caption hereto; that said deposition, or

6     any part thereof, when so taken, may be used on the

7     trial of this case with the same force and effect as if

8     the witness were present in court and testifying in

9     person;

10          THAT the necessity for preserving objections at

11     the time of taking is waived, and that any and all legal

12     objections to this deposition, or any part thereof, may

13     be urged at the time same is sought to be offered in

14     evidence on the trial of this cause, except, however,

15     that objections to the form of the question and/or

16     responsiveness of the answer must be made at the time of

17     taking, or else such objections are waived;

18          THAT the original of this deposition shall be

19     presented to Mr. Fisher, who shall in turn submit it to

20     the witness for his examination and signing and

21     thereafter shall return same to the officer taking this

22     deposition;

23          THAT if the signed original is not presented to

24     Mr. Flood prior to the time of trial or any hearing in

25     this matter, a copy may be used in lieu thereof.

4

```
 1                        INDEX
           ORAL DEPOSITION OF DAVID ROBERT FRIEDMAN
 2                      MAY 29, 2002

 3                                           Page

 4   Appearances .................................    2

 5   Stipulations................................. 3, 31

 6   Direct Examination-Mr. Flood.................    5
     Examination-Mr. Fourt.......................   32
 7   Redirect Examination-Mr. Flood..............   34

 8   Witness' Signature Page.....................   40

 9   Reporter's Certificate......................   41

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

5

```
 1              DAVID ROBERT FRIEDMAN,

 2  was called as a witness by the Plaintiff and, being

 3  first duly sworn, testified as follows:

 4                   DIRECT EXAMINATION

 5  QUESTIONS BY MR. FLOOD:

 6       Q.   Can you tell us your name, please?

 7       A.   David Robert Friedman.

 8       Q.   Where do you live?

 9       A.   South Padre Island, Texas.

10       Q.   What's your address?

11       A.   191B Parade, South Padre Island, Texas, 78597.

12       Q.   How long have you lived in this area?

13       A.   14 years.

14       Q.   Where did you live before that?

15       A.   Dallas, Texas.

16       Q.   What did you do in Dallas?

17       A.   I was in the real estate development business.

18       Q.   So you moved here in '88?

19       A.   '88.

20       Q.   Okay.  What did you do when you moved here in

21  '88?

