S2

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

AUG 0 9 2002

Michael N. Milby
Clerk of Court

| | |
|---|---|
| CSL DEVELOPMENT CORPORATION,   INC. § | |
| § | |
| **Plaintiff,** § | |
| v. § | |
| § | |
| GAIM-KO, INC.; RAY GALLEGOS; SOUTH § | CIVIL ACTION NO. B-01-059 |
| PADRE ISLAND FISHING CENTER, INC.; § | JURY DEMANDED |
| STANLEY McELROY; DAVE FRIEDMAN; § | |
| SRFP, INC.; and SOUTH PADRE ISLAND § | |
| FISHING CENTER JOINT VENTURE § | |
| § | |
| **Defendants.** § | |

## DEFENDANTS, RAY GALLEGOS AND GAIM-KO, INC.'S
## MOTION  FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

**NOW COME, RAY GALLEGOS** and **GAIM-KO, INC.** (hereinafter known as "Gaim-Ko") and file their Motion for Summary Judgment and in support would show the court as follows:

## I.

## FACTUAL BACKGROUND

Gaim-Ko is a New Mexico corporation which owns and operates casino gaming equipment.  Ray Gallegos is the founder and president of the corporation.  In the summer of 2000, Gaim-Ko began investigating the possibility of using ocean going vessels as casinos for its gaming equipment.   In the gaming boat industry, this type of operation is known as a "cruise to nowhere".  A typical "cruise to nowhere" operation takes on passengers at a United States port and sails ten miles offshore where casino style gambling is permissible.  After the designated time

Page 1

limit, the ship returns the passengers to the same port.

During this time period, Gaim-Ko began working with Lou Daleo, who specialized in brokering deals for large cruise ships. Mr. Daleo introduced Gaim-Ko to CSL Corporation, Inc. (hereinafter "CSL") and its president, Charles Liberis. CSL was operating a "cruise to nowhere" vessel (referred to as the M/V ENTERTAINER) out of South Padre Island, Texas. Starting in September of 2000, Gaim-Ko and CSL negotiated for the charter and/or sale of the M/V ENTERTAINER. After extensive negotiations, Gaim-ko executed its counter-part to the Agreement To Charter And Purchase Vessel (hereinafter "Charter/Purchase Agreement") on November 3, 2000. CSL signed the Charter/Purchase Agreement on November 4, 2000. The contract called for Gaim-Ko to charter the M/V ENTERTAINER from CSL and possibly purchase the vessel at Gaim-Ko's option.

The Charter/Purchase Agreement also contained a contingency clause in paragraph 4. The contract was conditioned on Gaim-Ko negotiating a berthing lease for the vessel at the South Padre Island Fishing Pier (hereinafter "Pier"). The Pier was the only one suitable for the M/V ENTERTAINER, and in fact, the Pier was being used by CSL for its operation. The Charter/Purchase Agreement, which defined Gaim-Ko as "Operator", stated that the escrow money "... **is fully refundable to Operator if the Pier Lease, hereinafter defined, is not negotiated to Operator's satisfaction within (1) week from execution hereof, in which event this Agreement shall be null and void.**" *See Appendix Exhibit* 14, p.3.

The Pier was owned through a leasehold interest by South Padre Island Fishing Center, Inc., SRFP, Inc, and South Padre Island Fishing Center Joint Venture (hereinafter "Pier Owners"). Pier Owners leased the land from the State of Texas, so any lease for dock space was

actually a "Pier Sublease". Pier Owners were represented by Stan McElroy and Dave Friedman. Prior to November 4, 2000, Gaim-Ko and Pier Owners had not met and had not entered into negotiations for a new Pier Sublease. On November 9, Gaim-Ko representatives traveled to South Padre Island to meet with CSL's representative, Charles Liberis, and Pier Owner representatives, Stan McElroy and Dave Friedman. No Pier Sublease negotiations took place on November 9, 2000.

On the afternoon of November 10, 2000, Gaim-Ko representatives, Ray Gallegos, Pete Montoya and John Hale, met with Pier Owner representatives, Stan McElroy and Dave Friedman, and CSL's representative, Charles Liberis, for the purpose of preliminary negotiations for a new Pier Sublease for the M/V ENTERTAINER. The meeting was driven by Mr. Liberis as he tried to encourage Gaim-Ko and Pier Owners to reach an agreement on the Pier Sublease. No terms were agreed to at this meeting. No contract was agreed to. No written proposals or offers were exchanged at this meeting. They did not even exchange a letter of intent. The conversation was an initial introduction of the parties and a general discussion of the Pier Sublease. Gaim-Ko and Pier Owners did not agree to or even seriously negotiate a Pier Sublease at the meeting.

Gaim-Ko returned to New Mexico without a Pier Sublease. However, Gaim-Ko continued to try and negotiate with Pier Owners even after the Charter/Purchase Agreement became null and void. Gaim-Ko sent a short two page Proposal For Sublease Agreement and $10,000.00 for consideration on November 17, 2000. The check was returned by Dave Friedman with a letter stating that the Pier Owners were not interested in subleasing the Pier to Gaim-Ko. Unable to negotiate a Pier Sublease to its satisfaction, Gaim-Ko requested the earnest money be returned as specified by the contract. The money was returned.

Page 3

## II.

## THE LAWSUIT

On April 20, 2001, Plaintiff sued the Pier Owners and Gaim-Ko by filing its Original Complaint in this court.

Plaintiff requested a dismissal of its allegations against Pier Owners and an Order of Dismissal was signed by this court on June 19, 2002. The remaining portion of this lawsuit alleges that Gaim-Ko breached its contract for the charter and possible sale of the M/V ENTERTAINER.

Plaintiff alleges in its Original Complaint, that all conditions precedent required by the Charter/Purchase Agreement were performed or had occurred. Also, Plaintiff claims that Gaim-Ko failed to fulfill its obligation under the contract.

## III.

## SUMMARY JUDGMENT EVIDENCE

Gaim-Ko argues the following Summary Judgment Evidence:

1.      Affidavit from Ray Gallegos; *Appendix, "Exhibit 1"*

2.      Affidavit from Pete Montoya; *Appendix, "Exhibit 2"*

3.      Affidavit from Jon Hale; *Appendix, "Exhibit 3"*

4.      Affidavit from Cate Stetson;  *Appendix, "Exhibit 4"*

5.      Affidavit from Stan McElroy; *Appendix, "Exhibit 5"*

6.      Affidavit from Dave Friedman; *Appendix, "Exhibit 6"*

7.      Affidavit from Charlotte Gallegos; *Appendix, "Exhibit 7"*

8.      Deposition testimony from Ray Gallegos, Jon Hale, Stan McElroy, Dave Friedman, Lou

Daleo, and Charles Liberis; *Appendix, "Exhibits 8 through 13"*

9.     Agreement to Charter and Purchase Vessel; *Appendix, "Exhibit 14"*

10.    Proposal for Sublease Agreement with cover letter and check, dated
       November 17, 2000, from Ray Gallegos to Dave Friedman; *Appendix, "Exhibit 15"*


## IV.

### SUMMARY JUDGMENT ARGUMENT

The evidence and facts of this case clearly demonstrate that the Pier Sublease was never negotiated to Gaim-Ko's satisfaction. The purpose of the contingent clause in paragraph 4 of the Charter/Purchase Agreement was to protect Gaim-Ko from being "stuck" with a large boat with nowhere to take on passengers. Obviously, a ship without a dock cannot operate as a business. So CSL and Gaim-Ko negotiated and agreed to a seven (7) day window for Gaim-Ko to negotiate a Pier Sublease. After the seven (7) days expired without satisfactory negotiations for the Pier Sublease, the contract became null and void.

The principal parties at the November 10, 2000 meeting have all testified that a Pier Sublease was not negotiated to Gaim-Ko's satisfaction. November 10, 2000 was the very first and only meeting between Gaim-Ko and the Pier Owners. Only very preliminary negotiations took place between the parties and it is clear from the Pier Owners affidavits that they never intended to lease the Pier to Gaim-Ko. *See Appendix Exhibits 5 and 6.* Both of the Pier Owner representatives, who have no interest in the outcome of this litigation, have testified that no agreement was negotiated with Gaim-Ko.

The individuals present at the meeting on November 10, 2000 have testified as follows:

Witness testimony:

| "The Pier Lease was **NOT** negotiated to Gaim-Ko's satisfaction" | Format of sworn testimony and location of Exhibit in Appendix |
|---|---|
| RAY GALLEGOS - President of Gaim-Ko | Affidavit - Exhibit 1<br>Deposition - Exhibit 8, p.192 ln.21-25<br>and p.193, ln.1-5 |
| STAN MCELROY - co-owner of the pier | Affidavit - Exhibit 5<br>Deposition - Exhibit 10, p. 111, ln. 3-25<br>and p. 112, ln.1-25 |
| DAVE FRIEDMAN - co-owner of the pier | Affidavit - Exhibit 6<br>Deposition - Exhibit 11, p. 28, ln. 9-22 |
| PETE MONTOYA - accountant for Gaim-Ko | Affidavit - Exhibit 2 |
| JON HALE - general manager for Gaim-Ko | Affidavit - Exhibit 3<br>Deposition - Taken on 8-2-02, Transcript NA |
| CHARLOTTE GALLEGOS - Gaim-Ko V.P. | Affidavit - Exhibit 7 |

In addition to the witnesses present at the meeting on November 10, 2000, the following witnesses also testified that the Pier Sublease was not negotiated to Gaim-Ko's satisfaction:

| The Pier Lease was **NOT** negotiated to Gaim-Ko's satisfaction | Format of sworn testimony and location of Exhibit in Appendix |
|---|---|
| CATE STETSON - Gaim-Ko Attorney | Affidavit - Exhibit 4 |
| LOU DALEO - ship broker | Deposition - Exhibit 12, p. 177, ln. 20-25<br>and p. 178, ln.1 |

Cate Stetson is Gaim-Ko's business transaction attorney.  She assisted Ray Gallegos in his attempt to negotiate a Pier Sublease.  Gaim-ko's own attorney says in her affidavit, attached as

Exhibit 4 to this Motion, that "As Mr. Gallegos' attorney, I had many concerns about the incomplete proposed sublease. On November 26, 2000... it was clear to me that the parties had not fully negotiated a berthing sublease."

There is no evidence in this case, with the exception of Plaintiff's totally unsupported testimony, that Gaim-Ko and Pier Owners had anything other than preliminary negotiations to sublease the Pier. In fact, every single witness in this case (as listed above with Exhibit cites) has testified that no agreement was reached on November 10, 2000. And even the Plaintiff admits that as late as November 14, 2000 he knew the parties were still trying to negotiate a Pier Sublease. *See Appendix Exhibit 13, the Deposition of Charles Liberis*, p. 47, ln. 2-5. This is a clear admission from Plaintiff that he knew as late as November 14, 2000 that no Pier Sublease had been negotiated.

And lastly, Lou Daleo, the ship broker, admits that the contract "fell apart because he (meaning Ray Gallegos) couldn't get a dock lease." *See Appendix Exhibit 12, the Deposition of Lou Daleo*, p. 177, ln. 20-25 and p. 178, ln. 1. Mr. Daleo knew that a ship is no good without a dock lease and he admits that the deal fell through because Gaim-Ko and Pier Owners could not agree on a sublease.

## V.

## CONCLUSION

There is no evidence to support any of the relevant factual allegations made in Plaintiff's complaint, and it is clear from the testimony in this case that there is no evidence to support the breach of contract cause of action. The Pier Sublease was not negotiated to Gaim-Ko's satisfaction, and therefore the contract, by operation of law, became null and void on November

Page 7

11, 2002.  Gaim-Ko, Inc. and Ray Gallegos are entitled to summary judgment as a matter of law.

WHEREFORE, PREMISES CONSIDERED, Defendants, GAIM-KO, INC. AND RAY

GALLEGOS pray that this summary judgment motion be set for hearing, and that after a hearing

the motion be granted,  all claims against Defendants be dismissed, attorney fees be awarded to

Defendant as allowed by law in the amount set forth in the Attorney Affidavit which will be

submitted at the court's request and for such other relief to which they may be entitled at law or

in equity.

Respectfully submitted,

By: _____
Paul L. Fourt, Jr.
Texas Bar Number 00785874
Federal Identification No. 19663
1000 E. Van Buren
Brownsville, TX 78520
Tel. 956-574-0109
Fax 956-574-0227

**ATTORNEY IN CHARGE FOR RAY
GALLEGOS and GAIM-KO, INC.**

Page 8

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document was sent by certified U.S. Mail on Aug. 9, 2002, to all counsel of record at each address listed below:

_P Fourt_

Paul L. Fourt, Jr.

