


FILED

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

AUG 1 6 2002

Michael N. Milby
Clerk of Court

| | |
|---|---|
| CSL DEVELOPMENT CORPORATION,   INC. | § |
| | § |
| Plaintiff, | § |
| v. | § |
| | § |
| GAIM-KO, INC.; RAY GALLEGOS; SOUTH | § |
| PADRE ISLAND FISHING CENTER, INC.; | § |
| STANLEY McELROY; DAVE FRIEDMAN; | § |
| SRFP, INC.; and SOUTH PADRE ISLAND | § |
| FISHING CENTER JOINT VENTURE | § |
| | § |
| Defendants. | § |

CIVIL ACTION NO. B-01-059
JURY DEMANDED

## DEFENDANTS, RAY GALLEGOS AND GAIM-KO, INC.'S RESPONSE TO PLAINTIFF'S FIRST MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

**NOW COME, RAY GALLEGOS** and **GAIM-KO, INC.** (hereinafter known as "Gaim-Ko") and file their Response to Plaintiff's First Motion for Summary Judgment and in support would show the court as follows:

## I.

## FACTUAL BACKGROUND

The factual background outlined in Gaim-Ko's Motion for Summary Judgment is incorporated herein for all purposes and the following additional facts support Gaim-Ko's defeat of Plaintiff's First Motion for Summary Judgment.

Plaintiff has materially misrepresented the facts of this case to the court. Specifically, Plaintiff over and over again refers to the two page PROPOSAL FOR SUBLEASE AGREEMENT, dated nov. 17, 2000, as a "sublease", a "Sublease Agreement", and an

-1-

"Agreement". Not one single time does Plaintiff call the two page document by its clear (and in bold face type) title, a **PROPOSAL** FOR SUBLEASE AGREEMENT.

Second, Plaintiff also failed to include the testimony of Stan McElroy, one of the Pier Owners. Stan McElroy has testified that only very basic negotiations took place and no negotiated terms were agreed to at the November 10, 2000 meeting. *See McElroy Affidavit,* Exhibit 6 and *McElroy Deposition,* Exhibit 10.

Plaintiff included an affidavit by a former CSL employee that claims Ray Gallegos and Dave Friedman told him that a dock lease had been agreed to. Both Ray Gallegos and Dave Friedman have testified in their affidavits and depositions that this is false. Gallegos and Friedman both testified from personal knowledge about the facts of the Nov. 10, 2000 meeting. Wayne Marks did not.

## II.

## PLAINTIFF'S SUMMARY JUDGMENT ALLEGATIONS

Plaintiff has alleged two points which it claims entitle it to a judgment as a matter of law:

1.    That Gaim-Ko negotiated a Pier Sublease to its satisfaction at the Nov. 10, 2000 meeting with the Pier Owners; and

2.    That Gaim-Ko sent a two page "Sublease Agreement" to Pier Owners on Nov. 17, 2000, which proves Gaim-Ko negotiated a Pier Sublease to its satisfaction on Nov. 10, 2000.

Both of these allegations are false. The evidence in this case defeats Plaintiff's summary judgment allegations and for that reason Plaintiff's First Motion for Summary Judgment must be denied.

## III.

### GAIM-KO'S EVIDENCE WHICH DEFEATS PLAINTIFF'S MOTION

Gaim-Ko argues the following Summary Judgment Evidence in its Response:

1.  Affidavit from Ray Gallegos; *Appendix, "Exhibit 1"*

2.  Affidavit from Pete Montoya; *Appendix, "Exhibit 2"*

3.  Affidavit from Jon Hale; *Appendix, "Exhibit 3"*

4.  Affidavit from Cate Stetson;  *Appendix, "Exhibit 4"*

5.  Affidavit from Stan McElroy; *Appendix, "Exhibit 5"*

6.  Affidavit from Dave Friedman; *Appendix, "Exhibit 6"*

7.  Affidavit from Mrs. Gallegos; *Appendix, "Exhibit 7"*

8.  Deposition testimony from Ray Gallegos, Jon Hale, Stan McElroy, Dave Friedman, Lou Daleo, and Charles Liberis; *Appendix, "Exhibits 8 through 13"*

9.  Proposal for Sublease Agreement with cover letter and check, dated November 17, 2000, from Ray Gallegos to Dave Friedman; *Appendix, "Exhibit 15"*

## III.

### SUMMARY JUDGMENT RESPONSE
### ARGUMENT & AUTHORITIES

**A.**  The November 10, 2000 meeting between Gaim-Ko and Pier Owners did not result in a negotiated Pier Sublease.

Plaintiff's Summary Judgment must fail because it presents no summary judgment evidence that the condition precedent required by the contract was satisfied. Plaintiff makes the conclusion that Ray Gallegos negotiated the Pier Sublease to his satisfaction without one single piece of admissible evidence. The only evidence CSL uses to support its claim is a surprise

affidavit by a witness it never identified in discovery. Mr. Wayne Marks, a former employee of Plaintiff, alleges hearsay evidence in a sham affidavit. Marks was not involved in the discussions at any time. He was not present at the Nov. 10, 2000 meeting. Yet, Marks claims Gallegos and Friedman told him a Pier Sublease was a done deal.

As the court well knows, statements made upon information and belief, as opposed to personal knowledge, are not entitled to weight in the summary judgment balance. *Lear, Inc. v. Adkins*, 395 U.S. 653, 671 (1969); See *also, Cadle Co v. Hayes,* 116 F.3d 957, 961 (1st Cir. 1997).

CSL has tendered an affidavit from a former employee (who was not even at the November 10th meeting) that claims " I was advised by Mr. Liberis and Mr. Gallegos that satisfactory terms had been reached with....the owner of the Sea Ranch Fishing Pier, and with its principals, Dave Friedman and Stan McElroy." "He told me, I swear it" type of evidence does not rise to the level of personal knowledge required by federal courts to support a movant's summary judgment. This type of self serving, inadmissable, hearsay affidavit testimony is not entitled to weight in the summary judgment balance. *Evans v. Technologies Applications & Serv. Co.,* 80 F.3d 954,962 (4th Cir. 1996)*; See also, Anheuser-Busch, Inc., v. Natural Beverage Distribs.,* 69 F.3d 337, 345 (9th Cir. 1995).

Even more important than the hearsay status of the sham affidavit is the fact that the admissible evidence established in this case is contrary to the substance of the sham affidavit. The witness present at the Nov. 10, 2000 meeting have all testified as follows:

Witness testimony:

"The Pier Lease was **NOT** negotiated          Format of sworn testimony and location
to Gaim-Ko's satisfaction"                             of Exhibit in Appendix

| | |
|---|---|
| RAY GALLEGOS - President of Gaim-Ko | <u>Affidavit</u> - Exhibit 1<br><u>Deposition</u> - Exhibit 8, p.192 ln.21-25<br>     and p.193, ln.1-5 |
| STAN MCELROY - co-owner of the pier | <u>Affidavit</u> - Exhibit 5<br><u>Deposition</u> - Exhibit 10, p. 111, ln. 3-25<br>     and p. 112, ln.1-25 |
| DAVE FRIEDMAN - co-owner of the pier | <u>Affidavit</u> - Exhibit 6<br><u>Deposition</u> - Exhibit 11, p. 28, ln. 9-22 |
| PETE MONTOYA - accountant for Gaim-Ko | <u>Affidavit</u> - Exhibit 2 |
| JON HALE - general manager for Gaim-Ko | <u>Affidavit</u> - Exhibit 3<br><u>Deposition</u> - Taken on 8-2-02, Transcript NA |
| CHARLOTTE GALLEGOS - Gaim-Ko V.P. | <u>Affidavit</u> - Exhibit 7 |

      The principle parties to the Nov. 10, 2000 meeting all testified that negotiations on the

Pier Sublease were preliminary and no agreement was reached. The deposition testimony reveals:

**Ray Gallegos Deposition**:         **Q.** Mr. Gallegos, I just have a few questions. When you
sent the $10,000.00 check together with the proposed
sublease, you knew and understood that there was no
agreement with Stan or Dave (Pier Owners) to lease the
pier, correct?
**A.** No, there was no agreement.
**Q.** In fact, you never discussed with Dave or Stan any of
the terms in that proposed sublease prior to sending it to
them?
**A.** No.
(*Gallegos Deposition* P. 192, Ln. 21-25 and P. 193, Ln.1-9)

**Stan McElroy Deposition:**      **Q.** What was discussed during the hour, hour and a half?
(Nov.10, 2000 meeting)
**A.** The history, the facility. And then I found it out of
sequence and uncomfortable toward the end when Mr.
Liberis was in a very somewhat aggressive, forceful but–

no, strike that – an anxious way throwing out some deal issues. *McElroy Deposition* P. 105, Ln.12-19.

**Q.** And there was -- Mr. Gallegos didn't have any discussions with you about leasing the space that the ENTERTAINER was leasing?

**A.** When?

**Q.** During that meeting? ( Nov. 10, 2000 meeting)

**A.** I don't recall any. You mean, that he (Gallegos) pulled us aside or that he took the floor and said, " I would like to do this, this and this"?

**Q.** Any discussions with Mr. Gallegos or anybody in his party with you or Dave about him leasing this space the ENTERTAINER had at the pier.

**A.** I don't recall Mr. Gallegos discussing it with us or laying out any plan. I recall Mr. Liberis kind of mediating, "Would you do this," and "Would you do this". *Id. at* P. 111, Ln. 11-24.

**Q.** So there were discussions between you and Dave and Mr. Gallegos about rent and a term and a lease?

**A.** Charles (Liberis) was driving the meeting. We were there listening. Charles took it suddenly to a place that – that took me aback regarding specific deal terms when there had been no indication of interest to move forward in any respect with even the same type of use. We had not indicated to anyone present that we were amenable to a deal. *Id. at* P. 122, Ln. 2-13.

**Dave Friedman Deposition:**    **Q.** Okay. The two page agreement that Mr. Gallegos included in his November 17, letter, it has a sub – under paragraph 1 of the sublease on page 1, it states: " Sublease term: The term of this sublease is proposed to be one year with two one-year options".

Is that the sublease term that was discussed at the November 10, 2000 meeting?

**A.** I believe it's one of several.

**Q.** Okay. And it's true, isn't it, that that term was not specifically disagreed with nor agreed with by either you or Mr. McElroy at the November 10 meeting?

**A.** That's correct. *Friedman Deposition*, P. 28, Ln. 9-20.

Ray Gallegos testified that no agreement was reached for a Pier Sublease on November 10, 2000. The Pier Owners have testified that the negotiations did not even rise to a level of

serious consideration.  In fact Mr. Friedman, when questioned by Plaintiff's own lawyer, readily admits that the parties never even agreed to a Term of the lease.  Rent and Term are the two most important and fundamental aspects of any lease.  And it is clear that neither had been negotiated or agreed at the November 10, 2000 meeting.  A lease can not be negotiated to any parties satisfaction when there is no agreement as to rent and term.

**B.**   The November 17, 2000 Proposal for Sublease Agreement was an offer from Gaim-Ko to Pier Owners, not a contract.

Plaintiff claims the November 17, 2000 Proposal for Sublease Agreement was in fact a sublease or an agreement, not a proposal.  This two page document is clearly an offer from Gaim-Ko to the Pier Owners.  However, Plaintiff has chosen to hide this very important fact from the court.  Plaintiff believes that if he calls this document an Agreement enough times, it will become a Sublease.  But the evidence can not and will never change the fact that this document was a proposal.  Dave Friedman characterized the November 17, 2000 Proposal for Sublease Agreement as an offer to enter into a sublease agreement. *Friedman Deposition*, P. 33, Ln. 13-23. This two page document is clearly an offer from Gaim-Ko to the Pier Owners.

Plaintiff is being disingenuous with the court by asking it to believe that the two page proposal was a Sublease Agreement, when Plaintiff's own original Sublease Agreement was a 15 page document with many provisions not even contemplated by the proposal of basic terms sent by Gaim-Ko. *See Original CSL Pier Sublease*, Exhibit 14.  Mr. Liberis, who is an attorney, even testified that the two page Proposal for Sublease Agreement was an offer:

Charles Liberis Deposition:                **Q.** So would it be fair to say, then, that this is some sort of –and I – I use the term – you used the term letter of intent earlier when we were dealing with you and Ray Gallegos.
**A.** Yeah. *Liberis Deposition*, P. 41, Ln. 5-9
**Q.** The title – the title of the document is Proposal for Sublease Agreement.  What does that mean to you?
**A.** If something says it is a proposal, I would not deem it to be a definitive agreement.
**Q.** If something says it's a proposal, would you characterize it as a letter of intent?
**A.** Yes. *Id. at*, P.42, Ln.5-12

Mr. Liberis also admitted that he knew Gaim-Ko and Pier Owners were involved in

negotiations even on November 14, 2000. Liberis testified as follows:

**Q.** The question is: Were you aware that they were still negotiating the lease for the pier on the 14th of November?
**A.** I Was. *Liberis Deposition*, P. 47, Ln. 2-5.

Plaintiff knew that no agreement was reached on the 10th of November 2000 and that the

parties continued to negotiate until the Pier Owners rejected Gaim-Ko's proposal.

The evidence and facts of this case demonstrate that the Pier Sublease was never

negotiated to Gaim-Ko's satisfaction.  The purpose of the contingent clause in paragraph 4 of the

Charter/Purchase Agreement was to protect Gaim-Ko from being "stuck" with a large boat with

nowhere to take on passengers.  Obviously, a ship without a dock cannot operate as a business.

So CSL and Gaim-Ko  negotiated and agreed to a seven (7) day window for Gaim-Ko to

negotiate a Pier Sublease.  After the seven (7) days expired without satisfactory negotiations for

the Pier Sublease, the contract became null and void.

