*57*

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

AUG 3 0 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| CSL DEVELOPMENT CORPORATION, INC. | § | |
| | § | |
| **Plaintiff,** | § | |
| v. | § | |
| | § | |
| GAIM-KO, INC.; RAY GALLEGOS; SOUTH | § | CIVIL ACTION NO. B-01-059 |
| PADRE ISLAND FISHING CENTER, INC.; | § | JURY DEMANDED |
| STANLEY McELROY; DAVE FRIEDMAN; | § | |
| SRFP, INC.; and SOUTH PADRE ISLAND | § | |
| FISHING CENTER JOINT VENTURE | § | |
| | § | |
| **Defendants.** | § | |

## DEFENDANTS, RAY GALLEGOS AND GAIM-KO, INC.'S AMENDED MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

**NOW COME, RAY GALLEGOS** and **GAIM-KO, INC.** (hereinafter "Gaim-Ko") and

file this Amended Motion for Summary Judgment and would show the court as follows:

### I.

### FACTUAL BACKGROUND

All facts, evidence and authorities contained in Defendant's Motion for Summary

Judgment are incorporated herein for all purposes. The November 10, 2000 meeting between

Stan McElroy and Dave Friedman ("Pier Owners") and Gaim-Ko representatives was an initial

introduction of the parties. *McElroy Affidavit,* "Exhibit 5". The meeting was also attended by

Charles Liberis, CSL's president, who attempted to negotiate or mediate between the Pier

Owners and Gaim-Ko. *McElroy Deposition,* "Exhibit 8", P. 111, Ln 22-24. Some terms for a

Pier Sublease were discussed by Mr. Liberis with the parties. *Friedman Deposition,* "Exhibit 9",

-1-

P 27, Ln. 6-11   Ray Gallegos, as a Gaim-Ko representative, made no offer or proposal to Pier

Owners at the meeting. *McElroy Deposition*, "Exhibit 8", P. 111, Ln. 11-24.  Pier Owners made

no offer or proposal to Gaim-Ko for a Pier Sublease at the meeting, and in fact, Stan McElroy

testified that Pier Owners did not even indicate to anyone at the meeting that they were amenable

to a deal. *Id.*, "Exhibit 8", P. 112, Ln. 11-13.

At the end of the November 10, 2000 meeting, the Gaim-Ko and Pier Owners did not

reach a single agreement in regards to a new Pier Sublease, including rental amount and lease

term.  *See Affidavits*, "Exhibits1,5 and 6".  Gaim-Ko and Pier Owners did not agree on a value for

these two basic, but absolutely necessary components of a lease.  *Friedman Deposition*, "Exhibit

9", P. 28, Ln. 9-22.

Ray Gallegos left the November 10, 2000 meeting without a negotiated Pier Sublease.

Because no offers or proposals were exchanged, and no agreements were reached, <u>the Pier

Sublease was not negotiated to Gaim-Ko's satisfaction</u>. *See Affidavits*, "Exhibits 1,2,4-6".

## II.

## <u>ARGUMENTS AND AUTHORITIES</u>

### A.   <u>THE PIER SUBLEASE WAS NOT NEGOTIATED TO GAIM-KO'S SATISFACTION AS REQUIRED BY THE CHARTER PURCHASE AGREEMENT</u>

The Pier Sublease was not negotiated to Gaim-Ko's satisfaction, therefore the condition

precedent, which was required by the Charter/Purchase Agreement, did not occur.  *Gallegos

Affidavit*, "Exhibit 1".  Gaim-Ko was not satisfied, nor would any reasonable businessperson be

satisfied, with the Pier Sublease negotiations because the parties could not even agree on basic

lease terms.  Ray Gallegos (President), Catherine Stetson (Corporate Attorney), Peter Montoya

(CPA), and John Hale (Operations Manager) all testify that the Pier Sublease was NOT NEGOTIATED TO GAIM-KO'S SATISFACTION. *See Affidavits*, "Exhibits 1-4". To be negotiated to Gaim-Ko's satisfaction, the parties would have needed to agree on at least the basic terms of a Pier Sublease. Even Plaintiff's own *Webster's Dictionary* definition of "negotiate" defines the word as "To confer with another so as to come to terms or reach an agreement." *Plaintiff's Response*, P. 6. In this case, the evidence is clear that Gaim-Ko and Pier Owners never came to terms or agreed on a Pier Sublease.

Plaintiff also tried to define "negotiating" in Ray Gallegos deposition. On Page 108, Line 19, Plaintiff's attorney asks Mr. Gallegos, " Sure. But basically *negotiation is just you talking to somebody – and either through letters or talking coming to what you two think will be the terms that are acceptable to both of you?*" Gallegos answered, "Right". Plaintiff admits that "negotiating" includes coming to terms or having a written or verbal agreement. The facts of this case simply do not show any written or verbal coming to terms between Gaim-Ko and Pier Owners. So even using Plaintiff's own definitions, one can plainly see the Pier Sublease could not have been "negotiated" to Gaim-Ko's satisfaction without some coming to terms or agreement.

It was impossible for Gaim-Ko to be satisfied with "negotiations" that did not come close to agreement on any terms. "Satisfaction clauses" have long been a part of established contract law. If a contract requires performance to be to the "satisfaction" of one of the parties, that party is required to exercise good faith in determining whether performance is satisfactory. *Black Lake Pipe Line Co. v. Union Const. Co.*, 538 S.W. 2d 80, 88 (Tex. 1976) This is an objective standard that does not seek to find the mental state of satisfaction of a party, but whether the performance would satisfy a reasonable person. *Id.* at 88. Although this case is not a true "performance

contract", it does contain a "satisfaction clause". Ray Gallegos has testified that he was not

satisfied, but the court may also ask the following questions:

Would a Pier Lease be negotiated to a reasonable person's satisfaction if:

1. No offers were made by either party for the Pier Lease?
2. No lease term was agreed to?
3. No base rent was agreed to?
4. No letters of intent or written proposals were exchanged?
5. Pier Owners had no willingness to negotiate with Gaim-Ko?

The answer is NO. No reasonable person would be satisfied under these facts, which are the

exact facts of this case. And Ray Gallegos has testified that Gaim-Ko was not satisfied.

In this case, the condition precedent must have occurred before Gaim-Ko's performance

under the Charter/Purchase Agreement was required. And no breach of contract could have

occurred unless Gaim-Ko satisfied the condition precedent. Gaim-Ko had no obligation to

perform under this contract until it negotiated the Pier Sublease to its satisfaction. And if the Pier

Sublease was not negotiated to Gaim-Ko's satisfaction within seven days, the Charter/Purchase

Agreement would become null and void. That is exactly what happened in this case. *Gallegos*

*Affidavit*, "Exhibit 1". Gaim-Ko did not negotiate a Pier Sublease to its satisfaction which made

the Charter/Purchase Agreement null and void seven days after Nov. 4, 2000.

