United States District Court
Southern District of Texas
FILED

AUG 3 0 2002

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| CSL DEVELOPMENT CORPORATION, INC. § <br> Plaintiff, § <br> § <br> VS. § <br> § <br> GAIM-KO, INC. and RAY GALLEGOS § <br> Defendants. § | § <br> § <br> § <br> CIVIL ACTION NO. B01-059 <br> JURY DEMANDED <br> § <br> § |

<u>PLAINTIFF'S SUPPLEMENT TO ITS MOTION FOR PARTIAL SUMMARY
JUDGMENT AND PLAINTIFF'S SUPPLEMENT TO ITS RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
and
WITHDRAWAL OF JURY DEMAND</u>

The Court has asked CSL to speak to the issue of whether the pier sublease between the owners of the Sea Ranch Pier and Gaim-Ko was negotiated to Gaim-Ko's satisfaction within one week of the execution of such underlying agreement.[1] In addition to the evidence and argument contained in CSL's motion for partial summary judgment, and, its response to defendants' motion for summary judgment, Gaim-Ko's satisfaction with the negotiations is further revealed by reviewing the evidence in light of one fundamental question:

What did each party want out of this deal?

1. <u>Gaim-Ko wanted a casino in which to put its equipment and staff.</u> In 1998, Ray Gallegos and his staff were suddenly and unexpectedly expelled from the casino at the Inn of the Mountain Gods resort in Ruidoso, New Mexico.[2]

---

[1] Gaim-Ko and Gallegos executed the Charter and Purchase Agreement on November 3, 2000, and, CSL (through Charles Liberis) executed the Agreement on November 4, 2000. Therefore, the negotiations had to take place on or before November 11, 2000, which they did.

[2] *See* Gallegos deposition, p. 46 – 52. Additional excerpts from the deposition of Mr. Gallegos are attached hereto as Exhibit "A". When Gaim-Ko was removed from Inn of the Mountain Gods in 1998, Gaim-Ko was clearing $1,000,000 month and had several employees.

Gaim-Ko had operated such casino and owned the $17,000,000 of gambling equipment within it. *See id.* When Mr. Gallegos finally recovered his gambling equipment in 2000, he had nowhere to operate it. Mr. Gallegos enlisted the help of ship broker Lou Daleo to find a home for his machines, and, to put Gallegos and his staff back to work in a casino.[3] Getting money into the machines was Gaim-Ko's principal concern:

> Q. .. it doesn't legally matter to you the name of the boat or who owns the boat –
> A. Right.
>
> Q. – or where the boat is located that Gaim-Ko has its machines on?
> A. Right.
>
> Q. What matters to you is that people show up and put money in the machines?
> A. Exactly, sir.
> ...
> Q. And that's your principal concern from Gaim-Ko?
> A. Yes, sir.

(Gallegos deposition, p. 92, line 24 – p. 93, line 13). The ENTERTAINER was the casino Gallegos wanted.

2.  <u>CSL wanted out of South Padre.</u>

By the Summer of 2000, CSL and Liberis wanted out of South Padre. In only nine months, the operator of the ENTERTAINER had lost over $700,000.00. (See affidavit of Charles S. Liberis attached hereto as Exhibit "B"). Mr. Liberis made plans to move the vessel to South Florida after the Labor Day weekend. *Id.* However, in August 2000, Mr. Daleo contacted Liberis to discuss Gaim-Ko taking

---

[3] Gallegos deposition, p. 116 – 118. Gallegos had about 1,000 slot machines and wanted the Entertainer because it was big and would be able to hold more machines:
> Q. About how many machines were you looking to place on a boat?
> A. The more – the most that I could.

2

over operations of the vessel. *Id.* Liberis told Daleo that South Padre would not work as a venue and that the charterer would ultimately lose money. *Id.*

3. <u>Nevertheless, Gaim-Ko still wanted to try and operate out of South Padre.</u>

Despite receiving proof of the dismal performance of the ENTERTAINER in South Padre, Gallegos and Gaim-Ko persisted. *Id.* When Daleo began trying to piece together the charter and sale of the ENTERTAINER, Liberis made it clear that he did not want to tarry because every day he stayed in South Padre cost him money that he would never recover. *Id.* For this reason, Liberis made time of the essence in his transaction with Gaim-Ko. (*See* page 11 of plaintiff's motion for partial summary judgment).

4. <u>Liberis recommended to Gaim-Ko that it NOT operate the ENTERTAINER out of South Padre and he suggested other venues</u>.

In their motion, the defendants make the unfounded conclusory assertion (to which CSL has properly objected) that the pier in South Padre was "the only one suitable for" the ship. (Defendant's motion, second page). This conclusory assertion of fact is not proper summary judgment evidence; even more, it is false.[4] In fact, Liberis provided Gaim-Ko with ideas for optional venues that were suitable for the ENTERTAINER. (Exhibit "A"). However, getting the machines into the floating casino was more important to Gallegos than where that casino might be.[5]

5. Despite being told that South Padre was a bad place to operate,

---

[4] In his affidavit attached hereto, Mr. Liberis, the owner of the vessel, makes it clear that the Sea Ranch pier was not the only suitable berth for the Entertainer.