22       A.   I purchased a restaurant.

23       Q.   Which one?

24       A.   Sea Ranch Restaurant, South Padre Island.

25       Q.   Okay.  Is that in the same location where the
```

06:56 PM (lines 5–25)

6

| | | |
|---|---|---|
| 06:56 PM | 1 | Sea Ranch Restaurant is now? |
| 06:56 PM | 2 | A.    That's correct. |
| 06:56 PM | 3 | Q.    Who did you purchase it from? |
| 06:56 PM | 4 | A.    Arestis Aguillar. |
| 06:56 PM | 5 | Q.    I'm sorry? |
| 06:57 PM | 6 | A.    Arestis Aguillar. |
| 06:57 PM | 7 | Q.    Okay.  Explain to me your interest in SRFP, |
| 06:57 PM | 8 | Inc. |
| 06:57 PM | 9 | A.    I'm a stockholder in that corporation. |
| 06:57 PM | 10 | Q.    What percentage of the total amount of stock |
| 06:57 PM | 11 | do you own? |
| 06:57 PM | 12 | A.    25 percent. |
| 06:57 PM | 13 | Q.    And who owns the remaining 75 percent? |
| 06:57 PM | 14 | A.    James L. Embry owns 50 percent and Bobbie |
| 06:57 PM | 15 | Pertle, his wife, owns the other 25 percent. |
| 06:57 PM | 16 | Q.    Where do they live? |
| 06:57 PM | 17 | A.    Dallas, Texas. |
| 06:57 PM | 18 | Q.    All right.  Do you own interest in any other |
| 06:57 PM | 19 | companies or entities that Mr. Embry and Ms. Pertle also |
| 06:58 PM | 20 | own interest in? |
| 06:58 PM | 21 | A.    Mr. Embry, yes. |
| 06:58 PM | 22 | Q.    What is that company or companies? |
| 06:58 PM | 23 | A.    Sea Ranch Enterprises, Inc. |
| 06:58 PM | 24 | Q.    Okay. |
| 06:58 PM | 25 | A.    Marina Village, Inc. |

7

06:58 PM 1     Q.    Is that all?

06:58 PM 2     A.    Two land joint ventures:  One called Tortuga

06:58 PM 3  Limited, one called Tugator Limited.  I think, to my

06:58 PM 4  knowledge, that's it.

06:58 PM 5     Q.    What business is Sea Ranch Enterprises, Inc.,

06:58 PM 6  in?

06:58 PM 7     A.    Owns and operates Sea Ranch Restaurant on

06:59 PM 8  South Padre Island.

06:59 PM 9     Q.    Okay.  Does Mr. Stan McElroy own any shares of

06:59 PM 10  Sea Ranch Enterprises, Inc.?

06:59 PM 11    A.    No, sir.

06:59 PM 12    Q.    Are you an employee of that corporation?

06:59 PM 13    A.    Yes, sir.

06:59 PM 14    Q.    Is that a Texas corporation?

06:59 PM 15    A.    Yes, sir.

06:59 PM 16    Q.    And Mr. Embry and Ms. Pertle own shares in

06:59 PM 17  that corporation?

06:59 PM 18    A.    We're talking about Sea Ranch Enterprises,

06:59 PM 19  Inc.?

06:59 PM 20    Q.    Yes.

06:59 PM 21    A.    Yes, sir.  Well, Ms. Pertle does not.

06:59 PM 22    Q.    Okay.  You and Mr. Embry do?

06:59 PM 23    A.    That's correct.

06:59 PM 24    Q.    Are there any other shareholders?

06:59 PM 25    A.    No, there are not.

8

| 06:59 PM | 1 | Q. What business is Marina Village, Incorporated, |
| 06:59 PM | 2 | in? |
| 06:59 PM | 3 | A. Owns and operates restaurants and various real |
| 06:59 PM | 4 | estate developments. |
| 06:59 PM | 5 | Q. Are those restaurants and real estate |
| 06:59 PM | 6 | developments in South Texas? |
| 06:59 PM | 7 | A. Yes, sir. |
| 07:00 PM | 8 | Q. All of them exclusively? |
| 07:00 PM | 9 | A. Yes, sir. |
| 07:00 PM | 10 | Q. Okay. Are they on South Padre Island? |
| 07:00 PM | 11 | A. South Padre Island and Port Isabel. |
| 07:00 PM | 12 | Q. Okay. What business is Tortuga Limited in? |
| 07:00 PM | 13 | A. It's a real estate parcel on South Padre |
| 07:00 PM | 14 | Island. |
| 07:00 PM | 15 | Q. So Tortuga Limited is a limited partnership |
| 07:00 PM | 16 | that owns a single piece of property? |
| 07:00 PM | 17 | A. That's correct. |
| 07:00 PM | 18 | Q. Okay. How large is that piece of property? |
| 07:00 PM | 19 | A. About 5 acres, I believe. |
| 07:00 PM | 20 | Q. Are there any improvements on those 5 acres? |
| 07:00 PM | 21 | A. No. |
| 07:00 PM | 22 | Q. When was Tortuga Limited formed? |
| 07:00 PM | 23 | A. I would say about 1994, I believe. |
| 07:00 PM | 24 | Q. Does Mr. McElroy have any interest in Tortuga |
| 07:01 PM | 25 | Limited? |

|          |    |                                                    |
|----------|----|----------------------------------------------------|
| 07:01 PM | 1  | A.    No.                                           |
| 07:01 PM | 2  | Q.    Marina Village, Inc.?                         |
| 07:01 PM | 3  | A.    No.                                           |
| 07:01 PM | 4  | Q.    What is Tugator Limited?                      |
| 07:01 PM | 5  | A.    A real estate partnership.                    |
| 07:01 PM | 6  | Q.    Is it the number 2 and then --               |
| 07:01 PM | 7  | A.    No.  It's T-U.                                |
| 07:01 PM | 8  | Q.    T-U.                                          |
| 07:01 PM | 9  | A.    G-A-T-O-R.                                    |
| 07:01 PM | 10 | Q.    Okay.  It's a -- I'm sorry.  What business is |
| 07:01 PM | 11 | it in?                                              |
| 07:01 PM | 12 | A.    It owns real estate.                          |
| 07:01 PM | 13 | Q.    Okay.  Where's the real estate?              |
| 07:01 PM | 14 | A.    On South Padre Island.                        |
| 07:01 PM | 15 | Q.    Okay.  Is that property improved?            |
| 07:01 PM | 16 | A.    No.                                           |
| 07:01 PM | 17 | Q.    How many acres does Tugator own?              |
| 07:01 PM | 18 | A.    I believe approximately two.                  |
| 07:01 PM | 19 | Q.    You were here earlier when Mr. McElroy was   |
| 07:01 PM | 20 | deposed?                                            |
| 07:01 PM | 21 | A.    Yes, sir.                                     |
| 07:01 PM | 22 | Q.    Were you here for his entire deposition?     |
| 07:01 PM | 23 | A.    I believe I was.  Yes, sir.                   |
| 07:02 PM | 24 | Q.    Okay.  Was there any testimony that           |
| 07:02 PM | 25 | Mr. McElroy gave that, in your opinion, was false? |

07:02 PM 1     A.    No, sir.

07:02 PM 2     Q.    Okay.

07:02 PM 3          MS. ROTHMAN:  Let me just interpose an

07:02 PM 4  objection, form, on that.

07:02 PM 5          MR. FLOOD:  To the answer?

07:02 PM 6          MS. ROTHMAN:  No.  It was to the

07:02 PM 7  question, but he got the answer out too quickly.

07:02 PM 8          THE WITNESS:  Shall I slow down?  I'm

07:02 PM 9  trying to, you know, expedite it.

07:02 PM 10         MR. FISHER:  You're doing fine, Dave.

07:02 PM 11         MS. ROTHMAN:  You're doing fine.  You're

07:02 PM 12  doing just fine.

07:02 PM 13     Q.   (By Mr. Flood)  The lease that was executed by

07:02 PM 14  CSL Development Corporation which facilitated the CASINO

07:02 PM 15  PADRE berthing at your pier, Mr. McElroy testified that

07:02 PM 16  you were primarily involved in the discussions and

07:02 PM 17  negotiations involving that lease; is that true?

07:03 PM 18     A.   I was involved.  I'm not sure that I'm

07:03 PM 19  primarily involved.  But yes, I was involved.

07:03 PM 20     Q.   Okay.  If you were not primarily involved, who

07:03 PM 21  was primarily involved?

07:03 PM 22     A.   I would say Mr. McElroy and myself.

07:03 PM 23     Q.   Okay.  So you would say -- did you jointly

07:03 PM 24  share that job of negotiating the lease with

07:03 PM 25  Mr. Liberis?

11

| 07:03 PM | 1 | A. I would say that's a fair statement. |
| 07:03 PM | 2 | Q. Okay. The other leases that have been entered |
| 07:03 PM | 3 | by the joint venture involving the OSPREY, did you |
| 07:03 PM | 4 | negotiate those? |
| 07:03 PM | 5 | A. Yes, sir. |
| 07:03 PM | 6 | Q. Exclusively? |
| 07:03 PM | 7 | A. With some input from Mr. McElroy. |
| 07:03 PM | 8 | Q. Okay. I gather from your answer that the |
| 07:03 PM | 9 | lease with CSL, negotiation of the lease with CSL had |
| 07:03 PM | 10 | more involvement by Mr. McElroy than the other lease |
| 07:03 PM | 11 | with the OSPREY. Is that true? |
| 07:04 PM | 12 | A. Yes, sir. |
| 07:04 PM | 13 | Q. Why? |
| 07:04 PM | 14 | A. Because the lease with CSL involved approval |
| 07:04 PM | 15 | from the General Land Office, and it was a more |
| 07:04 PM | 16 | complicated situation with a lot more deal points in it. |
| 07:04 PM | 17 | Q. Okay. And y'all had never entered a lease |
| 07:04 PM | 18 | with a gaming ship before. That's true? |
| 07:04 PM | 19 | A. That's correct, sir. |
| 07:04 PM | 20 | Q. Okay. More difficult to do something the |
| 07:04 PM | 21 | first time than it is, maybe, to do the second or third |
| 07:04 PM | 22 | time. Is that a fair statement? |
| 07:04 PM | 23 | A. I would say so. Yes, sir. |
| 07:04 PM | 24 | Q. Earlier Mr. McElroy was asked questions about |
| 07:04 PM | 25 | a meeting that took place on November 10th that you |

12

| | | |
|---|---|---|
| 07:04 PM | 1 | attended and that Mr. Liberis and Mr. Gallegos attended. |
| 07:05 PM | 2 | Do you recall that meeting and the testimony? |
| 07:05 PM | 3 |     A.   Yes, sir. |
| 07:05 PM | 4 |     Q.   Where was that meeting? |
| 07:05 PM | 5 |     A.   It was at the Sea Ranch fishing pier in an |
| 07:05 PM | 6 | upstairs bar called Hookers Sunset Bar. |
| 07:05 PM | 7 |     Q.   Okay.  Was there anyone else in the room with |
| 07:05 PM | 8 | you-all besides -- let me ask it this way:  Were there |
| 07:05 PM | 9 | customers and bartenders there? |
| 07:05 PM | 10 |     A.   No, sir.  The bar is closed and this was prior |