**JOE GRANT**

2437 Bay Area Blvd., #100
Houston, TX 77058
*CSL DEVELOPMENT CORP, INC.*

**JOHN FLOOD**        CERT MAIL
900 Frost Bank Plaza
802 N. Carancahua
Corpus Christi, Texas 78470
*CSL DEVELOPMENT CORP, INC.*

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CSL DEVELOPMENT CORPORATION, INC. | § | |
| | § | |
| **Plaintiff,** | § | |
| v. | § | |
| | § | |
| GAIM-KO, INC.; RAY GALLEGOS; SOUTH | § | CIVIL ACTION NO. B-01-059 |
| PADRE ISLAND FISHING CENTER, INC.; | § | JURY DEMANDED |
| STANLEY McELROY; DAVE FRIEDMAN; | § | |
| SRFP, INC.; and SOUTH PADRE ISLAND | § | |
| FISHING CENTER JOINT VENTURE | § | |
| | § | |
| **Defendants.** | § | |

# APPENDIX

# APPENDIX FOR RAY GALLEGOS AND GAIM-KO, INC.'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF

# INDEX OF APPENDIX

**A.**   **All Summary Judgment evidence in this Appendix is incorporated by reference into Defendant's Motion for Summary Judgment and Supporting Memorandum**

Verification of Summary Judgment Evidence

**B.**   **Summary Judgment Evidence**

1.   Affidavit from **Ray Gallegos**; *Appendix, "Exhibit 1"* [1]

2.   Affidavit from **Pete Montoya**; *Appendix, "Exhibit 2"*

3.   Affidavit from **Jon Hale**; *Appendix, "Exhibit 3"*

4.   Affidavit from **Cate Stetson**; *Appendix, "Exhibit 4"*

5.   Affidavit from **Stan McElroy**; *Appendix, "Exhibit 5"*

6.   Affidavit from **Dave Friedman**; *Appendix, "Exhibit 6"*

7.   Affidavit from **Charlotte Gallegos**; *Appendix, "Exhibit 7"*

8.   Deposition testimony from Ray Gallegos; *Appendix, "Exhibit 8"*

9.   Deposition testimony from Jon Hale; *Appendix "Exhibit 9"*

10.   Deposition testimony from Stan McElroy; *Appendix, "Exhibit 10"*

11.   Deposition testimony from Dave Friedman; *Appendix, "Exhibit 11"*

12.   Deposition testimony from Lou Daleo; *Appendix, "Exhibit 12"*

13.   Deposition testimony from Charles Liberis; *Appendix, "Exhibit 13"*

14.   Agreement to Charter and Purchase Vessel; *Appendix, "Exhibit 14"*

15.   Proposal for Sublease Agreement with cover letter and check, dated November 17, 2000, from Ray Gallegos to Dave Friedman; *Appendix, "Exhibit 15"*

---

[1] Original Affidavits of Exhibits 1,5 and 6 are on file in this matter as attached exhibits to Pier Defendant's First motion for Summary Judgment filed on April 16, 2002.

# VERIFICATION OF SUMMARY JUDGMENT EVIDENCE

### **AFFIDAVIT PAUL L. FOURT, JR.**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF CAMERON | § |

BEFORE ME, the undersigned notary, on this day, personally appeared Paul L. Fourt, Jr., a person whose identity is known to me. After I administered an oath to him, upon his oath, he said:

"My name is Paul L. Fourt, Jr. and I am over 18 years. I have never been convicted of a felony and I am capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct."

"All of the copies of the evidence presented in Defendant's Appendix for Summary Judgment are true and correct copies of the original documents. All deposition testimony was sworn to by the witnesses and was recorded by a certified court reporter. All affidavits are original except those noted in the index, and those originals are on file in this cause as exhibits in Defendants South padre Island Fishing Center, Inc., Stan McElroy, Dave Friedman, SPFP, Inc., And South Padre Island Fishing Center Joint Venture's First Motion For Summary Judgment"

Further Affiant sayeth not.

_____
Paul L. Fourt, Jr.

SWORN TO and SUBSCRIBED before me by Paul L. Fourt, Jr, on August __, 2002

_____
Notary Public in and for
the State of Texas

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CSL DEVELOPMENT CORPORATION, INC. §
§
    Plaintiff, §
§
VS. §    CIVIL ACTION NO. B-01-059
§
GAIM-KO, INC.; RAY GALLEGOS; SOUTH §
PADRE ISLAND FISHING CENTER, INC.; §
STANLEY McELROY; DAVE FRIEDMAN; §
SRFP, INC.; and SOUTH PADRE ISLAND §
FISHING CENTER JOINT VENTURE §

## AFFIDAVIT OF RAY GALLEGOS

STATE §
OF §
NEW MEXICO §

BEFORE ME, the undersigned authority, on this day personally appeared RAY GALLEGOS, who being by me duly sworn, on his oath deposed as follows:

1.     My name is RAY GALLEGOS. I am over eighteen (18) years of age, have never been convicted of a felony, and am fully competent to make this Affidavit. I have personal knowledge of the facts stated in this Affidavit, unless stated to the contrary, and those facts are true and correct. I am one of the Defendants in the above-styled lawsuit. I am the principle owner and Chief Executive of Gaim-Ko, Inc.

2.     In the summer of 2000, I and my company developed an interest in placing gambling machines owned by the company on a vessel which would operate from the Gulf Coast of Texas. We had in mind what is known in the industry as a "cruise to nowhere". Customers would board the vessel and would be served food and entertained while the vessel traveled offshore about ten miles. Once the vessel reached this point, the customers would be allowed to use our slot machines and other gambling devices. Thereafter, the ship would return to the port from which it departed.

3.     My company made contact with Lou Daleo, who is a broker specializing in connecting buyers and sellers of offshore cruise to nowhere gambling vessels. He advised us that there was a vessel Casino Padre which was

operating out of South Padre Island, Texas and was for sale. Eventually we entered into a contract with the vessel's owner, CSL Development Corporation, to purchase the vessel. Attached is a copy of the contract which was entered into.

4.  Gaim-Ko was never able to negotiate a contract for the lease of the South Padre Island Fishing Pier from its owners. That pier was the only one in the area suitable for docking the Casino Padre. We did speak to Stan McElroy and Dave Friedman who are the principals in the South Padre Island Fishing Pier partnership, about the possibility of leasing the pier in connection with the operation of the Casino Padre, and we sent them a proposal to enter into negotiations which contained basic deal points for a lease that were intended to prompt them to respond along with a check in the amount of $10,000.00 as consideration for them entering into negotiations with us. Mr. McElroy and Mr. Friedman advised that they were not interested in leasing the pier to us at that time and returned the check to us.

5.  Neither Stan McElroy or Dave Friedman or anyone from the Pier Defendants told us that the Casino Padre was unseaworthy or unsafe or a liability. We wanted to purchase the Casino Padre and would have purchased it had the South Padre Island Fishing Pier been available for lease to us.

6.  Neither I nor my company negotiated with Stan McElroy or Dave Friedman or anyone from the companies regarding the lease of the South Padre Island Fishing Pier to me or my company for use with another offshore gambling boat. My company did lease gaming equipment to another operator of a vessel to use for a cruise to nowhere gambling operation. This vessel operated near Houston, Texas.

Further affiant sayeth not.

RAY GALLEGOS

State:  New Mexico
County:  Bernalillo

SUBSCRIBED AND SWORN TO BEFORE ME by the said RAY GALLEGOS, on this the _____21_____ day of March, 2002.



OFFICIAL SEAL
Barbara A. Garrity
NOTARY PUBLIC
STATE OF NEW MEXICO
My Commission Expires  11/27/2006

Notary Public, State of New Mexico

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CSL DEVELOPMENT CORPORATION, INC. §
§
      **Plaintiff,** §
§
v. §
§
GAIM-KO, INC.; RAY GALLEGOS; SOUTH §     Civil Action No. B-01-059
PADRE ISLAND FISHING CENTER, INC.; §
STANLEY McELROY; DAVE FRIEDMAN; §
SRFP, INC.; and SOUTH PADRE ISLAND §
FISHING CENTER JOINT VENTURE §
§
      **Defendants.** §

## AFFIDAVIT PETER MONTOYA

STATE OF NEW MEXICO     §
                        §
COUNTY OF BERALILLO     §

     BEFORE ME, the undersigned notary, on this day, personally appeared Peter Montoya, a person whose identity is known to me. After I administered an oath to him, upon his oath, he said:

     "My name is Peter Montoya and I am over 18 years. I have never been convicted of a felony and I am capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct."

     "I work on a contract basis for Gaim-Ko, Inc. as an accountant. I have worked with Mr. Gallegos for over 25 years."

     "During the summer of 2000, I began work with Mr. Gallegos on the viability of operating an ocean going vessel as a casino. On November 3, 2000, after many months of negotiation, Gaim-Ko entered into an agreement to charter a vessel from CSL Development Corporation, Inc. The vessel was located in South Padre Island, Texas at the Sea Ranch Pier."

     "As part of my contract employment, I traveled with Mr. Gallegos, his wife and Jon Hale to South Padre Island, Texas on November 9, 2000. We ate dinner at the Sea Ranch restaurant that night and we were briefly introduced to Stan McElroy, the co-owner of the pier. No serious discussions took place regarding the Sea Ranch Pier at dinner on November 9, 2002."

"On November 10, 2000, I attended a meeting at the Sea Ranch Pier with Ray Gallegos, his wife, and Jon Hale for the purpose of starting negotiations on a dock lease with the owners of the pier and Charles Liberis. The meeting lasted approximately 2 hours and I was present for the entire meeting. General terms of the prior dock lease were discussed by Mr. Charles Liberis. This meeting was only an introduction of the parties. No proposals were exchanged between Gaim-Ko and Pier Owners. No agreements were reached. No documents or contracts were agreed to at this meeting."

"Gaim-Ko did not negotiate a dock lease to its satisfaction on November 10, 2000, in fact, I got the impression that the Pier Owners did not want to continue negotiations with Gaim-Ko for the Pier Lease after this meeting."

Further Affiant sayeth not.

Peter Montoya

State of New Mexico
County of Bernalillo

SWORN TO and SUBSCRIBED before me by Peter Montoya, on August 6, 2002

OFFICIAL SEAL
Barbara A. Garrity
NOTARY PUBLIC
STATE OF NEW MEXICO
My Commission Expires: 1/27/2006

Barbara A. Garrity
Notary Public in and for
the State of New Mexico
My commission expires: 1/27/2006

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CSL DEVELOPMENT CORPORATION, INC. §
§
**Plaintiff,** §
v. §
§
GAIM-KO, INC.; RAY GALLEGOS; SOUTH §     Civil Action No. B-01-059
PADRE ISLAND FISHING CENTER, INC.; §
STANLEY McELROY; DAVE FRIEDMAN; §
SRFP, INC.; and SOUTH PADRE ISLAND §
FISHING CENTER JOINT VENTURE §
§
**Defendants.** §

## AFFIDAVIT OF JON HALE

STATE OF TEXAS     §
                            §
COUNTY OF CAMERON     §

     BEFORE ME, the undersigned notary, on this day, personally appeared Jon Hale, a person whose identity is known to me. After I administered an oath to him, upon his oath, he said:

     "My name is Jon Hale and I am over 18 years. I have never been convicted of a felony and I am capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct."

     "In the summer of 2000, I was working as the general manager of gaming operations for Gaim-Ko, Inc. and Ray Gallegos. Part of my duties included finding potential deals for Gaim-Ko's gaming machines. In 2000, I made contact with Lou Daleo, a gambling vessel broker, about the charter of a ship by Gaim-Ko, for the purpose of running an offshore casino. I acted as an agent for Mr. Gallegos, but I did not have any authority to negotiate deal points or agree to a contract. On November 3, 2000, after a long negotiating period, Gaim-Ko signed a chatter/purchase contract with CSL Corporation for a vessel located in South Padre Island, TX."

     "On November 9, I went with Ray Gallegos, his wife, and Pete Montoya to meet with Charles Liberis and the Pier Owners in Texas. On November 10, 2000, we attended a meeting at the Sea Ranch Pier with Charles Liberis and the Pier Owners for the purpose of starting negotiations on a dock lease. I was present for the some of the meeting and I know some general terms of the prior dock lease were discussed. I was present at the end of the meeting and I know for a fact that no proposals were exchanged between Gaim-Ko and Pier Owners, no agreements were reached and no documents or contracts were agreed to at this meeting."

Further Affiant sayeth not.

_____
Jon Hale


SWORN TO and SUBSCRIBED before me by Jon Hale, on August 2, 2002



_____
Robert Lerma
Notary Public in and for
the State of Texas
My commission expires:

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CSL DEVELOPMENT CORPORATION, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Civil Action No. B-01-059 |
| | § | |
| GAIM-KO, INC.; RAY GALLEGOS; SOUTH | § | |
| PADRE ISLAND FISHING CENTER, INC.; | § | |
| STANLEY McELROY; DAVE FRIEDMAN; | § | |
| SRFP, INC.; and SOUTH PADRE ISLAND | § | |
| FISHING CENTER JOINT VENTURE, | § | |
| | § | |
| Defendants. | § | |

## AFFIDAVIT OF CATHERINE BAKER STETSON

| | |
|---|---|
| STATE OF NEW MEXICO | § |
| | § |
| COUNTY OF BERNALILLO | § |

BEFORE ME, the undersigned notary, on this day, personally appeared Catherine Baker Stetson, a person whose identity is known to me. After I administered an oath to her, upon her oath, she said:

"My name is Catherine Baker Stetson, and I am over 18 years. I have never been convicted of a felony, and I am capable of making this Affidavit. The facts stated in this Affidavit are within my personal knowledge and are true and correct."

"I am an attorney in New Mexico and represent Gaim-Ko, Inc. in numerous business matters."

"During the summer of 2000, Gaim-Ko, Inc. began work on the viability of operating an ocean-going vessel as a casino. During this time, I was retained to represent Gaim-Ko, Inc. and review the charter/purchase documents. I reviewed and revised several drafts of the charter/purchase agreement. On November 3, 2000, after many months of negotiation, Gaim-Ko, Inc. entered into

1

an agreement to charter a vessel from CSL Development Corporation, Inc., subject to certain conditions."

"Gaim-Ko, Inc. also retained my services to review documents and advise Mr. Gallegos on the possibility of a berthing sublease at the Sea Ranch Pier in South Padre Island. As Mr. Gallegos' attorney, I had many concerns about the incomplete terms of the proposed sublease."

"On November 26, 2000, I advised Mr. Gallegos in written correspondence of my concerns over the proposed Pier Sublease. At that time, there was no agreement by the parties on material terms of the proposed Pier Sublease. I was not satisfied that all the terms had been discussed or even addressed at that point, including major financial issues. At that point, the proposal was in draft form, and it was clear to me that the parties had not fully negotiated a berthing sublease."

Further Affiant sayeth not.

_____
Catherine Baker Stetson

SWORN TO AND SUBSCRIBED before me by Catherine Baker Stetson on August 7, 2002.