The principal parties at the November 10, 2000 meeting have all testified that a Pier

Sublease was not negotiated to Gaim-Ko's satisfaction.  November 10, 2000 was the very first

and only meeting between Gaim-Ko and the Pier Owners.  Only very preliminary negotiations

took place between the parties and it is clear from the Pier Owners' affidavits that they never

intended to sublease the Pier to Gaim-Ko. *See Appendix Exhibits 5 and 6.* Both Pier Owner

representatives, who have no interest in the outcome of this litigation, said the Pier Sublease was

not negotiated.

Plaintiff further alleges that Mr. Gallegos was satisfied with the terms of the of the

"sublease agreement" because "when asked about the lease term and rent that he included in the

Sublease Agreement that he signed on November 17, 2002 (sic) Mr. Gallegos testified as follows:

> Q. Well, wherever the term came from, they were acceptable to you?
> A. Yes, they were.
> Q. Were those the terms that you were looking for?
> A. Yes. *Plaintiff Motion For Summary Judgment*, P. 13.

In making this failed argument, Plaintiff leaves out the key fact of the November 17 offer:

### It was a proposal, an offer or a letter of intent.

Of course Mr. Gallegos was satisfied with the terms of his offer. Anyone that makes an offer is

satisfied with the terms of their own offer. That does not mean that negotiations are concluded at

that point, but rather the opposite. After one party makes an offer, negotiations are beginning or

are ongoing, not finished.

The Pier Sublease was not negotiated to Gaim-Ko's satisfaction, and therefore the

contract, by operation of law, became null and void on November 11, 2000. And because the

Charter/Purchase Agreement was null and void, Gaim-Ko was under not obligation to preform

under the contract.

WHEREFORE, PREMISES CONSIDERED, Defendants, GAIM-KO, INC. AND RAY

GALLEGOS pray that Plaintiff's First Motion for Summary Judgment be set for hearing, and that

after a hearing the motion be denied, all claims against Defendants be dismissed, attorney fees be awarded to Defendant as allowed by law in the amount set forth in the Attorney Affidavit which will be submitted at the court's request and for such other relief to which they may be entitled at law or in equity.

Respectfully submitted,

By: _____

Paul L. Fourt, Jr.
Texas Bar Number 00785874
Federal Identification No. 19663
1000 E. Van Buren
Brownsville, TX 78520
Tel. 956-574-0109
Fax 956-574-0227

**ATTORNEY IN CHARGE FOR RAY GALLEGOS and GAIM-KO, INC.**

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document was sent by certified U.S. Mail on Aug. 16, 2002, to all counsel of record at each address listed below:

Paul L. Fourt, Jr.

**JOE GRANT**

2437 Bay Area Blvd., #100
Houston, TX 77058
*CSL DEVELOPMENT CORP, INC.*

**JOHN FLOOD**
900 Frost Bank Plaza
802 N. Carancahua
Corpus Christi, Texas 78470
*CSL DEVELOPMENT CORP, INC.*

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CSL DEVELOPMENT CORPORATION, INC. | § | |
| | § | |
| **Plaintiff,** | § | |
| v. | § | |
| | § | |
| GAIM-KO, INC.; RAY GALLEGOS; SOUTH | § | CIVIL ACTION NO. B-01-059 |
| PADRE ISLAND FISHING CENTER, INC.; | § | JURY DEMANDED |
| STANLEY McELROY; DAVE FRIEDMAN; | § | |
| SRFP, INC.; and SOUTH PADRE ISLAND | § | |
| FISHING CENTER JOINT VENTURE | § | |
| | § | |
| **Defendants.** | § | |

---

# APPENDIX

---

# APPENDIX FOR RAY GALLEGOS AND GAIM-KO, INC.'S RESPONSE TO PLAINTIFF'S FIRST MOTION FOR SUMMARY JUDGMENT

# INDEX OF APPENDIX

**A.**  **All Summary Judgment evidence in this Appendix is incorporated by reference into Defendant's Response**

> Verification of Summary Judgment Evidence

**B.**  **Summary Judgment Evidence**

1. Affidavit from **Ray Gallegos**; *Appendix, "Exhibit 1"* [1]

2. Affidavit from **Pete Montoya**; *Appendix, "Exhibit 2"*

3. Affidavit from **Jon Hale**; *Appendix, "Exhibit 3"*

4. Affidavit from **Cate Stetson**; *Appendix, "Exhibit 4"*

5. Affidavit from **Stan McElroy**; *Appendix, "Exhibit 5"*

6. Affidavit from **Dave Friedman**; *Appendix, "Exhibit 6"*

7. Affidavit from **Charlotte Gallegos**; *Appendix, "Exhibit 7"*

8. Deposition testimony from Ray Gallegos; *Appendix, "Exhibit 8"*

9. Deposition testimony from Jon Hale; *Appendix "Exhibit 9"*

10. Deposition testimony from Stan McElroy; *Appendix, "Exhibit 10"*

11. Deposition testimony from Dave Friedman; *Appendix, "Exhibit 11"*

12. Deposition testimony from Lou Daleo; *Appendix, "Exhibit 12"*

13. Deposition testimony from Charles Liberis; *Appendix, "Exhibit 13"*

14. CSL original Pier Sublease, dated June 23, 1999; *Appendix, "Exhibit 14"*

15. Proposal for Sublease Agreement, dated Nov. 17, 2000, *Appendix, "Exhibit 15"*

---

[1] Original Affidavits of Exhibits 1- 7 are on file in this matter as attached exhibits to Pier Defendant's First motion for Summary Judgment filed on April 16, 2002 and Gaim-Ko's Motion for Summary Judgment filed Aug. 9, 2002.

# VERIFICATION OF SUMMARY JUDGMENT RESPONSE EVIDENCE

## AFFIDAVIT PAUL L. FOURT, JR.

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF CAMERON | § |

BEFORE ME, the undersigned notary, on this day, personally appeared Paul L. Fourt, Jr., a person whose identity is known to me. After I administered an oath to him, upon his oath, he said:

"My name is Paul L. Fourt, Jr. and I am over 18 years. I have never been convicted of a felony and I am capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct."

"All of the copies of the evidence presented in Defendant's Appendix for its Summary Judgment Response are true and correct copies of the original documents. All deposition testimony was sworn to by the witnesses and was recorded by a certified court reporter. All affidavits are original except those noted in the index, and those originals are on file in this cause as exhibits in Defendants South padre Island Fishing Center, Inc., Stan McElroy, Dave Friedman, SPFP, Inc., and South Padre Island Fishing Center Joint Venture's First Motion For Summary Judgment"

Further Affiant sayeth not.

_____
Paul L. Fourt, Jr.

SWORN TO and SUBSCRIBED before me by Paul L. Fourt, Jr, on August 15, 2002

_____
Notary Public in and for
the State of Texas

# VERIFICATION OF SUMMARY JUDGMENT EVIDENCE

### AFFIDAVIT PAUL L. FOURT, JR.

STATE OF TEXAS          §
                        §
COUNTY OF CAMERON       §


BEFORE ME, the undersigned notary, on this day, personally appeared Paul L. Fourt, Jr., a person whose identity is known to me.  After I administered an oath to him, upon his oath, he said:

"My name is Paul L. Fourt, Jr. and I am over 18 years.  I have never been convicted of a felony and I am capable of making this affidavit.  The facts stated in this affidavit are within my personal knowledge and are true and correct."

"All of the copies of the evidence presented in Defendant's Appendix for Summary Judgment are true and correct copies of the original documents.  All deposition testimony was sworn to by the witnesses and was recorded by a certified court reporter.  All affidavits are original except those noted in the index, and those originals are on file in this cause as exhibits in Defendants South padre Island Fishing Center, Inc., Stan McElroy, Dave Friedman, SPFP, Inc., And South Padre Island Fishing Center Joint Venture's First Motion For Summary Judgment"

Further Affiant sayeth not.

_____
Paul L. Fourt, Jr.


SWORN TO and SUBSCRIBED before me by Paul L. Fourt, Jr, on August __, 2002

_____
Notary Public in and for
the State of Texas

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CSL DEVELOPMENT CORPORATION, INC. §
§
   Plaintiff,                    §
§
VS.                              §         CIVIL ACTION NO. B-01-059
§
GAIM-KO, INC.; RAY GALLEGOS; SOUTH §
PADRE ISLAND FISHING CENTER, INC.; §
STANLEY McELROY; DAVE FRIEDMAN;  §
SRFP, INC.; and SOUTH PADRE ISLAND §
FISHING CENTER JOINT VENTURE      §

<u>**AFFIDAVIT OF RAY GALLEGOS**</u>

STATE      §
OF         §
NEW MEXICO §

BEFORE ME, the undersigned authority, on this day personally appeared RAY GALLEGOS, who being by me duly sworn, on his oath deposed as follows:

1.  My name is RAY GALLEGOS. I am over eighteen (18) years of age, have never been convicted of a felony, and am fully competent to make this Affidavit. I have personal knowledge of the facts stated in this Affidavit, unless stated to the contrary, and those facts are true and correct. I am one of the Defendants in the above-styled lawsuit. I am the principle owner and Chief Executive of Gaim-Ko, Inc.

2.  In the summer of 2000, I and my company developed an interest in placing gambling machines owned by the company on a vessel which would operate from the Gulf Coast of Texas. We had in mind what is known in the industry as a "cruise to nowhere". Customers would board the vessel and would be served food and entertained while the vessel traveled offshore about ten miles. Once the vessel reached this point, the customers would be allowed to use our slot machines and other gambling devices. Thereafter, the ship would return to the port from which it departed.

3.  My company made contact with Lou Daleo, who is a broker specializing in connecting buyers and sellers of offshore cruise to nowhere gambling vessels. He advised us that there was a vessel Casino Padre which was

operating out of South Padre Island, Texas and was for sale. Eventually we entered into a contract with the vessel's owner, CSL Development Corporation, to purchase the vessel. Attached is a copy of the contract which was entered into.

4.  Gaim-Ko was never able to negotiate a contract for the lease of the South Padre Island Fishing Pier from its owners. That pier was the only one in the area suitable for docking the Casino Padre. We did speak to Stan McElroy and Dave Friedman who are the principals in the South Padre Island Fishing Pier partnership, about the possibility of leasing the pier in connection with the operation of the Casino Padre, and we sent them a proposal to enter into negotiations which contained basic deal points for a lease that were intended to prompt them to respond along with a check in the amount of $10,000.00 as consideration for them entering into negotiations with us. Mr. McElroy and Mr. Friedman advised that they were not interested in leasing the pier to us at that time and returned the check to us.

5.  Neither Stan McElroy or Dave Friedman or anyone from the Pier Defendants told us that the Casino Padre was unseaworthy or unsafe or a liability. We wanted to purchase the Casino Padre and would have purchased it had the South Padre Island Fishing Pier been available for lease to us.

6.  Neither I nor my company negotiated with Stan McElroy or Dave Friedman or anyone from the companies regarding the lease of the South Padre Island Fishing Pier to me or my company for use with another offshore gambling boat. My company did lease gaming equipment to another operator of a vessel to use for a cruise to nowhere gambling operation. This vessel operated near Houston, Texas.

Further affiant sayeth not.

_R.A. Gallegos_
RAY GALLEGOS

State: New Mexico
County: Bernalillo

SUBSCRIBED AND SWORN TO BEFORE ME by the said RAY GALLEGOS, on this the _____21_____ day of March, 2002.



OFFICIAL SEAL
Barbara A. Garrity
NOTARY PUBLIC
STATE OF NEW MEXICO
My Commission Expires 1/27/2006

_Barbara A. Garrity_
Notary Public, State of New Mexico

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CSL DEVELOPMENT CORPORATION,   INC.

       **Plaintiff,**

v.

GAIM-KO, INC.; RAY GALLEGOS; SOUTH         Civil Action No. B-01-059
PADRE ISLAND FISHING CENTER, INC.;
STANLEY McELROY; DAVE FRIEDMAN;
SRFP, INC.; and SOUTH PADRE ISLAND
FISHING CENTER JOINT VENTURE

       **Defendants.**

## AFFIDAVIT PETER MONTOYA

STATE OF NEW MEXICO     §
                  §
COUNTY OF BERALILLO     §

     BEFORE ME, the undersigned notary, on this day, personally appeared Peter Montoya, a person whose identity is known to me. After I administered an oath to him, upon his oath, he said:

     "My name is Peter Montoya and I am over 18 years. I have never been convicted of a felony and I am capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct."

     "I work on a contract basis for Gaim-Ko, Inc. as an accountant. I have worked with Mr. Gallegos for over 25 years."

     "During the summer of 2000, I began work with Mr. Gallegos on the viability of operating an ocean going vessel as a casino. On November 3, 2000, after many months of negotiation, Gaim-Ko entered into an agreement to charter a vessel from CSL Development Corporation, Inc. The vessel was located in South Padre Island, Texas at the Sea Ranch Pier."

     "As part of my contract employment, I traveled with Mr. Gallegos, his wife and Jon Hale to South Padre Island, Texas on November 9, 2000. We ate dinner at the Sea Ranch restaurant that night and we were briefly introduced to Stan McElroy, the co-owner of the pier. No serious discussions took place regarding the Sea Ranch Pier at dinner on November 9, 2002."

"On November 10, 2000, I attended a meeting at the Sea Ranch Pier with Ray Gallegos, his wife, and Jon Hale for the purpose of starting negotiations on a dock lease with the owners of the pier and Charles Liberis. The meeting lasted approximately 2 hours and I was present for the entire meeting. General terms of the prior dock lease were discussed by Mr. Charles Liberis. This meeting was only an introduction of the parties. No proposals were exchanged between Gaim-Ko and Pier Owners. No agreements were reached. No documents or contracts were agreed to at this meeting."

"Gaim-Ko did not negotiate a dock lease to its satisfaction on November 10, 2000, in fact, I got the impression that the Pier Owners did not want to continue negotiations with Gaim-Ko for the Pier Lease after this meeting."