Plaintiff has provided the court with no admissible evidence that Gaim-Ko was satisfied

with the Pier Sublease negotiations. Plaintiff's is trying to use the November 17, 2000 Proposal

for Sublease Agreement ("Proposal") as evidence that Gaim-Ko negotiated the Pier Sublease to

its satisfaction. This attempt fails because it is false. The Proposal was just that, an offer from

Gaim-Ko. *Gallegos Deposition*, P. 150, Ln. 4-7. It was not a conformation of previously agreed

to Sublease terms or a contract. *See Friedman Affidavit and Friedman Deposition,* P. 33, Ln. 9-

22. The first paragraph of the Proposal states "in consideration of $10,000.00 of Earnest money - **the Subleasor agrees to enter into negotiations with Gaim-Ko Inc. to sublease the Premises...".** *See Proposal,* "Exhibit 10". Gaim-Ko could not have been more explicit in identifying the two page Proposal as an offer to negotiate.

      The only other evidence submitted by Plaintiff is the inadmissable affidavit of a former CSL employee. And for reasons discussed in Defendant's pending Motion, this affidavit is unreliable testimony that should not be considered.

IV.

**CONCLUSION**

      The Pier Sublease was not negotiated to Gaim-Ko's satisfaction. CSL's cause of action fails as a matter of law because there is no evidence to support its claim that (1) the condition precedent in the contract occurred and (2) that Gaim-Ko had an obligation to perform under the contract. As such, Gaim-Ko, Inc. and Ray Gallegos are entitled to summary judgment.

      WHEREFORE, PREMISES CONSIDERED, Defendants, GAIM-KO, INC. AND RAY GALLEGOS pray that the court grant all relief requested in Defendant's Motion for Summary Judgment.

Respectfully submitted,

By: _____

Paul L. Fourt, Jr.
Texas Bar Number 00785874
Federal Identification No. 19663
1000 E. Van Buren
Brownsville, TX 78520
T-956-574-0109 F-956-574-0227
**ATTORNEY IN CHARGE FOR RAY
GALLEGOS and GAIM-KO, INC.**

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document was sent by U.S. Mail and fax on Aug.

30, 2002, to all counsel of record at each address listed below:

Paul L. Fourt, Jr.

**JOE GRANT**
2437 Bay Area Blvd., #100
Houston, TX 77058
*CSL DEVELOPMENT CORP, INC.*

**JOHN FLOOD**
900 Frost Bank Plaza
802 N. Carancahua
Corpus Christi, Texas 78470
*CSL DEVELOPMENT CORP, INC.*

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CSL DEVELOPMENT CORPORATION,   INC. | § | |
| | § | |
| **Plaintiff,** | § | |
| v. | § | |
| | § | |
| GAIM-KO, INC.; RAY GALLEGOS; SOUTH | § | CIVIL ACTION NO. B-01-059 |
| PADRE ISLAND FISHING CENTER, INC.; | § | JURY DEMANDED |
| STANLEY McELROY; DAVE FRIEDMAN; | § | |
| SRFP, INC.; and SOUTH PADRE ISLAND | § | |
| FISHING CENTER JOINT VENTURE | § | |
| | § | |
| **Defendants.** | § | |

# APPENDIX

# APPENDIX FOR RAY GALLEGOS AND GAIM-KO, INC.'S AMENDED MOTION FOR SUMMARY JUDGMENT AND AUTHORITY IN SUPPORT THEREOF

# INDEX OF APPENDIX

**A.**   **All Summary Judgment evidence in this Appendix is incorporated by reference into Defendant's Motion for Summary Judgment and Supporting Memorandum**

Verification of Summary Judgment Evidence

**B.**   **Summary Judgment Evidence**

1.   Supplemental Affidavit from **Ray Gallegos**; *Appendix, "Exhibit 1"*

2.   Affidavit from **Pete Montoya**; *Appendix, "Exhibit 2"*

3.   Affidavit from **Jon Hale**; *Appendix, "Exhibit 3"*

4.   Supplemental Affidavit from **Cate Stetson**; *Appendix, "Exhibit 4"*

5.   Supplemental Affidavit from **Stan McElroy**; *Appendix, "Exhibit 5"*

6.   Supplemental Affidavit from **Dave Friedman**; *Appendix, "Exhibit 6"*

7.   Deposition testimony from Ray Gallegos; *Appendix, "Exhibit 7"*

8.   Deposition testimony from Stan McElroy; *Appendix, "Exhibit 8"*

9.   Deposition testimony from Dave Friedman; *Appendix, "Exhibit 9"*

10.   Proposal For Sublease Agreement, *Appendix, "Exhibit 10"*

# VERIFICATION OF SUMMARY JUDGMENT EVIDENCE

### **AFFIDAVIT PAUL L. FOURT, JR.**

STATE OF TEXAS          §
                                      §
COUNTY OF CAMERON   §


BEFORE ME, the undersigned notary, on this day, personally appeared Paul L. Fourt, Jr., a person whose identity is known to me.  After I administered an oath to him, upon his oath, he said:

"My name is Paul L. Fourt, Jr. and I am over 18 years.  I have never been convicted of a felony and I am capable of making this affidavit.  The facts stated in this affidavit are within my personal knowledge and are true and correct."

"All of the copies of the evidence presented in Defendant's Appendix for Amended Summary Judgment are true and correct copies of the original documents.  All deposition testimony was sworn to by the witnesses and was recorded by a certified court reporter.  The affidavits presented are original affidavits or true and correct photo copies of the original.  The original affidavits will be submitted to the court upon receipt."

Further Affiant sayeth not.


_____
Paul L. Fourt, Jr.


SWORN TO and SUBSCRIBED before me by Paul Fourt, on August 29, 2002


_____
Notary Public in and for
the State of Texas
My commission expires

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| CSL DEVELOPMENT CORPORATION,  INC. § | |
| § | |
| **Plaintiff,** § | |
| § | |
| v. § | |
| § | |
| GAIM-KO, INC.; RAY GALLEGOS; SOUTH § | Civil Action No. B-01-059 |
| PADRE ISLAND FISHING CENTER, INC.; § | |
| STANLEY McELROY; DAVE FRIEDMAN; § | |
| SRFP, INC.; and SOUTH PADRE ISLAND § | |
| FISHING CENTER JOINT VENTURE § | |
| § | |
| **Defendants.** § | |

## AFFIDAVIT RAY GALLEGOS

| | |
|---|---|
| STATE OF NEW MEXICO | § |
| | § |
| COUNTY OF BERALILLO | § |

BEFORE ME, the undersigned notary, on this day, personally appeared Ray Gallegos, a person whose identity is known to me. After I administered an oath to him, upon his oath, he said:

"My name is Ray Gallegos and I am over 18 years. I have never been convicted of a felony and I am capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct."