[5] Proof of this fact is found when one looks at what Gaim-Ko did when it abandoned the ENTERTAINER: it put some of its machines on someone else's ship in Surfside, Texas. (Gallegos deposition, pp. 90 – 91).

3

Gaim-Ko still wanted to operate the ship there. (Exhibit "A"). Liberis knew that getting a lease signed would take a lot of time and ultimately cost him money; therefore, he demanded that the lease need only be negotiated to Gaim-Ko's satisfaction.[6] The 2-hour discussions on November 10, 2000, included lease terms that Gallegos included in a Sublease Agreement that he signed on November 17, 2000, and overnighted to the sublessors along with a $10,000 check.

6. <u>Why did Gallegos sign and send the sublease agreement along with his $10,000?  Because he needed to memorialize his satisfaction with the lease negotiations so that he would then have the casino (the ENTERTAINER) he wanted.</u>

The most probative evidence of Gallegos' satisfaction with the November 10 negotiations is that he signed the November 17 agreement and parted with $10,000.00. Gallegos prepared, signed and sent such sublease agreement; doing so manifested his satisfaction with the negotiations and preserved the enforceability of the charter and purchase agreement. That the sublessors chose not to enter a sublease with Gallegos did not abrogate Gallegos' expressed satisfaction nor his duties under the contract. Gallegos' expressions of satisfaction with the negotiations got him the casino he wanted: the ENTERTAINER.

7. THEREFORE, plaintiff CSL respectfully requests that the Court grant its motion for partial summary judgment because Ray Gallegos was satisfied with the 2-hour negotiations on November 10, 2000; therefore, the pier sublease (as defined in the charter and purchase agreement) was negotiated to Gaim-Ko's

---

[6] *See* evidence discussed at page 11 of plaintiff's motion for partial summary judgment

4

satisfaction within one week of the execution of the charter and purchase agreement made the basis of plaintiff's action.

## WITHDRAWAL OF JURY DEMAND BY CSL DEVELOPMENT CORPORATION, INC.

8.  In its original complaint, CSL Development Corporation, Inc., demanded a jury trial. Pursuant to FRCP 38 and 28 U.S.C. §1873, CSL Development Corporation, Inc., hereby withdraws such jury demand and consents to a bench trial before the United States District Court for the Southern District of Texas.

Respectfully submitted,

By: _____
John Flood
State Bar. No. 07155910
Fed. I.D. No. 12593
900 Frost Bank Plaza
802 N. Carancahua
Corpus Christi, Texas 78470
(361) 654-8877
(361) 654-8879 (Facsimile)
**ATTORNEY IN CHARGE FOR COMPLAINANT**

OF COUNSEL:
J.A. Magallanes
State Bar No. 12809500
Magallanes, Hinojosa & Mancias
1713 Boca Chica
Brownsville, Texas 78520
(956) 544-6571
(956) 544-4290 (Facsimile)

Joseph M. Grant
State Bar No. 08301520
The Grant Law Firm
2437 Bay Area Blvd., #100
Houston, Texas 77058
(281) 286-1222
(281) 286-1444 (Facsimile)

5

## CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the foregoing was sent to Paul Fourt at the following address by fax on August 30, 2002.

Mr. Paul L. Fourt, Jr.
**Law Office of Paul L. Fourt, Jr.**
1000 E. Van Buren
Brownsville, Texas 78520

_____
John Flood

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CSL DEVELOPMENT CORPORATION, INC.,

    Plaintiff,

VS.                                                                                  CIVIL ACTION NO. B-01-059

GAIM-KO, INC.; RAY GALLEGOS; SOUTH
PADRE ISLAND FISHING CENTER, INC.;
STANLEY MCELROY; DAVE FRIEDMAN;
SRFP, INC.; and SOUTH PADRE ISLAND
FISHING CENTER JOINT VENTURE,

    Defendants.

---

### AFFIDAVIT OF CHARLES S. LIBERIS

STATE OF FLORIDA
COUNTY OF ESCAMBIA

BEFORE ME, the undersigned authority, on this day personally appeared CHARLES S. LIBERIS, being first duly sworn under oath deposes and says:

1. I am the President of CSL Development Corporation, Inc.("CSL"), the owner of the Motor Vessel M/V Entertainer ("the Entertainer").

2. On or about October of 1999, CSL Development Corporation chartered the M/V Entertainer to Casino Padre Investment Company, LLC. (Casino Padre)

3. Casino Padre operated the Vessel as a Casino Vessel from the Sea Ranch Fishing Pier ("Sea Ranch") located on South Padre Island, Texas, from November, 1999 until September, 2000.

4. Due to the adverse weather and sea conditions in the South Padre area, Casino Padre experienced a cancellation factor of approximately thirty percent (30%) and in the brief period of its operation incurred losses exceeding $700,000.

5. Due to the extensive losses that the operator incurred, it defaulted in its charter payments and agreed to return the Vessel back to its owner, CSL.

6. After extensive investigation, I, as President of CSL, came to the conclusion that it was not feasible to operate the Vessel at a profitable level from the South Padre Island area. This was the fourth Casino Vessel to fail operating out of South Padre.