| 07:05 PM | 11 | to the 3:00 p.m. opening, I believe. |
| 07:05 PM | 12 |     Q.   Okay.  Did you read Mr. Ray Gallegos' |
| 07:05 PM | 13 | deposition? |
| 07:05 PM | 14 |     A.   No, I did not. |
| 07:05 PM | 15 |     Q.   Okay.  I'm going to read to you some of his |
| 07:05 PM | 16 | deposition and I'm going to ask you some questions about |
| 07:05 PM | 17 | his recollection of the meeting, okay? |
| 07:05 PM | 18 |     A.   Yes, sir. |
| 07:05 PM | 19 |     Q.   At page 125, line 12 of his deposition, |
| 07:05 PM | 20 | Mr. Grant asked Mr. Gallegos to, quote, "Tell me about |
| 07:06 PM | 21 | that meeting." |
| 07:06 PM | 22 |            And the answer was:  "Well, nothing |
| 07:06 PM | 23 | happened.  It was just talk and Charles Liberis was |
| 07:06 PM | 24 | telling them that we were going to buy the boat and |
| 07:06 PM | 25 | stuff like this.  And Stan and Dave were very reserved. |

07:06 PM 1    They just listened, you know, and me thinking, well, you

07:06 PM 2    know, he has a lease because that's what Charles Liberis

07:06 PM 3    told me since Day 1.  He said, 'I have a long-term lease

07:06 PM 4    so don't worry.  I can get you a lease'."

07:06 PM 5                   I'm going to stop reading at that point.

07:06 PM 6    It is true that prior to November 10, 2000, Mr. Liberis

07:06 PM 7    had had a long-term lease, correct?

07:06 PM 8         A.    No, sir.

07:06 PM 9         Q.    Okay.  At any time prior to November 10, 2000,

07:06 PM 10   he had had a long-term lease?

07:06 PM 11        A.    No, sir.

07:06 PM 12        Q.    Okay.  Had he had more than a month-to-month

07:06 PM 13   lease?

07:06 PM 14        A.    Yes, sir.

07:06 PM 15        Q.    All right.  What was the longest term lease he

07:06 PM 16   had had up to that point?

07:07 PM 17        A.    Eight months, I believe, sir.

07:07 PM 18        Q.    And in November of 2000, it is true, is it

07:07 PM 19   not, that the joint venture was still willing to enter a

07:07 PM 20   long-term or a similar-term lease with CSL?

07:07 PM 21        A.    No, sir.

07:07 PM 22        Q.    Were there ever discussions between you and

07:07 PM 23   Mr. Friedman --

07:07 PM 24        A.    I'm Mr. Friedman.

07:07 PM 25        Q.    I'm sorry.  I apologize.  -- with you and

14

07:07 PM 1   Mr. McElroy regarding entering another lease with

07:07 PM 2   Mr. Liberis after October 2000, other than a

07:07 PM 3   month-to-month?

07:07 PM 4        A.   No, sir.  I don't believe so.

07:07 PM 5        Q.   Okay.  I'm going to continue reading from the

07:07 PM 6   answer of Mr. Gallegos when he was asked to tell us

07:07 PM 7   about what happened at the meeting, okay?

07:07 PM 8        A.   Yes, sir.

07:08 PM 9        Q.   Now, I'm picking up at line 20 on page 125.

07:08 PM 10            "And I was worried because I called him

07:08 PM 11  several times.  I said, 'Charles, are you sure you have

07:08 PM 12  a lease?'  'Yes.  Don't worry about it.'  It started

07:08 PM 13  getting close to get down there, so at this time when we

07:08 PM 14  went down there, one of the times, I guess, Mr. Liberis

07:08 PM 15  went to the bathroom or something and either Stan or the

07:08 PM 16  other gentleman said that they just didn't want that

07:08 PM 17  boat there.  They weren't happy with the boat."

07:08 PM 18            Now, I'm going to ask you -- I'm going to

07:08 PM 19  stop reading now.  I'm going to ask you whether you

07:08 PM 20  recall that conversation taking place between you,

07:08 PM 21  Mr. McElroy, and Mr. Gallegos, that being that

07:08 PM 22  Mr. Liberis left the presence of you and Mr. Gallegos

07:08 PM 23  and Mr. McElroy and that either Stan, being Stan

07:08 PM 24  McElroy, or the other gentleman -- and I'm going to

07:09 PM 25  suppose that that is you -- said that you, quote, "just

| | | |
|---|---|---|
| 07:16 PM | 1 | initial meeting and with which to reach a decision to |
| 07:16 PM | 2 | move forward. |
| 07:16 PM | 3 | Q.   Okay.  Such as? |
| 07:16 PM | 4 | A.   Such as a business plan. |
| 07:16 PM | 5 | Q.   Is a business plan, in your opinion, |
| 07:16 PM | 6 | nonsubstantive? |
| 07:16 PM | 7 | A.   No. |
| 07:16 PM | 8 | Q.   Okay.  But you discussed that in that |
| 07:16 PM | 9 | intervening week, didn't you? |
| 07:16 PM | 10 | A.   I don't understand the question. |
| 07:16 PM | 11 | Q.   And I may be wrong about your testimony.  It's |
| 07:16 PM | 12 | my understanding you said that nothing substantive was |
| 07:16 PM | 13 | discussed between November 10 and November 17 between |
| 07:16 PM | 14 | Gaim-Ko and either you or Mr. McElroy. |
| 07:16 PM | 15 | A.   Nothing was discussed with me. |
| 07:16 PM | 16 | Q.   Okay.  With you? |
| 07:16 PM | 17 | A.   With me. |
| 07:16 PM | 18 | Q.   Okay.  On November 11, 12, 13, 14, 15, 16, or |
| 07:16 PM | 19 | 17, you never spoke to Ray Gallegos, John Hale, or |
| 07:17 PM | 20 | anyone else with Gaim-Ko, Inc.? |
| 07:17 PM | 21 | A.   Not to my recollection. |
| 07:17 PM | 22 | Q.   All right.  So all the discussions that would |
| 07:17 PM | 23 | have taken place -- okay.  All right.  You don't recall |
| 07:17 PM | 24 | any.  All right.  Was a discussion of the sale of the |
| 07:17 PM | 25 | primary lease -- |

20

07:17 PM 1      A.    Sale of the primary lease.  I'm sorry.

07:17 PM 2      Q.    Right.  -- of your interests of the -- joint

07:17 PM 3  venture's interest in the primary lease, was that

07:17 PM 4  discussed in the intervening week, the week between

07:18 PM 5  November 10 and November 17?

07:18 PM 6      A.    I don't believe so.  Not to my knowledge.

07:18 PM 7      Q.    Okay.  Did you have any discussions with

07:18 PM 8  Mr. Liberis between November 10 and November 17th

07:18 PM 9  regarding his possible purchase of the joint venture's

07:18 PM 10 interests in the lease with the General Land Office?

07:18 PM 11     A.    I just don't recall.

07:18 PM 12     Q.    Okay.  Now, when you received the letter from

07:18 PM 13 Mr. Gallegos that enclosed a $10,000 check -- and I'll

07:19 PM 14 just read from the text of the letter.

07:19 PM 15          It says:  "Enclosed is my check" -- and

07:19 PM 16 this is a letter to you from R. A. Gallegos, president

07:19 PM 17 and owner of Gaim-Ko, Inc.  "Enclosed is my Check

07:19 PM 18 No. 5017004189 in the amount of $10,000 per our sublease

07:19 PM 19 agreement.  See attached."

07:19 PM 20          Can you tell me why Mr. Gallegos used the

07:19 PM 21 word "our" in that sentence, "per our sublease

07:19 PM 22 agreement"?

07:19 PM 23     A.    I have no idea.

07:19 PM 24     Q.    Okay.  What is it -- can you and I agree that

07:19 PM 25 Mr. Gallegos appears, according to this letter, to

21

| | | |
|---|---|---|
| 07:19 PM | 1 | believe that he has an agreement with you? |
| 07:20 PM | 2 | MR. FOURT:  Objection, form. |
| 07:20 PM | 3 | A.    Give me the question again, please. |
| 07:20 PM | 4 | Q.    (By Mr. Flood)  Sure. |
| 07:20 PM | 5 | MR. FLOOD:  If you don't mind, I'd like |
| 07:20 PM | 6 | you to read it, please. |
| 07:20 PM | 7 | (Requested portion was read.) |
| 07:20 PM | 8 | A.    According to this letter, yes. |
| 07:20 PM | 9 | MR. FOURT:  Same objection. |
| 07:20 PM | 10 | Q.    (By Mr. Flood)  I'm sorry.  I couldn't hear |
| 07:20 PM | 11 | your answer. |
| 07:20 PM | 12 | A.    Yes. |
| 07:20 PM | 13 | Q.    Okay.  So you and I can agree that looking at |
| 07:20 PM | 14 | this letter, Mr. Gallegos on November 17th appears to |
| 07:20 PM | 15 | believe that he has a lease agreement with you? |
| 07:20 PM | 16 | MS. ROTHMAN:  Objection, form. |
| 07:20 PM | 17 | MR. FOURT:  Same objection. |
| 07:20 PM | 18 | A.    Yes. |
| 07:20 PM | 19 | Q.    (By Mr. Flood)  Okay.  Now, when you received |
| 07:20 PM | 20 | this letter, did you contact Mr. Gallegos? |
| 07:20 PM | 21 | A.    No. |
| 07:20 PM | 22 | Q.    Why not? |
| 07:21 PM | 23 | A.    I believe I did not contact Mr. Gallegos.  I |
| 07:21 PM | 24 | talked to Mr. McElroy. |
| 07:21 PM | 25 | Q.    Okay. |

22

07:21 PM 1     A.    And asked him what was -- what this was all

07:21 PM 2  about or what was going on or where was he in his -- not

07:21 PM 3  negotiations, but in his due diligence with

07:21 PM 4  Mr. Gallegos.  And I said, "Well, what should I do?"

07:21 PM 5           He said, "Return the check."

07:21 PM 6     Q.    Okay.  And the reason you called Mr. McElroy

07:21 PM 7  and not Mr. Gallegos is because you hadn't been involved

07:21 PM 8  in the negotiations that week, correct?

07:21 PM 9     A.    That's correct.

07:21 PM 10    Q.    And it may have been that your partner,

07:21 PM 11 Mr. McElroy, had entered an agreement with Mr. Gallegos

07:21 PM 12 that you just didn't know about, correct?

07:21 PM 13           MS. ROTHMAN:  Objection, form.

07:21 PM 14    A.    No.

07:21 PM 15    Q.    (By Mr. Flood)  That didn't go in your -- that

07:21 PM 16 wasn't in your mind at all?

07:22 PM 17    A.    No.

07:22 PM 18    Q.    Then why didn't you call Mr. Gallegos and

07:22 PM 19 say --

07:22 PM 20    A.    I didn't need to.  Mr. McElroy would not enter

07:22 PM 21 into an agreement without my -- without us conferring.

07:22 PM 22    Q.    Okay.  So my question, then, is why did you