_____
Notary Public in and for the
State of New Mexico
My Commission Expires: May 13, 2004

2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CSL DEVELOPMENT CORPORATION, INC. §
                                   §
        Plaintiff,                 §
                                   §
VS.                                §        CIVIL ACTION NO. B-01-059
                                   §
GAIM-KO, INC.; RAY GALLEGOS; SOUTH §
PADRE ISLAND FISHING CENTER, INC.; §
STANLEY McELROY; DAVE FRIEDMAN;    §
SRFP, INC.; and SOUTH PADRE ISLAND §
FISHING CENTER JOINT VENTURE       §

## AFFIDAVIT OF STAN MCELROY

STATE OF TEXAS      §
                    §
COUNTY OF TRAVIS    §

BEFORE ME, the undersigned authority, on this day personally appeared STAN MCELROY, who being by me duly sworn, on his oath deposed as follows:

1.      My name is STAN MCELROY. I am over eighteen (18) years of age, have never been convicted of a felony, and am fully competent to make this Affidavit. I have personal knowledge of the facts stated in this Affidavit, unless stated to the contrary, and those facts are true and correct. I am one of the Defendants in the above-styled lawsuit.

2.      I have an interest in the South Padre Island Fishing Center, Inc., and South Padre Island Fishing Center Joint Venture.

3.      .It is alleged in the above-referenced lawsuit that I made representations to others that the Casino Padre f/k/a M/V Entertainer was unseaworthy or unsafe. I never made this representation to Lou Daleo. or anyone from Gaim-Ko, Inc. or anyone else. I never represented anything to anyone about the Casino Padre which was not true.

4.      .Plaintiff alleges in the above-referenced lawsuit that on or about November 10, 2000, a lease at SPIFCJV's pier was negotiated to Gaim-Ko, Inc.'s satisfaction. Such a pier lease would have had to have been approved by me, my partner, Dave Friedman and our Lessor, the State of Texas, acting by and through the Texas General Land Office. Although we had some very preliminary discussions with Gaim-Ko representatives about entering into a lease, the essential terms were never fully discussed, much less agreed on. In fact, we decided not to negotiate further with the Gaim-Ko representatives,

and returned their check for $10,000.00 which had been sent to us by them by a cover letter dated November 27, 2000 which described the $10,000 as consideration for an agreement to "enter into negotiations to enter into a sublease".

5.    I never told Ray Gallegos or anyone else from Gaim-Ko that the Casino Padre was unseaworthy or that it was not safe or that it was a "liability".

6.    Neither I nor anyone of the Pier Defendants entered into an agreement whereby Gaim-Ko would lease the pier in question for any vessel.

Further affiant sayeth not.

_____
STAN MCELROY

SUBSCRIBED AND SWORN TO BEFORE ME by the said STAN MCELROY, on this the ___20th___ day of March, 2002.

DEBBIE FRANK
Notary Public, State of Texas
My Commission Expires
12-20-03

_____
Notary Public, State of Texas

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CSL DEVELOPMENT CORPORATION, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-01-059 |
| | § | |
| GAIM-KO, INC.; RAY GALLEGOS; SOUTH | § | |
| PADRE ISLAND FISHING CENTER, INC.; | § | |
| STANLEY McELROY; DAVE FRIEDMAN; | § | |
| SRFP, INC.; and SOUTH PADRE ISLAND | § | |
| FISHING CENTER JOINT VENTURE | § | |

## AFFIDAVIT OF DAVE FRIEDMAN

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared STAN MCELROY, who being by me duly sworn, on his oath deposed as follows:

1.    My name is Dave Friedman. I am over eighteen (18) years of age, have never been convicted of a felony, and am fully competent to make this Affidavit. I have personal knowledge of the facts stated in this Affidavit, unless stated to the contrary, and those facts are true and correct. I am one of the Defendants in the above-styled lawsuit.

2.    I have an interest in the SRFP, Inc., and South Padre Island Fishing Center Joint Venture.

3.    .It is alleged in the above-referenced lawsuit that I made representations to others that the Casino Padre f/k/a M/V Entertainer was unseaworthy or unsafe. I never made this representation to Lou Daleo or anyone from Gaim-Ko, Inc. or anyone else. I never represented anything to anyone about the Casino Padre which was not true.

4.    .Plaintiff alleges in the above-referenced lawsuit that on or about November 10, 2000, a lease at SPIFCJV's pier was negotiated to Gaim-Ko, Inc.'s satisfaction. Such a pier lease would have had to have been approved by me, my partner Stan McElroy and our Lessor, the State of Texas, acting by and through the Texas General Land Office. Although we had some very preliminary discussions with Gaim-Ko representatives about entering into a lease, the essential terms were never fully discussed, much less agreed on. In fact, we decided not to negotiate further with the Gaim-Ko representatives,

and returned their check for $10,000.00 which had been sent to us by them by a cover letter dated November 27, 2000 which described the $10,000 as consideration for an agreement to "enter into negotiations to enter into a sublease".

5.   I never told Ray Gallegos or anyone else from Gaim-Ko that the Casino Padre was unseaworthy or that it was not safe or that it was a "liability".

6.   Neither I nor anyone of the Pier Defendants entered into an agreement whereby Gaim-Ko would lease the pier in question for any vessel.

Further affiant sayeth not.

DAVE FRIEDMAN

SUBSCRIBED AND SWORN TO BEFORE ME by the said DAVE FRIEDMAN, on this the _____ 19th _____ day of March, 2002.

JUDITH M. LEHN
MY COMMISSION EXPIRES
December 14, 2005

Notary Public, State of Texas

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| CSL DEVELOPMENT CORPORATION,   INC.   § | |
| § | |
| **Plaintiff,**   § | |
| § | |
| v.   § | |
| § | |
| GAIM-KO, INC.; RAY GALLEGOS; SOUTH   § | Civil Action No. B-01-059 |
| PADRE ISLAND FISHING CENTER, INC.;   § | |
| STANLEY McELROY; DAVE FRIEDMAN;   § | |
| SRFP, INC.; and SOUTH PADRE ISLAND   § | |
| FISHING CENTER JOINT VENTURE   § | |
| § | |
| **Defendants.**   § | |

### AFFIDAVIT OF CHARLOTTE GALLEGOS

| | |
|---|---|
| STATE OF NEW MEXICO | § |
| | § |
| COUNTY OF BERALILLO | § |

BEFORE ME, the undersigned notary, on this day, personally appeared Charlotte Gallegos, a person whose identity is known to me. After I administered an oath to her, upon her oath, she said:

"My name is Charlotte Gallegos and I am over 18 years. I have never been convicted of a felony and I am capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct."

"I am the Vice President of Gaim-Ko, Inc. and the wife of Ray Gallegos."

"During the summer of 2000, Gaim-Ko, Inc. began work on the viability of operating an ocean going vessel as a casino. On November 3, 2000, after many months of negotiation, Gaim-Ko entered into an agreement to charter a vessel from CSL Development Corporation, Inc. The vessel was located in South Padre Island, Texas at the Sea Ranch Pier."

"I traveled with my husband, Pete Montoya and Jon Hale to South Padre Island, Texas on November 9, 2000. The purpose of the trip was to see the boat and meet with the owners of the pier. We ate dinner at the Sea Ranch restaurant that night and I was briefly introduced to Stan McElroy, the co-owner of the pier. I was present at the table all night and did not hear any discussions regarding the Sea Ranch Pier at dinner on November 9, 2002."

"On November 10, 2000, I attended a meeting at the Sea Ranch Pier with my husband, Pete Montoya and Jon Hale for the purpose of starting negotiations on a dock lease with the owners of the pier and Charles Liberis. The meeting lasted approximately 2 hours and I was present for the entire meeting. General terms of the prior dock lease were discussed by Mr. Charles Liberis. This meeting was only an introduction of the parties. No proposals were exchanged between Gaim-Ko and Pier Owners. No agreements were reached. No documents or contract were agreed to at this meeting."

Further Affiant sayeth not.

_Charlotte Gallegos_
Charlotte Gallegos

SWORN TO and SUBSCRIBED before me by Charlotte Gallegos, on August _6_, 2002

OFFICIAL SEAL
Barbara A. Garrity
NOTARY PUBLIC
STATE OF NEW MEXICO
My Commission Expires: 1/27/2006

_Barbara A. Garrity_

Notary Public in and for
the State of New Mexico
My commission expires: 1/27/2006

# In The Matter Of:

*CSL Development Corporation, Inc.   v.*
*Gaim-Ko, Inc., et al.*

---

*Ray Gallegos*
*Vol. 1, December 4, 2001*

---

*Bean & Associates, Inc.*
*500 Marquette, NW, Suite 280 Albuquerque, NM  87102*
*119 East Marcy, Suite 110 Santa Fe, NM  87501*

*(505) 843-9494   or   (800) 669-9492*

*Original File GALLEG~1.TXT, 202 Pages*
*Min-U-Script® File ID: 1362823530*

# Word Index included with this Min-U-Script®

Page 1

[1]        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
[2]            BROWNSVILLE DIVISION
[3] CSL DEVELOPMENT CORPORATION, INC.,
[4]            Plaintiff,
[5] -vs-        CIVIL ACTION NO. B01 059
[6] GAIM-KO, INC.; RAY GALLEGOS;
   SOUTH PADRE ISLAND FISHING
[7] CENTER, INC.; STANLEY McELROY;
   DAVE FRIEDMAN; SRFP, INC.; and
[8] SOUTH PADRE ISLAND FISHING
   CENTER JOINT VENTURE,
[9]
[10]            Defendants.
[11]
[12]    VIDEO DEPOSITION OF RAY GALLEGOS
          December 4, 2001
[13]            9:00 a.m.
          2403 San Mateo Blvd., NE #W17
[14]        Albuquerque, New Mexico
[15]
[16]
[17]    PURSUANT TO THE FEDERAL RULES OF CIVIL
   PROCEDURE, this deposition was:
[18]
[19] TAKEN BY:  JOSEPH M. GRANT, ESQ.
          ATTORNEY FOR PLAINTIFF
[20]
[21] REPORTED BY:  DEBORAH L. O'CONNOR, RPR, CRR, CCR #297
          BEAN & ASSOCIATES, INC.
[22]     Professional Court Reporting Service
          500 Marquette, N.W., Suite 280
[23]     Albuquerque, New Mexico 87102
[24] (5736-18) DEB
[25]

Page 2

[1]            APPEARANCES
[2] For the Plaintiff:
[3]     THE GRANT LAW FIRM
          2437 Bay Area Blvd., #100
[4]     Houston, Texas 77058
          BY:  JOSEPH M. GRANT, ESQ.
[5]
          HILLIARD & MUNOZ, PPC
[6] -     719 S. Shoreline Blvd., Suite 600
          Corpus Christi, Texas 77401
[7]     BY:  JOHN FLOOD, ESQ.
[8] For the Defendants Gaim-Ko and Ray Gallegos:
[9]     PAUL J. FOURT, JR., ESQ.
          1000 E. Van Buren
[10]     Brownsville, Texas 78520
[11] For the Defendant South Padre Island Fishing Center
   Joint Venture:
[12]
          GRIFFITH, SAENZ & HILL, LLP
[13]     1325 Palm Blvd., Suite H
          Brownsville, Texas 78520
[14]     BY:  CARLA SAENZ, ESQ.
[15] For the Defendants Stanley McElroy, Dave Friedman,
   and SRFP, Inc.:
[16]
          ROERIG, OLIVERIA & FISHER, LLP
[17]     855 West Price Road, Suite 9
          Brownsville, Texas 78520
[18]     BY:  W. MICHAEL FISHER, ESQ. (by telephone)
[19] Also Present:
[20]     Rudy Ortiz, Esq.
          Mr. Dale Alverson, Videographer
[21]     Mr. Stanley McElroy (by telephone)
          Mr. Dave Friedman (by telephone)
[22]
[23]
[24]
[25]

Page 192

[1] you want to try to put those machines on another
[2] boat?

[3]    **A:** Probably so. It's to be determined.

[4]    **Q:** You're just waiting to see?

[5]    **A:** Yeah.

[6]    **Q:** If that's the case, is your preference to
[7] continue to just do a lease with somebody or on your
[8] next deal would you like to do kind of a joint
[9] venture purchase and the lease of equipment?

[10]    **A:** I still haven't decided. I've still got to
[11] talk to Rudy and several other people, financial
[12] people that I know, and see. Because right now, the
[13] way we are right now, we haven't had too much good
[14] luck. I mean, everybody is — I mean, I hate to be
[15] in this predicament here also. It takes time and
[16] money, you know.

[17]    **MR. GRANT:** Well, I don't have any more
[18] questions and I thank you again for your time and
[19] patience.

[20]                 **EXAMINATION**

[21]    **Q:** (By Ms. Saenz) Mr. Gallegos, I just have a
[22] few questions. When you sent the $10,000 check
[23] together with the proposed sublease, you knew and
[24] understood that there was no agreement with Stan or
[25] Dave to lease the pier, correct?

Page 193

[1]    **A:** No, there was no agreement.

[2]    **Q:** In fact, you had never entered into any
[3] agreement with Stan or Dave to lease that pier before
[4] you sent that check, correct?

[5]    **A:** No, sir — no, ma'am, I'm sorry.

[6]    **Q:** And, in fact, you never discussed with Dave
[7] or Stan any of the terms in that proposed sublease
[8] prior to your sending it to them?

[9]    **A:** No.

[10]    **Q:** And —

[11]    **A:** That's what I mentioned a while ago, that
[12] they told me just $10,000 retainer.

[13]    **Q:** And you understood — as you've already
[14] told us, you were anxious to lease the pier —

[15]    **A:** Yes, protect myself.

[16]    **Q:** — and you received a letter from
[17] Mr. Liberis on November 14 telling you that it was
[18] important to negotiate a lease or finalize a lease
[19] with Stan and Dave, correct?

[20]    **A:** Yes, ma'am.

[21]    **Q:** And in response to that letter, you sent
[22] the $10,000 as a deposit, an incentive to hold the
[23] lease, correct, or the pier, correct?

[24]    **A:** Yes, ma'am.