Further Affiant sayeth not.

_Peter Montoya_
Peter Montoya

State of New Mexico
County of Bernalillo

SWORN TO and SUBSCRIBED before me by Peter Montoya, on August 6, 2002

OFFICIAL SEAL
Barbara A. Garrity
NOTARY PUBLIC
STATE OF NEW MEXICO
My Commission Expires: 1/27/2006

_Barbara A. Garrity_

Notary Public in and for
the State of New Mexico
My commission expires: 1/27/2006

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CSL DEVELOPMENT CORPORATION, INC. | § | |
| | § | |
| **Plaintiff,** | § | |
| v. | § | |
| | § | |
| GAIM-KO, INC.; RAY GALLEGOS; SOUTH | § | Civil Action No. B-01-059 |
| PADRE ISLAND FISHING CENTER, INC.; | § | |
| STANLEY McELROY; DAVE FRIEDMAN; | § | |
| SRFP, INC.; and SOUTH PADRE ISLAND | § | |
| FISHING CENTER JOINT VENTURE | § | |
| | § | |
| **Defendants.** | § | |

## AFFIDAVIT OF JON HALE

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF CAMERON | § |

BEFORE ME, the undersigned notary, on this day, personally appeared Jon Hale, a person whose identity is known to me. After I administered an oath to him, upon his oath, he said:

"My name is Jon Hale and I am over 18 years. I have never been convicted of a felony and I am capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct."

"In the summer of 2000, I was working as the general manager of gaming operations for Gaim-Ko, Inc. and Ray Gallegos. Part of my duties included finding potential deals for Gaim-Ko's gaming machines. In 2000, I made contact with Lou Daleo, a gambling vessel broker, about the charter of a ship by Gaim-Ko, for the purpose of running an offshore casino. I acted as an agent for Mr. Gallegos, but I did not have any authority to negotiate deal points or agree to a contract. On November 3, 2000, after a long negotiating period, Gaim-Ko signed a chatter/purchase contract with CSL Corporation for a vessel located in South Padre Island, TX."

"On November 9, I went with Ray Gallegos, his wife, and Pete Montoya to meet with Charles Liberis and the Pier Owners in Texas. On November 10, 2000, we attended a meeting at the Sea Ranch Pier with Charles Liberis and the Pier Owners for the purpose of starting negotiations on a dock lease. I was present for the some of the meeting and I know some general terms of the prior dock lease were discussed. I was present at the end of the meeting and I know for a fact that no proposals were exchanged between Gaim-Ko and Pier Owners, no agreements were reached and no documents or contracts were agreed to at this meeting."

Further Affiant sayeth not.

_____
Jon Hale


SWORN TO and SUBSCRIBED before me by Jon Hale, on August 2, 2002



_____
Robert Lerma
Notary Public in and for
the State of Texas
My commission expires:

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CSL DEVELOPMENT CORPORATION, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Civil Action No. B-01-059 |
| | § | |
| GAIM-KO, INC.; RAY GALLEGOS; SOUTH | § | |
| PADRE ISLAND FISHING CENTER, INC.; | § | |
| STANLEY McELROY; DAVE FRIEDMAN; | § | |
| SRFP, INC.; and SOUTH PADRE ISLAND | § | |
| FISHING CENTER JOINT VENTURE, | § | |
| | § | |
| Defendants. | § | |

## AFFIDAVIT OF CATHERINE BAKER STETSON

| | |
|---|---|
| STATE OF NEW MEXICO | § |
| | § |
| COUNTY OF BERNALILLO | § |

BEFORE ME, the undersigned notary, on this day, personally appeared Catherine Baker Stetson, a person whose identity is known to me. After I administered an oath to her, upon her oath, she said:

"My name is Catherine Baker Stetson, and I am over 18 years. I have never been convicted of a felony, and I am capable of making this Affidavit. The facts stated in this Affidavit are within my personal knowledge and are true and correct."

"I am an attorney in New Mexico and represent Gaim-Ko, Inc. in numerous business matters."

"During the summer of 2000, Gaim-Ko, Inc. began work on the viability of operating an ocean-going vessel as a casino. During this time, I was retained to represent Gaim-Ko, Inc. and review the charter/purchase documents. I reviewed and revised several drafts of the charter/purchase agreement. On November 3, 2000, after many months of negotiation, Gaim-Ko, Inc. entered into

1

an agreement to charter a vessel from CSL Development Corporation, Inc., subject to certain conditions."

"Gaim-Ko, Inc. also retained my services to review documents and advise Mr. Gallegos on the possibility of a berthing sublease at the Sea Ranch Pier in South Padre Island. As Mr. Gallegos' attorney, I had many concerns about the incomplete terms of the proposed sublease."

"On November 26, 2000, I advised Mr. Gallegos in written correspondence of my concerns over the proposed Pier Sublease. At that time, there was no agreement by the parties on material terms of the proposed Pier Sublease. I was not satisfied that all the terms had been discussed or even addressed at that point, including major financial issues. At that point, the proposal was in draft form, and it was clear to me that the parties had not fully negotiated a berthing sublease."

Further Affiant sayeth not.


Catherine Baker Stetson

SWORN TO AND SUBSCRIBED before me by Catherine Baker Stetson on August 7, 2002.


Notary Public in and for the
State of New Mexico
My Commission Expires: _May 13, 2004_

2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CSL DEVELOPMENT CORPORATION, INC.  §
§
     Plaintiff,                            §
§
VS.                                        §        CIVIL ACTION NO. B-01-059
§
GAIM-KO, INC.; RAY GALLEGOS; SOUTH         §
PADRE ISLAND FISHING CENTER, INC.;         §
STANLEY McELROY; DAVE FRIEDMAN;            §
SRFP, INC.; and SOUTH PADRE ISLAND         §
FISHING CENTER JOINT VENTURE               §

## AFFIDAVIT OF STAN MCELROY

STATE OF TEXAS         §
§
COUNTY OF TRAVIS       §

BEFORE ME, the undersigned authority, on this day personally appeared STAN MCELROY, who being by me duly sworn, on his oath deposed as follows:

1.      My name is STAN MCELROY. I am over eighteen (18) years of age, have never been convicted of a felony, and am fully competent to make this Affidavit. I have personal knowledge of the facts stated in this Affidavit, unless stated to the contrary, and those facts are true and correct. I am one of the Defendants in the above-styled lawsuit.

2.      I have an interest in the South Padre Island Fishing Center, Inc., and South Padre Island Fishing Center Joint Venture.

3.      .It is alleged in the above-referenced lawsuit that I made representations to others that the Casino Padre f/k/a M/V Entertainer was unseaworthy or unsafe. I never made this representation to Lou Daleo or anyone from Gaim-Ko, Inc. or anyone else. I never represented anything to anyone about the Casino Padre which was not true.

4.      .Plaintiff alleges in the above-referenced lawsuit that on or about November 10, 2000, a lease at SPIFCJV's pier was negotiated to Gaim-Ko, Inc.'s satisfaction. Such a pier lease would have had to have been approved by me, my partner, Dave Friedman and our Lessor, the State of Texas, acting by and through the Texas General Land Office. Although we had some very preliminary discussions with Gaim-Ko representatives about entering into a lease, the essential terms were never fully discussed, much less agreed on. In fact, we decided not to negotiate further with the Gaim-Ko representatives,

and returned their check for $10,000.00 which had been sent to us by them by a cover letter dated November 27, 2000 which described the $10,000 as consideration for an agreement to "enter into negotiations to enter into a sublease".

5.     I never told Ray Gallegos or anyone else from Gaim-Ko that the Casino Padre was unseaworthy or that it was not safe or that it was a "liability".

6.     Neither I nor anyone of the Pier Defendants entered into an agreement whereby Gaim-Ko would lease the pier in question for any vessel.

Further affiant sayeth not.

_____
STAN MCELROY


SUBSCRIBED AND SWORN TO BEFORE ME by the said STAN MCELROY, on this the ___20th___ day of March, 2002.

DEBBIE FRANK
Notary Public, State of Texas
My Commission Expires
12-20-03

_____
Notary Public, State of Texas

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CSL DEVELOPMENT CORPORATION, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-01-059 |
| | § | |
| GAIM-KO, INC.; RAY GALLEGOS; SOUTH | § | |
| PADRE ISLAND FISHING CENTER, INC.; | § | |
| STANLEY McELROY; DAVE FRIEDMAN; | § | |
| SRFP, INC.; and SOUTH PADRE ISLAND | § | |
| FISHING CENTER JOINT VENTURE | § | |

## AFFIDAVIT OF DAVE FRIEDMAN

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared STAN MCELROY, who being by me duly sworn, on his oath deposed as follows:

1.  My name is Dave Friedman. I am over eighteen (18) years of age, have never been convicted of a felony, and am fully competent to make this Affidavit. I have personal knowledge of the facts stated in this Affidavit, unless stated to the contrary, and those facts are true and correct. I am one of the Defendants in the above-styled lawsuit.

2.  I have an interest in the SRFP, Inc., and South Padre Island Fishing Center Joint Venture.

3.  .It is alleged in the above-referenced lawsuit that I made representations to others that the Casino Padre f/k/a M/V Entertainer was unseaworthy or unsafe. I never made this representation to Lou Daleo or anyone from Gaim-Ko, Inc. or anyone else. I never represented anything to anyone about the Casino Padre which was not true.

4.  .Plaintiff alleges in the above-referenced lawsuit that on or about November 10, 2000, a lease at SPIFCJV's pier was negotiated to Gaim-Ko, Inc.'s satisfaction. Such a pier lease would have had to have been approved by me, my partner Stan McElroy and our Lessor, the State of Texas, acting by and through the Texas General Land Office. Although we had some very preliminary discussions with Gaim-Ko representatives about entering into a lease, the essential terms were never fully discussed, much less agreed on. In fact, we decided not to negotiate further with the Gaim-Ko representatives,

and returned their check for $10,000.00 which had been sent to us by them by a cover letter dated November 27, 2000 which described the $10,000 as consideration for an agreement to "enter into negotiations to enter into a sublease".

5.    I never told Ray Gallegos or anyone else from Gaim-Ko that the Casino Padre was unseaworthy or that it was not safe or that it was a "liability".

6.    Neither I nor anyone of the Pier Defendants entered into an agreement whereby Gaim-Ko would lease the pier in question for any vessel.

Further affiant sayeth not.

DAVE FRIEDMAN

SUBSCRIBED AND SWORN TO BEFORE ME by the said DAVE FRIEDMAN, on this the _____19<u>th</u>_____ day of March, 2002.



JUDITH M. LEHN
MY COMMISSION EXPIRES
December 14, 2005

Notary Public, State of Texas

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CSL DEVELOPMENT CORPORATION,   INC.    §

        **Plaintiff,**    §

v.    §

        §

GAIM-KO, INC.; RAY GALLEGOS; SOUTH    §    Civil Action No. B-01-059
PADRE ISLAND FISHING CENTER, INC.;    §
STANLEY McELROY; DAVE FRIEDMAN;    §
SRFP, INC.; and SOUTH PADRE ISLAND    §
FISHING CENTER JOINT VENTURE    §

        **Defendants.**    §

## AFFIDAVIT OF CHARLOTTE GALLEGOS

STATE OF NEW MEXICO          §
                         §
COUNTY OF BERALILLO          §

       BEFORE ME, the undersigned notary, on this day, personally appeared Charlotte Gallegos, a person whose identity is known to me. After I administered an oath to her, upon her oath, she said:

       "My name is Charlotte Gallegos and I am over 18 years. I have never been convicted of a felony and I am capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct."

       "I am the Vice President of Gaim-Ko, Inc. and the wife of Ray Gallegos."

       "During the summer of 2000, Gaim-Ko, Inc. began work on the viability of operating an ocean going vessel as a casino. On November 3, 2000, after many months of negotiation, Gaim-Ko entered into an agreement to charter a vessel from CSL Development Corporation, Inc. The vessel was located in South Padre Island, Texas at the Sea Ranch Pier."

       "I traveled with my husband, Pete Montoya and Jon Hale to South Padre Island, Texas on November 9, 2000. The purpose of the trip was to see the boat and meet with the owners of the pier. We ate dinner at the Sea Ranch restaurant that night and I was briefly introduced to Stan McElroy, the co-owner of the pier. I was present at the table all night and did not hear any discussions regarding the Sea Ranch Pier at dinner on November 9, 2002."

"On November 10, 2000, I attended a meeting at the Sea Ranch Pier with my husband, Pete Montoya and Jon Hale for the purpose of starting negotiations on a dock lease with the owners of the pier and Charles Liberis. The meeting lasted approximately 2 hours and I was present for the entire meeting. General terms of the prior dock lease were discussed by Mr. Charles Liberis. This meeting was only an introduction of the parties. No proposals were exchanged between Gaim-Ko and Pier Owners. No agreements were reached. No documents or contract were agreed to at this meeting."

Further Affiant sayeth not.