"On November 9, 2000, I traveled to South Padre Island, Texas to meet with Stan McElroy and Dave Friedman ("Pier Owners") to negotiate a "Pier Sublease" for a vessel I was going to purchase. On November 10, 2000, I met with Pier Owners and CSL's owner, Charles Liberis at the Sea Ranch Pier. My general manager, John Hale, and my CPA, Peter Montoya, were also present for the meeting."

"This meeting was an introduction of the parties and an attempt to discuss the possibility of Gaim-Ko entering into a Pier Sublease. I made no offers to pier owners and made no agreements. General deal points were discussed by Mr. Liberis, But neither I nor Pier owners negotiated a Pier Sublease. I was not satisfied with the preliminary negotiations that took place because we had no agreement as to major deal points like lease term and rent."

"At the November 10, 2000 meeting, the Pier Owners did not even appear willing to negotiate a Pier Sublease.  Stan McElroy did not make any offers or even indicate a willingness to negotiate with Gaim-Ko.  In fact, he did not consider our meeting "negotiations".  Gaim-Ko needed a place to dock the vessel, but was unable to negotiate a Pier Sublease to Gaim-Ko's satisfaction.  When I left the meeting, I was disappointed that a Pier Sublease had not been negotiated to my satisfaction.  I wanted to buy the boat and I was unable to negotiate a Pier Sublease."

"My November 17, 2000 Proposal for Sublease was not a confirmation of or contract for terms agreed to at the November 10, 2000 meeting.  I sent that proposal and money in an attempt to encourage Pier Owners to negotiate a Pier Sublease.  The terms in my proposal were not negotiated between me and Pier Owners.  Not one single deal point in my proposal had been agreed to by Pier Owners at the meeting.  It was simply my offer to them."

Further Affiant sayeth not.

_R.A. Gallegos_
Ray Gallegos

State of New Mexico
County of Bernalillo

SWORN TO and SUBSCRIBED before me by Ray Gallegos, on August 26, 2002

OFFICIAL SEAL
Barbara A. Garrity
NOTARY PUBLIC
STATE OF NEW MEXICO
My Commission Expires: 1/27/2006

_Barbara A. Garrity_
Notary Public in and for
the State of New Mexico
My commission expires: 1/27/2006

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN  DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CSL DEVELOPMENT CORPORATION,   INC.

      **Plaintiff,**

v.

GAIM-KO, INC.; RAY GALLEGOS; SOUTH          Civil Action No. B-01-059
PADRE ISLAND FISHING CENTER, INC.;
STANLEY McELROY; DAVE FRIEDMAN;
SRFP, INC.; and SOUTH PADRE ISLAND
FISHING CENTER JOINT VENTURE

      **Defendants.**

## AFFIDAVIT PETER MONTOYA

| | |
|---|---|
| STATE OF NEW MEXICO | § |
| | § |
| COUNTY OF BERALILLO | § |

      BEFORE ME, the undersigned notary, on this day, personally appeared Peter Montoya, a person whose identity is known to me.  After I administered an oath to him, upon his oath, he said:

      "My name is Peter Montoya and I am over 18 years.  I have never been convicted of a felony and I am capable of making this affidavit.  The facts stated in this affidavit are within my personal knowledge and are true and correct."

      "I work on a contract basis for Gaim-Ko, Inc. as an accountant. I have worked with Mr. Gallegos for over 25 years."

      "During the summer of 2000, I began work with Mr. Gallegos on the viability of operating an ocean going vessel as a casino.  On November 3, 2000, after many months of negotiation, Gaim-Ko entered into an agreement to charter a vessel from CSL Development Corporation, Inc. The vessel was located in South Padre Island, Texas at the Sea Ranch Pier."

      "As part of my contract employment, I traveled with Mr. Gallegos, his wife and Jon Hale to South Padre Island, Texas on November 9, 2000.  We ate dinner at the Sea Ranch restaurant that night and we were briefly introduced to Stan McElroy, the co-owner of the pier.  No serious discussions took place regarding the Sea Ranch Pier at dinner on November 9, 2002."

"On November 10, 2000, I attended a meeting at the Sea Ranch Pier with Ray Gallegos, his wife, and Jon Hale for the purpose of starting negotiations on a dock lease with the owners of the pier and Charles Liberis. The meeting lasted approximately 2 hours and I was present for the entire meeting. General terms of the prior dock lease were discussed by Mr. Charles Liberis. This meeting was only an introduction of the parties. No proposals were exchanged between Gaim-Ko and Pier Owners. No agreements were reached. No documents or contracts were agreed to at this meeting."

"Gaim-Ko did not negotiate a dock lease to its satisfaction on November 10, 2000, in fact, I got the impression that the Pier Owners did not want to continue negotiations with Gaim-Ko for the Pier Lease after this meeting."

Further Affiant sayeth not.


_Peter Montoya_
Peter Montoya

State of New Mexico
County of Bernalillo

SWORN TO and SUBSCRIBED before me by Peter Montoya, on August 6, 2002

OFFICIAL SEAL
Barbara A. Garrity
NOTARY PUBLIC
STATE OF NEW MEXICO
My Commission expires 1/27/2006

_Barbara A. Garrity_

Notary Public in and for
the State of New Mexico
My commission expires: 1/27/2006

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CSL DEVELOPMENT CORPORATION, INC. | § | |
| | § | |
| **Plaintiff,** | § | |
| v. | § | |
| | § | |
| GAIM-KO, INC.; RAY GALLEGOS; SOUTH | § | Civil Action No. B-01-059 |
| PADRE ISLAND FISHING CENTER, INC.; | § | |
| STANLEY McELROY; DAVE FRIEDMAN; | § | |
| SRFP, INC.; and SOUTH PADRE ISLAND | § | |
| FISHING CENTER JOINT VENTURE | § | |
| | § | |
| **Defendants.** | § | |

## AFFIDAVIT OF JON HALE

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF CAMERON | § |

BEFORE ME, the undersigned notary, on this day, personally appeared Jon Hale, a person whose identity is known to me. After I administered an oath to him, upon his oath, he said:

"My name is Jon Hale and I am over 18 years. I have never been convicted of a felony and I am capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct."

"In the summer of 2000, I was working as the general manager of gaming operations for Gaim-Ko, Inc. and Ray Gallegos. Part of my duties included finding potential deals for Gaim-Ko's gaming machines. In 2000, I made contact with Lou Daleo, a gambling vessel broker, about the charter of a ship by Gaim-Ko, for the purpose of running an offshore casino. I acted as an agent for Mr. Gallegos, but I did not have any authority to negotiate deal points or agree to a contract. On November 3, 2000, after a long negotiating period, Gaim-Ko signed a chatter/purchase contract with CSL Corporation for a vessel located in South Padre Island, TX."