7. I immediately began making preparations to remove the Vessel after Labor Day, take it to dry dock, and relocate it to South Florida.

8. In August of 2000, I was contacted by Lou Daleo, a Vessel broker, who indicated that Gaim-Ko would be interested in chartering the Vessel for an operation out of the Sea Ranch Fishing Pier. At that time, I told Mr. Daleo that I would not charter the Vessel for operation there as I did not feel that it was a viable port of operation and that ultimately the charterer would default and CSL would have to take the Vessel back.

9. During the negotiations, I made it very clear to Mr. Daleo that the Vessel had to leave South Padre shortly after Labor Day as the season would go out and what little profit that had been accumulated through the summer months would be burned up in the period following Labor Day.

10. Gaim-Ko and Gallegos went to South Padre to inspect the Vessel and do their due diligence. They were given copies of the dismal operating results of Casino Padre.

11. After Gaim-Ko's due diligence inspection, Daleo told me that Gaim-Ko wished to keep the Vessel in the South Padre area notwithstanding my advice to the contrary. I refused to negotiate a charter, but agreed to let them operate the Vessel from this area on the condition that the transaction be structured as a charter purchase with a substantial down payment, full payment in one year, and the personal guarantees by the President of Gaim-Ko, Gallegos. I felt that it would be highly improbable for the Vessel to operate at a profit and I wanted the comfort of a substantial down payment and personal guarantee if the Vessel was going to operate from this port.

12. Daleo attempted to make the execution of a lease on the Sea Ranch Pier a condition precedent to the Charter Purchase Agreement.

13. I refused to agree to such a condition because I felt that due to the short fuse of the contract (there was a due diligence period of only 7days after the date that the Agreement to Charter and Purchase Vessel was executed (November 4, 2000). It would be impossible to reach a final agreement with the owners of the Sea Ranch.

14. Subsequently, Kate Stetson, Gaim-Ko's attorney, told me that she was going to advise Mr. Gallegos and Gaim-Ko not to enter into the Charter Purchase Agreement unless the lease on the Sea Ranch was made a condition to the agreement I told her that if that was the case, we did not have a deal.

15. Based on Mrs. Stetson's comment, I assumed that we did not have a meeting of the

minds and prepared the Vessel to leave for Florida immediately as my overhead was now exceeding my income.

16. Subsequently I received a call from Mr. Daleo who advised me that he had talked to Mr. Gallegos. He advised that Gaim-Ko would not be insistent on making the Sea Ranch lease a condition to the Charter Purchase Agreement as they were aware that there were other piers in South Padre. Mr. Daleo stated that Gaim-Ko still liked the Sea Ranch location and wanted to know if I would introduce Gaim-Ko to the Owners of Sea Ranch and assist them in negotiating terms that would be satisfactory to Gaim-Ko.

17. On November 4, 2000, an Agreement to Charter and Purchase Vessel "Agreement" was executed.

18. On November 10, I met Mr. Gallegos at South Padre Island for the purpose of discussing the parameters of the meeting with the owners of the Sea Ranch.

19. I again explained to Mr. Gallegos that I did not think it would be feasible for him to have a signed lease during the due diligence that was allowed under the Agreement for charter and purchase. At that time, Mr. Gallegos advised me that he really didn't care about entering into a final contract with Sea Ranch as he felt that written documents were "meaningless" and what he really wanted to do was get a feeling for how he interacted with McElroy and Friedman, the owners.

20. Mr. Gallegos and I met with Messrs McElroy and Friedman. At the end of that meeting Mr. Gallegos stated that he was comfortable with the general nature of the discussions and the terms that were discussed. His comment to me was he felt that both Friedman and McElroy were reasonable people and that sooner or later they would come to an agreement.

21. The due diligence period under the Agreement ended on November 11, 2000. I was never advised prior to that time that Gaim-Ko wished to declare the Agreement null and void. To the contrary, it was my understanding that they were pleased at the manner in which the negotiations were proceeding on the Sea Ranch and that they had forwarded a check in the amount of $10,000 to show good faith.

22. It is my understanding that the assertion has been made that the Sea Ranch Pier was the only one suitable for the Entertainer. That is a false statement because there are other piers and marinas in the South Padre area suitable for the Entertainer including the State Dock in Port Isabel. Daleo and Ray Gallegos were aware that there were other berths suitable for the Entertainer.

IN WITNESS WHEREOF, dated this _28_ day of _August_, 2002.

_____
Charles S. Liberis


STATE OF FLORIDA
COUNTY OF ESCAMBIA

Sworn to and subscribed before me this _28th_ day of _August_, 2002, by _Charles S Liberis_, who is personally known to me or produced identification in the form of _N/A_ and acknowledged that her/she executed the same for the uses and purposes therein expressed.

_____
NOTARY SEAL



Barbara A. Barlow
MY COMMISSION # CC832644 EXPIRES
May 9, 2003
BONDED THRU TROY FAIN INSURANCE, INC.

C:\My Files\GaimKo.Affidavit5.CSL.wpd