07:22 PM 23 call Mr. McElroy and not Mr. Gallegos?

07:22 PM 24    A.    I was trying to ascertain the status of our --

07:22 PM 25 of whatever -- where we were in this program with the

25

07:26 PM 1    this agreement, would you have had authority to sign it

07:26 PM 2    on behalf of the joint venture?

07:26 PM 3        A.    On the joint venture only?

07:26 PM 4        Q.    Yeah.   On the second page it has the signature

07:26 PM 5    line for the South Padre Island Center Joint Venture.

07:26 PM 6        A.    No.

07:26 PM 7        Q.    You would not have had authority to do so?

07:26 PM 8        A.    No, sir.

07:26 PM 9        Q.    Okay.   Why is that?

07:26 PM 10       A.    Because our joint venture agreement calls for

07:26 PM 11   anything that needs approval by the General Land Office

07:26 PM 12   has to be approved by Mr. McElroy.

07:26 PM 13       Q.    Okay.   So is it your testimony that this

07:26 PM 14   document would have had to have been approved by the

07:26 PM 15   General Land Office?

07:26 PM 16       A.    I believe it would have.   Yes, sir.

07:26 PM 17       Q.    Why?

07:26 PM 18       A.    Because I don't believe that the -- a gaming

07:27 PM 19   boat was in our use clause in our lease.

07:27 PM 20       Q.    Okay.   But you'd already received consent to

07:27 PM 21   have the gaming ship there, the same gaming ship,

07:27 PM 22   correct, from the General Land Office?

07:27 PM 23       A.    Yes.   Yes.

07:27 PM 24       Q.    Okay.   So it's your testimony that this

07:27 PM 25   document is a sublease that Mr. McElroy would have had

| | | |
|---|---|---|
| 07:27 PM | 1 | to have signed? |
| 07:27 PM | 2 | A.   That's correct. |
| 07:27 PM | 3 | Q.   Okay.  What is the phone number at the -- what |
| 07:27 PM | 4 | was the phone number in November of 2000 at the |
| 07:27 PM | 5 | restaurant? |
| 07:27 PM | 6 | A.   Area code (956) 761-1314. |
| 07:28 PM | 7 | Q.   Is there a separate number for -- do you have |
| 07:28 PM | 8 | an office separate and apart from the restaurant? |
| 07:28 PM | 9 | A.   Yes. |
| 07:28 PM | 10 | Q.   All right.  What's the number at your office? |
| 07:28 PM | 11 | A.   Area code (956) 761-4665. |
| 07:28 PM | 12 | Q.   And how about a cell phone at that time?  And |
| 07:28 PM | 13 | I assume that office number was the number that you gave |
| 07:28 PM | 14 | me that would have been in place in November of 2000? |
| 07:28 PM | 15 | A.   Yes. |
| 07:28 PM | 16 | Q.   Okay.  Did you have a cell phone in November |
| 07:28 PM | 17 | of 2000? |
| 07:28 PM | 18 | A.   Yes. |
| 07:28 PM | 19 | Q.   Do you recall or do you have the same number? |
| 07:28 PM | 20 | A.   No.  I don't have the same number.  It was |
| 07:28 PM | 21 | 570-CASH. |
| 07:28 PM | 22 | Q.   Okay.  956? |
| 07:28 PM | 23 | A.   956. |
| 07:28 PM | 24 | Q.   At the meeting on November 10th when |
| 07:29 PM | 25 | Mr. Liberis was, as Mr. McElroy described earlier, |

07:29 PM 1    quote, "mediating," end quote, were the terms -- were

07:29 PM 2    rent and the term period of the potential lease

07:29 PM 3    discussed?

07:29 PM 4         A.    Not in those specific terms.

07:29 PM 5         Q.    Okay.  In what terms were they discussed?

07:29 PM 6         A.    Mr. Liberis sort of moderated this meeting to

07:29 PM 7    the extent of "would you take" type inquiries.

07:29 PM 8         Q.    Okay.  And when he would propose a "and would

07:29 PM 9    you take" proposals were used both for the term period

07:30 PM 10    and for the amount of rent?

07:30 PM 11         A.    Yeah.

07:30 PM 12         Q.    Okay.  And when he would ask, "Would you take

07:30 PM 13    a particular amount," were there answers provided?

07:30 PM 14         A.    To some degree, yes.

07:30 PM 15         Q.    Okay.  What were some of the amounts of rent

07:30 PM 16    that he proposed that were discussed?

07:30 PM 17         A.    I can't specifically recall amounts, but they

07:30 PM 18    were in ranges, it seems, or back-and-forth type

07:30 PM 19    conversations.

07:30 PM 20         Q.    Do you recall whether the numbers discussed

07:30 PM 21    were more or less than what CSL was paying at the time?

07:30 PM 22         A.    They were less.

07:30 PM 23         Q.    Okay.  And do you recall whether the term

07:30 PM 24    periods that were discussed were more or less than the

07:31 PM 25    primary lease that CSL received from the joint venture?

28

07:31 PM 1      A.    I believe they were less.

07:31 PM 2      Q.    Okay.  So the discussions were specific enough

07:31 PM 3 that you know that the amounts discussed as to rent were

07:31 PM 4 less that what CSL was paying and that the terms

07:31 PM 5 proposed and discussed were less than what CSL had.  You

07:31 PM 6 just can't recall the exact --

07:31 PM 7      A.    That seems to be -- it sticks in my mind.

07:31 PM 8 Yes.

07:31 PM 9      Q.    Okay.  The two-page agreement that

07:32 PM 10 Mr. Gallegos included in his November 17 letter, it has

07:32 PM 11 a sub -- under paragraph 1 of the sublease on page 1, it

07:32 PM 12 states:  "Sublease term:  The term of this sublease is

07:32 PM 13 proposed to be one year with two one-year options."

07:32 PM 14           Is that the sublease term that was

07:32 PM 15 discussed at the November 10 meeting?

07:32 PM 16      A.    I believe it's one of several.

07:32 PM 17      Q.    Okay.  And it's true, isn't it, that that term

07:32 PM 18 was not specifically disagreed with nor agreed with by

07:32 PM 19 either you or Mr. McElroy at the November 10 meeting?

07:33 PM 20      A.    That's correct.

07:33 PM 21      Q.    All right.  But it is one that was discussed?

07:33 PM 22      A.    I believe so, yes.

07:33 PM 23      Q.    All right.  And the sublease rent that is

07:33 PM 24 included in this agreement that was forwarded by

07:33 PM 25 Mr. Gallegos on the 10th -- or on the 17th, I'm sorry --

07:33 PM 1   states under paragraph 1:  "The rent for the first year

07:33 PM 2   is proposed to be 60,000 payable in advance.  Rent for

07:33 PM 3   the second and third years is proposed to be $120,000

07:33 PM 4   per year payable at the beginning of each year."

07:33 PM 5           Now, that would have been less than what

07:33 PM 6   CSL paid, true?

07:33 PM 7       A.   Correct.

07:33 PM 8       Q.   All right.  And is that, those numbers for

07:33 PM 9   sublease rent, those were numbers that were discussed at

07:33 PM 10  the meeting on November 10th, true?

07:33 PM 11      A.   Yes.

07:34 PM 12      Q.   Okay.  Now, between November 10th and

07:34 PM 13  November 17th, did you have any discussions with Charles

07:34 PM 14  Liberis?

07:34 PM 15      A.   I don't recall.

07:34 PM 16      Q.   Do you recall having any discussions with

07:34 PM 17  anyone else with CSL Development Corporation other than

07:34 PM 18  Mr. Liberis between November 10th and November 17th?

07:34 PM 19      A.   No.

07:34 PM 20      Q.   Okay.  So the answer to my question is, you

07:34 PM 21  did not have any discussions with anyone else?

07:34 PM 22      A.   I have never discussed anything with CSL other

07:35 PM 23  than Mr. Liberis at that -- at that level of management.

07:35 PM 24      Q.   Now, between -- and I may be wrong about this,

07:35 PM 25  but my recollection is that Mr. McElroy testified that

07:35 PM 1   the $1.2 million idea that was floated to -- for

07:35 PM 2   Mr. Liberis to purchase the -- Mr. Liberis or Gaim-Ko to

07:35 PM 3   purchase the interests that the joint venture had

07:35 PM 4   aquired from the General Land Office, that that was

07:35 PM 5   discussed in the week between November 10 and

07:35 PM 6   November 17th.  Do you recall those conversations?

07:35 PM 7        A.    In that time period, no.

07:35 PM 8        Q.    Okay.  What is your recollection of when those

07:35 PM 9   discussions took place?

07:36 PM 10       A.    My recollection of those discussions took

07:36 PM 11  place sometime after the Gaim-Ko, after we returned

07:36 PM 12  this -- this letter and check.  And I think Mr. Liberis

07:36 PM 13  made a remark of, "Well, we'll just buy you out."

07:36 PM 14             And I came back with an answer or he

07:36 PM 15  said, "What would it take to buy you out," and I think I

07:36 PM 16  said, "Well, why don't you try 1.2 million."

07:36 PM 17             And I think that's the -- the length of

07:36 PM 18  the discussion.

07:36 PM 19       Q.    Where did that number come from?

07:36 PM 20       A.    That number came from a feeling of what we had

07:36 PM 21  invested and what we might take for it.  It was solely

07:37 PM 22  in my opinion.

07:37 PM 23       Q.    Okay.  But if Mr. Liberis had accepted that

07:37 PM 24  offer, is that a deal that you-all might have done?

07:37 PM 25       A.    I would have discussed it with my partners.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CSL DEVELOPMENT CORPORATION, INC. | § | |
| | § | |
| Complainant, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B01-059 |
| | § | JURY DEMANDED |
| GAIM-KO, INC. and RAY GALLEGOS | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# EXHIBIT "E":

# Excerpts from the sworn deposition testimony of Catherine Stetson taken on December 4, 2001.

1