[25]    **Q:** But there was never any discussions or

Page 194

[1] never any agreement with Stan or Dave to lease that
[2] pier, correct?

[3]    **A:** No.

[4]    **MS. SAENZ:** Thank you. Those are all the
[5] questions I have.

[6]    **MR. FOURT:** I have no questions, but I
[7] don't know — I'm going to pass the witness. Do you
[8] have any more questions?

[9]    **MR. FLOOD:** No more questions.

[10]    **MR. FOURT:** I'd like to exercise our right
[11] under the federal rules to receive a copy in 30 days
[12] for corrections.

[13]    **MR. FISHER:** I reserve my questions until
[14] the time of trial.

[15]    **THE VIDEOGRAPHER:** This concludes the
[16] deposition of Ray Gallegos. It's 2:47 p.m. We are
[17] off the record.

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 195

[1]       IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
[2]             BROWNSVILLE DIVISION
[3]  CSL DEVELOPMENT CORPORATION, INC.,
[4]                Plaintiff,
[5]  -vs-         CIVIL ACTION NO. B01 059
[6]  GAIM-KO, INC.; RAY GALLEGOS;
     SOUTH PADRE ISLAND FISHING
[7]  CENTER, INC.; STANLEY McELROY;
     DAVE FRIEDMAN; SRFP, INC.; and
[8]  SOUTH PADRE ISLAND FISHING
     CENTER JOINT VENTURE,
[9]
[10]              Defendants.
[11]    CERTIFICATE OF COMPLETION OF DEPOSITION
[12]  I, DEBORAH L. O'CONNOR, New Mexico CCR #297, DO
[13]  HEREBY CERTIFY that on December 4, 2001, the
[14]  deposition of RAY GALLEGOS was taken before me at the
[15]  request of, and sealed original thereof retained by:
[16]     JOHN FLOOD, ESQ.
        Attorney for the Plaintiff
[17]  HILLIARD & MUNOZ, PPC
      719 S. Shoreline Blvd., Suite 600
[18]  Corpus Christi, Texas 77401
[19]  I FURTHER CERTIFY that copies of this certificate
[20]  have been mailed or delivered to the following
[21]  counsel of record and parties not represented by
[22]  counsel:
[23]     JOSEPH M. GRANT, ESQ.
        Attorney for the Plaintiff
[24]  THE GRANT LAW FIRM
      2437 Bay Area Blvd., #100
[25]  Houston, Texas 77058

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CSL DEVELOPMENT CORPORATION, INC. §
§
    Plaintiff, §
§
VS. §
§   CIVIL ACTION NO. B01-059
GAIM-K0, INC.; RAY GALLEGOS; SOUTH §   JURY DEMANDED
PADRE ISLAND FISHING CENTER, INC.; §
STANLEY McELROY;DAVE FRIEDMAN; §
SRFP, INC.; and SOUTH PADRE ISLAND §
FISHING CENTER JOINT VENTURE §
§
    Defendants. §

DEPOSITION OF:

# STANLEY EUGENE McELROY

## MAY 29, 2002

# *COPY*



**Worldwide
Corporate Headquarters**
3000 Weslayan, Suite 235
Houston, Texas 77027
Tel: 713-572-2000

For Services Worldwide
**800-745-1101**

**Texas
Regional Office**
4245 N. Central Expwy, Suite 475
Dallas, Texas 75205
Tel: 214-219-3080

02:47 PM  1  think he said something like, "Charles has some people

02:47 PM  2  down looking at the boat."

02:47 PM  3      Q.   Okay.  So when you went into that meeting the

02:47 PM  4  next day with those people, you knew that Charles had

02:47 PM  5  some people down looking at the boat and you just

02:47 PM  6  assumed that those were the people?

02:47 PM  7      A.   No.  That was made clear that -- they were

02:47 PM  8  introduced.  I mean, that's what they were doing there.

02:47 PM  9  I mean, the night before.  I'm not sure how it was

02:47 PM 10  stated, but obviously it was -- it was them.

02:47 PM 11      Q.   And there was -- Mr. Gallegos didn't have any

02:47 PM 12  discussions with you about leasing the space that the

02:47 PM 13  ENTERTAINER was leasing?

02:48 PM 14      A.   When?

02:48 PM 15      Q.   During that meeting.

02:48 PM 16      A.   I don't recall any.  You mean, that he pulled

02:48 PM 17  us aside or that he took the floor and said, "I would

02:48 PM 18  like to do this, this, and this"?

02:48 PM 19      Q.   Any discussions with Mr. Gallegos or anybody

02:48 PM 20  in his party with you or Dave about him leasing this

02:48 PM 21  space that the M/V ENTERTAINER had at the pier.

02:48 PM 22      A.   I don't recall Mr. Gallegos discussing it with

02:48 PM 23  us or laying out any plan.  I recall Mr. Liberis kind of

02:48 PM 24  mediating, "Would you do this," and "Would you do this?"

02:48 PM 25      Q.   Mediating between whom?

112

02:48 PM 1       A.    Between Dave and I and Mr. Gallegos.

02:48 PM 2       Q.    So there were discussions between you and Dave

02:48 PM 3  and Mr. Gallegos about rent and a term and a lease?

02:48 PM 4       A.    As I've stated before -- I've answered that.

02:49 PM 5              MR. FISHER:    Go ahead and answer it

02:49 PM 6  again, Stan.

02:49 PM 7       A.    Charles was driving the meeting.    We were

02:49 PM 8  there listening.    Charles took it suddenly to a place

02:49 PM 9  that -- that took me aback regarding specific deal terms

02:49 PM 10 when there had been no indication of interest to move

02:49 PM 11 forward in any respect with even that type of use.    We

02:49 PM 12 had not indicated to anyone present that we were

02:49 PM 13 amenable to a deal.    We had not said that we absolutely

02:49 PM 14 were not.    And here we were and had just met these

02:49 PM 15 people and were being asked if theoretically or, "Would

02:49 PM 16 you take this," and then over to the -- to the --

02:50 PM 17 Mr. Gallegos, "Would you pay this?"

02:50 PM 18      Q.    (By Mr. Grant)    So Mr. Liberis and

02:50 PM 19 Mr. Gallegos took the negotiations into an area or took

02:50 PM 20 the discussion, whatever term you want to use,

02:50 PM 21 discussion or negotiation, into an area that you would

02:50 PM 22 have preferred to have taken place in the future, if at

02:50 PM 23 all?

02:50 PM 24      A.    I don't remember Mr. Gallegos taking it there.

02:50 PM 25 I remember Mr. Liberis taking it there.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CSL DEVELOPMENT CORPORATION, INC. §
                                  §
        Plaintiff,                §
                                  §
VS.                               §
                                  §        CIVIL ACTION NO. B01-059
GAIM-K0, INC.; RAY GALLEGOS; SOUTH §       JURY DEMANDED
PADRE ISLAND FISHING CENTER, INC.; §
STANLEY McELROY; DAVE FRIEDMAN;    §
SRFP, INC.; and SOUTH PADRE ISLAND §
FISHING CENTER JOINT VENTURE       §
                                  §
        Defendants.               §

DEPOSITION OF:

# DAVID  ROBERT  FRIEDMAN

MAY  29,  2002

# *COPY*



**Worldwide
Corporate Headquarters**
3000 Weslayan, Suite 235
Houston, Texas 77027
Tel: 713-572-2000

For Services Worldwide
**800-745-1101**

**Texas
Regional Office**
4245 N. Central Expwy, Suite 475
Dallas, Texas 75205
Tel: 214-219-3080

| | | |
|---|---|---|
| 07:27 PM | 1 | to have signed? |
| 07:27 PM | 2 | A.  That's correct. |
| 07:27 PM | 3 | Q.  Okay.  What is the phone number at the -- what |
| 07:27 PM | 4 | was the phone number in November of 2000 at the |
| 07:27 PM | 5 | restaurant? |
| 07:27 PM | 6 | A.  Area code (956) 761-1314. |
| 07:28 PM | 7 | Q.  Is there a separate number for -- do you have |
| 07:28 PM | 8 | an office separate and apart from the restaurant? |
| 07:28 PM | 9 | A.  Yes. |
| 07:28 PM | 10 | Q.  All right.  What's the number at your office? |
| 07:28 PM | 11 | A.  Area code (956) 761-4665. |
| 07:28 PM | 12 | Q.  And how about a cell phone at that time?  And |
| 07:28 PM | 13 | I assume that office number was the number that you gave |
| 07:28 PM | 14 | me that would have been in place in November of 2000? |
| 07:28 PM | 15 | A.  Yes. |
| 07:28 PM | 16 | Q.  Okay.  Did you have a cell phone in November |
| 07:28 PM | 17 | of 2000? |
| 07:28 PM | 18 | A.  Yes. |
| 07:28 PM | 19 | Q.  Do you recall or do you have the same number? |
| 07:28 PM | 20 | A.  No.  I don't have the same number.  It was |
| 07:28 PM | 21 | 570-CASH. |
| 07:28 PM | 22 | Q.  Okay.  956? |
| 07:28 PM | 23 | A.  956. |
| 07:28 PM | 24 | Q.  At the meeting on November 10th when |
| 07:29 PM | 25 | Mr. Liberis was, as Mr. McElroy described earlier, |

07:29 PM 1   quote, "mediating," end quote, were the terms -- were

07:29 PM 2   rent and the term period of the potential lease

07:29 PM 3   discussed?

07:29 PM 4       A.   Not in those specific terms.

07:29 PM 5       Q.   Okay.  In what terms were they discussed?

07:29 PM 6       A.   Mr. Liberis sort of moderated this meeting to

07:29 PM 7   the extent of "would you take" type inquiries.

07:29 PM 8       Q.   Okay.  And when he would propose a "and would

07:29 PM 9   you take" proposals were used both for the term period

07:30 PM 10  and for the amount of rent?

07:30 PM 11      A.   Yeah.

07:30 PM 12      Q.   Okay.  And when he would ask, "Would you take

07:30 PM 13  a particular amount," were there answers provided?

07:30 PM 14      A.   To some degree, yes.

07:30 PM 15      Q.   Okay.  What were some of the amounts of rent

07:30 PM 16  that he proposed that were discussed?

07:30 PM 17      A.   I can't specifically recall amounts, but they

07:30 PM 18  were in ranges, it seems, or back-and-forth type

07:30 PM 19  conversations.

07:30 PM 20      Q.   Do you recall whether the numbers discussed

07:30 PM 21  were more or less than what CSL was paying at the time?

07:30 PM 22      A.   They were less.

07:30 PM 23      Q.   Okay.  And do you recall whether the term

07:30 PM 24  periods that were discussed were more or less than the

07:31 PM 25  primary lease that CSL received from the joint venture?

07:31 PM 1     A.    I believe they were less.

07:31 PM 2     Q.    Okay.  So the discussions were specific enough

07:31 PM 3    that you know that the amounts discussed as to rent were

07:31 PM 4    less that what CSL was paying and that the terms

07:31 PM 5    proposed and discussed were less than what CSL had.  You

07:31 PM 6    just can't recall the exact --

07:31 PM 7     A.    That seems to be -- it sticks in my mind.

07:31 PM 8    Yes.

07:31 PM 9     Q.    Okay.  The two-page agreement that

07:32 PM 10   Mr. Gallegos included in his November 17 letter, it has

07:32 PM 11   a sub -- under paragraph 1 of the sublease on page 1, it

07:32 PM 12   states:  "Sublease term:  The term of this sublease is

07:32 PM 13   proposed to be one year with two one-year options."

07:32 PM 14              Is that the sublease term that was

07:32 PM 15   discussed at the November 10 meeting?

07:32 PM 16    A.    I believe it's one of several.

07:32 PM 17    Q.    Okay.  And it's true, isn't it, that that term

07:32 PM 18   was not specifically disagreed with nor agreed with by

07:32 PM 19   either you or Mr. McElroy at the November 10 meeting?

07:33 PM 20    A.    That's correct.

07:33 PM 21    Q.    All right.  But it is one that was discussed?

07:33 PM 22    A.    I believe so, yes.

07:33 PM 23    Q.    All right.  And the sublease rent that is

07:33 PM 24   included in this agreement that was forwarded by

07:33 PM 25   Mr. Gallegos on the 10th -- or on the 17th, I'm sorry --

07:47 PM  1    questions earlier about Exhibit 1.  This is the cover

07:47 PM  2    letter sent by Ray Gallegos to you; is that correct?

07:47 PM  3       A.    Yes, sir.

07:47 PM  4       Q.    And attached to that cover letter was a check;

07:47 PM  5    is that correct?

07:47 PM  6       A.    Yes, sir.

07:47 PM  7       Q.    And what was the amount of that check?

07:47 PM  8       A.    $10,000.

07:47 PM  9       Q.    And also attached to that cover letter was a

07:47 PM 10    document entitled Proposal for Sublease Agreement; is

07:47 PM 11    that correct?

07:47 PM 12       A.    Yes, sir.

07:47 PM 13       Q.    What does the title Proposal for Sublease

07:47 PM 14    Agreement mean to you?

07:47 PM 15       A.    Proposal for sublease agreement.  That

07:47 PM 16    they're -- Mr. Gallegos, whoever the author of the

07:48 PM 17    letter was, was going to give us a proposal to enter

07:48 PM 18    into a sublease agreement.

07:48 PM 19       Q.    So that's an offer, in other words?  Is that

07:48 PM 20    how you would characterize --

07:48 PM 21       A.    That's correct.  Yeah.

07:48 PM 22       Q.    -- it, as an offer?

07:48 PM 23       A.    That's what I would say.

07:48 PM 24       Q.    So in no way do you construe that document to

07:48 PM 25    be a contract?