Charlotte Gallegos

SWORN TO and SUBSCRIBED before me by Charlotte Gallegos, on August 16, 2002

OFFICIAL SEAL
Barbara A. Garrity
NOTARY PUBLIC
STATE OF NEW MEXICO
My Commission Expires: 1/27/2006

Notary Public in and for
the State of New Mexico
My commission expires: 1/27/2006

# In The Matter Of:

*CSL Development Corporation, Inc.   v.*
*Gaim-Ko, Inc., et al.*

---

## Ray Gallegos
### Vol. 1, December 4, 2001

---

### Bean & Associates, Inc.

*500 Marquette, NW, Suite 280 Albuquerque, NM  87102*
*119 East Marcy, Suite 110 Santa Fe, NM  87501*

*(505) 843-9494   or   (800) 669-9492*

*Original File GALLEG~1.TXT, 202 Pages*
*Min-U-Script® File ID: 1362823530*

**Word Index included with this Min-U-Script®**

Page 140

[1]  A: Yeah, I guess they had a reason not to sign
[2]  it. They sent it back.
[3]  Q: Have you had a chance to review it?
[4]  A: Yeah, I saw it.
[5]  Q: Is it fair to say that the terms of this
[6]  agreement were acceptable to you when you signed it?
[7]  A: The $10,000?
[8]  Q: No, the terms of this agreement that we've
[9]  marked as Exhibit 1.
[10]  A: I signed it. It's fair to say yes.
[11]  Q: So the terms were acceptable to you?
[12]  A: Yes.
[13]  Q: Now, do you recall when you sent the check
[14]  and this agreement to Mr. Friedman?
[15]  A: I don't recall.
[16]  Q: How would you be able to find that out?
[17]  A: You'll have to check with my controller on
[18]  that.
[19]  Q: Would you look at page 2 of the photocopy
[20]  of the official check? And in the right-hand corner
[21]  it appears to say "November 17, 2000." Do you see
[22]  that, sir, right above the $10,000?
[23]  A: Yeah.
[24]  Q: All right. So you got your check,
[25]  cashier's check, on November 17, and the sublease

Page 141

[1]  agreement that you signed states that it's effective
[2]  November 17. So is it fair to say that you
[3]  transmitted this to Mr. Friedman shortly after you
[4]  got your cashier's check?
[5]  A: Yes, sir.
[6]  Q: Do you have any reason to believe that you
[7]  didn't send it right after you got your cashier's
[8]  check?
[9]  A: I believe so.
[10]  Q: Do you have any reason to believe that you
[11]  did not do it right after you got the cashier's
[12]  check?
[13]  A: If I sent it on the 17th and the cashier's
[14]  check says the 17th, I imagine that's when it was
[15]  sent.
[16]  Q: All right. Where did you come up with the
[17]  terms for this sublease agreement?
[18]  A: Probably my attorney. I don't even know
[19]  who is the one that did it.
[20]  Q: Well, wherever the terms came from, they
[21]  were acceptable to you?
[22]  A: Yes, they were.
[23]  Q: Do you remember negotiating these terms?
[24]  A: No.
[25]  Q: Don't know where these terms came from?

Page 142

[1]  A: No.
[2]  Q: Were these the terms that you were looking
[3]  for?
[4]  A: Yes.
[5]  Q: And were these the terms that if you had
[6]  gotten these terms earlier and Mr. Friedman and
[7]  Mr. McElroy had been willing to allow the Entertainer
[8]  to stay at the pier, would these have been the same
[9]  terms that you would have agreed to on that lease?
[10]  A: I'm sure. That's what I offered for the
[11]  lease.
[12]  Q: So let me ask that in another way. If
[13]  these terms were agreeable to you with a sublease
[14]  with South Padre Island, would they have also been
[15]  agreeable to you for the charter agreement with the
[16]  Entertainer?
[17]  A: Come again?
[18]  Q: Well, to ask you in another way, if these
[19]  terms were agreeable to you on the 17th with a lease
[20]  with South Padre Island, would these terms also have
[21]  been agreeable to you with regard to your contract
[22]  with Mr. Liberis for the Entertainer?
[23]  A: Well, right. I mean I had no problems with
[24]  the Entertainer.
[25]  Q: And these, if you look at them, these are

Page 143

[1]  the same terms that you had in your contract with
[2]  Mr. Liberis for the Entertainer, 120,000 per year for
[3]  the rent?
[4]  A: Could be.
[5]  Q: Would it surprise you if they were?
[6]  A: No. All you have to do is add.
[7]  Q: Now, earlier in your testimony you stated
[8]  that you did not send any agreements or sign any
[9]  agreements with Mr. Friedman, you just sent the check
[10]  to him. Does this refresh your recollection?
[11]  A: I guess it does, sir. I mean, it's my
[12]  signature, so I can't lie.
[13]  Q: Okay. But you just don't recall doing
[14]  this?
[15]  A: I don't recall.
[16]  Q: And you don't recall where this contract
[17]  came from, who drafted the contract?
[18]  A: No, I don't.
[19]  Q: So it could have come from your office but
[20]  it could have come from their office, Mr. Friedman's
[21]  office, you just don't know?
[22]  A: No, that's our letterhead.
[23]  Q: No, sir, I'm talking about the agreement,
[24]  the sublease agreement. You're not sure whose office
[25]  that came from, your office or Mr. Friedman's office?

Page 192

[1] you want to try to put those machines on another
[2] boat?
[3]    A: Probably so. It's to be determined.
[4]    Q: You're just waiting to see?
[5]    A: Yeah.
[6]    Q: If that's the case, is your preference to
[7] continue to just do a lease with somebody or on your
[8] next deal would you like to do kind of a joint
[9] venture purchase and the lease of equipment?
[10]    A: I still haven't decided. I've still got to
[11] talk to Rudy and several other people, financial
[12] people that I know, and see. Because right now, the
[13] way we are right now, we haven't had too much good
[14] luck. I mean, everybody is — I mean, I hate to be
[15] in this predicament here also. It takes time and
[16] money, you know.
[17]    MR. GRANT: Well, I don't have any more
[18] questions and I thank you again for your time and
[19] patience.
[20]                    EXAMINATION
[21]    Q: (By Ms. Saenz) Mr. Gallegos, I just have a
[22] few questions. When you sent the $10,000 check
[23] together with the proposed sublease, you knew and
[24] understood that there was no agreement with Stan or
[25] Dave to lease the pier, correct?

Page 193

[1]    A: No, there was no agreement.
[2]    Q: In fact, you had never entered into any
[3] agreement with Stan or Dave to lease that pier before
[4] you sent that check, correct?
[5]    A: No, sir — no, ma'am, I'm sorry.
[6]    Q: And, in fact, you never discussed with Dave
[7] or Stan any of the terms in that proposed sublease
[8] prior to your sending it to them?
[9]    A: No.
[10]    Q: And —
[11]    A: That's what I mentioned a while ago, that
[12] they told me just $10,000 retainer.
[13]    Q: And you understood — as you've already
[14] told us, you were anxious to lease the pier —
[15]    A: Yes, protect myself.
[16]    Q: — and you received a letter from
[17] Mr. Liberis on November 14 telling you that it was
[18] important to negotiate a lease or finalize a lease
[19] with Stan and Dave, correct?
[20]    A: Yes, ma'am.
[21]    Q: And in response to that letter, you sent
[22] the $10,000 as a deposit, an incentive to hold the
[23] lease, correct, or the pier, correct?
[24]    A: Yes, ma'am.
[25]    Q: But there was never any discussions or

Page 194

[1] never any agreement with Stan or Dave to lease that
[2] pier, correct?
[3]    A: No.
[4]    MS. SAENZ: Thank you. Those are all the
[5] questions I have.
[6]    MR. FOURT: I have no questions, but I
[7] don't know — I'm going to pass the witness. Do you
[8] have any more questions?
[9]    MR. FLOOD: No more questions.
[10]    MR. FOURT: I'd like to exercise our right
[11] under the federal rules to receive a copy in 30 days
[12] for corrections.
[13]    MR. FISHER: I reserve my questions until
[14] the time of trial.
[15]    THE VIDEOGRAPHER: This concludes the
[16] deposition of Ray Gallegos. It's 2:47 p.m. We are
[17] off the record.
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 195

[1]        IN THE UNITED STATES DISTRICT COURT
[1]         FOR THE SOUTHERN DISTRICT OF TEXAS
[2]              BROWNSVILLE DIVISION
[3] CSL DEVELOPMENT CORPORATION, INC.,
[4]              Plaintiff,
[5] -vs-          CIVIL ACTION NO. B01 059
[6] GAIM-KO, INC.; RAY GALLEGOS;
[6]    SOUTH PADRE ISLAND FISHING
[7] CENTER, INC.; STANLEY McELROY;
[7]    DAVE FRIEDMAN; SRFP, INC.; and
[8] SOUTH PADRE ISLAND FISHING
[8]    CENTER JOINT VENTURE,
[9]
[9]              Defendants.
[10]
[11]    CERTIFICATE OF COMPLETION OF DEPOSITION
[12]    I, DEBORAH L. O'CONNOR, New Mexico CCR #297, DO
[13] HEREBY CERTIFY that on December 4, 2001, the
[14] deposition of RAY GALLEGOS was taken before me at the
[15] request of, and sealed original thereof retained by:
[16]    JOHN FLOOD, ESQ.
[16]    Attorney for the Plaintiff
[17] HILLIARD & MUNOZ, PPC
[17]    719 S. Shoreline Blvd., Suite 600
[18]    Corpus Christi, Texas 77401
[19] I FURTHER CERTIFY that copies of this certificate
[20] have been mailed or delivered to the following
[21] counsel of record and parties not represented by
[22] counsel:
[23]    JOSEPH M. GRANT, ESQ.
[23]    Attorney for the Plaintiff
[24]    THE GRANT LAW FIRM
[24]    2437 Bay Area Blvd., #100
[25]    Houston, Texas 77058

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CSL DEVELOPMENT CORPORATION, INC. §
§
       Plaintiff, §
§
VS. §
§    CIVIL ACTION NO. B01-059
GAIM-K0, INC.; RAY GALLEGOS; SOUTH §    JURY DEMANDED
PADRE ISLAND FISHING CENTER, INC.; §
STANLEY McELROY; DAVE FRIEDMAN; §
SRFP, INC.; and SOUTH PADRE ISLAND §
FISHING CENTER JOINT VENTURE §
§
       Defendants. §

DEPOSITION OF:

## STANLEY EUGENE McELROY

MAY 29, 2002

## *COPY*



**Worldwide**
**Corporate Headquarters**
3000 Weslayan, Suite 235
Houston, Texas 77027
Tel: 713-572-2000

For Services Worldwide
**800-745-1101**

**Texas**
**Regional Office**
4245 N. Central Expwy, Suite 475
Dallas, Texas 75205
Tel: 214-219-3080

02:37 PM 1      Q.    And were they joining in the conversation as

02:37 PM 2   well?

02:37 PM 3      A.    Conversation the following day?

02:37 PM 4      Q.    Yes.   Okay.   We're talking about the meeting

02:37 PM 5   the next day.

02:37 PM 6      A.    Yeah.   It was -- it was really a -- this

02:37 PM 7   meeting became -- it was a further introduction.   And I

02:38 PM 8   sat down and I think Dave sat down and we thought we

02:38 PM 9   were just being introduced further to these people and

02:38 PM 10  there would be some expression of what their concept

02:38 PM 11  was.   So it was very casual and very friendly.

02:38 PM 12     Q.    What was discussed during the hour, hour and a

02:38 PM 13  half?

02:38 PM 14     A.    The history, the facility.   And then I found

02:38 PM 15  it out of sequence and uncomfortable toward the end when

02:38 PM 16  Mr. Liberis was in a very somewhat aggressive, forceful

02:39 PM 17  but -- no, strike that -- an anxious way throwing out

02:39 PM 18  some deal issues, "Would you do this." "Would you do

02:39 PM 19  that."

02:39 PM 20     Q.    What deal issues was Mr. Liberis throwing out?

02:39 PM 21     A.    Rent, maybe some term, but I recall mostly

02:39 PM 22  rent.

02:39 PM 23     Q.    And how much rent was he throwing out?

02:39 PM 24     A.    I don't remember.   It was less than he was

02:39 PM 25  paying, but then he said what if they paid so much for a

02:39 PM 1    certain period of time and then once they got going they

02:39 PM 2    could pay more, would you agree to this, would you agree

02:40 PM 3    to that.   It was -- and again, it was -- it was

02:40 PM 4    disconcerting to me.

02:40 PM 5         Q.   In what way?

02:40 PM 6         A.   It was out of -- there was no -- for me, there

02:40 PM 7    was no basis for that level of discussion.

02:40 PM 8         Q.   Did you tell him that?

02:40 PM 9         A.   I didn't want to embarrass him.  I didn't

02:40 PM 10   really understand what his agenda was at the time.  This

02:40 PM 11   was -- I didn't understand.   I -- we broke and I visited

02:40 PM 12   with Dave and said, "Dave, you know, this is strange and

02:40 PM 13   I don't know what -- I don't know what he's up to."  I

02:40 PM 14   think I said something like that.  But, you know, I

02:40 PM 15   don't get this.

02:40 PM 16        Q.   So you didn't understand why Mr. Gallegos and

02:40 PM 17   Mr. Liberis were there talking to you and Dave?

02:41 PM 18        A.   No.  Mr. Liberis.  I didn't understand the --

02:41 PM 19   the nature of the subject that he was bringing forth at

02:41 PM 20   that -- at that time.  I thought it was inappropriate.

02:41 PM 21        Q.   Why was it inappropriate?

02:41 PM 22        A.   Because I didn't think it was -- there was

02:41 PM 23   even close to the fundamental comfort level that

02:41 PM 24   reasonable people arrive at before they enter into

02:41 PM 25   negotiations, much less any kind of agreement.

02:47 PM  1    think he said something like, "Charles has some people

02:47 PM  2    down looking at the boat."

02:47 PM  3         Q.    Okay.  So when you went into that meeting the

02:47 PM  4    next day with those people, you knew that Charles had

02:47 PM  5    some people down looking at the boat and you just

02:47 PM  6    assumed that those were the people?

02:47 PM  7         A.    No.  That was made clear that -- they were

02:47 PM  8    introduced.  I mean, that's what they were doing there.

02:47 PM  9    I mean, the night before.  I'm not sure how it was

02:47 PM 10    stated, but obviously it was -- it was them.

02:47 PM 11         Q.    And there was -- Mr. Gallegos didn't have any

02:47 PM 12    discussions with you about leasing the space that the

02:47 PM 13    ENTERTAINER was leasing?

02:48 PM 14         A.    When?

02:48 PM 15         Q.    During that meeting.