"On November 9, I went with Ray Gallegos, his wife, and Pete Montoya to meet with Charles Liberis and the Pier Owners in Texas. On November 10, 2000, we attended a meeting at the Sea Ranch Pier with Charles Liberis and the Pier Owners for the purpose of starting negotiations on a dock lease. I was present for the some of the meeting and I know some general terms of the prior dock lease were discussed. I was present at the end of the meeting and I know for a fact that no proposals were exchanged between Gaim-Ko and Pier Owners, no agreements were reached and no documents or contracts were agreed to at this meeting."

Further Affiant sayeth not.

_____
Jon Hale

SWORN TO and SUBSCRIBED before me by Jon Hale, on August 2, 2002



_____
Robert Lerma
Notary Public in and for
the State of Texas
My commission expires:

**4**

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CSL DEVELOPMENT CORPORATION, INC. | § | |
| | § | |
| **Plaintiff,** | § | |
| v. | § | |
| | § | |
| GAIM-KO, INC.; RAY GALLEGOS; SOUTH | § | Civil Action No. B-01-059 |
| PADRE ISLAND FISHING CENTER, INC.; | § | |
| STANLEY McELROY; DAVE FRIEDMAN; | § | |
| SRFP, INC.; and SOUTH PADRE ISLAND § | | |
| FISHING CENTER JOINT VENTURE | § | |
| | § | |
| **Defendants.** | § | |

**AFFIDAVIT OF CATHERINE BAKER STETSON**

| | |
|---|---|
| STATE OF NEW MEXICO | § |
| | § |
| COUNTY OF BERNALILLO | § |

BEFORE ME, the undersigned notary, on this day, personally appeared Catherine Baker Stetson, a person whose identity is known to me. After I administered an oath to her, upon her oath, she said:

"My name is Catherine Baker Stetson, and I am over 18 years. I have never been convicted of a felony, and I am capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct."

"I am an attorney in New Mexico and represent Gaim-Ko, Inc. (Gaim-Ko) in numerous business matters."

"In November 2000, I was working with Gaim-Ko on the purchase of a casino boat and the subleasing of a pier space to be used as a berth for the boat. According to my records, I worked on the development of a berth sublease on Nov. 3, 18, 26, and 27, 2000. I had requested a copy of Mr. Liberis's then-current sublease with the pier lessors and received that document from Mr. Liberis on November 13, reviewed the document on the 18th, and, on the 26th and 27th, and communicated to Gaim-ko about the inadequacy of the transaction terms as evidenced by the document I had received."

"As Gaim-ko's attorney, I had several concerns about the incomplete negotiations for the pier sublease and expressed them to Mr. Gallegos. While a pier sublease was discussed and a proposal

expired "[i]f a mutually acceptable lease is not negotiated between the parties within ninety [sic] days." Even if it had been signed by the pier lessors–which of course it was not--the proposal would have been, at that time, by its own terms, merely an agreement "to enter into negotiations." It did not and could reflect the terms of any negotiated agreement, because satisfactory negotiations had yet to occur. Because the pier lessors refused to accept the earnest money, sign the proposal, or "enter into negotiations with Gaim-ko," as proposed, no pier sublease was or could have been negotiated, to Gaim-Ko's satisfaction or otherwise."

Further Affiant sayeth not.

_____
Catherine Baker Stetson

SWORN TO and SUBSCRIBED before me by Catherine Baker Stetson, on August 28, 2002

_____
Notary Public in and for
the State of New Mexico
My commission expires: 1/6/04

08/30/02  FRI 12:37 FAX 5123060850          Tejas Securities                                    ☒002

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CSL DEVELOPMENT CORPORATION,  INC.    §
                                                      §
        **Plaintiff,**                                §
                                                      §
v.                                                    §
                                                      §
GAIM-KO, INC.; RAY GALLEGOS; SOUTH       §          Civil Action No. B-01-059
PADRE ISLAND FISHING CENTER, INC.;       §
STANLEY McELROY; DAVE FRIEDMAN;          §
SRFP, INC.; and SOUTH PADRE ISLAND       §
FISHING CENTER JOINT VENTURE             §
                                                      §
        **Defendants.**                               §

## AFFIDAVIT STAN MCELROY

STATE OF NEW TEXAS          §
                                      §
COUNTY OF TRAVIS            §

        BEFORE ME, the undersigned notary, on this day, personally appeared Stan McElroy, a
person whose identity is known to me.  After I administered an oath to him, upon his oath, he
said:

1.      My name is Stan McElroy and I am over 18 years.  I have never been convicted of a
        felony and I am capable of making this affidavit.  The facts stated in this affidavit are
        within my personal knowledge and are true and correct.  Dave Friedman and I share an
        interest in the Sea Ranch Pier ("Pier Owners").

2.      Plaintiff alleges in the above-referenced lawsuit that a sublease for the Sea Ranch Pier
        was negotiated to Gaim-Ko's satisfaction at the November 10, 2000 meeting between
        Pier Owners and Ray Gallegos.  No sublease terms were negotiated by Gaim-Ko and the
        preliminary discussions that did take place were initiated by Charles Liberis, who was not
        a party to the sublease.  Not once did Ray Gallegos propose a deal point or negotiate a
        lease provision.

3.      Gaim-Ko representatives never fully discussed the essential terms of a sublease and
        certainly no agreement was reached to sublease the pier.  Ray Gallegos did not propose,
        offer or agree to essential deal terms for a pier sublease at the meeting.  The November
        10, 2000 meeting was an introduction of the parties and did not include any level of
        negotiations, preliminary or otherwise, between Gaim-Ko and the Pier partners for a pier

sublease with Gaim-Ko.

4.    At the end of the November 10, 2000 meeting, it was clear to all parties that no pier sublease had been negotiated. The pier sublease could not have been negotiated to Gaim-Ko's satisfaction because we did not discuss or negotiate essential deal points or exchange proposals or offers, or commit to do so.

5.    The first and only communication of interest was in a "proposal to enter into negotiations" letter dated November 17, 2000 from Ray Gallegos to Dave Friedman. This letter did contain some deal points that would be acceptable to Gaim-Ko. Along with the letter, Gaim-Ko sent a check for $10,000 for the purpose of showing Gaim-Ko's financial credibility in the event the Pier partnership agreed to commence negotiations. I decided not to enter into negotiations with Gaim-Ko and the check was not cashed or deposited but immediately returned to Gaim-Ko along with a letter expressing the Pier partnership's decision not to enter into negotiations with Gaim-Ko at that time.