```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2                  BROWNSVILLE DIVISION

 3   CSL DEVELOPMENT CORPORATION, INC.,

 4                          Plaintiff,

 5    -vs-              CIVIL ACTION NO. B01 059

 6   GAIM-KO, INC.; RAY GALLEGOS;
     SOUTH PADRE ISLAND FISHING
 7   CENTER, INC.; STANLEY McELROY;        ORIGINAL
     DAVE FRIEDMAN; SRFP, INC.; and
 8   SOUTH PADRE ISLAND FISHING
     CENTER JOINT VENTURE,
 9
                            Defendants.
10

11

12        VIDEO DEPOSITION OF CATHERINE STETSON
                  December 4, 2001
13                    3:56 p.m.
              1305 Rio Grande Blvd., NW
14              Albuquerque, New Mexico

15

16

17       PURSUANT TO THE FEDERAL RULES OF CIVIL
     PROCEDURE, this deposition was:
18

19   TAKEN BY:  JOHN FLOOD, ESQ.
                ATTORNEY FOR PLAINTIFF
20

21   REPORTED BY:  DEBORAH L. O'CONNOR, RPR, CRR, CCR #297
                   BEAN & ASSOCIATES, INC.
22                 Professional Court Reporting Service
                   500 Marquette, N.W., Suite 280
23                 Albuquerque, New Mexico 87102

24   (5736-18) DEB

25
```


SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

2

```
 1                     APPEARANCES

 2   For the Plaintiff:

 3        THE GRANT LAW FIRM
          2437 Bay Area Blvd., #100
 4        Houston, Texas 77058
          BY:  JOSEPH M. GRANT, ESQ.
 5
          HILLIARD & MUNOZ, PPC
 6        719 S. Shoreline Blvd., Suite 600
          Corpus Christi, Texas 77401
 7        BY:  JOHN FLOOD, ESQ.

 8   For the Defendants Gaim-Ko and Ray Gallegos:

 9        PAUL J. FOURT, JR., ESQ.
          1000 E. Van Buren
10        Brownsville, Texas 78520

11   For the Defendant South Padre Island Fishing Center
     Joint Venture:
12
          GRIFFITH, SAENZ & HILL, LLP
13        1325 Palm Blvd., Suite H
          Brownsville, Texas 78520
14        BY:  CARLA SAENZ, ESQ.