LH/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CSL DEVELOPMENT CORPORATION, INC. §
§
Plaintiff, §
§
VS. §          CIVIL ACTION NO. B01-059
§          JURY DEMANDED
GAIM-K0, INC.; RAY GALLEGOS; SOUTH §
PADRE ISLAND FISHING CENTER, INC.; §
STANLEY McELROY; DAVE FRIEDMAN; §
SRFP, INC.; and SOUTH PADRE ISLAND §
FISHING CENTER JOINT VENTURE §
§
Defendants. §

VIDEOTAPED DEPOSITION OF:

# LOUIS DALEO

MAY 30, 2002

# *COPY*



*WORLDWIDE COURT REPORTERS, INC.*

**Worldwide Corporate Headquarters**
3000 Weslayan, Suite 235
Houston, Texas 77027
Tel: 713-572-2000
Fax: 713-572-2009

For Services Worldwide
**800-745-1101**
*worldwidecourtreporters.com*

**Texas Regional Office**
4245 N. Central Expwy, Suite 475
Dallas, Texas 75205
Tel: 214-219-3080
Fax: 214-219-3055

1   boat."  And said he related -- he proceeded to tell me

2   what this gentleman relayed to him.

3          It was obviously enough to cause him some

4   concern to back up and look again at what was -- what

5   was about to transpire.

6      Q.   Wouldn't that cause anyone concern, though?

7      A.   If the captain of the boat didn't give his

8   boat a good recommendation, that would make me very --

9   very suspect, yes.

10     Q.   And Ray was right to be concerned about that,

11  correct?

12     A.   Yes.

13          MR. GRANT:  Objection as to form.

14     Q.   (By Mr. Fourt)  But that -- that didn't cause

15  him not to go through with the deal; is that correct?

16          MR. GRANT:  Objection as to form.

17     A.   I can't -- I can't say "yes" or "no" because I

18  don't know what was in his mind as to have caused his

19  decision.

20     Q.   (By Mr. Fourt)  But from the -- the letters

21  and the correspondence and your conversations, it's

22  clear that Mr. Gallegos continued to pursue this deal

23  even after he talked to Captain Louie.  Is that fair?

24          MR. GRANT:  Objection as to form.

25     A.   That's correct.  This thing fell apart because

1    he couldn't get a dock lease.

2        Q.    (By Mr. Fourt)  You've previously been

3    requested to produce some documents that may or may not

4    be in another file.  Do you recall that?

5        A.    Yes.

6        Q.    I'm probably going to have some more questions

7    for you based on those documents, but I'd like to

8    review those first.  So, if we can have an agreement to

9    get those documents over to us as part of this

10   deposition, we probably can do a brief telephone

11   extension of this, if that's okay with you.

12       A.    It will take me a couple of days to go to the

13   archives and pull out what you're looking for, but I

14   can do that, yes.

15               MR. FOURT:  Okay.  I'm going to go ahead

16   and pass the witness at this time.

17               Thank you very much.

18                         **EXAMINATION**

19   QUESTIONS BY MR. WRIGHT:

20       Q.    Mr. Daleo, my name is Todd Wright.  I'm one of

21   the attorneys representing South Padre Island Fishing

22   Center Joint Venture.  I just want to make you aware of

23   that.  I have a few questions for you today.

24               It's my understanding that you've been in the

25   brokerage business -- boat brokerage business for

PWB/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| CSL DEVELOPMENT CORPORATION, INC. § | |
| § | |
| Plaintiff, § | |
| § | |
| VS. § | CIVIL ACTION NO. B-01-059 |
| § | |
| GAIM-K0, INC.; RAY GALLEGOS; SOUTH § | |
| PADRE ISLAND FISHING CENTER, INC.; § | |
| STANLEY McELROY; DAVE FRIEDMAN; § | |
| SRFP, INC.; and SOUTH PADRE ISLAND § | |
| FISHING CENTER JOINT VENTURE § | |
| § | |
| Defendants. § | |

DEPOSITION OF:

# CHARLES  LIBERIS

JULY  11,  2002

# *COPY*



**Worldwide
Corporate Headquarters**
3000 Weslayan, Suite 235
Houston, Texas 77027
Tel: 713-572-2000
Fax: 713-572-2009

For Services Worldwide
**800-745-1101**
*worldwidecourtreporters.com*

**Texas
Regional Office**
4245 N. Central Expwy, Suite 475
Dallas, Texas 75205
Tel: 214-219-3080
Fax: 214-219-3055

CHARLES LIBERIS - 7/11/02

```
 1  form.                                                      11:06 AM

 2      Q.    (BY MR. FOURT)   The question is:   Were you

 3  aware that they were still negotiating the lease for the

 4  pier on the 14th of November?

 5      A.    I was.                                            11:06 AM

 6            THE  WITNESS:   When you get to a point where

 7  we can break --

 8            MR. FOURT:  We can break right now, that's

 9  fine.

10            (Break.)                                         11:16 AM

11      Q.    (BY MR. FOURT)  Okay.  We're back on the record

12  after a short break.  Sir, I'm going to show you what's

13  been marked as Exhibit No. 7, which is a letter from you

14  to Catherine Stetson, who was Mr. Gallegos' attorney.

15  The date of that letter is November 14th, 2000.  Would    11:16 AM

16  you refresh your memory with that letter, please.

17      A.    I'm sorry, I -- what about it?

18      Q.    Do you remember that correspondence?

19      A.    I don't, but it's from my office.  It's signed

20  by my secretary for me.                                    11:16 AM

21      Q.    Could you just read the brief paragraph of that

22  letter?

23      A.    "Pursuant to our conversation, enclosed please

24  find the lease between South Padre Island Fishing Center

25  Joint Venture and the State of Texas."                     11:17 AM
```

WORLDWIDE COURT REPORTERS, INC.

# AGREEMENT TO CHARTER AND PURCHASE VESSEL

This AGREEMENT TO CHARTER AND PURCHASE VESSEL ("Agreement") is dated as of this ___4th___ day of November, 2000, between CSL Corporation, Inc., a Delaware corporation, with its principal place of business at Three Christina Centre, 201 N. Walnut Street, Wilmington, DE 19801 ("Owner"), and Gaim-Ko, Inc., a New Mexico corporation, with its principal office at 2403 San Mateo Blvd, NE, Suite W17, Albuquerque, NM 87110 ("Operator").

## Terms and Conditions

1.   Charter.  Owner agrees to let and Operator agrees to hire the vessel M/V Entertainer, O.N. 500051, built in Warren, Rhode Island in 1965, and converted at Bender ShipBuilding & Repair Co., Inc., Mobile, Alabama in January 1994, a U.S. registered ship ("the Vessel," which term shall include all gear, machinery, equipment, furnishings and other articles located on the Vessel ("Owner's supplied equipment"), specifically excluding casino equipment including but not limited to slot machines, gaming tables and cage equipment.)

2.   Delivery; Closing; Charter Period; Extension Payments.  The Vessel shall be delivered by Owner to Operator on the closing date ("Closing"), which shall be December 1, 2000.   A photo log will be taken to record the Vessel's delivery condition (for Owner's account).  The period that the Vessel is chartered hereunder (the "Charter Period") is for twelve (12) months commencing on the date of Closing. Operator has the option to extend  the Charter for up to two additional twelve (12) month periods upon payment by Operator to Owner of Two-Hundred Fifty Thousand

Charter.Agmu/Rev 11/01/00 9:10 a.m.            1

Dollars ($250,000) per extension, in cash or cashier's check, on or before September 30, 2001 and 2002, respectively. All of the amounts of such extension payment(s), and one-half (½) of the additional charter payments, will be applied towards the Purchase Price.

3.  <u>Inventory</u>.  Promptly after execution of this Agreement, an inventory shall be made jointly by Owner and Operator of all galley, salon, bar and public rooms furnishings that are to be available for Operator's use as of the date of delivery of the Vessel, and the inventory shall be signed by Operator and Owner at Closing and shall be attached hereto as Exhibit A. This inventory shall be maintained at Operator's expense, and any missing or damaged articles shall be replaced or paid for by Operator upon ten (10) days written notice from Owner.

4.  <u>Charter Hire and Deposit</u>.  The Charter Hire shall be One Million Five-Hundred Thousand Dollars ($1,560,000) annually, payable in twelve (12) equal monthly installments of One-Hundred Thirty Thousand Dollars ($130,000.00) due on the 1st day of each month, beginning on December 1, 2000. In addition, Operator shall pay all applicable state and federal taxes resulting from the charter and operation of the Vessel, if any. The monthly Charter Hire payments and applicable taxes, if any, shall be paid by Operator in advance to Owner by wire transfer to Owner's account or by check as instructed by Owner in writing. Operator shall concurrently fax to owner evidence of each payment. One-half (½) of all Charter Hire payments will be applied towards the Purchase Price, defined below. All amounts expressed as dollars in this Agreement shall mean United States dollars.

Upon execution of this Agreement, Operator shall pay into an escrow with Coastal Marine for the benefit of Owner, the amount of One-Hundred Thirty Thousand Dollars ($130,000.00) plus applicable taxes to be applied as the first full month's Charter Hire. Such amount is fully refundable to Operator if the Pier Lease, hereafter defined, is not negotiated to Operator's satisfaction within one (1) week from execution hereof, in which event this Agreement shall be null and void. If the Pier Lease is timely negotiated to Operator's satisfaction, the $130,000 plus tax will be promptly paid to Owner and Owner will perform its obligations to dry dock and paint the Vessel, as more particularly described below. Once the $130,000 has been released from escrow it and all future deposits and payments of any nature shall be deemed earned and non-refundable.

5.   Purchase Price. The purchase price ("Purchase Price") of the Vessel is Four Million Dollars ($4,000,000). At Closing, Operator shall deliver or cause to be delivered the following:

5.1   The sum of Two-Hundred Fifty Thousand Dollars ($250,000) in cash or cashier's check, which shall be applied against the Purchase Price;

5.2   An executed promissory note ("Note") for the balance of the Purchase Price in the amount of Three Million, Seven Hundred Fifty Thousand Dollars ($3,750,000), plus interest thereon at the rate of six percent (6%) per annum, which shall be payable as follows:

5.2.1   An installment of Two-Hundred Fifty Thousand Dollars ($250,000) plus interest due on or before April 1, 2001;

Charter.Agmt/Rev 11/01/00 9:10 a.m.            3

5.2.2  Monthly payments of Sixty-Five Thousand Dollars ($65,000), representing one half (½) of each Charter Hire payment, beginning on December 1, 2000 and on the first of every month thereafter of the Charter Period or any extension thereof until the principal balance is paid in full;

5.2.3  The sum of $2,720,000 plus interest on November 30, 2001.  Operator may make prepayments of principal all of which will be credited towards the purchase price.

5.3  The certificates of insurance required as described more fully below; and

5.4  The promissory note as well as the full and complete performance of this Agreement shall be secured by a valid first lien on Operator's property, as described in the attached Exhibit B. Such lien shall automatically expire on May 31, 2001, if Operator is not in default under this Agreement. The liened property shall be stored at a location acceptable to Owner and Operator.

6.  <u>Purchase</u>.  If Operator has fully and completely performed its payment and other charter obligations under this Agreement, it may at any time during the Charter Period or any extension thereof, without prepayment penalty, exercise its right to purchase the Vessel by paying the balance of the Note then owing to Owner, including all interest and charges, if any, accrued thereon.

7.    Drydocking by Owner.  After the execution of this Agreement and release of the earnest money from escrow, Owner shall, at Owner's expense, dry dock the Vessel for the purpose of sandblasting and repainting the bottom and painting the hull 12 inches above the waterline.

8.    Operator's Inspection and Owner's Warranties. At Closing, Owner shall, at Owner's sole expense, provide to Operator a current marine survey, U.S. Coast Guard certification, and ABS Load Line certification for its Port of Operation, all indicating that the Vessel is technically ready to trade in U.S. waters    Certifications for Operator's crew, safety inspection, and inspection by OCMI for Certificate of Inspection at time of recertification or at new port of operation are Operator's responsibility.

Operator unconditionally accepts the Vessel by execution of this Agreement, and Operator understands and agrees that, except as it otherwise provided in this Agreement, the charter and purchase are on an "as is" basis, and that no warranty either real, expressed, or implied, and no representation as to condition, seaworthiness, merchantability or fitness for any purpose or use in any trade whatsoever of the Vessel (including among other uses gambling activities), including but not limited to whether current or future United States Federal or State law or regulations, will permit the Vessel to operate for Operator's intended purposes as a day cruise vessel in its intended area of operation, has been given by Owner or its authorized representatives.

It is further agreed that the Owner shall have no responsibility for any incidental, special or consequential damages or any other damages of any nature whatsoever

arising from this Agreement or from negotiations relating to this Agreement, including, without limitation, damages for lost profits or personal injury, which result or are claimed to result from any defect, failure, fault, or condition in the Vessel or related assets. The warranties set forth in this Agreement are in lieu of all other warranties, whether express or implied or statutory, and there are no warranties which extend beyond the description on the face hereof. Upon execution of this Agreement, Operator confirms that it has not relied on any representation of Owner (Owner's representation) or Broker regarding this Vessel or the business of the Vessel and has decided to charter the Vessel based upon its own investigation. Operator waives its right to any *in rem* claim against the Vessel that may arise under or as a result of this Agreement.

9.    <u>Mortgages; Retention of Title</u>.  Not withstanding anything herein or elsewhere contained to the contrary, it is specifically agreed to by the parties that title to the Vessel shall remain in owner until such time as all obligations of Operator shall have been fully performed. The Vessel is subject to a First Preferred Ship's Mortgage in favor of Bank of Pensacola ("Mortgagee"). Operator shall, at execution hereof, execute a Second Preferred Ship's Mortgage in favor of Owner to secure the payments due hereunder. This Agreement shall be subject and subordinate to the Mortgage. Owner shall deliver to title to the Vessel free and clear of all mortgages at the time the Purchase Price, plus any accrued interest, is paid in full. It is specifically agreed to by the parties that title to the Vessel shall remain in Owner until such time as all obligations of Operator shall have been fully performed.