02:48 PM 16         A.    I don't recall any.  You mean, that he pulled

02:48 PM 17    us aside or that he took the floor and said, "I would

02:48 PM 18    like to do this, this, and this"?

02:48 PM 19         Q.    Any discussions with Mr. Gallegos or anybody

02:48 PM 20    in his party with you or Dave about him leasing this

02:48 PM 21    space that the M/V ENTERTAINER had at the pier.

02:48 PM 22         A.    I don't recall Mr. Gallegos discussing it with

02:48 PM 23    us or laying out any plan.  I recall Mr. Liberis kind of

02:48 PM 24    mediating, "Would you do this," and "Would you do this?"

02:48 PM 25         Q.    Mediating between whom?

WORLDWIDE COURT REPORTERS, INC.

02:48 PM 1      A.    Between Dave and I and Mr. Gallegos.

02:48 PM 2      Q.    So there were discussions between you and Dave

02:48 PM 3  and Mr. Gallegos about rent and a term and a lease?

02:48 PM 4      A.    As I've stated before -- I've answered that.

02:49 PM 5            MR. FISHER:    Go ahead and answer it

02:49 PM 6  again, Stan.

02:49 PM 7      A.    Charles was driving the meeting.  We were

02:49 PM 8  there listening.  Charles took it suddenly to a place

02:49 PM 9  that -- that took me aback regarding specific deal terms

02:49 PM 10 when there had been no indication of interest to move

02:49 PM 11 forward in any respect with even that type of use.  We

02:49 PM 12 had not indicated to anyone present that we were

02:49 PM 13 amenable to a deal.  We had not said that we absolutely

02:49 PM 14 were not.  And here we were and had just met these

02:49 PM 15 people and were being asked if theoretically or, "Would

02:49 PM 16 you take this," and then over to the -- to the --

02:50 PM 17 Mr. Gallegos, "Would you pay this?"

02:50 PM 18     Q.    (By Mr. Grant)  So Mr. Liberis and

02:50 PM 19 Mr. Gallegos took the negotiations into an area or took

02:50 PM 20 the discussion, whatever term you want to use,

02:50 PM 21 discussion or negotiation, into an area that you would

02:50 PM 22 have preferred to have taken place in the future, if at

02:50 PM 23 all?

02:50 PM 24     A.    I don't remember Mr. Gallegos taking it there.

02:50 PM 25 I remember Mr. Liberis taking it there.

01-12036
KC/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CSL DEVELOPMENT CORPORATION, INC. §
                                   §
         Plaintiff,                §
                                   §
VS.                                §
                                   §        CIVIL ACTION NO. B01-059
GAIM-K0, INC.; RAY GALLEGOS; SOUTH §        JURY DEMANDED
PADRE ISLAND FISHING CENTER, INC.; §
STANLEY McELROY; DAVE FRIEDMAN;    §
SRFP, INC.; and SOUTH PADRE ISLAND §
FISHING CENTER JOINT VENTURE       §
                                   §
         Defendants.               §

DEPOSITION OF:

# DAVID  ROBERT  FRIEDMAN

### MAY  29,  2002

# *COPY*



**Worldwide
Corporate Headquarters**
3000 Weslayan, Suite 235
Houston, Texas 77027
Tel: 713-572-2000

For Services Worldwide
**800-745-1101**

**Texas
Regional Office**
4245 N. Central Expwy, Suite 475
Dallas, Texas 75205
Tel: 214-219-3080

26

| | | |
|---|---|---|
| 07:27 PM | 1 | to have signed? |
| 07:27 PM | 2 | A. That's correct. |
| 07:27 PM | 3 | Q. Okay. What is the phone number at the -- what |
| 07:27 PM | 4 | was the phone number in November of 2000 at the |
| 07:27 PM | 5 | restaurant? |
| 07:27 PM | 6 | A. Area code (956) 761-1314. |
| 07:28 PM | 7 | Q. Is there a separate number for -- do you have |
| 07:28 PM | 8 | an office separate and apart from the restaurant? |
| 07:28 PM | 9 | A. Yes. |
| 07:28 PM | 10 | Q. All right. What's the number at your office? |
| 07:28 PM | 11 | A. Area code (956) 761-4665. |
| 07:28 PM | 12 | Q. And how about a cell phone at that time? And |
| 07:28 PM | 13 | I assume that office number was the number that you gave |
| 07:28 PM | 14 | me that would have been in place in November of 2000? |
| 07:28 PM | 15 | A. Yes. |
| 07:28 PM | 16 | Q. Okay. Did you have a cell phone in November |
| 07:28 PM | 17 | of 2000? |
| 07:28 PM | 18 | A. Yes. |
| 07:28 PM | 19 | Q. Do you recall or do you have the same number? |
| 07:28 PM | 20 | A. No. I don't have the same number. It was |
| 07:28 PM | 21 | 570-CASH. |
| 07:28 PM | 22 | Q. Okay. 956? |
| 07:28 PM | 23 | A. 956. |
| 07:28 PM | 24 | Q. At the meeting on November 10th when |
| 07:29 PM | 25 | Mr. Liberis was, as Mr. McElroy described earlier, |

| | | |
|---|---|---|
| 07:29 PM | 1 | quote, "mediating," end quote, were the terms -- were |
| 07:29 PM | 2 | rent and the term period of the potential lease |
| 07:29 PM | 3 | discussed? |
| 07:29 PM | 4 | A.    Not in those specific terms. |
| 07:29 PM | 5 | Q.    Okay.  In what terms were they discussed? |
| 07:29 PM | 6 | A.    Mr. Liberis sort of moderated this meeting to |
| 07:29 PM | 7 | the extent of "would you take" type inquiries. |
| 07:29 PM | 8 | Q.    Okay.  And when he would propose a "and would |
| 07:29 PM | 9 | you take" proposals were used both for the term period |
| 07:30 PM | 10 | and for the amount of rent? |
| 07:30 PM | 11 | A.    Yeah. |
| 07:30 PM | 12 | Q.    Okay.  And when he would ask, "Would you take |
| 07:30 PM | 13 | a particular amount," were there answers provided? |
| 07:30 PM | 14 | A.    To some degree, yes. |
| 07:30 PM | 15 | Q.    Okay.  What were some of the amounts of rent |
| 07:30 PM | 16 | that he proposed that were discussed? |
| 07:30 PM | 17 | A.    I can't specifically recall amounts, but they |
| 07:30 PM | 18 | were in ranges, it seems, or back-and-forth type |
| 07:30 PM | 19 | conversations. |
| 07:30 PM | 20 | Q.    Do you recall whether the numbers discussed |
| 07:30 PM | 21 | were more or less than what CSL was paying at the time? |
| 07:30 PM | 22 | A.    They were less. |
| 07:30 PM | 23 | Q.    Okay.  And do you recall whether the term |
| 07:30 PM | 24 | periods that were discussed were more or less than the |
| 07:31 PM | 25 | primary lease that CSL received from the joint venture? |

07:31 PM  1    A.    I believe they were less.

07:31 PM  2    Q.    Okay.  So the discussions were specific enough

07:31 PM  3  that you know that the amounts discussed as to rent were

07:31 PM  4  less that what CSL was paying and that the terms

07:31 PM  5  proposed and discussed were less than what CSL had.  You

07:31 PM  6  just can't recall the exact --

07:31 PM  7    A.    That seems to be -- it sticks in my mind.

07:31 PM  8  Yes.

07:31 PM  9    Q.    Okay.  The two-page agreement that

07:32 PM 10  Mr. Gallegos included in his November 17 letter, it has

07:32 PM 11  a sub -- under paragraph 1 of the sublease on page 1, it

07:32 PM 12  states:  "Sublease term:  The term of this sublease is

07:32 PM 13  proposed to be one year with two one-year options."

07:32 PM 14         Is that the sublease term that was

07:32 PM 15  discussed at the November 10 meeting?

07:32 PM 16    A.    I believe it's one of several.

07:32 PM 17    Q.    Okay.  And it's true, isn't it, that that term

07:32 PM 18  was not specifically disagreed with nor agreed with by

07:32 PM 19  either you or Mr. McElroy at the November 10 meeting?

07:33 PM 20    A.    That's correct.

07:33 PM 21    Q.    All right.  But it is one that was discussed?

07:33 PM 22    A.    I believe so, yes.

07:33 PM 23    Q.    All right.  And the sublease rent that is

07:33 PM 24  included in this agreement that was forwarded by

07:33 PM 25  Mr. Gallegos on the 10th -- or on the 17th, I'm sorry --

07:47 PM 1    questions earlier about Exhibit 1.  This is the cover

07:47 PM 2    letter sent by Ray Gallegos to you; is that correct?

07:47 PM 3         A.   Yes, sir.

07:47 PM 4         Q.   And attached to that cover letter was a check;

07:47 PM 5    is that correct?

07:47 PM 6         A.   Yes, sir.

07:47 PM 7         Q.   And what was the amount of that check?

07:47 PM 8         A.   $10,000.

07:47 PM 9         Q.   And also attached to that cover letter was a

07:47 PM 10   document entitled Proposal for Sublease Agreement; is

07:47 PM 11   that correct?

07:47 PM 12        A.   Yes, sir.

07:47 PM 13        Q.   What does the title Proposal for Sublease

07:47 PM 14   Agreement mean to you?

07:47 PM 15        A.   Proposal for sublease agreement.  That

07:47 PM 16   they're -- Mr. Gallegos, whoever the author of the

07:48 PM 17   letter was, was going to give us a proposal to enter

07:48 PM 18   into a sublease agreement.

07:48 PM 19        Q.   So that's an offer, in other words?  Is that

07:48 PM 20   how you would characterize --

07:48 PM 21        A.   That's correct.  Yeah.

07:48 PM 22        Q.   -- it, as an offer?

07:48 PM 23        A.   That's what I would say.

07:48 PM 24        Q.   So in no way do you construe that document to

07:48 PM 25   be a contract?

LH/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CSL DEVELOPMENT CORPORATION, INC. §
§
        Plaintiff, §
§
VS. §
§      CIVIL ACTION NO. B01-059
GAIM-K0, INC.; RAY GALLEGOS; SOUTH §      JURY DEMANDED
PADRE ISLAND FISHING CENTER, INC.; §
STANLEY McELROY;DAVE FRIEDMAN; §
SRFP, INC.; and SOUTH PADRE ISLAND §
FISHING CENTER JOINT VENTURE §
§
        Defendants. §

VIDEOTAPED DEPOSITION OF:

# LOUIS DALEO

MAY 30, 2002

# *COPY*



**Worldwide**
**Corporate Headquarters**
3000 Weslayan, Suite 235
Houston, Texas 77027
Tel: 713-572-2000
Fax: 713-572-2009

For Services Worldwide
**800-745-1101**
*worldwidecourtreporters.com*

**Texas**
**Regional Office**
4245 N. Central Expwy, Suite 475
Dallas, Texas 75205
Tel: 214-219-3080
Fax: 214-219-3055

1    boat." And said he related -- he proceeded to tell me

2    what this gentleman relayed to him.

3         It was obviously enough to cause him some

4    concern to back up and look again at what was -- what

5    was about to transpire.

6    Q.    Wouldn't that cause anyone concern, though?

7    A.    If the captain of the boat didn't give his

8    boat a good recommendation, that would make me very --

9    very suspect, yes.

10   Q.    And Ray was right to be concerned about that,

11   correct?

12   A.    Yes.

13        MR. GRANT:  Objection as to form.

14   Q.    (By Mr. Fourt)  But that -- that didn't cause

15   him not to go through with the deal; is that correct?

16        MR. GRANT:  Objection as to form.

17   A.    I can't -- I can't say "yes" or "no" because I

18   don't know what was in his mind as to have caused his

19   decision.

20   Q.    (By Mr. Fourt)  But from the -- the letters

21   and the correspondence and your conversations, it's

22   clear that Mr. Gallegos continued to pursue this deal

23   even after he talked to Captain Louie.  Is that fair?

24        MR. GRANT:  Objection as to form.

25   A.    That's correct.  This thing fell apart because

178

1    he couldn't get a dock lease.

2        Q.    (By Mr. Fourt)  You've previously been

3    requested to produce some documents that may or may not

4    be in another file.  Do you recall that?

5        A.    Yes.

6        Q.    I'm probably going to have some more questions

7    for you based on those documents, but I'd like to

8    review those first.  So, if we can have an agreement to

9    get those documents over to us as part of this

10   deposition, we probably can do a brief telephone

11   extension of this, if that's okay with you.

12       A.    It will take me a couple of days to go to the

13   archives and pull out what you're looking for, but I

14   can do that, yes.

15            MR. FOURT:  Okay.  I'm going to go ahead

16   and pass the witness at this time.

17            Thank you very much.

18                      **EXAMINATION**

19   QUESTIONS BY MR. WRIGHT:

20       Q.    Mr. Daleo, my name is Todd Wright.  I'm one of

21   the attorneys representing South Padre Island Fishing

22   Center Joint Venture.  I just want to make you aware of

23   that.  I have a few questions for you today.

24            It's my understanding that you've been in the

25   brokerage business -- boat brokerage business for

PWB/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CSL DEVELOPMENT CORPORATION, INC. §
　　　　　　　　　　　　　　　　　　§
　　　　　Plaintiff,　　　　　　　　　§
　　　　　　　　　　　　　　　　　　§
VS.　　　　　　　　　　　　　　　　§
　　　　　　　　　　　　　　　　　　§　　CIVIL ACTION NO. B-01-059
GAIM-K0, INC.; RAY GALLEGOS; SOUTH §
PADRE ISLAND FISHING CENTER, INC.; §
STANLEY McELROY; DAVE FRIEDMAN; §
SRFP, INC.; and SOUTH PADRE ISLAND §
FISHING CENTER JOINT VENTURE §
　　　　　　　　　　　　　　　　　　§
　　　　　Defendants.　　　　　　　　§

DEPOSITION OF:

# CHARLES LIBERIS

JULY 11, 2002

# *COPY*



**Worldwide**
**Corporate Headquarters**
3000 Weslayan, Suite 235
Houston, Texas 77027
Tel: 713-572-2000
Fax: 713-572-2009

For Services Worldwide
**800-745-1101**
*worldwidecourtreporters.com*

**Texas**
**Regional Office**
4245 N. Central Expwy, Suite 475
Dallas, Texas 75205
Tel: 214-219-3080
Fax: 214-219-3055

CHARLES LIBERIS - 7/11/02

1    Q.    Well, it's obvious that this document that's    10:58 PM

2  Exhibit 1 is not a copy of your sublease with the names

3  changed, correct?