**Further Affiant sayeth not.**

Stan McElroy

SWORN TO and SUBSCRIBED before me by Stan McElroy, on August 20, 2002

Notary Public in and for

the State of Texas
My commission expires:



DEBBIE FRANK
Notary Public, State of Texas
My Commission Expires
12-20-03

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CSL DEVELOPMENT CORPORATION,  INC. | § | |
| | § | |
| **Plaintiff,** | § | |
| v. | § | |
| | § | |
| GAIM-KO, INC.; RAY GALLEGOS; SOUTH | § | Civil Action No. B-01-059 |
| PADRE ISLAND FISHING CENTER, INC.; | § | |
| STANLEY McELROY; DAVE FRIEDMAN; | § | |
| SRFP, INC.; and SOUTH PADRE ISLAND | § | |
| FISHING CENTER JOINT VENTURE | § | |
| | § | |
| **Defendants.** | § | |

## AFFIDAVIT DAVE FRIEDMAN

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF CAMERON | § |

BEFORE ME, the undersigned notary, on this day, personally appeared Dave Friedman, a person whose identity is known to me. After I administered an oath to him, upon his oath, he said:

1.    My name is Dave Friedman and I am over 18 years.  I have never been convicted of a felony and I am capable of making this affidavit.  The facts stated in this affidavit are within my personal knowledge and are true and correct.  Stan McElroy and I share an interest in the Sea Ranch Pier ("Pier Owners").

2.    Plaintiff alleges in the above-referenced lawsuit that a sublease for the Sea Ranch Pier was negotiated to Gaim-Ko's satisfaction at the November 10, 2000 meeting between Pier Owners and Ray Gallegos.  No sublease terms were negotiated by Gaim-Ko and the preliminary discussions that did take place were initiated by Charles Liberis, who was not a party to the sublease.  Not once did Ray Gallegos propose a deal point or negotiate a lease provision.

3.    Gaim-Ko representatives never fully discussed the essential terms of a sublease and certainly no agreement was reached to sublease the pier.  Ray Gallegos did not offer, consent or agree to any essential deal terms for a pier sublease at the meeting.  The November 10, 2000 meeting was an introduction of the parties.  There was no intent by me to enter into serious negotiations for a pier sublease with Gaim-Ko.

4.    At the end of the meeting, it was clear to all parties that no pier sublease had been
      negotiated. The pier sublease could not have been negotiated to Gaim-Ko's satisfaction
      because we did not even exchange proposals or offers at the November 10, 2000 meeting.
      Stan and I only agreed to consider any proposals by Gaim-Ko.

5.    The first offer or proposal for a pier sublease was sent by Ray Gallegos on November17,
      2000. This Proposal for Sublease Agreement was received by me and it was clearly an
      offer to negotiate for a pier sublease. The deal points included in the proposal were not
      negotiated by Gaim-Ko and Pier Owners prior to the proposal. Ray Gallegos also sent a
      $10,000.00 check as a show of good faith just so we would evaluate their proposal. The
      $10,000.00 check was not payment of rent or payment for any negotiated term. I decided
      not to negotiate with Gaim-Ko and returned the escrow check, along with a rejection of
      their offer.

Further Affiant sayeth not.


                                                    _____
                                                            Dave Friedman


SWORN TO and SUBSCRIBED before me by Dave Friedman, on August _29_____, 2002


        ┌─────────────────────────┐
        │      JERRY RAMIREZ       │
        │   MY COMMISSION EXPIRES  │          _____
        │     September 23, 2002   │          Notary Public in and for
        └─────────────────────────┘          the State of Texas
                                             My commission expires:

# In The Matter Of:

*CSL Development Corporation, Inc. v.*
*Gaim-Ko, Inc., et al.*

---

## Ray Gallegos
### Vol. 1, December 4, 2001

---

## Bean & Associates, Inc.
### 500 Marquette, NW, Suite 280 Albuquerque, NM 87102
### 119 East Marcy, Suite 110 Santa Fe, NM 87501

### (505) 843-9494 or (800) 669-9492

Original File GALLEG~1.TXT, 202 Pages
Min-U-Script® File ID: 1362823530

## Word Index included with this Min-U-Script®

**CSL Development Corporation Inc. v.**
**Gaim-Ko, Inc., et al.**

Page 108

[1] **Q:** Well, what do you think it means to
[2] negotiate an agreement? We've been talking about it
[3] all morning.
[4] **A:** Well, you know, talking about a contract or
[5] whatever, I — and executing an agreement is signing
[6] it, right?
[7] **Q:** Correct.
[8] **A:** Okay. Negotiating it is, if both parties
[9] are in compliance, they want to agree to it, then you
[10] can execute it.
[11] **Q:** I guess negotiating is the two parties, you
[12] or somebody else, are sitting down and you're
[13] negotiating the terms to an agreement that you will
[14] execute in the future if you two can come to terms
[15] that you both accept. Is that a fair definition?
[16] **A:** Yes. Providing that everything that the
[17] people that made the contract had to offer was right
[18] on the table, you know.
[19] **Q:** Sure. But basically negotiation is just
[20] you talking to somebody —
[21] **A:** Right, sure.
[22] **Q:** — and either through letters or talking
[23] coming to what you two think will be terms that are
[24] acceptable to both of you?
[25] **A:** Right.

Page 109

[1] **Q:** And just because you've negotiated it,
[2] doesn't mean you're bound by a contract, correct?
[3] **A:** Right.
[4] **Q:** It's just — it's not until you execute a
[5] contract that you're bound?
[6] **A:** Right, but, now, here, there is another
[7] thing. You can sign something but if the other party
[8] is not fulfilled the way it should have been
[9] fulfilled, I don't think it's legal.
[10] **Q:** I understand, but that's the next stage.
[11] Once you have an agreement, if somebody breaches the
[12] agreement, then you would go after them under the
[13] agreement. Do you agree with me?
[14] **A:** No, I don't.
[15] **Q:** In your negotiations with Southern Gaming,
[16] all right, you said that you guys sat down over a
[17] period of time, a month, two months, whatever, and
[18] you negotiated terms that were acceptable to both of
[19] you.
[20] **A:** Right.
[21] **Q:** Now, at that point, you were not bound to
[22] go through with the agreement if you didn't want to,
[23] correct?
[24] **A:** How was that again, sir?
[25] **Q:** At the point that you two had said, all

Page 110

[1] right, we've negotiated this, we think we've got the
[2] terms we both can live with, we'll have the attorney
[3] draw up the contract, you are not bound at the point
[4] where you had negotiated terms that were acceptable
[5] to you, were you?
[6] **A:** If I hadn't signed it.
[7] **Q:** So from your understanding, until you had
[8] signed the document, until you had executed the
[9] document, you were not bound to go through with
[10] anything?
[11] **A:** Right.
[12] **Q:** So even though you had sat down and agreed
[13] to terms with the other party and both sides had
[14] agreed to the terms, you're still not bound by it
[15] until you both have signed a contract, correct?
[16] **A:** Uh-huh.
[17] **Q:** Do you agree with me?
[18] **A:** I agree with you.
[19] **Q:** And that's what I was trying to get at. I
[20] wanted to make sure we were using the same
[21] understandings of negotiate, which is to sign — or
[22] to talk about terms and agree on terms and execute is
[23] to sign the document. Are we on the same terms —
[24] **A:** I still — you got me lost. I don't — I
[25] don't understand what you're talking about.