15   For the Defendants Stanley McElroy, Dave Friedman,
     and SRFP, Inc.:
16
          ROERIG, OLIVERIA & FISHER, LLP
17        855 West Price Road, Suite 9
          Brownsville, Texas 78520
18        BY:  W. MICHAEL FISHER, ESQ. (by telephone)

19   Also Present:

20        Mr. Ray Gallegos
          Rudy Ortiz, Esq.
21        Mr. Dale Alverson, Videographer
          Mr. Stanley McElroy (by telephone)
22        Mr. Dave Friedman (by telephone)

23

24

25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

3

1                          INDEX                    PAGE

2   CATHERINE STETSON

3   Examination By Mr. Flood                           6

4

5                        EXHIBITS

6   EXHIBIT              DESCRIPTION               PAGE

7   44        Memo from Daleo to Gallegos            23

8   45        10/31/00 e-mail from Stetson to        32
              Liberis re your redline
9
    46        10/30/00 memo from Daleo to Stetson    32
10            re deal points

11  47        10/29/00 memo from Daleo to Ray re     32
              clarification to Cate
12
    48        WordPerfect document compare           33
13            summary

14  49        Agreement to charter and purchase      33
              vessel
15
    50        Third draft                            35
16
    51        10/29/00 mem from Daleo to Ray re      38
17            clarification to Cate

18  52        10/27/00 memo from Daleo to Stetson    39
              re Gaim-Ko agreement
19
    53        Second draft                           35
20
    54        Offer to charter/purchase              42
21
    55        Charter-purchase agreement             35
22
    56        9/18/00 fax from Garrity to Stetson    43
23
    57        9/18/00 fax from Garrity to Stetson    44
24            re new casino built barge

25  58        9/18/00 fax from Montoya to Stetson    45
              re Texas project



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

4

1   59      9/11/00 letter from Liberis to      45
            Gallegos re M/V Entertainer
2
    60      Condition and valuation survey      45
3           report

4   61      Draft                               37

5   62      Draft                               36

6   63      Draft                               36

7   64      Fifth draft                         36

8   65      Draft                               37

9

10  CERTIFICATE OF COMPLETION OF DEPOSITION     51

11  WITNESS SIGNATURE/CORRECTION PAGE           54

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

5

1          THE VIDEOGRAPHER:  My name is Dale

2   Alverson, videographer for Bean and Associates, Inc.,

3   at 500 Marquette, NW, Suite 280, Albuquerque, New

4   Mexico 87102.  The court reporter is Deborah

5   O'Connor.

6          This is the videotaped deposition of

7   Catherine Stetson in the matter of CSL Development

8   Corporation, Inc., vs. Gaim-Ko, Inc.; Ray Gallegos;

9   South Padre Island Fishing Center, Inc.; Stanley

10  McElroy; Dave Friedman; SRFP, Inc.; and South Padre

11  Island Fishing Center Joint Venture, Case No. B01-059

12  in the United States District Court for the Southern

13  District of Texas, Brownsville Division.

14          We are in the offices of Catherine Stetson

15  at 1305 Rio Grande, NW, Albuquerque, New Mexico

16  87104.  Will the attorneys please state their names

17  for the record.

18          MR. FLOOD:  John Flood and Joe Grant for

19  the plaintiff.

20          MS. SAENZ:  Carla Saenz for South Padre

21  Island Fishing Center Joint Venture.

22          MR. FISHER:  Michael Fisher here for the

23  pier defendants other than South Padre Island pier --

24  fishing pier.

25          MR. FOURT:  Paul Fourt with Gaim-Ko, Inc.,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

6

1    and Ray Gallegos.

2            THE VIDEOGRAPHER:  We are on the record.

3    The date is December 4, 2001.  The time now is 3:56

4    p.m.  Will the reporter please swear in the witness.

5            CATHERINE STETSON,

6    having been first duly sworn, testified as follows:

7                    EXAMINATION

8        Q.    (By Mr. Flood)  Good afternoon.

9        A.    Hi.

10       Q.    My name is John Flood.  Could you tell your

11   name, please?

12       A.    My name is Katherine Stetson.

13       Q.    All right.  And if you would, tell the

14   folks on the jury what you do for a living.

15       A.    I'm an attorney and a lobbyist.

16       Q.    All right.  And we're here at your office

17   in Albuquerque, New Mexico, in December, 2001,

18   correct?

19       A.    That's correct.

20       Q:    And I say that because I want you to know

21   that at some point we may bring a television and a

22   VCR in front of the jury down in Brownsville and play

23   parts of your deposition.  Okay?

24       A.    Okay.

25       Q.    And have you ever had your deposition

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

7

1  taken?

2      A.    Yes.

3      Q.    All right.  If you would, just briefly give

4  me an idea of when that was and what it involved.

5      A.    A long time ago, 20 years.

6      Q.    Okay.  And you're an attorney here in

7  Albuquerque and you assisted Mr. Gallegos and his

8  company in the dealings related to the ship, the

9  Entertainer, correct?

10     A.    That's correct.

11     Q.    If you would, just give us an understanding

12 of what your role was.

13     A.    Basically to make sure the documents

14 reflected the parties' agreement.

15     Q.    All right.  And in that regard who did you

16 mostly deal with from the CSL side, Mr. Liberis, or

17 did you deal mostly with Mr. Daleo, the broker?

18     A.    I think originally I dealt more with

19 Mr. Daleo and at the end I dealt more with

20 Mr. Liberis.

21     Q.    Okay.  So when you started getting into the

22 specifics of the words and phrases that would be used

23 in the actual agreement that everyone signed, you

24 started to deal with Mr. Liberis more; is that a fair

25 characterization?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

8

1    A.    I don't think it is, but I don't -- I mean,

2    I didn't -- I didn't talk to either one of them that

3    often, but the words went through Mr. Daleo.  But I

4    think at the end I was talking to Mr. Liberis about a

5    couple of specific things, about a couple of specific

6    things, but it wasn't so much the words were through

7    him, no.

8    Q.    And we'll get into those specifics in a

9    little while.  I just wanted to get an understanding

10   of who the players were and who you dealt with.

11   A.    Just those two.

12   Q.    Okay.  A couple ground rules as far as the

13   parties go.  I want to reach an agreement with you

14   about names we can use.  I represent Mr. Liberis and

15   his company, CSL Development, okay, and I may call

16   them CSL, I may call it Mr. Liberis, I may even slip

17   and call him the plaintiff.

18   A.    I would recognize all three.

19   Q.    Okay.  Good.  On the other side, I may call

20   Mr. Gallegos's company Gaim-Ko or I may refer to

21   Mr. Gallegos sometimes, but that's who I'm referring

22   to as far as your client goes, okay?  And then I'll

23   call the pier defendants, that would be Mr. McElroy,

24   Mr. Friedman, and the company who owned the pier down

25   in South Padre Island, okay?  And you heard all of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

**DEAN & ASSOCIATES, Inc.**
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

9

1    them listed off a minute ago and Mr. Fisher called

2    them the pier defendants.  I may call them the pier

3    folks, okay?

4         A.     As long as you don't use their specific

5    names because I don't think I would recognize them.

6    The pier guys is fine.

7         Q.     Perfect.  Now, today, prior to your

8    deposition, we were provided with portions of your

9    file and I understand that you took out documents

10   that would be passing between you and your client

11   that would be privileged and I've looked through them

12   and I don't see any that I think would be privileged.