10.   <u>Use of Vessel</u>. The Operator, having already inspected the Vessel, is satisfied that the Vessel is suitable for its required purpose, and the Operator is responsible for

Charter.Agmt/Rev 11/01/00 9:10 a.m.                     6

obtaining from the authorities necessary approvals to operate the Vessel in its proposed area of operations and for its intended purpose. The Vessel shall not carry more passengers or cargo than can lawfully and safely be carried and shall not in any event exceed the number of passengers as stipulated by local and survey authorities. Cargo capacity is limited to passengers personal luggage only. The Vessel shall not sail in any territorial waters outside the United States. Vessel shall only operate out of South Padre Island, Texas ("Port of Operation") as may be permitted by its then current survey, and shall be restricted to voyage within the number of miles from shore as permitted by its then current survey.

11.    <u>Risk of Loss Prior to Delivery</u>. The risk of loss, damage or destruction of the Vessel shall be borne by Owner prior to Delivery. If there is no Delivery due to loss, damage or destruction of the Vessel, any monies paid by Operator shall be returned to Operator, and this Agreement shall be deemed null and void.

12.    <u>Documentation</u>. Throughout the Charter Period, Operator at its expense will maintain the registration and documentation of Vessel in Owner's name under the laws and regulations of the United States. Owner will, at the expense of Operator, execute such

documents and furnish such information as Operator may reasonably require to enable Operator to obtain and maintain the documentation of the Vessel, and Operator will not permit the Vessel to be registered or documented or operated under any flag other than that of the United States. Neither party will do or suffer or permit to be done anything that might injuriously affect or prejudice in any way the registration and documentation of the Vessel under the laws and regulations of the United States. Owner will not change the Port of Documentation of the Vessel.

13.  <u>Maintenance</u>.  Operator shall have full responsibility for maintenance and repair of the Vessel and all of its fixtures, furnishings and equipment throughout the Charter period and at its expense will

13.1  maintain and preserve the Vessel and maintain and preserve or replace Owner's supplied equipment to the end that (i) the Vessel and her equipment will at all times during the Charter Period be in the same condition,  running order and repair as on Delivery, reasonable wear and tear excepted, and (ii) the Vessel shall be tight, staunch, strong and well and sufficient tackled, appareled, furnished, equipped and in every respect as seaworthy and in as good operating condition as at Delivery, and

13.2  cause the Vessel to be overhauled, drydocked, cleaned and bottom-painted as may be required to maintain the Vessel in class to maintain its load line certificate and in compliance with all regulatory and survey requirements. (c) cause the Vessel to undergo surveys as may be required by the Vessel's underwriters and promptly comply with all recommendations and requirements resulting from each survey.  Operator will notify Owner of each proposed drydocking as far in advance as practicable.  Operator must receive Owner's prior written approval, which approval will not be unreasonably withheld, both as to scope of work and as to the designated shipyard.  Owner in its sole discretion may appoint a supervisor to represent the Vessel while in dry dock. The cost of said representative, if any, shall be paid by Operator.   All replacements to Owner's supplied equipment placed on or installed in the Vessel shall be of identical or superior quality, free and clear of all liens,

03-NOV-2000 10:20 FROM-STETSON LAW OFFICES +505-256-5177 T-375 P 008/035 F-813

encumbrances and rights of others and shall immediately become the property of Owner and be subject to this Agreement.

14. <u>Repair</u>. Operator will permit representatives of Owner at any time and without notice to inspect the Vessel and the Vessel's logs, papers and cargo but in such a manner as to not unduly disrupt the operations of the Vessel. All reasonable expenses in connection with any such inspection shall be paid by Operator. Operator agrees to undertake at its expense to perform any repair work that in Owner's reasonable opinion is necessary. Without limitation, any repair or maintenance requested by Owner shall be deemed reasonable and shall be performed promptly if:

14.1 Requested by the Insurance Carrier, U.S. Coast Guard, the American Bureau of Shipping or any other regulatory agency having jurisdiction over the Vessel.

14.2 As to any matter affecting the hull, stability, passenger safety or comfort to a standard that existed on the date of this Agreement as determined by Boris Kirilloff, the Naval Architect who supervised conversion of the Vessel or if not available, another Naval Architect selected by Owner.

14.3 As to any matter relating to the maintaining of the running gear and machinery of every nature including but not limited to engines, generators, mechanical, electrical, plumbing, and HVAC to a standard that existed on the date of this Agreement as determined by International Marine Diesel Specialists, Inc., Ft. Lauderdale, Florida, independent Marine consultants or if not available, another marine consultant selected by Owner.

15. <u>Relocation Expenses</u>.  All of the preparation expenses for relocating the Vessel and all of the expenses incurred in relocating the Vessel shall be paid by Operator.

16. <u>Payment of Taxes and Compliance with Governmental Laws and Regulations</u>.  All applicable state and federal taxes on the Charter Hire payments, and taxes that may be imposed as a result of the operation or from income earned by Operator, are the sole responsibility of Operator, and Operator shall indemnify, defend and hold Owner harmless from payment of same and shall not permit any lien to be imposed against the Vessel with regard to the same.  Any and all taxes that may be imposed against Owner as a result of income earned by Owner (except for sales tax on the Charter) are the responsibility of Owner, and Owner shall indemnify, defend and hold Operator harmless from payment of same and shall not permit any lien to be imposed against the Vessel with regard to the same.  Any duties, taxes or fees on the Vessel of any country, state, city, regulatory or taxing authority incurred prior to the date of this Agreement shall be the responsibility of the Owner, and validation of such payment is the responsibility of Owner.  Any duties, taxes, or fees of the Vessel, incurred on or after the date of this Agreement shall be the responsibility of Operator, and validation of such payment is the responsibility of Operator.  Further, Operator warrants that it shall comply with all operational requirements imposed by any governmental agency or law of the United States including but not limited to surveys or other inspections.

It shall be Operator's responsibility to comply with all United States Federal, State and local laws and regulations relating to crew manning and operation of the Vessel, including compliance with all drug and alcohol regulations.

Operator warrants that, during the Charter Period and any extensions thereto, the Vessel will comply with all applicable U.S. Federal and State laws and regulations relating to navigation, pollution and safety, including, but not limited to, the U.S.C.G. Regulations contained in Titles 33 and 46 of the Code of Federal Regulations, as amended, and will reimburse Owner for any expenses, insurance premiums, costs of modifications to the Vessel, or other costs that Mortgagee and/or Owner may incur in complying with such laws and regulations.

17.   <u>Assignment</u>.  Operator shall not assign this Agreement nor transfer possession or control the Vessel or cause a change in control in or of Operator or of management except with the prior consent in writing of Owner.  Operator may not sub-let the Vessel.

18.   <u>Officers and Crew</u>.  During the Charter Period, Operator shall provide and pay the master and such other officers and seamen as required by the authorities and governments that shall have jurisdiction in the areas in which the Vessel is to be operated and, in any event, a sufficient complement of master, officers and seamen as shall be required for the safe and efficient operation of the Vessel.  The Operator shall at all times indemnify and keep indemnified, and hold harmless and defend Owner and Mortgagee and their servants or agents from any actions, proceedings, claims or demands made against them or any one of them by any master, officer or crew member of the Vessel for crew's wages, salvage or otherwise.  The senior captain, marine manager and chief engineer shall be employees of Owner.  Their salary will be reimbursed to Owner by Operator or at Owner's sole option paid by Operator directly to the employee.

19.    <u>Working Expenses</u>. Operator shall provide and pay for all provisions, fuel oil, greases and other consumables and shall pay all port charges, pilotage, agencies, commissions and all other charges whatsoever.

20.    <u>Liens Against Vessel</u>. During the Charter Period or any extension thereto, neither Operator nor its agents, nor the Master of the Vessel, shall have any right, power, or authority to create, incur, or permit to be imposed upon the Vessel any liens whatsoever except for crews' wages and salvage. Operator agrees to carry a properly certified copy of this Agreement, and any addendum thereto, with the ship's papers. In no event shall Operator procure or permit to be procured for the Vessel any supplies, necessaries or services, except for crew services and salvage, without previously obtaining a statement signed by an authorized representative of the furnisher thereof acknowledging such supplies, necessaries or services are being furnished on the credit of Operator and not on the credit of the Vessel or her Owner or Mortgagee, and that the furnisher claims no maritime lien against the Vessel, and therefore waives any such lien that may arise from operation of law or customer, usage and practice.  Operator shall notify any person furnishing repairs, supplies, towage, or other necessaries to the Vessel that neither Operator, its agents, nor the Master, has any right to create, incur, or permit to be imposed upon the Vessel any liens whatsoever.  Such notice shall be in writing with copy to Owner.  Operator further agrees to fasten to the Vessel at all points of entrance, in the engine room, the wheelhouse, and other locations in the Vessel where notices are normally displayed, and to maintain during the life of this Agreement, a conspicuous notice reading as follows:

"This Vessel is the property of CSL Development Corporation. It is under charter to Gaim-Ko, Inc., and by the terms of the Charter Agreement, neither Gaim-Ko, Inc., nor the Master, nor anyone in possession of the Vessel has any right, power, or authority to create, incur, or permit to be imposed upon the Vessel any liens whatsoever."

Should any lien or liens, excluding the permitted Mortgages described above, be placed against the Vessel for any reason whatsoever including but not limited to crew's wages, salvage, or otherwise, Operator is responsible and agrees at its expense and cost to discharge and eliminate any and all such liens within 24 hours of placement of said lien. Failure to do so may, at Owner's option, result in immediate termination of this Agreement. Operator waives any lien it currently has or may have in the future against the Vessel.

21.  <u>Survey</u>.

21.1    The Vessel is a U.S. registered Vessel as evidenced by the Survey Certificate provided to Operator. The Vessel shall remain a U.S. registered ship.

21.2    After Delivery, Operator shall be responsible for keeping the Vessel in survey and in obtaining the necessary approvals from the surveying authorities, depending on its area of operation. The Vessel shall be dry docked as required by the authorities, and during that period the Operator shall pay all costs and expenses of the dry docking and survey.

22. <u>Change of Name</u>. Operator shall have the right, at its expense, to rename and to change the name of the Vessel, to paint the Vessel it its own colors, to install and display its tack insignia, and to fly its own house flag. Owner will, at the cost and expense of Operator, cooperate in the execution and filing of any documents necessary to affect a change in the name of the Vessel. At time of redelivery to Owner, Operator, at its expense, shall return Vessel to its original colors, flag and name.

23. <u>Owner Cooperation</u>. Operator intends to operate the Vessel as a day cruise vessel on voyages out of the Port of Operation. Operator will be required to obtain necessary approvals from United States governmental authorities, including the United States Coast Guard, for operation of the Vessel. Owner shall fully cooperate and assist Operator, as reasonably necessary, with regard to Operator's dealings with such authorities. Such cooperation shall include Owner's making the Marine Manager or other appropriate representative of Owner reasonably available at mutually convenient times and places for meetings with such authorities, provided however that Operator shall pay a reasonable fee and reasonable travel expenses, including lodging and meals of Owner's representatives.

24. <u>Security Bonds</u>. Any security bonds or deposits required by the governments or other authorities in the area of operation shall be provided by Operator, and all costs and expenses incurred in providing such shall be met by Operator.

25. <u>Area of Operation</u>. The Vessel shall be employed only in lawful trade and carriage of passengers from the Port of Operation only. Further, the Vessel may only be operated in such areas or in such parts of that area in which the Vessel can be safely

Charter.Agrmt/Rev 11/01/00 9:10 a.m.                    14

operated and can always safely lie afloat and within the limits imposed by the authorities under which the Vessel is registered.

26.   Notice of Loss, Requisition, Liable, Sale, Casualties.  In the event of

26.1   actual total loss of the Vessel,

26.2   requisition of the use of or title to, or seizure of, the Vessel by any governmental authority or persons acting under the color thereof,

26.3   the filing of any libel against the Vessel, or the attachment, levying upon, detection, sequestration or taking into custody of the Vessel in connection with any proceeding,

26.4   Marshal's or other sale of the Vessel, or

26.5   any casualty, accident or damage to the Vessel,

Operator will immediately give verbal notice thereof (containing full particulars) to Owner and Mortgagee, and within 24 hours give written notice by facsimile and registered mail.

27.   Insurance.

27.1   Hull & Machinery.  During the term of this Agreement, the Vessel and Owner's supplied equipment shall be kept insured by Operator at its expense against Fire, Collision, Hull, Machinery, Salvage marine and War Risks in the

names of Operator, Owner and Mortgagee, as their interests may appear. The hull and machinery insurance coverage shall be for an amount no less than Six Million Five-Hundred Thousand Dollars ($6,500,000) and for on-board gambling equipment in the amount no less than Seven-Hundred Thousand Dollars ($700,000) with a carrier acceptable to Owner exclusive of coverage for any equipment owned or leased by Operator. Operator, at its expense, shall carry appropriate personal property insurance with a carrier reasonably suitable to Owner for any equipment owned or leased by operator in an amount equal to its fair market value.

27.2    <u>Protection and Indemnity</u>. Operator shall purchase Protection and Indemnity Insurance with a carrier acceptable to Owner in the names of Operator, Owner and Mortgagee as their interests may appear, in an amount not less than U.S. Ten Million Dollars ($10,000,000.00), the cost of which shall be payable by the Operator. Deductibles, if any, shall not exceed Five Thousand Dollars ($5,000). Operator shall be responsible for the deductible on any insurance claim for injury to anyone on the vessel including but not limited to employees, independent contractors, concessionaires, passengers and guests.

27.3    <u>Carrier and Coverage</u>. The insurances shall be underwritten by a first class insurer who shall be approved by Owner and Mortgagee, and Certificates of Currency showing Owner's and Mortgagee's interest shall be supplied to Owner and Mortgagee. The above insurance shall include both an Innocent Owner's Interest Clause and a Loss Payable and Non-Cancellation Clause in forms acceptable to Owner.

28.   <u>War</u>.