4    A.    You and I agree on something.

5    Q.    So would it be fair to say, then, that this is    10:58 AM

6  some sort of -- and I -- I use the term -- you used the

7  term letter of intent earlier when we were dealing with

8  you and Ray Gallegos.

9    A.    Yeah.

10   Q.    And that was a similar two-page document    10:58 AM

11 outlining the general terms?

12   A.    That always provided it would be subject to a

13 definitive agreement.

14   Q.    Okay.  With that kind of background, now, would

15 you indicate -- or would that change your testimony as    10:59 AM

16 to whether or not this is a letter of intent or proposal

17 or whether it's an actual contract?

18   A.    I told you, I don't know what it is because I

19 think on its face it's inconsistent.

20   Q.    Well, assuming that on -- on its face that it's    10:59 AM

21 not inconsistent, it says proposal for sublease

22 agreement.  What does that title mean to you?

23   A.    No.  Assuming that it does not say it's a

24 sublease.

25   Q.    Well, let me just -- okay.  Poor question.    10:59 AM

CHARLES LIBERIS - 7/11/02

1    Mr. Flood's objection to my bad question is dully noted,    10:59 AM

2    in his head.  I'll re-ask that question.

3              MR. FLOOD:  Well, you can go ahead and just

4    sustain the one you read in my mind.

5        Q.   (BY MR. FOURT)  The title -- the title of the    10:59 I

6    document is Proposal for Sublease Agreement.  What does

7    that mean to you?

8        A.    If something says it is a proposal, I would not

9    deem it to be a definitive agreement.

10       Q.    If something says it's a proposal, would you    11:00 I

11   characterize it as a letter of intent?

12       A.    Yes.

13       Q.    And a letter of intent, I believe we testified

14   earlier that that is just a process or part of the

15   negotiations?    11:00 An

16       A.    I would agree with that.

17       Q.    So would you characterize this letter as a

18   letter of intent?

19              MR. GRANT:  Objection; asked and answered.

20              MR. FLOOD:  Then let's go to the letter.    11:00 AM

21              MR. FOURT:  Well, let's -- let's not

22   because it's not your deposition.

23       Q.   (BY MR. FOURT)  Would you characterize --

24              MR. FLOOD:  Okay.  You said letter, that's

25   all --    11:00 AM

CHARLES LIBERIS - 7/11/02

1  form.                                                    11:06 AM

2      Q.    (BY MR. FOURT)   The question is:   Were you

3  aware that they were still negotiating the lease for the

4  pier on the 14th of November?

5      A.    I was.                                         11:06 AM

6          THE WITNESS:   When you get to a point where

7  we can break --

8          MR. FOURT:   We can break right now, that's

9  fine.

10             (Break.)                                     11:16 AM

11     Q.    (BY MR. FOURT)  Okay.  We're back on the record

12  after a short break.  Sir, I'm going to show you what's

13  been marked as Exhibit No. 7, which is a letter from you

14  to Catherine Stetson, who was Mr. Gallegos' attorney.

15  The date of that letter is November 14th, 2000.  Would   11:16 AM

16  you refresh your memory with that letter, please.

17     A.    I'm sorry, I -- what about it?

18     Q.    Do you remember that correspondence?

19     A.    I don't, but it's from my office.  It's signed

20  by my secretary for me.                                 11:16 AM

21     Q.    Could you just read the brief paragraph of that

22  letter?

23     A.    "Pursuant to our conversation, enclosed please

24  find the lease between South Padre Island Fishing Center

25  Joint Venture and the State of Texas."                  11:17 AM

WORLDWIDE COURT REPORTERS, INC.



Liberis
EXHIBIT NO. 1
7/11/02
P. WALTZ

4

# BERTH AND SUBLEASE AGREEMENT

THIS BERTH AND SUBLEASE AGREEMENT ("Agreement") is made and entered into effective the 23rd day of June, 1999 (the "Effective Date") by and between **South Padre Island Fishing Center Joint Venture**, a Texas joint venture ("Sublessor") whose address is One Padre Boulevard, South Padre Island, Texas 78597, and **CSL Development Corporation** ("Sublessee"), a Delaware corporation whose address is 1610 Barrancas Avenue, Pensacola Florida 32501.

## PREAMBLE

Pursuant to that Lease Agreement LC No. 94-027 (the "Ground Lease") dated as of June 30, 1994, by and between the State of Texas, (the "State"), as Lessor, and Sublessor, as Lessee, Sublessor has a leasehold interest in the premises described in Exhibit "A" thereto (the "Premises").

Approximately 17.52 acres of the Premises is comprised of submerged land on which Sublessor has constructed a pier and other improvements (the "Pier").

Subject to the terms and conditions of the Lease and the conditions set forth herein, Sublessor desires to sublease to Sublessee, and Sublessee desires to sublease from Sublessor, a berth and appurtenant rights.

Now, therefore, Sublessor and Sublessee agree as follows:

1.    **Premises**.  Sublessor hereby subleases to Sublessee and Sublessee hereby subleases from Sublessor the following, all of which are located on the Premises in Cameron County, Texas:

    1.1    <u>Berth</u>.  The exclusive right to a berth for one (1) cruise ship (herein the "Cruise Ship"), initially to be the "M/V Entertainer."  The berth is located at the end of the Pier, as more particularly described on <u>Exhibit "A"</u> attached hereto and initialed by Sublessor and Sublessee for identification (hereinafter, the "Plat").

    1.2    <u>Ticket Counter</u>.  The non-exclusive right to use of the area designated "Ticket Counter" on the Plat for the sale of Cruise Ship tickets.

Draft 6/22/99

1

CA<sup>2</sup>

0004

1.3   Modular Office.  The non-exclusive right to use the area designated "Office" on the Plat for non-retail general offices purposes and, subject to compliance with applicable provisions of the Ground Lease (including, without limitation, Article VI thereof), to construct improvements thereon.

1.4   Parking.  The non-exclusive right to use a maximum of two hundred (200) parking spaces in the area designated as "Parking" on the Plat for free parking of passenger vehicles operated by Sublessee's employee and customers; provided, Sublessor shall have no obligation to provide more than fifty (50) parking spaces for such use until expiration of the thirtieth (30th) day after the Sublessor's receipt of the Security Deposit (as defined in Section 4.3 below).

Unless referred to individually, the foregoing are hereinafter referred to, collectively, as the "Subleased Premises". SUBLESSEE HEREBY CONFIRMS THAT SUBLESSEE HAS INSPECTED THE PHYSICAL AND TOPOGRAPHICAL CONDITION OF THE SUBLEASED PREMISES AND ACCEPTS THE SAME "AS IS" IN ITS EXISTING PHYSICAL AND TOPOGRAPHIC CONDITION. SUBLESSOR DISCLAIMS ANY AND ALL WARRANTIES OF HABITABILITY, SUITABILITY, FITNESS FOR ANY PURPOSE AND ANY OTHER EXPRESS OR IMPLIED WARRANTY NOT EXPRESSLY SET FORTH IN THIS AGREEMENT.  SUBLESSOR AND SUBLESSEE HEREBY AGREE AND ACKNOWLEDGE THAT THE USE OF THE TERM "GRANT" AND/OR "CONVEY" IN NO WAY IMPLIES THAT THIS AGREEMENT IS FREE OF LIENS, ENCUMBRANCES AND/OR PRIOR RIGHTS.  SUBLESSEE IS HEREBY PUT ON NOTICE THAT ANY PRIOR GRANT AND/OR ENCUMBRANCE MAY BE OF RECORD AND SUBLESSEE IS ADVISED TO EXAMINE THOSE RECORDS AND ALL OTHER LAND TITLE RECORDS IN WHICH THE SUBLEASED PREMISES ARE LOCATED IN THE ARCHIVES AND RECORDS DIVISION OF THE TEXAS GENERAL LAND OFFICE, 1700 NORTH CONGRESS AVENUE, AUSTIN, TEXAS, 78701, AND ALL OTHER LAND TITLE RECORDS IN WHICH THE SUBLEASED PREMISES ARE LOCATED.

2.   Term.  The term of this Agreement shall be for a period commencing on the Effective Date and terminating on the expiration of the one hundred eightieth (180th) day after the date of the Rent Commencement Date (as hereinafter defined), unless earlier terminated or extended as provided herein.

2.1   Failure to Obtain Permits.  Notwithstanding the foregoing to the contrary, in the event Sublessee, after diligent effort, is unable on or before September 1, 1999, to obtain all governmental and regulatory approvals necessary for the operation of its Offshore Business (as defined in Section 3.2 below), then Sublessee shall have the right to terminate this Agreement upon written notice delivered to Sublessor on or before September 5, 1999; Sublessor shall retain all sums paid as Rent (as hereinafter

defined) prior to the effective date of termination; and, thereafter, neither party shall have any further obligations to the other except for those obligations which accrued prior to the effective date of termination.

2.2   Future Government Regulation.   In the event that, subsequent to the Rent Commencement Date (as hereinafter defined), governmental laws or regulations prohibit Sublessee's use of the Subleased Premises for the purposes provided herein in such a manner as to preclude Sublessee's operation of its Offshore Business (i.e., docking a Cruise Ship which contains gaming equipment and machinery to be operated elsewhere), Sublessee may terminate this Agreement effective upon written notice to Sublessor. In the event Sublessee terminates this Agreement pursuant to this Section 2.2, along with its notice of termination, Sublessee shall provide Sublessor with a copy of the subject law(s) or regulation(s) and, upon Sublessor's receipt of such notice, this Agreement shall terminate and neither party shall have any further obligations to the other except for those obligations which accrued prior to the effective date of termination.

3.   Use.  The Subleased Premises may be used only for the purposes specified in Sections 1.1 through 1.4 above, and no other.

3.1   Compliance with Laws.  At all times Sublessee shall conduct its affairs and use the Subleased Premises in accordance with the provisions of the Ground Lease, this Agreement and all applicable statutes, ordinances, rules and regulations. Any breach by Sublessee of its obligations under this Agreement shall entitle Sublessor, at its option, to terminate this Agreement upon written notice to Sublessee as specified in Section 14 below, or to pursue remedies available at law or in equity. In the event Sublessor elects to terminate this Agreement, upon Sublessor's written notice of such termination to Sublessee, this Agreement shall terminate and neither party shall have any further obligations to the other except for those obligations which accrued prior to the effective date of termination.

3.2   Offshore Business.  Though the parties acknowledge that Sublessee intends, provided appropriate governmental authorization is obtained, to operate a day cruise casino business on the Cruise Ship and provide on-board entertainment, including gaming (the "Offshore Business"), Sublessee agrees not to accept any orders for gaming activities from the Subleased Premises and at all times to conduct such activities at locations other than the Subleased Premises. The parties specifically acknowledge and agree that Sublessee shall have no right to use the Subleased Premises for the Offshore Business and that any such use on or adjacent to the Subleased Premises shall constitute a breach of this Agreement for which Sublessor may terminate this Agreement upon notice to Sublessee.

Draft 6/22/99

3

4.     <u>Consideration</u>. Sublessee agrees to pay to Sublessor the following consideration for use of the Subleased Premises ("Rent"):

4.1     <u>Rent</u>. Commencing on the earlier to occur of (a) September 1, 1999, or (b) the thirtieth (30th) day after the date Sublessee receives all regulatory approvals required to commence operation of the Offshore Business, or (c) the date Sublessor departs from the Subleased Premises on its initial cruise for the purpose of operating the Offshore Business (such date hereinafter the "Rent Commencement Date"), Sublessee agrees to pay to Sublessor, monthly, as "Rent" for the Subleased Premises the greater of (1) $10,000.00 per month, or (2) a sum per month equal to the product of One and NO/100 Dollars ($1.00) multiplied by the number of passenger cruise tickets sold to "paying passengers" (as hereinafter defined) over and above the number of 10,000 per month. Rent in the minimum amount of $10,000 shall be payable each month in advance. Any additional sums owing Sublessor as Rent shall be due and payable on the fifteenth (15th) day of the following month and shall be delivered with a statement certified by an officer of Sublessee which itemizes ticket sales for the subject month on a per day basis. Sublessor shall be entitled, during normal business hours, to inspect Sublessee's records to determine appropriate accounting and remittance of Rent. Should the Rent Commencement Date occur on a day other than the first day of a month, Rent shall be prorated for such month. For the purposes of this Agreement a "paying passenger" is a person who purchases a Cruise Ship ticket for a scheduled cruise for the purpose of engaging in Sublessee's Offshore Business, and passengers who are given complimentary tickets or admissions based on the volume or quality of their casino play shall be deemed paying passengers.

4.2     <u>Taxes and Assessments</u>. During the term of this Agreement, the Sublessee shall pay directly to the applicable taxing or other authority any State or local sales taxes or assessments which are, or may be, in effect and applicable to Sublessee's business.