Page 111

[1] **Q:** Well, you don't think negotiating is the
[2] same as executing an agreement, do you?
[3] **A:** No, I don't.
[4] **Q:** And you understand what the term to
[5] negotiate means, to discuss with somebody else terms?
[6] **A:** Yeah, you can discuss and try to make
[7] arrangements to where you can form a contract or
[8] whatever and — but negotiate is a lot more than
[9] that, I think.
[10] **Q:** Well, is it a contract? Is negotiating a
[11] contract?
[12] **A:** No, it isn't. I don't think so.
[13] **Q:** And when you negotiate with somebody,
[14] you're not binding yourself, are you?
[15] **A:** I think a contract is when you sign
[16] something, you sign something that you feel that
[17] is —
[18] **Q:** It's just a written contract when you sign
[19] a contract.
[20] **A:** Right.
[21] **Q:** And it could be for anything. I mean, when
[22] you get your cable, you sign an agreement, cable TV,
[23] that's a contract. Have you ever done that?
[24] **A:** Yes, I have.
[25] **Q:** If you get water, if you have water

Page 148

[1] A: Yes, it is.

[2] Q: And is it your signature as guarantor at

[3] the bottom?

[4] A: Yes, sir.

[5] Q: Is this the agreement that you entered into

[6] on behalf of Gaim-Ko with Charles Liberis and CSL

[7] Corporation?

[8] A: Yes.

[9] Q: Now, I believe you had said earlier that if

[10] Stan and Dave had agreed give you the lease, give you

[11] a lease at the pier, you would have gone through with

[12] your contract and purchased the boat and put it in at

[13] the CLN pier?

[14] A: I'm sure I would have.

[15] Q: I believe you stated earlier that the

[16] reason they told you that they would not was because

[17] they did not want the Entertainer at their dock?

[18] A: That's right.

[19] Q: And if you had come there with a boat that

[20] they liked, they would have given you a lease?

[21] A: I never heard them tell me that.

[22] Q: Did they tell you that they wouldn't let

[23] any boat be there?

[24] A: In fact, they weren't even interested in

[25] leasing at the time.

Page 149

[1] Q: Well, what I'm asking you is, you had

[2] stated while Mr. Liberis was out of the room, they

[3] came to you and told you —

[4] A: Excuse me. I got a hiatal hernia. Okay.

[5] Q: You had stated earlier that they came to

[6] you while Mr. Liberis was out of the room and told

[7] you that the reason that they weren't going to go

[8] into a lease with you on this was because they did

[9] not want the Entertainer there.

[10] A: I think also most likely they didn't want

[11] to do business with Charles Liberis.

[12] Q: Well, they weren't doing business with him,

[13] they were doing business with you.

[14] A: No, but, I mean, Charles Liberis and the

[15] boat, they didn't want the boat there.

[16] Q: So that was the reason, was they told you

[17] they just didn't want his boat there?

[18] A: Right.

[19] Q: They didn't tell you, "We don't want any

[20] boat here," they said, "We just don't want the

[21] Entertainer here;" isn't that correct?

[22] A: I don't know if they told me that, sir.

[23] Q: Do you recall them telling you that we

[24] don't want any boat at this dock?

[25] A: I don't recall that either.

Page 150

[1] Q: But you do recall them saying that we don't

[2] want this boat at the dock?

[3] A: Right.

[4] Q: And, obviously, you thought that you could

[5] enter into a lease with them because you sent a

[6] sublease to them with a certified check for $10,000?

[7] A: I sent a proposal to them, yes.

[8] Q: And you took the terms and these were the

[9] same terms under your contract with Charles Liberis

[10] that you put into the sublease?

[11] A: Right.

[12] Q: Now, if you didn't think they were going to

[13] enter into any agreement with you and they didn't

[14] want any boats there, why would you have sent that

[15] agreement to them and sent them a $10,000 check?

[16] A: Because I thought they were going to give

[17] me the lease. That's what Charles Liberis kept

[18] telling me, that he had a long term lease and he

[19] could sublease it to me, so evidently he didn't have

[20] no lease.

[21] Q: And you thought they were going to give you

[22] the same lease that Charles had?

[23] A: That's right.

[24] Q: And the terms of the lease that Charles had

[25] were fine with you?

Page 151

[1] A: I don't know what terms he had, but they

[2] wanted $10,000 from me is what they wanted.

[3] Q: But that's what your hope was when you went

[4] there, that they would give you the same lease that

[5] Charles had?

[6] A: Yes, sir.

[7] Q: And had they been willing to do that, you

[8] would have accepted it and purchased the boat?

[9] A: Probably.

[10] Q: If they had given you that same lease he

[11] had and it was only because of Mr. Liberis and the

[12] Entertainer that they said they weren't going to do

[13] that?

[14] A: Probably.

[15] Q: Now, are you still dealing with the folks

[16] from the Sea Island pier?

[17] A: The who?

[18] Q: Stan and Dave from Sea Island Pier?

[19] A: No.

[20] Q: You're not dealing with anybody from the

[21] pier?

[22] A: No.

[23] Q: When was the last time you had any dealings

[24] with anybody from Sea Island Pier, whether it was

[25] Stan or Dave or anybody working for them?

01-12037
KC/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CSL DEVELOPMENT CORPORATION, INC. §
§
    Plaintiff,                     §
                                    §
VS.                                 §
                                    §    CIVIL ACTION NO. B01-059
GAIM-K0, INC.; RAY GALLEGOS; SOUTH §    JURY DEMANDED
PADRE ISLAND FISHING CENTER, INC.; §
STANLEY McELROY;DAVE FRIEDMAN;      §
SRFP, INC.; and SOUTH PADRE ISLAND §
FISHING CENTER JOINT VENTURE        §
                                    §
    Defendants.                     §

DEPOSITION OF:

# STANLEY EUGENE McELROY

MAY 29, 2002

# *COPY*



**Worldwide**
**Corporate Headquarters**
3000 Weslayan, Suite 235
Houston, Texas 77027
Tel: 713-572-2000

For Services Worldwide
**800-745-1101**

**Texas**
**Regional Office**
4245 N. Central Expwy, Suite 475
Dallas, Texas 75205
Tel: 214-219-3080

111

02:47 PM 1  think he said something like, "Charles has some people

02:47 PM 2  down looking at the boat."

02:47 PM 3      Q.    Okay.  So when you went into that meeting the

02:47 PM 4  next day with those people, you knew that Charles had

02:47 PM 5  some people down looking at the boat and you just

02:47 PM 6  assumed that those were the people?