13   So what I'm going to do in a little while is go

14   through each one of those and have you tell me what

15   draft it is and how it was different and things like

16   that.  Well, don't worry, it won't be a --

17        A.     Good, because I'm afraid I'm going to fall

18   short on that one.

19        Q.     It won't be word by word, I promise you.

20   But, first of all, I'm going to try to get an

21   understanding of why it is you were brought in and

22   what it is that you did specifically, okay?

23        A.     Uh-huh.

24        Q.     Had you prior to this transaction ever done

25   any work for Mr. Gallegos or his company, Gaim-Ko?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

10

1      A.    Yes.

2      Q.    Was any of that work in relation to the

3   purchase or sale of a vessel?

4      A.    No.

5      Q.    This is the first time he had ever gotten

6   into this business, correct?

7      A.    That's correct, as far as I know.

8      Q.    Was it the first time you had ever been

9   involved in the drafting of a conveyance document of

10  a vessel?

11     A.    Yes.

12     Q.    Okay.  What did you do, if anything, to

13  familiarize yourself with the terminology and the

14  things like that as far as conveyance of vessels?

15     A.     I called a maritime attorney.

16     Q.    Any particular attorney?

17     A.    An attorney in Connecticut.  They don't do

18  a lot of maritime law here in Albuquerque.

19     Q.    I figured.  I was curious about it.  Do you

20  recall the name of that attorney in Connecticut?

21     A.    Yes.

22     Q.    What was his or her name?

23     A.    Donald Vitale.

24     Q.    And what city does he live in?

25     A.    He lives in -- he practices in Waterbury.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

**BEAN & ASSOCIATES, Inc.**
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

11

1   I don't know where he lives.

2        Q.    In Waterbury?

3        A.    Waterbury, Connecticut.

4        Q.    Is it V-I-T-A-L-I?

5        A.    A-L-E.

6        Q.    A-L-E.  All right.  How did you find him?

7        A.    He is a personal friend.

8        Q.    Does he do exclusively maritime law or does

9   he do other work also?

10       A.    Other work.

11       Q.    Okay.  Thank you.  I'm going to show you --

12  well, before I get there, did he participate in the

13  drafting of any of the provisions --

14       A.    No.

15       Q.    Okay.  All right.  He just gave you some

16  general guidance and --

17       A.    Yes.

18       Q.    Did he provide you with any sort of

19  references or --

20       A:    No.

21       Q.    Okay.  All right.  He said good luck on

22  your first maritime adventure?

23       A.    It isn't that much different than --

24       Q.    Okay.

25       A.    -- you know, a transaction of other sorts.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

26

1    like to do -- have you finished looking through your

2    whole file?

3         A.    No, but I've finished looking at what I

4    needed to look at.

5         Q.    All right.  Nothing definitive in there

6    that allows you to conclude that you prepared that

7    paragraph?

8         A.    No, but, I mean -- no.

9         Q.    All right.  Okay.  Looking at the entire

10   agreement, 35-page agreement, which is marked as

11   Exhibit 3, are there any clauses, terms or words in

12   that agreement that you consider -- that you

13   considered at the time to be ambiguous?

14        A.    Well, I would -- from the best of my

15   recollection, I would say yes because I did have a

16   couple of discussions with Mr. Daleo because there

17   were misspellings, there were poor punctuations,

18   there were things that weren't clear to me and when I

19   would raise them, I would be -- he would be critical

20   of it and basically say, look, we want it the way it

21   was written, the banks want it the way it was

22   written, we just want to change the minimal amount

23   and we don't care about the spelling and punctuation.

24        Q.    Mr. -- go ahead.  I apologize.

25        A.    Ask a question.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

27

1      Q.     Just to ensure the record is clear,
2   Mr. Daleo was not your client, correct?
3      A.     That's correct.
4      Q.     Did your client sign the agreement over
5   your objection?
6      A.     This agreement?
7      Q.     Yes.
8      A.     I don't -- no, it's not my place to tell
9   him what to sign or not.  I mean --
10     Q.     Did you apprise your client of your opinion
11  that the agreement contained ambiguities?
12     A.     I apprised my client of my opinion of the
13  agreement.  I wouldn't -- I don't know whether I
14  specifically characterized something as ambiguous.
15     Q.     Okay.  Did you use any words that meant to
16  convey that the document contained ambiguity without
17  using that word exactly?
18     A.     That wasn't my biggest problem with the
19  document, its having ambiguities.
20     Q.     What was your biggest problem?
21     A.     I thought it was -- I thought it was -- I
22  thought it was pretty one-sided and in many cases not
23  that well written.
24     Q.     Okay.  But he signed it even though you
25  gave him that opinion?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

28

1    A.    He signed it, yes.

2    Q.    Okay.  Well, did you give him those

3    opinions after he signed it or prior to his signing

4    it?

5    A.    Probably both.

6    Q.    Okay.  All right.  Okay.  Do you have an

7    understanding of why the sale of the Entertainer fell

8    through?

9    A.    I don't know why the sale of the

10    Entertainer was ever a subject and I don't know why

11    it ever fell through.  I don't know why he decided to

12    buy it and I don't know why he decided not to and

13    that isn't generally the kind of thing -- I don't

14    usually ask my clients why are you doing it.  I do

15    what they tell me to do.

16    Q.    So is it fair to state that it is your

17    testimony that you have no understanding as to why

18    the sale of the M/V Entertainer did not occur?

19    A.    I do not know why it did not occur.

20    Q.    And you have no understanding in any manner

21    why it didn't?

22    A.    Well, I mean, I -- no, I don't really -- I

23    don't know.  I do not know why it didn't.  We never

24    discussed why it didn't.

25    Q.    Has it ever been conveyed to you any

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

29

1   rationale as to why it did not occur by anyone?

2        A.    I know that financing was an issue.

3        Q.    Okay.

4        A.    But I don't know that that was a definitive

5   issue and I know of no other issue.

6        Q.    And financing was an issue for whom?

7        A.    For the buyer, my client.

8        Q.    What was the issue regarding financing?

9        A.    It was an expensive boat and my client had

10  to make sure that he had the money to buy the boat

11  because he didn't want to default on it.

12       Q.    All right.  And how is it that you gained

13  that information, that your client was having

14  difficulty securing the funds to purchase?

15       A.    Well, I didn't -- I'm not sure that there

16  was a difficulty in it, but I know it was an issue.

17  I don't know that he had difficulty doing it, but to

18  come up with $5 million is -- or 4 million or

19  whatever it is is a lot of money and I know he had to

20  go to people to find the money.  I mean, that was a

21  subject of discussion.  Whether he was having

22  difficulty -- I didn't know whether he was doing it

23  successfully or not doing it successfully.

24       Q.    Okay.  Do you -- is Mr. Gallegos or Gaim-Ko

25  still a client of yours?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

38

1   to me prior to the deposition, the yellow stickies

2   were on the right margin.  What is the significance

3   of the pages that were marked with the yellow

4   stickies, if any?

5        A.    I don't know -- did I mark them?

6        Q.    I received it that way.

7        A.    Did you mark them?

8              MR. FOURT:  I don't know.

9              THE WITNESS:  Who knows?

10       Q.    (By Mr. Flood)  None in your mind?

11       A.    Not in my mind.

12       Q.    Okay.  If you could, let's go back to that

13  bottom stack and see if you can find Exhibit 51.