28.1   Unless Owner's consent in writing be first obtained, the Vessel shall not be ordered to voyage to nor continue to any place or on any voyage nor be used on any service which will bring the Vessel within a zone which is dangerous as a result of any actual or threatened act of war, war-like operations, acts of piracy or hostility, revolution, civil war, civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of sanctions, nor carry goods that may in any way expose the Vessel to any risks of seizure, capture, penalties or any other interferences of any kind whatsoever by belligerent or fighting powers or parties or by governments or rulers.

28.2   Should the Vessel approach or be brought or ordered within such zone or be exposed in any way to the said risks, the Charter Hire payments shall be paid for all the time lost, including any loss owing to loss or injury to the Master, officers or crew or to the action of the crew in refusing to proceed to such zone or to be exposed to such risks.

28.3   Operator shall have the liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destinations, delivery or in any other ways whatsoever given by any government or any person or body acting or purporting to act with the authority of such government of by any committee or any persons having under the terms of the way risk insurance on the Vessel the right to give such orders or directions.

29. **Salvage.** Operator will not permit the Vessel to be used in salvage operations of any nature save as required by law. All delays occasioned by attempting or rendering towage or salvage services as required by law or repairing damage occasioned thereby shall be borne by Operator, and all benefits arising from such salvage operations shall be for Operator's sole benefit.

30. **Modification.** During the term of this Agreement or any extension thereof, Operator shall not modify or alter the Vessel in any respect without the prior approval of Owner in writing, which consent (in case of minor and not structural modifications) shall not unreasonably be withheld. Any modifications or alterations to the Vessel agreed by Owner shall be carried out to a standard approved by Owner and the Survey authorities, and the cost and expenses incurred in such modifications or alterations shall be paid by Operator.

31. **Affirmative Representations of Operator:** As an inducement for Owner to enter into this Agreement, Operator makes the following representations:

31.1 Neither Owner nor Charles S. Liberis, or broker or any of their representatives have made any representations regarding the legality, viability, or profitability of operating the Vessel.

31.2 All financial projections provided by Owner to Operator were hypothetical, for discussion purposes only, and not relied on by Operator in making its business decision to enter into this transaction.

Charter.Agmt/Rev 11/01/00 9:10 a.m.  .  18

31.3   Either Operator nor any of its directors, officers, or stockholders, is under investigation for, has ever been indicted, charged or convicted of a felony of any nature or a misdemeanor involving gambling.

32.   **Corporate Authority**.  Operator and Owner warrant that they each have the power and authority to enter into this Agreement and all other documents executed, received or delivered hereunder.  Each represents that all necessary corporate and stock owner action has been to authorize and direct the execution hereof by Operator and Owner and to consummate this transaction, and that Operator shall obtain, as required, permits and approvals in accordance with all governmental regulatory requirements.

33.   **Conveyance of Personalty**.  As additional consideration for this Agreement, Operator does hereby grant and convey to Owner all of the personalty, currency, food, liquor stores, furniture, equipment, fixtures, of every kind and nature presently on the Vessel and any additions and replacements thereof (the "personalty") brought upon the Vessel during the period of this Agreement or any extensions thereto.  Owner grants to Operator the right to the use of the personalty during the term of this Agreement upon the condition precedent that Operator is in compliance with each of the terms and conditions of this Agreement and further conditioned on Operator's promptly replacing all personalty so used.

34.   **No Set-Off**.  No payment of Charter Hire or other payment required to be made by Operator by the terms of this Charter shall be subject to any right of set-off, counterclaim, defense, abatement, suspension, deferment or reduction, and Operator shall have no right to terminate this Agreement (except as expressly provided herein)

or to be released, relieved or discharged from any obligation or liability hereunder for any reason whatsoever, including without limitation:

34.1    any damage to, or loss, requisition, seizure, forfeiture or Marshal's or other sale of the Vessel;

34.2    any libel, attachment, levy, detention, sequestration or taking into custody of the Vessel, or any restriction of or prevention of or interference with the use of the Vessel; or

34.3    any title defect or encumbrance or any disposition from the Vessel not by reason of some act, omission or breach on the part of Owner or a third party, whether or not resulting from accident and whether or not without fault on the part of Operator, Operator will continue to make all payments required of Operator by the terms of this Agreement without interruption or abatement.

35.    **Events of Default; Retaking**.

35.1    If any of the following events ("Events of Default") shall occur, namely, if

35.1.1 Operator shall fail to pay any Charter Hire or additional payments on Purchase Price on the due dates hereof, or

35.1.2 Operator shall fail to perform or comply with any of the provisions of this Agreement,

then and in such event, Owner may, at its option, immediately withdraw the Vessel from the service of Operator upon giving written notice to Operator, without compensation of liability to Operator and without prejudice to any claim for damage suffered or to be suffered by reason of any such default which Owner might otherwise have had against Operator in the absence of such withdrawal, and, upon the giving of such notice, retaking this Vessel, wherever found, whether upon the high seas or in any port, harbor or other place, without prior demand and without legal process, and for that purpose enter upon any dock, pier or other premises where the Vessel may be and take possession thereof, or require Operator, at Operator's expense, forthwith to redeliver the Vessel to Owner and/or exercise any rights and privileges Owner may have in law and/or in equity.

35.2 Upon the occurrence of an Event of Default and at any time thereafter so long as the same shall be continuing, Owner may, at its option, upon ten (10) days written notice to Operator, declare Owner to be in default; and at any time thereafter, so long as Operator shall not have remedied all outstanding Events of Default, Owner may do, and Charterer shall comply with, one or more the following, as Owner in its sole discretion shall so elect to the extent permitted by, and subject compliance with any mandatory requirements of applicable law then in effect:

35.2.1 Upon written demand, Owner may cause Operator at Operator's expense to, and Operator hereby agrees that it will, promptly redeliver the Vessel, or cause the Vessel to be redelivered, to Owner with all reasonable dispatch and in the same manner and in the same condition

as if the Vessel were being redelivered at the expiration of the Charter Period in accordance herewith, and all obligations of Operator shall apply to such redelivery; or Owner or its agent, at Owner's option without further notice, may, but shall be under no obligation to, retake the Vessel where ever found, whether upon the high seas or at any port, harbor or other place and irrespective of whether Operator, any suboperator or any other person may be in possession of the Vessel, all without prior demand and without legal process, and for that purpose Owner or its agent may enter upon any dock, pier or other premises where the Vessel may be and may take possession thereof, without Owner or its agent incurring any liability by reason of such retaking, whether for the restoration or damage to property caused by such retaking or otherwise. Operator, to induce Owner to enter into this Agreement, covenants not to sue Owner or Owner's agents or assert as an affirmative defense in any litigation Owner or Owner's agents anything that is related or connected with Owner or Owner's agents fulfilling any of the above purposes.

35.2.2 Owner, by written notice to Operator, may require Operator to pay to Owner, and Operator hereby agrees that it will pay to Owner, all unpaid Charter Hire payments as liquidated damages for loss of a bargain and not as a penalty, plus interest on such amount at the rate of 10% per annum, from the payment date specified in such notice to the date of actual payment.

35.2.3 Owner, by written notice to Operator, may accelerate all payments due under the promissory note.

36.    Assignment of Pier Lease. Operator does hereby assign, transfer and set over unto the Owner, with the right to reassign all of its rights, title and interest in and to the lease and in and to the demised premises and berth located at the Sea Ranch Pier ("Pier Lease"); it being expressly understood and agreed that this assignment of the Pier Lease is made by Operator to Owner upon the following terms, covenants, limitations, and conditions:

36.1    Operator shall retain possession of the leased premises in accordance with the terms and conditions of the Pier Lease so long as no default is made in this Agreement.

36.2    If default be made by Operator in the performance of this Agreement, then Owner shall have the option of taking over the leased pier premises, provided, however, that in the event Owner elects to exercise said option of taking over the demised premises for the purpose of operating the same, written notice of its election so to do shall be mailed promptly by Owner to Lessor. Upon the exercise of such option, Owner shall be deemed to be substituted as the Lessee in said Pier Lease in the place and instead of Operator, and shall be deemed to have assumed expressly all of the terms, covenants, and obligations of the Pier Lease theretofore applicable to Operator, and shall likewise be entitled to enjoy all of the rights and privileges granted to Operator under the terms and conditions of the Pier Lease, with the right to reassign same.

36.3 It is understood and agreed that so long as Owner shall not have exercised its option under the foregoing provisions hereof as to the leased pier premises, Owner shall not be liable for rent or any obligation of Operator under and by virtue of or in connection with the Pier Lease, and Operator shall remain liable for such rent and obligations.

36.4 As a condition precedent to this Charter taking effect, Lessor shall execute its approval in form satisfactory to Owner.

37. <u>Termination of Agreement and Turnover</u>. In the event that this Agreement terminates for any reason whatsoever, other than by Operator exercising and closing on its option to purchase the Vessel, including but not limited to, termination of the Charter Period or any extensions thereof, or upon a material default by Operator hereunder, then in that event, Operator at Owner's sole option, shall use reasonable efforts to deliver and turn over the business conducted on the Vessel as a going concern and without disruption in service ("the Turnover"). The Turnover shall include but not be limited to:

37.1 Operator's delivery to Owner of the name, address and pay schedule of each employee;

37.2 Operator's granting a release of any employee who will not be employed by Operator or its affiliates from any contractual arrangement that would prevent said employee from being employed by Owner;

37.3 All customer lists and rating cards;

37.4    All mailing lists;

37.5    An assignment of all telephone numbers and yellow page listings;

37.6    All advertising promotion and collateral material;

37.7    An assignment of all media contracts;

37.8    All software including but not limited to reservations and accounting software;

37.9    Group sales lists, lead lists and existing group contracts;

37.10    Operating manuals;

37.11    Internal controls; and

37.12    Employee procedure manuals.

38.    <u>Right of First Refusal</u>.  In the event that Operator elects for the business to be turned over, then in that event, Owner shall have the right of first refusal for a period of thirty (30) days to purchase at a mutually agreed upon fair market value, all furniture, fixtures and equipment used by Operator in the conduct of the business.

39.    <u>Remedies Cumulative</u>.  Each and every power and remedy herein given to Owner or otherwise existing shall be cumulative and in addition to every other remedy herein so given or now or hereafter existing at law, in equity, in admiralty, or under statute,

Charter.Agmt/Rev 11/01/00 9:10 a.m.                25

and each and every power and remedy, whether herein so given or otherwise existing, maybe exercised from time to time and as often and in such order as may be deemed expedient by Owner, and the exercise, or the beginning of the exercise, of any power or remedy shall not be construed to be a waiver of the right to exercise at the same time, or thereafter, any other right, power or remedy. No delay or omission by Owner in the exercise of any right or power or in the pursuit of any remedy shall impair any such right or be construed a waiver of any default or to be an acquiescence therein.

Owner shall be liable for any and all additional hire payable hereunder before, during or after the exercise of any of the available remedies and for all reasonable legal fees and any other reasonable costs and expenses whatsoever incurred by Owner by reason of the occurrence of any Event of Default or by reason of the exercise by Owner of any remedy hereunder, including, without limitation, any reasonable costs and expenses incurred by Owner in connection with retaking of the Vessel, or upon the redelivery or taking of the Vessel, or the placing of the Vessel in the condition and seaworthiness required by the terms hereof. No remedy referred to in this Section is intended to be exclusive, but each shall be cumulative and is in addition to, and may be exercised concurrently with, any other remedy that is referred to in this section or that may otherwise be available to Owner at law, in equity or in admiralty; provided, however, that liquidated damages having been agreed to by the parties hereto, Owner shall not be entitled to recover from Operator as damages for the Vessel upon the occurrence of one or more Events of Default an amount in excess of such liquidated damages for the Vessel plus costs and expenses referred to in the following subsection hereof as may be incurred by Owner in connection with the occurrence of such Event or Events of Default. The rights of Owner and the obligations of Operator under this Section shall be effective and enforceable regardless of the pendency of any

Charter.Agmu/Rev 11/01/00 9:10 a.m.                    26

proceeding that has or might have the effect of preventing Owner or Operator from complying with the terms of this Charter. No express or implied waiver by Owner of any Event of Default shall in any way be, or be construed to be, a waiver of any further or subsequent Event of Default.

Operator and R.A. Gallegos, personally, shall be liable for payment of any deficiency after retaking of the Vessel by Owner subsequent to default by Operator. Owner shall be entitled to exercise all legal rights upon the Guarantor whether under this Agreement, the Promissory Note or the Secured Ship Preferred Mortgage of this Agreement prior to bringing any civil action against Operator seeking to collect any amounts due hereunder.

40.  _Operator's Obligation Unconditional_. Operator's obligation to pay all charter hire and other amounts payable hereunder shall be absolute and unconditional under any and all circumstances and shall not be affected by any circumstances of any character, including, without limitation the following: (i) any defect in the title, seaworthiness, condition, design, operation or fitness for use of the Vessel or the ineligibility of the Vessel for any particular trade, (ii) any loss or destruction of, or damage to, the Vessel or interruption or cessation in the use or possession thereof by Operator for any reason whatsoever and of any whatever duration, (iii) the ineligibility of the Vessel for documentation under the laws or flag of any nation or to engage in the United States coastwise trade for any reason, (iv) any insolvency, bankruptcy, reorganization or similar proceeding by or against Operator or (v) any other circumstance or happening whatsoever whether or not similar to any of the foregoing. Operator hereby waives, to the extent permitted by applicable law, any and all rights that it may now have or that at any time hereafter may be conferred upon it by statute or otherwise, to

terminate, cancel, quit or surrender the charter of the Vessel hereunder except in accordance with the express terms hereof. If for any reason whatsoever this Agreement shall be terminated in whole or in part by operation of law or otherwise except as specifically provided herein, Operator nonetheless agrees to pay to Owner an amount equal to each hire payment at the time such payment would have become due and payable in accordance with the terms hereof had this Agreement not been terminated in whole or in part. Each payment made by Operator hereunder shall be final, and Operator will not seek to recover all or any part of such payment from Owner or any assignee of Owner for any reason whatsoever.