4.3     <u>Security Deposit</u>. On the Rent Commencement Date, Sublessee agrees to deposit with Sublessor the sum of Ten Thousand and NO/100 Dollars ($10,000.00) (the "Security Deposit") as security for Sublessee's faithful performance of its obligations under this Sublease. Sublessor and Sublessee agree that the Security Deposit may be commingled with funds of Sublessor and Sublessor shall have no obligation or liability for payment of interest on such deposit. Sublessee shall not mortgage, assign, transfer or encumber the Security Deposit without the prior written consent of Sublessor and any attempt by Sublessee to do so shall be void, without force or effect and shall not be binding upon Sublessor. If Sublessee fails to pay any Rent or other amount when due and payable under this Sublease, or fails to perform any of the terms hereof, Sublessor may appropriate and apply or use all or any portion of the Security Deposit for Rent payments or any other amount then due and unpaid, for payment of any

Draft 6/22/99

amount for which Sublessor has become obligated as a result of Sublessee's default or breach, and for any loss or damage sustained by Sublessor as a result of Sublessee's default or breach, and Sublessor may so apply or use the Security Deposit without prejudice to any other remedy Sublessor may have by reason of Sublessee's default or breach. If Sublessor so uses any of the Security Deposit, Sublessee shall, within ten (10) days after written demand therefor, restore the Security Deposit to the full amount originally deposited; Sublessee's failure to do so shall constitute a default hereunder for which Sublessor shall have the right to exercise any remedy provided for in Section 14 below.   Provided Sublessee is not then in default on any of its obligations hereunder, on the first day of the last month of the Sublease term (or renewal period, if applicable), Sublessor shall return the Security Deposit to Sublessee or, if Sublessee has assigned its interest under this Sublease, to the last assignee of Sublessee. If Sublessor sells or assigns its interest in the Subleased Premises, Sublessor may deliver the Security Deposit to Sublessor's successor in interest under this Sublease and thereupon be relieved of any further liability or obligation with respect to the Security Deposit.

5.    **Insurance**.  Sublessee agrees to purchase and maintain insurance coverage, and provide certificates and renewals thereof, as required pursuant to the Ground Lease; provided (a) all such policies shall name both the State and Sublessor as additional insureds, and (b) Sublessee shall maintain commercial general liability insurance and liquor liability insurance in minimum amounts of Two Million Five Hundred Thousand and NO/100 Dollars ($2,500,000.00).

6.    **Utilities**.  Sublessor shall, at its expense, provide water and 480-volt 3-phase 200AMP electrical stub-outs at the locations specified on the Plat. Except as provided herein, Sublessor shall have no responsibility for the provision of any utility stub-out or service, and Sublessee shall be responsible for the payment of all electricity, water, wastewater, gas, phone and other utility extension and service and for disposal of all trash generated at the Subleased Premises. Trash containers shall located near the berth in a location approved by Sublessor, shall be of a type reasonably approved by Sublessor, and shall be screened from view. Notwithstanding any other term or provision of this Agreement to the contrary, (a) Sublessee acknowledges and agrees that it shall not locate or use sewage pump-out facilities on or near the Subleased Premises, and (b) in the event Sublessee is required to extend electric utility infrastructure beyond the location specified on the Plat, upon the first renewal of the term of this Agreement as provided below, Sublessee shall be entitled to a credit against Rent, not to exceed, in the aggregate $8,000.00; provided, if Sublessee reasonably determines that the cost of any such extension shall exceed $8,000.00, then Sublessee shall so advise Sublessor and Sublessor may elect to either (y) undertake such work at its own cost and expense, or (z) authorize Sublessee to expend an amount in excess of $8,000 for such work , which amount shall also be credited against Rent until recouped.

5

Draft 6/22/99

CXX

JUN.23.1999  1:53PM   SELMAN&LUNSON           NO.663   P.37/?

7.    <u>Condemnation</u>. If during the term of this Agreement or any extension or renewal thereof, all of the Subleased Premises should be taken for any public or quasi-public use under any law, ordinance, or regulation, or by right of eminent domain, or should be sold to the condemning authority under threat of condemnation, this Agreement shall terminate and the Rent shall be abated during the unexpired portion of this Agreement, effective as of the date of the taking of said premises by the condemning authority.

    7.1    <u>Sublessor's Right to Restore</u>. If less than all of the Subleased Premises shall be taken for any public or quasi-public use under any law, ordinance or regulation, or by right of eminent domain, or should be sold to the condemning authority under threat of condemnation, Sublessor may elect to terminate this Agreement or to restore the Subleased Premises as mutually agreed between Sublessor Sublessee. In the event this Agreement is not terminated, then Sublessor shall perform such restoration with available condemnation proceeds within a reasonable time of the taking., and the Rent payable during the unexpired portion of this Agreement shall be adjusted equitably.

    7.2    <u>Allocation of Awards</u>. Sublessor shall be entitled to receive and retain all proceeds payable for a taking of the leasehold estate and improvements located on the Subleased Premises. Sublessee shall be entitled to receive and retain any separate awards for loss of profits and moving expenses. The termination of this Agreement shall not affect the rights of the respective parties to such awards.

8.    <u>Assignment</u>. Sublessee hereby acknowledges and agrees that it shall not have the right to assign or sublet the Subleased Premises, whether by operation of law or otherwise, without Sublessor's prior written consent, which consent shall not be unreasonably withheld; provided, Sublessee may assign Sublessee's interest in this Agreement to an Affiliate (as hereinafter defined) upon written notice to Sublessor. For the purposes of this Agreement, "Affiliate" shall mean and refer to an entity which is controlled by Sublessee (i.e., an entity of which Sublessee owns at least fifty-one percent [51%] of the outstanding shares, membership interests or otherwise of such entity), or which controls Sublessee (i.e., an entity which owns at least fifty-one percent [51%] of Sublessee), or which is under common control with Sublessee (such as a brother-sister relationship). Sublessor and Sublessee acknowledge and agree that Sublessee intends to assign this Agreement to an Affiliate to be formed under Texas law on or before expiration of the First Renewal Period and, upon such assignment and assumption by such Affiliate of Sublessee's obligations hereunder, Sublessee shall be released from its obligations hereunder.

9.    <u>Indemnification and Hold Harmless Agreements</u>. Sublessor and Sublessee hereby agree as follows:

Draft 6/22/99

6



9.1   Sublessee. SUBLESSEE SHALL PROTECT, DEFEND AND HOLD SUBLESSOR AND THE STATE HARMLESS IN ACCORDANCE WITH THE TERMS OF THE INDEMNIFICATION PROVISIONS OF THE GROUND LEASE. SUBLESSEE AGREES TO INDEMNIFY AND HOLD SUBLESSOR AND THE STATE HARMLESS AGAINST ANY AND ALL ACTIONS, CLAIMS, DEMANDS, DAMAGES, LIABILITIES AND EXPENSES (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND COURT COSTS) ASSERTED AGAINST, IMPOSED UPON OR INCURRED BY SUBLESSOR BY REASON OF ANY VIOLATION CAUSED, SUFFERED OR PERMITTED BY SUBLESSEE AND/OR SUBLESSEE'S OFFICERS, DIRECTORS, VENTURERS, AGENTS, REPRESENTATIVES, SERVANTS, EMPLOYEES, CONTRACTORS, SUBCONTRACTORS, LICENSEES OR INVITEES ("SUBLESSEE REPRESENTATIVES") OF ANY OF THE TERMS, COVENANTS OR CONDITIONS OF THE GROUND LEASE. Notwithstanding the foregoing, in no event shall Sublessee be liable to Sublessor for any matter relating to this Agreement in an amount in excess of the total of all Rent paid to Sublessee hereunder. The foregoing agreements shall survive expiration or earlier termination of this Agreement.

9.2   Sublessor.   SUBJECT TO THE PROVISIONS OF THIS AGREEMENT, SUBLESSOR SHALL AND HEREBY DOES INDEMNIFY AND HOLD SUB-LESSEE HARMLESS FROM AND AGAINST ANY AND ALL ACTIONS, CLAIMS, DEMANDS, DAMAGES, LIABILITIES AND EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND COURT COSTS) ASSERTED AGAINST, IMPOSED UPON OR INCURRED BY SUBLESSEE BY REASON OF ANY VIOLATION CAUSED, SUFFERED OR PERMITTED BY SUBLESSOR, ITS OFFICERS, DIRECTORS, VENTURERS, REPRESENTATIVES, AGENTS, SERVANTS, CONTRACTORS, SUBCONTRACTORS, LICENSEES OR EMPLOYEES OF ANY OF THE TERMS, COVENANTS OR CONDITIONS OF THE GROUND LEASE THAT SUBLESSEE HAS NOT COVENANTED AND AGREED TO COMPLY WITH UNDER THE TERMS OF THIS AGREEMENT. Notwithstanding the foregoing, in no event shall Sublessor be liable to Sublessee or any third party for any matter relating to this Agreement in an amount in excess of the total of all Rent paid to Sublessor hereunder. The foregoing agreements shall survive expiration or earlier termination of this Agreement.

10.   Sublessor's Obligations.

10.1   Unobstructed Access.   Sublessor shall provide unobstructed access to the Subleased Premises from the upland portion of the Premises all times for the Cruise Ship at its

Draft 6/22/99

7

CY2

JUN.23.1999  1:56PM  SELMA&DUTTON  NO.583  P.10/17

berth and for Sublessee's vendors, employees and passengers. Sublessor and Sublessee acknowledge and agree that Sublessor shall have no obligation to police navigable waters or to dredge the channel in which Sublessee which access the Pier.

10.2   <u>Sublessor's Maintenance</u>. Except for damage occasioned by Sublessee and/or Sublessee's Representatives, Sublessor shall maintain the Leased Premises (exclusive of Sublessee's improvements and fixtures thereto) in a safe and usable condition, including, but not limited to, replacement of damaged and deteriorated dock and pilings. Sublessor shall have no further repair and maintenance obligations hereunder.

10.3   <u>Right to Sublease</u>. Sublessor represents and warrants to Sublessee that it has the right to sublease the Subleased Premises for the purposes set forth in Section 1 and 3 above, and that no additional State approval is required to grant Sublessee the right to use the Subleased Premises as provided herein.

11.   <u>Sublessee's Obligations</u>. Sublessee hereby acknowledges and agrees to use the Subleased Premises pursuant to the terms of the Ground Lease, this Agreement and in accordance with all applicable laws, ordinances, rules and regulations, and reasonable rules and regulations imposed by the State and/or Sublessor from time to time.

11.1   <u>No Waste</u>. Sublessee hereby acknowledges and agrees it shall not commit, or suffer to be committed, any waste on the Subleased Premises nor shall it maintain, or permit the maintenance or commission of, any nuisance on the Subleased Premises.

11.2   <u>Maintenance</u>. Except as otherwise provided herein, Sublessee hereby acknowledges and agrees to keep and maintain the Subleased Premises and the Cruise Ship in good condition and repair, as the same existed on the Effective Date, reasonable wear and tear excepted. Damage caused by Sublessee or Sublessee's Representatives shall be repaired at Sublessee's sole expense.

11.3   <u>Alterations</u>. Sublessee hereby acknowledges and agrees not to make any alterations or changes in the Subleased Premises without the express, prior written consent of Sublessor, and all such alterations or changes shall be made in conformance with the provisions of the Ground Lease.

11.4   <u>Conduct</u>. Sublessee shall be responsible for the conduct and acts of Sublessee and Sublessee's Representatives on the Subleased Premises at all times during term of this Agreement, and shall indemnify and hold Sublessor harmless therefrom as provided herein.

8

Draft 6/22/99

12.  Inspection by Sublessor.  Sublessee hereby acknowledges and agrees that the State, Sublessor and/or their respective agents or representatives may enter into and upon the Subleased Premises (but not the Cruise Ship) at all reasonable times for the purpose of inspection, making repairs or alterations.

13.  Option to Renew.  Provided Sublessee has fully performed all of its obligations hereunder, at the option of Sublessee, this Agreement may be renewed for two (2) additional terms of five (5) years each. Renewal shall be by written notice delivered, with respect to the first renewal period, no later than thirty (30) days prior to expiration of the initial term (such period, the "First Notice Period") and, with respect to the second renewal period, no later than sixty (60) days prior to expiration of the first renewal period. Each renewal term, if any, shall be referred to as a "renewal period". If Sublessee fails to timely exercise any renewal, such renewal and all subsequent renewal options shall lapse and be of no further force and effect.

13.1  Additional Premises.  Subject to Sublessor's and Sublessee's mutual agreement reduced to writing on or before expiration of the First Notice Period (which agreement shall be subject to an agreed joint use and/or reciprocal easement agreement, a space/use plan and the approval of third parties, as applicable), commencing with the first renewal period, the Subleased Premises as defined in Section 1 above can be expanded to grant to Sublessee the non-exclusive use and occupancy of certain vertical improvements then located on the Premises and the exclusive right to use and occupancy, as applicable, of the area on which the business known as "Hookers is located as of the Effective Date, all furniture, fixtures and equipment located therein and a license to use the name "Hookers" for Sublessee's business at such location.

13.2  Renewal Period Terms.  Commencing on the first day of the first renewal period, Sublessee shall pay Sublessor monthly Rent equal to the greater of (1) $10,000.00 per month, or (2) a sum per month equal to the product of One and 75/100 Dollars ($1.75) multiplied by the number of passenger cruise tickets sold to paying passengers over and above the number of 10,000 per month. Commencing on the first day of the second renewal period, Sublessee shall pay Sublessor monthly Rent equal to the greater of (1) $10,000.00 per month, or (2) a sum per month equal to the product of Two and NO/100 Dollars ($2.00) multiplied by the number of passenger cruise tickets sold to paying passengers over and above the number of 10,000 per month. product of Two and NO/100 Dollars ($2.00) multiplied by the number of passenger cruise tickets issued over and above the number of 10,000 per month. Except as set forth above and in any amendment to this Agreement, all other terms and provisions shall remain in full force and effect during the renewal period(s).

9

Draft 6/22/99

C/8

13.3   Other Provisions. Except as otherwise provided in Sections 13.1 and 13.2, all other terms and provisions of this Agreement shall continue in full force and effect during each renewal period.