02:47 PM 7      A.    No.  That was made clear that -- they were

02:47 PM 8  introduced.  I mean, that's what they were doing there.

02:47 PM 9  I mean, the night before.  I'm not sure how it was

02:47 PM 10 stated, but obviously it was -- it was them.

02:47 PM 11     Q.    And there was -- Mr. Gallegos didn't have any

02:47 PM 12 discussions with you about leasing the space that the

02:47 PM 13 ENTERTAINER was leasing?

02:48 PM 14     A.    When?

02:48 PM 15     Q.    During that meeting.

02:48 PM 16     A.    I don't recall any.  You mean, that he pulled

02:48 PM 17 us aside or that he took the floor and said, "I would

02:48 PM 18 like to do this, this, and this"?

02:48 PM 19     Q.    Any discussions with Mr. Gallegos or anybody

02:48 PM 20 in his party with you or Dave about him leasing this

02:48 PM 21 space that the M/V ENTERTAINER had at the pier.

02:48 PM 22     A.    I don't recall Mr. Gallegos discussing it with

02:48 PM 23 us or laying out any plan.  I recall Mr. Liberis kind of

02:48 PM 24 mediating, "Would you do this," and "Would you do this?"

02:48 PM 25     Q.    Mediating between whom?

112

| | | |
|---|---|---|
| 2:48 PM | 1 | A.    Between Dave and I and Mr. Gallegos. |
| 02:48 PM | 2 | Q.    So there were discussions between you and Dave |
| 02:48 PM | 3 | and Mr. Gallegos about rent and a term and a lease? |
| 02:48 PM | 4 | A.    As I've stated before -- I've answered that. |
| 02:49 PM | 5 | MR. FISHER:  Go ahead and answer it |
| 02:49 PM | 6 | again, Stan. |
| 02:49 PM | 7 | A.    Charles was driving the meeting.  We were |
| 02:49 PM | 8 | there listening.  Charles took it suddenly to a place |
| 02:49 PM | 9 | that -- that took me aback regarding specific deal terms |
| 02:49 PM | 10 | when there had been no indication of interest to move |
| 02:49 PM | 11 | forward in any respect with even that type of use.  We |
| 02:49 PM | 12 | had not indicated to anyone present that we were |
| 02:49 PM | 13 | amenable to a deal.  We had not said that we absolutely |
| 02:49 PM | 14 | were not.  And here we were and had just met these |
| 02:49 PM | 15 | people and were being asked if theoretically or, "Would |
| 02:49 PM | 16 | you take this," and then over to the -- to the -- |
| 02:50 PM | 17 | Mr. Gallegos, "Would you pay this?" |
| 02:50 PM | 18 | Q.    (By Mr. Grant)  So Mr. Liberis and |
| 02:50 PM | 19 | Mr. Gallegos took the negotiations into an area or took |
| 02:50 PM | 20 | the discussion, whatever term you want to use, |
| 02:50 PM | 21 | discussion or negotiation, into an area that you would |
| 02:50 PM | 22 | have preferred to have taken place in the future, if at |
| 02:50 PM | 23 | all? |
| 02:50 PM | 24 | A.    I don't remember Mr. Gallegos taking it there. |
| 02:50 PM | 25 | I remember Mr. Liberis taking it there. |

01-12036
KC/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CSL DEVELOPMENT CORPORATION, INC. §
                                    §
            Plaintiff,              §
                                    §
VS.                                 §
                                    §     CIVIL ACTION NO. B01-059
GAIM-K0, INC.; RAY GALLEGOS; SOUTH  §     JURY DEMANDED
PADRE ISLAND FISHING CENTER, INC.;  §
STANLEY McELROY; DAVE FRIEDMAN;     §
SRFP, INC.; and SOUTH PADRE ISLAND  §
FISHING CENTER JOINT VENTURE        §
                                    §
            Defendants.             §

DEPOSITION OF:

# DAVID ROBERT FRIEDMAN

MAY 29, 2002

*COPY*



**Worldwide
Corporate Headquarters**
3000 Weslayan, Suite 235
Houston, Texas 77027
Tel: 713-572-2000

For Services Worldwide
**800-745-1101**

**Texas
Regional Office**
4245 N. Central Expwy, Suite 475
Dallas, Texas 75205
Tel: 214-219-3080

26

07:27 PM  1    to have signed?

07:27 PM  2        A.    That's correct.

07:27 PM  3        Q.    Okay.   What is the phone number at the -- what

07:27 PM  4    was the phone number in November of 2000 at the

07:27 PM  5    restaurant?

07:27 PM  6        A.    Area code (956) 761-1314.

07:28 PM  7        Q.    Is there a separate number for -- do you have

07:28 PM  8    an office separate and apart from the restaurant?

07:28 PM  9        A.    Yes.

07:28 PM 10        Q.    All right.   What's the number at your office?

07:28 PM 11        A.    Area code (956) 761-4665.

07:28 PM 12        Q.    And how about a cell phone at that time?   And

07:28 PM 13    I assume that office number was the number that you gave

07:28 PM 14    me that would have been in place in November of 2000?

07:28 PM 15        A.    Yes.

07:28 PM 16        Q.    Okay.   Did you have a cell phone in November

07:28 PM 17    of 2000?

07:28 PM 18        A.    Yes.

07:28 PM 19        Q.    Do you recall or do you have the same number?

07:28 PM 20        A.    No.   I don't have the same number.   It was

07:28 PM 21    570-CASH.

07:28 PM 22        Q.    Okay.   956?

07:28 PM 23        A.    956.

07:28 PM 24        Q.    At the meeting on November 10th when

07:29 PM 25    Mr. Liberis was, as Mr. McElroy described earlier,

WORLDWIDE COURT REPORTERS, INC.

```
 :29 PM   1   quote, "mediating," end quote, were the terms -- were

07:29 PM  2   rent and the term period of the potential lease

07:29 PM  3   discussed?

07:29 PM  4        A.   Not in those specific terms.

07:29 PM  5        Q.   Okay.  In what terms were they discussed?

07:29 PM  6        A.   Mr. Liberis sort of moderated this meeting to

07:29 PM  7   the extent of "would you take" type inquiries.

07:29 PM  8        Q.   Okay.  And when he would propose a "and would

07:29 PM  9   you take" proposals were used both for the term period

07:30 PM 10   and for the amount of rent?

07:30 PM 11        A.   Yeah.

07:30 PM 12        Q.   Okay.  And when he would ask, "Would you take

07:30 PM 13   a particular amount," were there answers provided?

07:30 PM 14        A.   To some degree, yes.

07:30 PM 15        Q.   Okay.  What were some of the amounts of rent

07:30 PM 16   that he proposed that were discussed?

07:30 PM 17        A.   I can't specifically recall amounts, but they

07:30 PM 18   were in ranges, it seems, or back-and-forth type

07:30 PM 19   conversations.

07:30 PM 20        Q.   Do you recall whether the numbers discussed

07:30 PM 21   were more or less than what CSL was paying at the time?

07:30 PM 22        A.   They were less.

07:30 PM 23        Q.   Okay.  And do you recall whether the term

07:30 PM 24   periods that were discussed were more or less than the

07:31 PM 25   primary lease that CSL received from the joint venture?
```

A.   I believe they were less.

Q.   Okay.  So the discussions were specific enough that you know that the amounts discussed as to rent were less that what CSL was paying and that the terms proposed and discussed were less than what CSL had.  You just can't recall the exact --

A.   That seems to be -- it sticks in my mind. Yes.

Q.   Okay.  The two-page agreement that Mr. Gallegos included in his November 17 letter, it has a sub -- under paragraph 1 of the sublease on page 1, it states: "Sublease term:  The term of this sublease is proposed to be one year with two one-year options."