14       A.    51 or 61?

15       Q.    5-1, I apologize.  51.

16       A.    Yes.

17       Q.    What is 51?

18       A.    Memo from Lou Daleo to Raymond.

19       Q.    Does it have any of your handwriting on it?

20       A.    "Gaim-Ko/boat."

21       Q.    That is your handwriting?

22       A.    Yes.

23       Q.    Any other handwriting of yours on that

24  exhibit?

25       A.    No.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

39

1     Q.    52?

2     A.    Memo to me from Lou Daleo.

3     Q.    All right.  Does that contain any

4 handwriting of yours?

5     A.    It has a note up at the top,

6 "Gaim-Ko/boat," and it has a red bracket on one

7 paragraph and it says "not true" under another

8 paragraph and then it has language at the back with

9 edits.

10    Q.    What does that part of that paragraph that

11 is bracketed off as stating "not true," what is the

12 substance --

13    A.    They're two different things.  One is

14 bracketed and not true is next to another paragraph.

15    Q.    I apologize.  I read that "not true" to

16 apply to the paragraph.  What is the substance of the

17 paragraph that you wrote "not true" next to it?

18    A.    It has to do with the payments, payment

19 schedule.

20    Q.    What is -- what was inaccurate about that

21 statement?

22    A.    The payment schedule was really screwed up.

23 That was one of the things that I didn't care about

24 the document before -- I don't know what it means

25 right now, but not that I'm an accountant, but when



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

40

1  you deal with a multimillion dollar deal, you try to
2  track out your -- and the payment schedule was not
3  accurate in my opinion.
4      Q.    Okay.  Why was it inaccurate?
5      A.    I don't remember why.  I mean, that was
6  part of, you know, conversation I had had with my
7  client.  There were a number of things that I didn't
8  like about this deal and one of them is I just think
9  it was inaccurately written as far as how the payment
10 terms were.  It just didn't add up.  I mean, we ran
11 tables on it.  It just didn't add up right.
12     Q.    Did you provide a recommendation as to how
13 to phrase the payment schedule that would -- that was
14 in your opinion accurate?
15     A.    I might have -- and I don't really remember
16 that because at this point Mr. Daleo was not being
17 very cooperative.  I mean, the deal wanted to get
18 done.  This was actually just a few days before it
19 was ultimately signed and everybody just wanted to
20 get the deal done.  I draw attention to these things,
21 but I don't make the deal.
22     Q.    Anything else besides the payment schedule
23 and -- what was the other thing?  Anything else
24 besides the payment schedule that you -- oh, and the
25 ambiguities that we didn't specifically discuss but

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

41

1   we generally referred to --

2       A.    You generally referred to.  I didn't refer

3   to any ambiguities.  I think there were problems with

4   the documents but it was not so much ambiguities as

5   inaccuracies --

6       Q.    Okay.  Any --

7       A.    -- or things left out.

8       Q.    Any other omissions or inaccuracies

9   substantively that you recall that you voiced to your

10  client and which they disregarded and went ahead and

11  signed the document anyway?

12      A.    All of the things -- virtually all of the

13  things -- well, I would have to go back and find from

14  the date of this through and see what changes were

15  made in the documents, but there were many, many

16  things the matter including I thought it was

17  important that my client insist on having an updated

18  marine survey, which ultimately we did get included

19  and we did receive, but that was -- that was

20  something that I was concerned about.

21          There had been no title searches done, no

22  liens -- whatever the equivalent for boats are.

23  There are many, many things like that in doing a

24  multimillion dollar transaction that I would be picky

25  enough about because I'm very picky.  And so the



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

42

1    payment schedule was one and the liens was one

2    that -- the timing about when the boat was going to

3    be painted, dry docked and painted, was one.  There

4    were a number of things, you know.  I wouldn't

5    characterize them as ambiguities.  I would

6    characterize them as issues that needed to be dealt

7    with.

8        Q.    Specifics that were not included?

9        A.    Or that were -- yes.  Or that were

10   inaccurate.

11       Q.    And these --

12       A.    But that's what "not true" meant.

13       Q.    I apologize.  I don't mean to interrupt

14   you.  These concerns and -- were voiced to your

15   client by you prior to his execution of the document?

16       A.    Yes.

17       Q.    Okay.  What is Exhibit 54?

18       A.    Where is Exhibit 54?  Okay.  An offer to

19   charter slash purchase.

20       Q.    Okay.  Is that the -- the subject of that

21   the M/V Entertainer?

22       A.    Yes, I believe so.  Yes, it is.

23       Q.    And is -- and I'm going to ask you the same

24   question.  Is there any of your handwriting on that

25   document?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CSL DEVELOPMENT CORPORATION, INC. | § | |
| | § | |
| Complainant, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B01-059 |
| | § | JURY DEMANDED |
| GAIM-KO, INC. and RAY GALLEGOS | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# EXHIBIT "F":

# Affidavit of Wayne Marks, Chief Financial Officer of sureBET Casinos, Inc. and former General Manager of Casino Padre, LLC

## AFFIDAVIT

STATE OF _California_
COUNTY OF _Riverside_

BEFORE ME, personally appeared, WAYNE MARKS, being first duly sworn deposes and says:

1. My name is Wayne Marks. My residence is 73885 Shadow Mountain Drive, Palm Desert CA 92260; my work address is 84245 Indio Springs Pkwy, Indio CA 92203.

2. I served as the Chief Financial Officer of sureBET Casinos, Inc. and the General Manager of Casino Padre, LLC. until November 24, 2000.

3. I have actual knowledge that Charles S. Liberis, the President of CSL Development Corporation and President of sureBET Casinos, Inc. met with Dave Friedman, Stan McElroy and Ray Gallegos at the Sea Ranch Pier on Friday, November 10, 2000 for the purpose of negotiating a lease on the Sea Ranch Pier for Gaim-Ko, Inc of which Mr. Gallegos is President.

4. Immediately after the meeting on November 10, 2000, I was advised by both Mr. Liberis and Mr. Gallegos that satisfactory terms had been reached with the South Padre Island Fishing Center Joint Venture, the owner of the Sea Ranch Fishing Pier, and with its principals, Dave Friedman and Stan McElroy.

5. On Monday, November 13, 2000, I had a discussion with Dave Friedman at the Sea Ranch Fishing Pier. On that date, Mr. Friedman again reiterated to me that a satisfactory agreement had been reached with Mr. Gallegos. Mr. Friedman further told me that "the lease is a done deal" and that "the only thing that remains to be done is that the attorney (he did not specify whether it would be his attorney or Mr. Gallegos' attorney) is going to take the identical lease previously prepared between Sea Ranch and Casino Padre, LLC. and simply change the name of the lessee to Gaim-Ko, Inc."

6. Further Affiant sayeth naught.

IN WITNESS WHEREOF, dated this _26_ day of _August_ 2002

Wayne Marks

LIBERIS                    04335409          08/05 '02 ω.45 NO.727  03/03

STATE OF _California_
COUNTY OF _Riverside_

    Sworn to and subscribed before me this __26__ day of ____July____, 2002, by
__Wayne Marks__, who is personally known to me or produced
identification in the form of _____ and acknowledged that her/she executed the
same for the uses and purposes therein expressed.

> ROBERT W. HOLLENBECK
> COMM. # 1286317
> NOTARY PUBLIC-CALIFORNIA
> RIVERSIDE COUNTY
> COMM. EXP. OCT. 13, 2004

NOTARY SEAL