41. <u>Owner May Cure Defaults; Reimbursement of Expenses.</u> If Operator shall fail to perform or observe any of the terms of this Agreement, Owner may, in its discretion, do all acts and make all expenditures necessary to remedy such failure, including without limitation, the taking out of insurance on the Vessel and entry upon the Vessel to make repairs, and Operator shall promptly reimburse Owner, with interest at the rate of 10% per annum for any and all expenditures so made; but Owner, though privileged so to do, shall be under no obligation to Operator to do any such act or make any such expenditures nor shall the making thereof relieve Operator of any default in that respect. Operator will also reimburse Owner promptly, with interest at the rate of 10% per annum for any and all expenditures made by Owner at any time in withdrawing the Vessel from service of Operator or otherwise protecting its rights hereunder and for any and all damages sustained by Owner from or by reason of any default or defaults of Operator.

42. <u>Purchase of Fuel and Inventory.</u> Operator shall purchase from Owner the fuel on the vessel at the time of the closing at the cost price thereof to Owner, and Operator shall

pay Owner for the same at the time of delivery of the Vessel. The written statement of the Marine Manager as to the amount of fuel on the Vessel at such time shall be accepted as conclusive by the parties. Operator shall purchase all unopened liquor and groceries, unopened food stuffs, paper and plastic goods, stores, disposables, oils, lubricants, and other operating inventories on the Vessel from Owner at Owner's invoiced cost.

43. <u>Indemnity</u>. Operator shall at all times indemnify and keep indemnified, and hold harmless and defend Owner and Mortgagee and their servants or agents from any actions, proceedings, claims or demands made against them or anyone of them by any passenger, servant or agent or guest of Operator arising out of any act of any passenger, servant, agent or guest of Operator.

Should the Vessel be arrested, confiscated or detained as a result of the act or omission of Operator or of the unlawful use of the Vessel by Operator during the Charter Period or any extension thereto, Operator indemnifies Owner against all costs, expenses and damages sustained by Owner resulting from such arrest, confiscation or detention. Operator shall take all steps reasonably required to insure that no illegal drugs or other substances are transported aboard the Vessel, whether by crew, passengers or otherwise. Such steps shall include, but not be limited to, the adoption of policies specifically prohibiting the use or carriage of illegal drugs aboard the Vessel and publicizing such policies to passengers and crew.

44. <u>Insolvency of Operator</u>. The filing of any petition in bankruptcy, or the adjudication of Operator as a bankrupt or insolvent, or the appointment of a receiver or trustee to take possession of all or substantially all of the assets of Operator, or a general

assignment by Operator for the benefit of creditors, or any action taken or suffered by Operator under any state or federal Insolvency or Bankruptcy Act shall constitute a breach and a default of this agreement by Operator, and in such event Owner may at its option terminate this Agreement and exercise any and all of its rights as set forth in this Agreement.

It is understood and agreed that neither this Agreement, nor any interest herein or hereunder, nor any estate created hereby, shall pass by operation of law under any state or Federal Insolvency or Bankruptcy Act to any trustee, receiver, assignee for the benefit of creditors, or any other person whatsoever without the prior express written consent of Owner and Mortgagee. Any purported transfer in violation of the provisions of this paragraph shall constitute a breach and a default of this Agreement, and in such event Owner may at its option declare this Agreement terminated and exercise any and all of its rights and remedies as set forth in this Agreement.

45.  **Applicable law.**  The interpretation of this Agreement shall be governed by the general maritime law of the United States. All non-maritime issues of law will be decided by application of Florida law. Neither party hereof shall be considered the drafter of this Agreement. While Owner and Operator have no authority to confer jurisdiction upon any court that does not have jurisdiction over a dispute, both consent to *in personam* jurisdiction of the United States District Court for the Northern District of Florida for enforcement of this Agreement.

46.  **Notices.**  All notices, requests, demands or other communications to or upon the respective parties hereto shall be deemed to have been duly given upon the date of delivery, if sent by courier or overnight delivery; seven (7) business days after

Charter.Agrm/Rev 11/01/00 9:10 a.m.                    30

dispatch if set by prepaid registered post; or one (1) business day after dispatch if made by confirmed telex, cable or facsimile transmission to the party to which such notice, request, demand or other communication is required or permitted to be given or made under this Agreement. Such notices, request, demands, or other communications shall be addressed as follows:

If to the Owner:    CSL Development Corporation

                    c/o Edward M. Luria, Esquire, Trustee

                    918 Sixteenth Street, N.W., Suite 200

                    Washington DC 20006


                              **And**


                    Charles S. Liberis

                    1610 Barrancas Avenue

                    Pensacola, Florida 32501

If to the Operator:   R.A. Gallegos

                    2403 San Mateo Blvd, NE, Suite W17

                    Albuquerque, NM 87110


47.    <u>Time</u>. This is of the essence for the performance of all obligations and the satisfaction of all conditions of this Agreement.


48.    <u>Attorneys' Fees</u>. Should any party hereto employ an attorney for the purpose of enforcing or construing this Agreement, or any judgment based on this Agreement,

in any legal proceeding whatsoever, including but not limited to insolvency, bankruptcy, arbitration, declaratory relief, or other litigation as well as any appeals thereof, the prevailing party shall be entitled to receive from the other party or parties thereof reimbursement for reasonable attorneys' fees and costs, including, but not limited to, service of process costs, filing fees, court and court reporter costs, investigative costs, expert witness fees, and the cost of any bonds, and such reimbursement shall be included in any judgment or final order issued in that proceeding.

49. <u>Counterparts</u>. This Agreement may be executed in any manner of identical counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same instrument when each party has signed one (1) such counterpart. In addition, facsimile signed copies of this Agreement shall serve and have the effect of binding originals until such time as the parties hereto are able to exchange original signed copies.

50. <u>Severability</u>. In the event that any of the terms, conditions, or provisions of this Agreement are held to be illegal, unenforceable, or invalid by any court of competent jurisdiction, the legality, validity, and enforceability of the remaining terms, conditions, or provisions shall not be affected thereby.

51. <u>Lien on Equipment</u>. Operator does hereby pledge to Owner as security for the Charter Hire, Promissory Note and other payments and performance of this Agreement, all furniture, fixtures, gaming equipment, cash in banks, and personal property of every nature used by Operator in connection with the Vessel's operation,

whether located on the Vessel or elsewhere. Operator agrees to execute any further documentation necessary to protect Owner's security interest in the above.

52.  <u>Guarantee and Pledge of Ownership Interest</u>. For valuable consideration, R.A. Gallegos, ("Guarantor") does hereby guarantee the performance of the terms and conditions and the payments of the sums set forth in this Agreement by Operator including but not limited to the Charter Agreement and payments due under the Promissory Note. In addition, Guarantor agrees to pay any attorneys' fees and costs incurred in enforcing this Guarantee. It is further agreed that any assignment of this Agreement shall not release Guarantor from his obligations as Guarantor hereunder. Guarantor hereby further waives the right to require Owner to proceed against Operator or its assignees, or to pursue any other remedy in its power and Guarantor hereby authorizes Owner to proceed directly against Guarantor. Performance of the Guarantee shall be secured by a pledge of all of Guarantor's interest in Operator which interest will represent no less than One-Hundred percent (100%).

53.  <u>Complete Agreement and Severability</u>. The parties acknowledge receipt of a copy of this Agreement; that the terms of the Agreement are the entire agreement between them; and that they have not received or relied on any representations that are not expressed in this Agreement. **No prior, present, or future agreements or representations will be relied on or will bind the parties unless in writing and incorporated into this Agreement.** Modifications of this Agreement will not be binding unless in writing, signed and delivered by the party to be bound. Signatures, initials and modifications communicated by facsimile or telecopy will be considered as original. If any provision of this Agreement is or becomes invalid or

Charter Agmt/Rev 11/01/00 9:10 a.m.                33

unenforceable, all remaining provisions will continue to be fully effective unless said provision specifically provides to the contrary.

54.   <u>Pilot, Tugboat or Stevedor Negligence</u>.  Operator shall be responsible for all losses sustained by Owner or Vessel or Mortgagee through the negligence of pilots, tugboats or stevedores.

55.   <u>Tickets</u>.  Operator shall use a form of passenger ticket approved by the insurance carrier.

56.   <u>Attorney Disclosure</u>.  Operator is aware that Charles S. Liberis is an attorney and represents that Charles S. Liberis has not given any legal advice to Operator. Operator further represents that it has received its own independent legal advice regarding this Agreement.

57.   <u>Miscellaneous</u>.  This Agreement constitutes the entire agreement between the parties hereto, and it is agreed and understood that there are no other duties, obligations, liability or warranties implied or otherwise. This Agreement is binding on Owner and Operator, their successors or assigns, as soon as executed by both parties hereto.

WITNESS:                          OWNER:

                                  CSL DEVELOPMENT CORPORATION

_____         By: _____

                                  Its: _____

Charter.Agmt/Rev 11/01/00 9:10 a.m.            34

OPERATOR:

GAIM-KO, INC.

By: *R. A. Gallegos*

Its: *President—Owner*

## GUARANTY

The undersigned, being the principal shareholder of the Operator named in the within and foregoing Agreement, individually guarantees the performance of the Operator (as well as any successors and assigns) of each of the terms, covenants and obligations of such Agreement and the payment by the Operator (as well as the successors and assigns of Operator) of all amounts due under this Agreement including but not limited to the Charter Payments and payments due under the Promissory Note. The undersigned's obligations and liabilities under this Guaranty are primary, absolute and unconditional and this Guaranty may be enforced directly against the undersigned independently of the Operator (or Operator's successors or assigns) and independently of any other security that has been pledged in connection with the transaction contemplated by such Agreement.

DATED: *November 3, 2000*

GUARANTOR(S):

*R. A. Gallegos*
R.A. Gallegos, individually

Charter-Agmt/Rev 11/01/00 9:10 a.m.                35

# Gaim-Ko, Inc.

Mr. Dave Friedman
South Padre Island Center Joint Venture
One Padre Boulevard
South Padre Island, Texas 78597

Dear Mr. Friedman:

Enclosed is my check, number 5017004189 in the amount of $10,000, per our Sublease Agreement (see attached).

Sincerely,

R. A. Gallegos
President/Owner

1 Attachment

1 Enclosure

## Proposal For Sublease Agreement

This proposal to enter into a Sublease Agreement (the "Sublease") is made and effective November 17, 2000, by Gaim-ko Inc. to South Padre Island Center Joint Venture (Sublessor).

Sublessor is the tenant in a lease agreement dated June 30, 1994 with The State of Texas.

Gaim-ko Inc. now desires to sublease the Leased Property from Sublessor.

NOW, THEREFORE, in consideration of $10,000 of Earnest money, the receipt and sufficiency of which are hereby respectively acknowledged, the Sublessor agrees to enter into negotiations with Gaim-ko Inc. to Sublease the Premises as described below. If a mutually acceptable lease is not negotiated between the parties within ninty (90) days from the date of this proposal then Sublessor shall return the $10,000 of Earnest money to Gaim-ko Inc. Sublessor also agrees to discuss the possibility of Gaim-ko purchasing from Sublessor the rights to the lease with the State of Texas.

### PREMISES
A. Berth. The exclusive right to a berth for one (1) cruise ship. The berth is located at the end of the Pier.

B. Ticket Counter. The non-exclusive right to use the area designated "Ticket Counter" on the plat for the sale of Cruse Ship tickets.

C. Modular Office. The non-exclusive right to use a maximum of two (200) parking spaces in the area designated as "Parking" on the Plat for free parking.

### 1. Sublease.
A. Sublessor proposes to sublease the Leased Property as follows:
Sublease Term:  The term of this sublease is proposed to be one year, with two, one year options.
Sublease Rent:  The rent for the first year is proposed to be Sixty Thousand ($60,000), payable in advance. Rent for the second and third years is proposed to be One Hundred Twenty Thousand ($120,000) per year payable at the beginning of each year.

### 2. Obligations Under Master Lease.
Subtenant agrees to comply with the terms of the Master Lease and shall not do or permit to be done anything that would constitute a breach or default of Sublessor's obligations in the Master Lease.  Sublessor agrees to comply with all of Sublessor's obligations in the Master Lease. Sublessor agrees timely to pay rent and other charges due under the Master Lease and, provided Subtenant is not in breach or default of any obligation in this Sublease, shall not do anything to disturb Subtenant's use of the Leased Property pursuant to this Sublease.

### 3. Indemnification.
A.  Subtenant will indemnify, protect, defend and hold Sublessor harmless from and against any and all loss, cost, damage and expense arising out of or in any way related to a breach or default

- 1 -

of Sublessor's obligations in the Master Lease by Subtenant.

B.  Sublessor will indemnify, protect, defend and hold Subtenant harmless from and against any and all loss, cost, damage and expense arising out of or in any way related to a breach or default of the Master Lease by Sublessor.

### 3.  No Assignment or Sublease.
Subtenant shall not, without the prior written consent of both Sublessor and the landlord in the Master Lease, assign this Sublease or sublet the Leased Property or any part thereof.

### 4.  Notices.
Any notice given in connection with this Agreement, shall be in writing and shall be given to the appropriate party by personal delivery or by certified mail, postage prepaid, or recognized overnight delivery service as follows:

> If to Sublessor:
> South Padre Island Center Joint Venture
> One Padre Boulevard, South Padre Island, Texas 78597

> If to Subtenant:
> Gaim-ko, Inc
> 2403 San Mateo Blvd. N.E. Ste. W17
> Albuquerque N.M. 87110

### 5.  Headings.
Headings used in this Agreement are provided for convenience only and shall not be used to construe meaning or intent.

IN WITNESS WHEREOF, the parties hereto have caused this Sublease to be duly executed as of the date first above written.

_____          _____

South Padre Island Center Joint Venture          Gaim-ko, Inc



***50170041897*** ⑆121000248⑈4861 503258⑈