14.   Defaults and Remedies.  If Sublessee shall allow the Rent to be in arrears more than five (5) days after the date due, or shall any other default on the part of the Sublessee continue for five (5) days after delivery of written notice from Sublessor of such element of default, or should any other person than Sublessee secure possession of the Subleased Premises, or any part thereof, by reason of receivership, bankruptcy proceedings or other operation of law in any manner whatsoever, Sublessor may, at its discretion, without notice to Sublessee, declare Sublessor in default of this Agreement and either (a) terminate this Agreement, or (b) enter onto and take possession of the Subleased Premises and remove all persons and property therefrom without being deemed guilty of any manner of trespass, and re-let the Subleased Premises or any part thereof, for all or any part of the remainder of the term.  In the event Sublessor exercises its option to take possession, and should Sublessor be unable to re-let after reasonable efforts to do so, or should such monthly Rent be less than the Rent Sublessee was obligated to pay hereunder, then Sublessee shall pay the amount of such deficiency to Sublessor plus any applicable costs of reletting, collections and other reasonable expenses incurred in enforcing Sublessor's rights hereunder.  In no event shall Sublessor be obligated to find a new tenant on behalf of Sublessee.  In the event the Rent is not paid within the five (5) days after the date due, a late charge (which charge constitutes a penalty and not interest) of one and one-half percent (1-1/2%) per month on the unpaid balance shall be applicable.

14.1   No Cruise Ship Lien.  The Cruise Ship will be operated pursuant to a Charter Agreement which provides, among other things, that during the charter period, neither the Operator, nor its agents, nor the Master of the Vessel, shall have any right, power, or authority to create, incur or permit to be imposed upon the Cruise Ship any liens whatsoever.  Accordingly, Sublessor acknowledges that this Agreement is entered into on the credit of the Sublessee and not on the credit of the Cruise Ship or her owner or mortgagee and that the Sublessor claims no maritime or other lien against the Cruise Ship, and therefore waives any liens, whether statutory landlord liens or otherwise, against the Cruise Ship that it currently has or may have in the future or that may arise from operation of law or custom, usage and practice.

15.   Signage.  Upon Sublessee's receipt of all approvals required to operate its Offshore Business and subject to Sublessor's approval of location and content, which consent shall not be unreasonably withheld or delayed, Sublessee will be permitted, at its sole expense, to erect signs upon the Subleased Premises.

16.   Joint Use Areas.  Subject to Sublessor's prior written consent with respect to location, improvements, if any, to be located thereon and Sublessee's provision of insurance in favor of the State and Sublessor, Sublessee may use certain areas of the Pier as passenger waiting areas and for

10

other purposes (each a "Joint Use Area" and, collectively, the "Joint Use Areas"). Each Joint Use Area shall be clearly marked and, subject to Sublessee's rights pursuant to Section 13.1 at the time of renewal, subject to pre-existing uses. Such use shall additionally be subject to the rights of the general public as provided in the Ground Lease. At Sublessor's option exercised prior to expiration or termination of this Agreement, all permanent improvements erected or installed by Sublessee within the Joint Use Areas shall become the property of Sublessor.

17.   **Exclusivity.**  Provided Sublessee is not in default of this Agreement, during the term of this Agreement, Sublessor agrees not to sublease a dock or berth space for use by any vessel which conducts one day gaming cruises, "Cruises to Nowhere", river boat gambling, or similar activities.

18.   **Ingress/Egress.**  Sublessor may relocate required parking hereunder to another location within the Subdivision (as hereinafter defined) and/or ingress and egress points to the Subleased Premises so long as the required number of spaces are provided in similar or better facilities. For the purposes of this section "Subdivision" shall mean and refer to approximately 18.587 acres of land legally described as Lot 1, Block 1 TALMWD Subdivision, Cameron County, Texas.

19.   **Notices.**  All notices provided to be given under this Agreement shall be given by certified or registered mail, addressed to the proper party, at the following addresses:

> Sublessor:     South Padre Island Fishing Center Joint Venture
> One Padre Blvd.
> South Padre Island, Texas  78597
> Attention: Dave Friedman
>
> With a copy to:
>
> Stanley E. McElroy
> 3304 Thousand Oaks Cove
> Austin, Texas  78746
>
> Sublessee:     CSL Development Corporation
> 1610 Barrancas Avenue
> Pensacola FL 32501

20.   **Holdover.**  If Sublessee continues in possession of the Subleased Premises after the expiration of this Agreement and, therefore, holds over after the expiration of this Sublease, Sublessee will be deemed to be occupying the Subleased Premises on a month-to-month tenancy basis. Sublessee will be subject to all the terms and conditions of this Agreement, except that all Rent and other sums

11

Draft 6/22/99

payable to Sublessor by Sublessee shall be increased one hundred twenty-five percent (125%) as liquidated damages for the hold-over period (provided, in the event Sublessee's holdover causes Sublessor to holdover pursuant to the Ground Lease, then, notwithstanding the foregoing to the contrary, Sublessee shall pay all of Sublessor's costs under the Ground Lease, including, without limitation, holdover rent at the rate of two hundred percent (200%)). The above-described tenancy from month-to-month may be terminated by either party upon thirty (30) days written notice to the other.

21.     **Independent Obligations.** The obligation of Sublessee to pay all Rent and other sums under this Agreement and the obligation of Sublessee to perform Sublessee's other covenants and duties under this Agreement constitute independent, unconditional obligations to be performed at all times required under this Agreement, except when an abatement or reduction is expressly provided for in this Agreement. Sublessee waives and relinquishes any right to assert, either as a claim or as a defense, that Sublessor is bound to perform or is liable for the nonperformance of any implied covenant or implied duty of Sublessor not expressly set forth in this Agreement.

22.     **Special Damages.** Under no circumstances whatsoever shall Sublessor or Sublessee ever be liable for consequential damages or special damages. The term "Sublessor" shall mean only the Lessee of the Premises, and in the event of such Lessee's transfer of its interest in the Subleased Premises, it shall thereupon be released and discharged from all covenants and obligations shall be binding during the term of this Agreement

23.     **Performance of Obligations.** All monetary obligations of Sublessor and Sublessee are performable exclusively in Cameron County, Texas (including, without limitation, any monetary obligation of Sublessor or Sublessee for damages for any breach of the respective covenants, duties or obligations of Sublessor or Sublessee under this Agreement).

24.     **Prohibited Name.** Sublessor and Sublessee acknowledge and agree that Sublessee is prohibited from naming or referring to the Subleased Premises, any portion thereof, any business operated thereon and/or the Cruise Ship as "Queen Isabella", "Old Queen Isabella" and/or any similar designation.

25.     **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and assigns when permitted by this Agreement.

26.     **Severability.** The invalidity of any clause or portion of this Agreement shall not affect any other provisions thereof and this Agreement shall be construed as if such invalid, illegal or unenforceable provisions had never been contained therein.

27.     **Amendment.** No amendment, modification or alteration of the terms hereof shall be binding unless the same be in writing, dated subsequent to the date hereof, and duly executed by the parties hereto.

12

Draft 6/22/99

C12

JUN.23.1999   2:02PM   SELMAN&MUNSON                                    NO.668   P.15/17

28.    **Rights Cumulative.** Time is of the essence pursuant to this Agreement. The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by either party shall not preclude or waive its right to use any or all other remedies. Said rights and remedies are given in addition to any other rights the parties may be by law, statute, ordinance or otherwise.

29.    **No Waiver.** No waiver by the parties hereto of any default or breach of any term, condition or covenant of this Agreement shall be deemed to be a waiver of any other breach of the same or any other term, condition or covenant contained herein.

30.    **Recording.** Neither this Sublease nor any memorandum hereof may be recorded by Sublessee among the land records of the jurisdiction in which the Subleased Premises are located or in any other place of public record without the express written consent of Sublessor.

31.    **Attorney's Fees.** In the event Sublessor or Sublessee breach any of the terms of this Agreement whereby the party not in default employs attorneys to protect or enforce their rights hereunder, subject to the terms hereof, the prevailing party shall be entitled to recover reasonable costs, including reasonable attorney's fees, through the appellate level of court. This Agreement shall be construed under and in accordance with the laws of the State of Texas. Venue shall be in Cameron County.

32.    **Force Majeure.** Neither Sublessor nor Sublessee shall be required to perform any term, condition or covenant in this Agreement so long as such performance is delayed or prevented by any acts of God, strikes, lockouts, material or labor restrictions by any governmental authority, civil riot, floods and any other cause not reasonably within the control of Sublessor or Sublessee and which by the exercise of due diligence Sublessor or Sublessee is unable, wholly or in part, to prevent or overcome.

33.    **No Compete.** During the term of the Agreement and so long as Sublessee is not in default, Sublessor agrees that it shall not engage in any business activity on or around the Subleased Premises which is in competition in any way with Sublessee's Offshore Business, specifically including leasing space to any other cruise ship operation involved in on-board gaming or Sublessor itself engaging in such business.

34.    **Facsimile Signature.** The facsimile signature of a party to this Agreement shall be binding on such party.

35.    **Status and Identification of Sublessee.** Sublessee agrees to provide Sublessor with the following on or before the Rent Commencement Date: (a) a current financial statement, (b) a copy of its articles of incorporation and bylaws (or, if this Agreement has been assigned to an Affiliate or third party as provided herein, its articles of organization and regulations or such other organizational documents as are applicable to such entity), and (c) the name, address, phone and fax number of its authorized representative in Texas.

13

Draft 6/22/99

Exhibit "A"
Plat
(to be attached)

Draft 6/22/99

34.   Entire Agreement.  This Agreement constitutes the sole and only Agreement of the parties hereto and supersedes any prior understandings or written or oral agreements between the parties respecting the subject matter set in it.

IN WITNESS WHEREOF, the undersigned Sublessor and Sublessee have executed this Agreement in multiple counterparts, each of which shall be deemed an original, as of the Effective Date.

SUBLESSOR:

South Padre Island Fishing Joint Venture, a Texas joint venture

By: SRFP, Inc., a Texas corporation, its Managing Venturer

By: _____
David Friedman, President

SUBLESSEE:

CSL Development Corporation, a Delaware corporation

By: _____

Name: Charles S. Liberis

Title: President

### Proposal For Sublease Agreement

This proposal to enter into a  Sublease Agreement (the "Sublease") is made and effective
November 17, 2000, by Gaim-ko Inc. to South Padre Island Center Joint Venture (Sublessor).

Sublessor is the tenant in a lease agreement dated June 30, 1994 with The State of Texas.

Gaim-ko Inc. now desires to sublease the Leased Property from Sublessor.

NOW, THEREFORE, in consideration of $10,000 of Earnest money, the receipt and sufficiency
of which are hereby respectively acknowledged, the Sublessor agrees to enter into negotiations
with Gaim-ko Inc. to Sublease the Premises as described below. If a mutually acceptable lease is
not negotiated between the parties within ninty (90) days from the date of this proposal then
Sublessor shall return the $10,000 of Earnest money to Gaim-ko Inc. Sublessor also agrees to
discuss the possibility of Gaim-ko purchasing from Sublessor the rights to the lease with the
State of Texas.

### PREMISES
A. Berth. The exclusive right to a berth for one (1) cruise ship. The berth is located at the end of
the Pier.

B. Ticket Counter. The non-exclusive right to use the area designated "Ticket Counter" on the
plat for the sale of Cruse Ship tickets.

C. Modular Office. The non-exclusive right to use a maximum of two (200) parking spaces in
the area designated as "Parking" on the Plat for free parking.

### 1. Sublease.
A.  Sublessor proposes to sublease the Leased Property as follows:
Sublease Term:  The term of this sublease is proposed to be one year, with two, one year
options.
Sublease Rent:  The rent for the first year is proposed to be Sixty Thousand ($60,000), payable
in advance. Rent for the second and third years is proposed to be One Hundred Twenty
Thousand ($120,000) per year payable at the beginning of each year.

### 2. Obligations Under Master Lease.
Subtenant agrees to comply with the terms of the Master Lease and shall not do or permit to be
done anything that would constitute a breach or default of Sublessor's obligations in the Master
Lease.  Sublessor agrees to comply with all of Sublessor's obligations in the Master Lease.
Sublessor agrees timely to pay rent and other charges due under the Master Lease and, provided
Subtenant is not in breach or default of any obligation in this Sublease, shall not do anything to
disturb Subtenant's use of the Leased Property pursuant to this Sublease.

### 3. Indemnification.
A.  Subtenant will indemnify, protect, defend and hold Sublessor harmless from and against any
and all loss, cost, damage and expense arising out of or in any way related to a breach or default

-1-

of Sublessor's obligations in the Master Lease by Subtenant.

B.  Sublessor will indemnify, protect, defend and hold Subtenant harmless from and against any and all loss, cost, damage and expense arising out of or in any way related to a breach or default of the Master Lease by Sublessor.

3.  **No Assignment or Sublease**.
Subtenant shall not, without the prior written consent of both Sublessor and the landlord in the Master Lease, assign this Sublease or sublet the Leased Property or any part thereof.

4.  **Notices**.
Any notice given in connection with this Agreement, shall be in writing and shall be given to the appropriate party by personal delivery or by certified mail, postage prepaid, or recognized overnight delivery service as follows:

> If to Sublessor:
> > South Padre Island Center Joint Venture
> > One Padre Boulevard, South Padre Island, Texas 78597

> If to Subtenant:
> > Gaim-ko, Inc
> > 2403 San Mateo Blvd. N.E. Ste. W17
> > Albuquerque N.M. 87110

5.  **Headings**.
Headings used in this Agreement are provided for convenience only and shall not be used to construe meaning or intent.

IN WITNESS WHEREOF, the parties hereto have caused this Sublease to be duly executed as of the date first above written.

_____          _____

South Padre Island Center Joint Venture          Gaim-ko, Inc