Is that the sublease term that was discussed at the November 10 meeting?

A.   I believe it's one of several.

Q.   Okay.  And it's true, isn't it, that that term was not specifically disagreed with nor agreed with by either you or Mr. McElroy at the November 10 meeting?

A.   That's correct.

Q.   All right.  But it is one that was discussed?

A.   I believe so, yes.

Q.   All right.  And the sublease rent that is included in this agreement that was forwarded by Mr. Gallegos on the 10th -- or on the 17th, I'm sorry --

33

| | | |
|---|---|---|
| :47 PM | 1 | questions earlier about Exhibit 1.  This is the cover |
| 07:47 PM | 2 | letter sent by Ray Gallegos to you; is that correct? |
| 07:47 PM | 3 | A.    Yes, sir. |
| 07:47 PM | 4 | Q.    And attached to that cover letter was a check; |
| 07:47 PM | 5 | is that correct? |
| 07:47 PM | 6 | A.    Yes, sir. |
| 07:47 PM | 7 | Q.    And what was the amount of that check? |
| 07:47 PM | 8 | A.    $10,000. |
| 07:47 PM | 9 | Q.    And also attached to that cover letter was a |
| 07:47 PM | 10 | document entitled Proposal for Sublease Agreement; is |
| 07:47 PM | 11 | that correct? |
| 07:47 PM | 12 | A.    Yes, sir. |
| 07:47 PM | 13 | Q.    What does the title Proposal for Sublease |
| 07:47 PM | 14 | Agreement mean to you? |
| 07:47 PM | 15 | A.    Proposal for sublease agreement.  That |
| 07:47 PM | 16 | they're -- Mr. Gallegos, whoever the author of the |
| 07:48 PM | 17 | letter was, was going to give us a proposal to enter |
| 07:48 PM | 18 | into a sublease agreement. |
| 07:48 PM | 19 | Q.    So that's an offer, in other words?  Is that |
| 07:48 PM | 20 | how you would characterize -- |
| 07:48 PM | 21 | A.    That's correct.  Yeah. |
| 07:48 PM | 22 | Q.    -- it, as an offer? |
| 07:48 PM | 23 | A.    That's what I would say. |
| 07:48 PM | 24 | Q.    So in no way do you construe that document to |
| 07:48 PM | 25 | be a contract? |

### Proposal For Sublease Agreement

This proposal to enter into a  Sublease Agreement (the "Sublease") is made and effective
November 17, 2000, by Gaim-ko Inc. to South Padre Island Center Joint Venture (Sublessor).

Sublessor is the tenant in a lease agreement dated June 30, 1994 with The State of Texas.

Gaim-ko Inc. now desires to sublease the Leased Property from Sublessor.

NOW, THEREFORE, in consideration of $10,000 of Earnest money, the receipt and sufficiency
of which are hereby respectively acknowledged, the Sublessor agrees to enter into negotiations
with Gaim-ko Inc. to Sublease the Premises as described below. If a mutually acceptable lease is
not negotiated between the parties within ninty (90) days from the date of this proposal then
Sublessor shall return the $10,000 of Earnest money to Gaim-ko Inc. Sublessor also agrees to
discuss the possibility of Gaim-ko purchasing from Sublessor the rights to the lease with the
State of Texas.

### PREMISES
A. Berth. The exclusive right to a berth for one (1) cruise ship. The berth is located at the end of
the Pier.

B. Ticket Counter. The non-exclusive right to use the area designated "Ticket Counter" on the
plat for the sale of Cruse Ship tickets.

C. Modular Office. The non-exclusive right to use a maximum of two (200) parking spaces in
the area designated as "Parking" on the Plat for free parking.

1. **Sublease**.
A.  Sublessor proposes to sublease the Leased Property as follows:
Sublease Term:  The term of this sublease is proposed to be one year, with two, one year
options.
Sublease Rent:  The rent for the first year is proposed to be Sixty Thousand ($60,000), payable
in advance. Rent for the second and third years is proposed to be One Hundred Twenty
Thousand ($120,000) per year payable at the beginning of each year.

2. **Obligations Under Master Lease**.
Subtenant agrees to comply with the terms of the Master Lease and shall not do or permit to be
done anything that would constitute a breach or default of Sublessor's obligations in the Master
Lease.  Sublessor agrees to comply with all of Sublessor's obligations in the Master Lease.
Sublessor agrees timely to pay rent and other charges due under the Master Lease and, provided
Subtenant is not in breach or default of any obligation in this Sublease, shall not do anything to
disturb Subtenant's use of the Leased Property pursuant to this Sublease.

3. **Indemnification**.
A.  Subtenant will indemnify, protect, defend and hold Sublessor harmless from and against any
and all loss, cost, damage and expense arising out of or in any way related to a breach or default

- 1 -

of Sublessor's obligations in the Master Lease by Subtenant.

B. Sublessor will indemnify, protect, defend and hold Subtenant harmless from and against any and all loss, cost, damage and expense arising out of or in any way related to a breach or default of the Master Lease by Sublessor.

### 3. No Assignment or Sublease.

Subtenant shall not, without the prior written consent of both Sublessor and the landlord in the Master Lease, assign this Sublease or sublet the Leased Property or any part thereof.

### 4. Notices.

Any notice given in connection with this Agreement, shall be in writing and shall be given to the appropriate party by personal delivery or by certified mail, postage prepaid, or recognized overnight delivery service as follows:

> If to Sublessor:
> South Padre Island Center Joint Venture
> One Padre Boulevard, South Padre Island, Texas 78597

> If to Subtenant:
> Gaim-ko, Inc
> 2403 San Mateo Blvd. N.E. Ste. W17
> Albuquerque N.M. 87110

### 5. Headings.

Headings used in this Agreement are provided for convenience only and shall not be used to construe meaning or intent.

IN WITNESS WHEREOF, the parties hereto have caused this Sublease to be duly executed as of the date first above written.

_____          _____
South Padre Island Center Joint Venture         Gaim-ko, Inc

-2-